UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X

ALAN NEWTON,

                  Plaintiff,

      -against-

THE CITY OF NEW YORK; DISTRICT ATTORNEYS MARIO
MEROLA AND ROBERT T. JOHNSON, INDIVIDUALLY,
AND IN THEIR OFFICIAL CAPACITY; ANDREA FREUND
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY AND
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF THE
CITY OF NEW YORK WHO ARE/ WERE ASSISTANT
DISTRICT ATTORNEYS WITHIN THE OFFICE OF THE
DISTRICT ATTORNEY, COUNTY OF BRONX; DETECTIVE
JOANNE NEWBERT, DETECTIVE PHILLIP GALLIGAN,
DETECTIVE [JOHN DOE] HARTFIELD, DETECTIVE
[JOHN DOE] RYAN, DETECTIVE [JOHN DOE] HARRIS,
POLICE OFFICER DOUGLAS LEHO, POLICE OFFICER
WILLIAM SEAN O'TOOLE, LIEUTENANT MICHAEL
SHEEHAN, SERGEANT PATRICK J. McGUIRE, POLICE
OFFICER [JOHN DOE] HASKINS, POLICE OFFICER
[JANE DOE] KIELY, INSPECTOR JACK J. TRABITZ
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES
OF THE CITY OF NEW YORK WHO ARE/ WERE MEMBERS
OF THE POLICE DEPARTMENT OF THE CITY OF NEW
YORK,

                Defendants.

-------------------------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

      Plaintiff, Alan Newton, by and through his attorney, John F. Schutty of The Law

Office of John F. Schutty, P.C., complaining of the Defendants, respectfully alleges:

## JURISDICTION & VENUE

    1.    This action arises under the Constitution of the United States, particularly

the Fourth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United

States through the Civil Rights Act, Title 42 U.S.C. §§ 1983 and 1988, as well as Article

I, §§ 6 and 11 of the New York State Constitution, for the violation of Plaintiff Alan Newton's civil rights.

2.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

3.    This Court also has supplemental, ancillary and pendant jurisdiction to adjudicate all claims asserted under state law herein under 28 U.S.C §§ 1367.

4.    The acts and transactions constituting the civil rights violations occurred in the County of the Bronx, in the Southern District of New York.  In addition, Defendants reside, are found, have agents, or transact their affairs in the Southern District of New York.  Venue is therefore, proper in this district pursuant to 28 U.S.C. §§ 1391 (b).

## THE PARTIES

5.    Plaintiff Alan Newton was, at the time of most of the acts alleged herein, a citizen of the United States and resident of the County of Bronx at 1330 Webster Avenue, Apt. 21K.  At the time of some of the acts alleged herein he was housed at various correctional facilities within the State of New York.  Plaintiff presently resides at 1624 Remsen Avenue, Brooklyn, New York 11216.

6.    At all times referred to herein, Defendant The City of New York ("The City") was and still is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York, and situated within the Southern District of New York.

7.    At all times referred to herein, the Police Department of the City of New York (hereinafter "NYPD") was and still is an agency or instrumentality of The City,

situated within the Southern District of New York. The NYPD did not and does not have a legal identity separate and apart from Defendant The City.

8.      At all times referred to herein, Defendants Mario Merola and Robert T. Johnson were the elected District Attorneys of Bronx County for The City (hereinafter referred to, respectively, as "DA Merola" and "DA Johnson"), and Defendant Andrea Freund, Esq. (hereinafter "ADA Freund"), John F. Carroll, Esq. (hereinafter "ADA Carroll"), Robert Moore, Esq. (hereinafter "ADA Moore"), Rafael Curbello, Esq. (hereinafter "ADA Curbello"), and various John/Jane Doe Assistant District Attorneys (hereinafter "ADA John/Jane Does"), were Assistant District Attorneys in the Office of the District Attorney, County of Bronx.

9.      Upon information and belief, at all relevant times, Defendants DA Merola, DA Johnson, ADA Freund, and ADA Carroll, ADA Moore, ADA Curbello, and various ADA John/Jane Does, were acting within the scope of their employment as District Attorneys or Assistant District Attorneys for the State of New York.

10.     Upon information and belief, at all relevant times, Defendants DA Merola, DA Johnson, ADA Freund, and ADA Carroll, ADA Moore, ADA Curbello, and various ADA John/Jane Does, were acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of the Bronx District Attorney's Office.

11.     At all times referred to herein, Defendant The City, by its agents, servants, and representatives, was responsible for the operation, maintenance and control of the NYPD and the Bronx County District Attorney's Office and the selection, training,

supervision, evaluation and disciplining of NYPD personnel and Assistant District Attorneys in the Bronx County District Attorney's Office.

12.     At all times referred to herein, Defendants DA Merola and DA Johnson, as the District Attorneys for Bronx County, were the responsible policy makers for Defendant The City and the State of New York with respect to the management of the Bronx County District Attorney's Office.

13.     At all times referred to herein, Defendants DA Merola, DA Johnson, ADA Freund, and ADA Carroll, ADA Moore, ADA Curbello, and various ADA John/Jane Does, acted on behalf of Defendant The City and the State of New York as municipal policymakers with the granted authority to: (a) determine what exculpatory information and records should be gathered and disclosed during the investigation and prosecution of individuals suspected or accused of crimes; (b) determine what evidence and testimony should be gathered presented at grand jury proceedings, hearings and at trial; (c) ensure that criminal investigations are conducted thoroughly and diligently;  (d) ensure that evidence is not withheld or falsified; (e) ensure that witnesses do not commit perjury or give inaccurate testimony; (f) ensure that criminal proceedings are handled ethically and in accordance with the laws and Constitutions of the State of New York and the United States; (g) assert arguments that have a basis in fact and law, (h) conduct thorough and diligent investigations to protect the rights of the innocent, and (i) ensure that criminal evidence is properly registered, stored, preserved, maintained and produced in a timely manner to a criminal defendant and his/her attorneys.

14.    At all times referred to herein, Defendant Detective Joanne Newbert (Shield 2604) (hereinafter "Newbert") was employed by the Defendant The City as a police officer.

15.    At all times referred to herein, Defendant Detective Phillip Galligan (Shield 614) (hereinafter "Galligan") was employed by the Defendant The City as a police officer.

16.    At all times referred to herein, Defendant Detective [John Doe] Hartfield (hereinafter "Hartfield") was employed by the Defendant The City as a police officer.

17.    At all times referred to herein, Defendant Detective [John Doe] Ryan (hereinafter "Ryan") was employed by the Defendant The City as a police officer.

18.    At all times referred to herein, Defendant Detective [John Doe] Harris (hereinafter "Harris") was employed by the Defendant The City as a police officer.

19.    At all times referred to herein, Defendant Police Officer Douglas Leho (Shield 21937) (hereinafter "Leho") was employed by the Defendant The City as a police officer.

20.    At all times referred to herein, Defendant Police Officer William Sean O'Toole (Shield 1836) (hereinafter "O'Toole") was employed by the Defendant The City as a police officer.

21.    At all times referred to herein, Defendant Lieutenant Michael Sheehan (hereinafter "Sheehan") was employed by the Defendant The City as a senior police officer and a supervisor, policy maker and Commanding Officer of the NYPD's Bronx Sex Crimes Unit.

22.     At all times referred to herein, Defendant Sergeant Patrick J. Maguire (hereinafter "McGuire") was employed by the Defendant The City as a police officer.

23.     At all times referred to herein, Defendant Police Officer [John Doe] Haskins (hereinafter "Haskins") was employed by the Defendant The City as a police officer.

24.     At all times referred to herein, Defendant Police Officer [Jane Doe] Kiely (hereinafter "Kiely") was employed by the Defendant The City as a police officer.

25.     At all times referred to herein, Defendant Inspector Jack J. Trabitz (hereinafter "Trabitz") was employed by the Defendant The City as a senior police officer and a supervisor, policy maker and Commanding Officer of the NYPD's Property Clerk's Division.

26.     At all times referred to herein, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz and various NYPD John/Jane Does, individually and in their official capacities as employees of the City of New York, who are/were members of the NYPD, were employed by the Defendant The City as police officers and were involved in acts and/or omissions relating to the arrest of Plaintiff Alan Newton and/or the registration and/or maintenance and/or storage and/or control of evidence relating to Plaintiff's arrest and conviction under Bronx Indictment No. 2441/84.

27.     Upon information and belief, and at all relevant times, Defendants Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz and various NYPD John/Jane Does, individually and in their official capacities as employees of the City of New York who are/were members of

the Police Department of the City of New York, acted within the scope of their employment as police officers for Defendant The City.

28.    At all times referred to herein, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz and various NYPD John/Jane Does, individually and in their official capacities as employees of The City who are/were members of the NYPD, were acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of Defendant The City.

29.    At all times referred to herein, Defendant The City, through its agents, servants and representatives, including Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz and various NYPD John/Jane Does, individually and in their official capacities as employees of The City who are/were members of the NYPD, were responsible for the unbiased investigation of crimes, the apprehension of proper suspects, the weighing of eyewitness evidence against alibi evidence, the pursuit and study of physical evidence, and the providing of accurate information for prosecution to the Bronx District Attorney's Office and other prosecutorial authorities; these Defendants were also responsible for other functions, including giving truthful evidence, revealing exculpatory evidence (and refraining from withholding or falsifying evidence), making further inquiry when reasonable in a criminal investigation (and not deviating from accepted practices in that regard), and preserving and properly storing critical evidence resulting from a criminal investigation and/or conviction; these Defendants were obliged to perform all these functions in accordance

with the Constitutions and laws of the State of New York and the United States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

## NOTICE OF CLAIM & ARTICLE 50(H) HEARING

30.    Plaintiff Alan Newton served written Notice of Claim upon The City and NYPD on September 29, 2006. More than thirty (30) days have passed since the service and filing of said Notice and the claim has not been settled or otherwise resolved.

31.    On December 19, 2006, Plaintiff Alan Newton appeared and answered questions posed by counsel for The City at a hearing held pursuant to Section 50-H of the General Municipal Law.

32.    Plaintiff Alan Newton has satisfied all conditions precedent for the filing of the within action.

## INTRODUCTION TO THE CLAIM

33.    Plaintiff Alan Newton was released from prison on July 6, 2006 after an incarceration of more than twenty-two years for a crime that he did not commit. The People of the State of New York alleged that he assaulted, robbed and raped a 25-year old woman (hereinafter referred to as "VJ" to protect her identity) on June 23, 1984 (Bronx Indictment No. 2441/84). Plaintiff was convicted of this crime based solely on questionable eyewitness identifications. No other evidence corroborated the questionable witness identifications created, cultivated and shaped by NYPD investigators and the Bronx District Attorney's Office.

34.    Throughout twenty-two plus years of incarceration, Mr. Newton steadfastly maintained that he was innocent and, in refusing to admit guilt for the crime, he was denied parole on three separate occasions. He endured a lengthier imprisonment

to avoid any admission of guilt that might hinder a future opportunity to establish his innocence.

35.    With advancements in forensic (DNA) evidence after his conviction, and after exculpatory evidence lost or secreted by the NYPD was located, Mr. Newton was finally exonerated of the assault, robbery and rape charges brought against him under Bronx County Indictment No. 2441/84. See Justice John J. Byrne's July 6, 2006 Order vacating the latter conviction (and dismissing the accusatory instrument).

## FACTUAL AND PROCEDURAL BACKGROUND

36.    On May 27, 1984, Plaintiff was twenty-two (22) years old. He was then employed by New York Telephone Company as a business representative trainee. He had been previously and consistently employed since graduating high school as a bank teller – first, at the Dime Savings Bank, and then, at Manufacturer's Hanover Trust Co. He was living with his mother, two brothers and a sister (four other sisters lived elsewhere) in a five bedroom apartment at 1330 Webster Avenue, Bronx, New York.

37.    On June 23, 1984, a 25-year old woman, "VJ" [although VJ is now deceased, her name has been abbreviated to protect her family's privacy], was horrifically beaten and raped at 4:00 a.m. after exiting a convenience store in the Bronx. The rapist, in an apparent effort to prevent a subsequent identification, cut the victim's face with a box cutter, blinding her in the left eye. VJ, an epileptic and admitted alcoholic, had taken her epilepsy medication and then consumed at least ten or eleven glasses of beer before encountering her assailant. She initially told police his name was "Willie" and she offered only a vague description of him. After Mr. Newton's mug shot photograph was shown to VJ, however, she misidentified Mr. Newton as her assailant and began to use

Mr. Newton's features to describe her assailant. Despite a solid alibi, Mr. Newton was indicted for the horrific June 23, 1984 rape, robbery and assault.

38.    Under separate counts of Bronx Indictment No. 2441/84, Plaintiff Alan Newton was accused of raping, robbing and assaulting VJ, twice, between 4:00 and 5:00 a.m. on June 23, 1984. Plaintiff adamantly denied that he was the assailant and he presented an alibi defense that was supported by two other witnesses.

39.    By the end of June, 1984, the criminal charges filed against Plaintiff developed increasing momentum: the victim, initially uncertain about her identification of Mr. Newton, grew increasingly confident after further, tainted meetings with NYPD investigators and ADA Freund; NYPD investigators and ADA Freund, who became unreasonably and increasingly convinced that they had arrested the correct man, ceased their investigation into other likely suspects, failed to follow leads that would have taken them away from Plaintiff, and failed to test physical evidence that might have proved Plaintiff was innocent; the District Attorney's Office aggressively prosecuted Mr. Newton as a sex offender, even after the complaining witnesses expressed an admitted lack of confidence in their identifications.

40.    The first positive thing that happened to Mr. Newton in twenty-two years was that the Bronx District Attorney's Office located a long-missing "rape kit" containing semen collected from the victim of the June 23, 1984 rape; Mr. Newton had requested this evidence eleven years earlier. A DNA test on the semen evidence conclusively established that: (1) Mr. Newton was not the rapist, and (2) Mr. Newton had been misidentified by the victim (and another witness).

41.    On July 6, 2006, Justice John Byrne vacated Mr. Newton's conviction for rape, assault and robbery under Bronx County Indictment No. 2441/84 and dismissed the underlying accusatory instrument.

42.    We now know that Plaintiff was unjustly convicted of rape, robbery and assault under Bronx Indictment No. 2441/84 due to a gross disregard for Plaintiff's constitutional rights by NYPD investigators and members of the Bronx District Attorney's Office. The investigation and prosecution of the crime by the Defendants was woefully tainted and flawed, and material evidence was withheld from Plaintiff and his attorneys. The pre-conviction taints and flaws were only enhanced by the separate, wrongful post-conviction acts of certain Defendants while he was incarcerated – the intentional withholding and/or reckless loss of critical exculpatory evidence in violation of Plaintiff's constitutional rights. The Defendants' conduct demonstrates that the Defendants acted with a reckless disregard for Plaintiff's constitutional rights -- during their investigation of the crime, during their prosecution of Plaintiff at pretrial hearings and trial, and during Plaintiff's subsequent incarceration.

### The Robbery, Rape & Assault of VJ

43.    The victim of the alleged crime, VJ, began the evening of June 22, 1984 by visiting her mother and her mother's boyfriend at an apartment on 158th Street in the Bronx. The trio spent the evening consuming five quarts of beer of "Old English" beer. VJ, an admitted alcoholic, drank at least eight or nine glasses of beer at that time. She fell asleep, woke up after midnight, and walked to a friend's apartment at 169th Street and Third Avenue, where she drank more beer – at least two more glasses. VJ then decided to visit her ex-boyfriend Robert Lee Dwight at his apartment at 180th Street.

44.    VJ had begun to suffer from epileptic seizures after a beating at the hands of her then-boyfriend, Mr. Dwight, in 1979 or 1980. To control her seizures, she had been taking Phenobarbital (30 milligrams) and Dilantin (20 milligrams) every day. Phenobarbital is a barbiturate with anticonvulsant effects; it is used to treat and prevent seizures; it acts by slowing down the brain and nervous system, thereby reducing the spread of seizure activity. Dilantin, the brand name for Phenytoin, is also an anticonvulsant that acts on the motor cortex to inhibit seizure activity. Epilepsy patients are regularly warned that alcohol should not be consumed after taking Phenobarbital or Dilantin because alcohol enhances the effects of the drugs – extreme drowsiness, motor impairment, dizziness, lightheadedness and unsteadiness increase and intensify.

45.    Though VJ had been warned not to mix her epilepsy medication with alcohol, she was still taking her daily epilepsy medication and drinking beer in June, 1984. In fact, she began the evening of June 22, 1984 by taking her epilepsy medication (Dilantin and Phenobarbital) and then consuming, admittedly, a substantial amount of alcohol -- *at least* ten or eleven glasses of beer -- in direct violation of her doctor's instructions. Since VJ was a very petite woman (she was 5' foot tall and weighed about 100 pounds), the consumption of ten or eleven glasses of potent beer, coupled with the epilepsy medication, would have caused her to be in an undeniable state of intoxication/inebriation late that evening and early the next morning.

46.    At approximately 4:00 a.m., VJ entered a bodega/superette located at 4373 Third Avenue (at 180th Street) intending to purchase yet more alcohol -- another quart of "Old English" beer. Only one other person was present in the store at that time – the store clerk, Ms. Aurea Gonzalez. Ms. Gonzalez had begun her shift at 7:00 p.m. and had

been working nine hours already by 4:00 a.m. Ms. Gonzalez heard a car horn honk just before VJ entered the store, and then she observed VJ enter the store followed immediately by a black man. As VJ was approaching the front counter with her quart of Old English beer, the black man also approached the front counter where the clerk was positioned. As VJ spoke with the store clerk, VJ saw the black man's face only for a few seconds.

47.     Although VJ claimed at trial that she had never seen this black man before, he entered the bodega moments after VJ, and the clerk heard him say "hurry up" as he left the front counter where VJ and the store clerk were talking. This man was in the store for only a few moments; he departed shortly after purchasing a pack of cigarettes; VJ followed after him moments later; the two patrons were in the store just for a few minutes.

48.     Leaving the store, VJ allegedly decided not to visit Mr. Dwight and began to look for a cab. Ms. Gonzalez testified at trial that she observed the man, and then VJ, enter the car parked just outside the store – with no sign of a struggle. VJ, on the other hand, claimed that "a man" suddenly grabbed her from behind after she left the superette; he allegedly grabbed her by the mouth, put a silver box cutter razor to her throat, and forced her, first, into a two-door blue and white Pontiac Grand Prix.

49.     In the car, VJ allegedly recognized the man as the customer she had seen moments earlier in the bodega. He drove to Southern Boulevard, made a right turn, and drove a few more blocks. As the man made another right turn, the car stalled on a hill. VJ, who had been in the car for two minutes, allegedly could not get out because the door latch on the passenger door was missing.

50.   The man dragged VJ out of the car and took her to a nearby park.  He threw her on the grass, called her a "bitch," and sodomized her.  He then raped her, took her cigarettes and money, and left.  VJ followed him and pleaded with him to return her money.  After he returned her money and cigarettes, she went back to look for her shoes.

51.   VJ headed towards Southern Boulevard, but "he came back."  She believed that the same man that had sodomized and raped her in the park had returned and grabbed her from behind; he dragged her back up the hill and took her into a "dark," abandoned building.  With the razor again in his hand he took her up to the third floor landing.  There were no lights inside the building and there were no street lights nearby.  She nevertheless believes that it was the same man who had sodomized and raped her in the park because, when the man sat on her chest, she saw his face briefly in the dark.

52.   In the landing area, the man raped her again, called her "bitch," and cut her face and chest repeatedly with the box cutter.  He ejaculated inside of her.  He took her money and fled.  VJ passed out.  When she came to, she left the abandoned building, went to a call box, and requested police assistance.  According to VJ, the entire incident - - from when she was first forced into the car until she called the police - - took approximately forty-five minutes.

### The NYPD Investigation of the Crime

#### A.   Initial Contact with VJ

53.   On June 23, 1984, between 5:13 and 5:21 a.m., Police Officer Douglas Leho arrived at the call box located at 176th Street and Marmian Avenue in response to VJ's call for assistance.  When he arrived, VJ was hysterical and was bleeding profusely from wounds on her face and chest.  She told Officer Leho that she had been abducted,

slashed and raped; she was able to supply only the most minimal description of her attacker: "a male black approximately 27 years of age wearing a beige shirt, pants. That is about it." She also advised him that her assailant had used a blue and white Grand Prix automobile to abduct her. Officer Leho transported VJ immediately to Jacobi Hospital.

54.    At the hospital, a "rape kit" was used to collect critical physical evidence from VJ's body. The "rape kit," containing among other things, blood, semen and hairs collected from VJ's body, was delivered to NYPD investigators for processing and testing. Ultimately, an NYPD serologist, Detective Harris, was assigned the task of testing the physical evidence within the rape kit. For some unexplained reason, NYPD investigators, including Detective Harris, failed to: (a) determine the blood type of VJ's assailant from the collected semen, or (b) compare the head, body and/or pubic hair to those of the victim or any suspect. The rape kit was "vouchered" and soon otherwise dismissed as irrelevant with regards to the police and DA Office investigation.

55.    VJ underwent lengthy surgery on June 23; she was in serious condition and was unable to convey much substantive information to the NYPD investigation team assigned to her case that day. Detective Joanne Newbert did, however, speak briefly with the VJ at 12:30 p.m., just prior to her surgery on June 23.

### B.    The Crime Scene Investigation

56.    After speaking briefly with VJ at Jacobi Hospital, Detective Newbert then went with an NYPD investigation team to the call box which VJ had used early that morning. Following a trail of blood, NYPD investigators (Newbert, Galligan, Hartfield and O'Toole) went into an abandoned building located at 861 Crotona Park North. A

piece of a mirror and a pack of cigarettes were found on the third floor landing, but no "useful" fingerprints allegedly were found or recovered.

57.   According to Detective Newbert, the crime scene in the abandoned building (the third floor landing where the second attack took place) "was not sealed off"; no attempt was made to secure any fingerprints (by her or the crime scene unit) because the walls in that location were "filthy" and there was, in any event, likely to "be a slew" of fingerprints according to Newbert. Upon information and belief, NYPD investigators conducted no search, cursory or otherwise, of Crotona Park where the first attack occurred.

**C.**   **"Willie" Is the First Suspect**

58.   Detective Newbert testified that, during the earliest stage of the NYPD investigation on June 23, VJ told her that a man named "Willie" had attacked her. Based upon that information, NYPD investigators (Detectives Galligan, Newbert, Hartfield and Police Officer O'Toole) canvassed the area around Crotona Park North on the afternoon of June 23 looking for witnesses; they found a woman who knew someone named "Willie." This woman stated that she knew a "Willie" who drove a blue and white Pontiac and that he lived on the third floor of the abandoned building where the second attack took place. Detectives Newbert and Galligan, however, discounted the reliability of this seemingly relevant information claiming that Ms. Chamberlin was a "drug addict" who had been arrested several times. Ms. Chamberlin also allegedly provided the NYPD investigators with a "bogus" name and home address.  Her real name and arrest record were never produced to Mr. Newton or his attorneys.

59.    When Detective Galligan returned to the vicinity of 861 Crotona Park North the next day (June 24), he allegedly was unsuccessful in his attempts to find either Ms. Chamberlin or the blue and white Pontiac. Detective Galligan testified that Ms. Chamberlin had ten prior arrests and that she had previously used five different names. Detective Galligan admitted that he stopped looking for Ms. Chamberlin after June 25 because Alan Newton became the "target" of the NYPD investigation -- to the exclusion of all others -- based on VJ's "identification."

60.    Detectives Newbert and Galligan ultimately reached the summary conclusion that Ms. Chamberlin could no longer be located and, in any event, they decided that she would be an unreliable and irrelevant witness in light of their belief that Alan Newton was VJ's assailant. They took this action despite the fact that they learned that three "Willies" lived or had lived in the building where the second assault occurred. Finally, the NYPD investigators also testified that, with respect to the blue and white Pontiac, "we had information that the car was stolen." This latter bit "information" was totally unreliable layered hearsay; the "information" was from VJ who told them that "Willie had told her that the car was stolen."

61.    Detective Galligan claimed that he had placed notes in a notebook concerning his conversation with Ms. Chamberlin. However, he no longer had those notes at the time of Mr. Newton's criminal trial. Detective Galligan claimed that he turned the notes over to Detective Newbert, but when he looked in her file for the case he could not find them. Those notes have never been turned over to Mr. Newton or his attorneys and apparently they have never been found. No further particulars were

-17-

supplied to Mr. Newton or his defense attorney about "Willie," Ms. Chamberlin, or the blue and white Pontiac.

### E.    The NYPD's Tainted & Flawed "Identification" Procedures

### 1.    VJ

62.    VJ claimed that the man who attacked her in the abandoned building was the same man who was in the bodega and the same man who abducted her with his car. She admitted, however, that saw his face in the bodega only "for about five seconds" (or less than "60 seconds"); that she saw his face in the car for "a minute, maybe a minute and a half," and that she was never able to observe his face clearly in the park, on the street, or in the abandoned building because of the darkness and the poor lighting. In sum, she was medicated, intoxicated and she readily admitted that she was never able to obtain a good look at her assailant.

63.    VJ initially told the police that someone known as "Willie" had attacked her. Her description of her assailant then changed over time. VJ initially described her assailant only in the most general of terms to NYPD investigators. First, to Police Officer Leho, in her hysterical state shortly after reporting the crime, she described her assailant only as a "male black approximately twenty-seven years of age wearing a beige shirt, pants. That is about it."

64.    To Detective Newbert on June 23, VJ first described her assailant as a black man named "Willie" who was about 5'4" tall; she then inexplicably changed her estimation of his height to 5'9" and her estimation of his weight to 180 pounds claiming that he was "large." Still later, after viewing photographs and a physical lineup containing Mr. Newton, she told Detective Newbert that her assailant was 5'7" to 5'8"

tall, and weighed 150 to 160 pounds.   VJ initially admitted that she did not know whether her assailant had a light or dark complexion "because it was so dark out," but then she later claimed confidently that he had a dark complexion.

65.   VJ was an admitted alcoholic taking epilepsy medication; she defied her doctor's instructions and had consumed a substantial amount of alcohol just prior to the crime – at least ten or eleven glasses of "Old English" beer from quart-sized bottles. The inconsistencies in VJ's description of her assailant, therefore, should have been questioned by NYPD investigators, especially in light of her admitted physical condition at the time of the attacks; unfortunately, the description inconsistencies were never questioned by NYPD investigators (or the Bronx District Attorney's Office).

66.   On June 25, 1984, VJ was shown a group of mug shot photographs at Jacobi Hospital while she was still recovering from her surgery (and loss of one eye); she was asked to tell NYPD investigators if anyone was "similar looking" to the man who had assaulted her.   It was only after VJ reviewed about 200 hundred mug shot photographs that she identified Mr. Newton.   Unfortunately, before the display of photographs, NYPD investigators (Newbert, Galligan, *et al.*) did not ask VJ about her assailant's features, *viz.*, his hair, eyes, nose, mouth, etc.

67.   VJ's description of her assailant only became conveniently consistent after she viewed Mr. Newton's photograph and conferred with NYPD investigators about him. It is only then that she begins to describe her assailant as a black male, with short cut hair, a mustache, 5'7" to 5'8" tall, and weighing 150 to 160 pounds. NYPD investigators, specifically Defendants Leho, Newbert, Galligan, Hartfield, Ryan, and O'Toole should

have elicited a more complete description of the assailant from her first, as a check to determine how well she could recall him, before showing mug shot photographs to her.

68.    As VJ recovered from her injuries in the days following the attacks, and after she was shown Mr. Newton's photograph, she downplayed any reference that she had made previously to a "Willie"; in fact, she later denied that she ever knew the name of her attacker.

69.    On June 28, 1984, VJ viewed a lineup at a police station. Mr. Newton was seated in the number 5 position. VJ testified that she wasn't sure her assailant was in the number 5 position "right away." Though NYPD investigators claimed that VJ identified Mr. Newton as her assailant from simply seeing him in the lineup, Detectives Newbert and Galligan admitted in their trial testimony that VJ asked them to have each lineup participant repeat the phrase "I'll fix you so you don't identify me you bitch" -- a phrase that had been uttered by her attacker -- before a positive identification was recorded. In other words, VJ could not make an immediate identification of Mr. Newton when she first observed him in a lineup.

70.    Three very flawed attempts at a voice identification were then conducted. During the first procedure, each member of the lineup remained seated and, in numerical order, they repeated the phrase *while the shade was up in the viewing room.* VJ claimed that she could not hear Mr. Newton's voice, alleging that he had spoken the phrase too softly. Mr. Newton then was asked to repeat the phrase a second time; according to Detective Newbert, every other member of the lineup had repeated the phrase once. Detective Galligan and VJ, on the other hand, testified that each member of the lineup

repeated the phrase a second time while standing "five or six inches" in front of the viewing window.

71.    Following Mr. Newton's repeat of the phrase a second time at the viewing window with the shade up, VJ told Detective Newbert that she still was unable to hear number 5, and she left the viewing room "shaking her head"; the men then were told to go to a side door of the lineup room, which was slightly ajar, where they again repeated the phrase while VJ stood on the other side of the door. Following the third procedure, VJ told the police that number 5 was the person who attacked her. Mr. Newton was arrested shortly after the third voice identification procedure.

72.    During the first two voice identification procedures, NYPD Investigators impermissibly (a) advised the lineup members each to speak in the numerical order in which they had been viewed by VJ, while (b) allowing VJ to view the lineup participants as they spoke. Detective Galligan admitted that there was a shade on the one-way mirror, which, if pulled down, would have prevented VJ from seeing the men as they spoke; the shade nevertheless remained up during the first two voice identification procedures. Detective Newbert recalled that VJ was viewing the one-way mirror as the lineup participants spoke. During the third voice identification procedure, which took place at the side door, VJ was unable to see the men as they spoke. However, during this final procedure, the lineup participants were still speaking in the numerical order in which they had been sitting (one through six).

73.    Police Officer O'Toole, who was inside the lineup room, recalled that the five fillers thought the voice identification procedure was a "big joke." At least one of the fillers, who regularly participated in lineups at the Precinct in question, testified that

this lineup was "different" because lineup members had to approach the viewing glass, speak, and show their mouths and teeth. From his vantage point, O'Toole could not see whether the shade was up or down on the one-way mirror during the voice identification procedures, but he believed that the shade should have been down if they were testing only for a voice identification.

74.     With respect to the reliability of VJ's identification of Mr. Newton as her assailant, perhaps the most egregious conduct occurred when VJ telephoned the Bronx District Attorney's Office (ADA Freund) a few days prior to start of the criminal trial and advised that she was no longer "positive" that Mr. Newton was her assailant. ADA Freund advised the trial judge: "I cannot state to the Court the exact words she used."

75.     The importance of the precise substance of that discussion between ADA Freund and VJ cannot be overstated; nevertheless, ADA Freund withheld exactly what VJ said from the court, Mr. Newton and his attorney. Under these circumstances, ADA Freund and the Bronx District Attorney's Office showed a callous disregard for Mr. Newton's constitutional rights; ADA Freund had an obligation to disclose precisely what VJ had said in recanting prior to trial. Moreover, ADA Freund also should have requested that the Wade Hearing be reopened to take evidence on the subject of VJ's identification confidence as she remained in exclusive control of this vital evidence (instead, ADA Freund and the Bronx District Attorney's Office opposed defense counsel's request that the Wade Hearing be reopened).

76.     At trial (before the jury), VJ subsequently claimed that her "identification" recantation was due only to a generalized fear of reprisal; significantly, however, she offered no evidence that any threats had been made to her or her family. In front of the

jury, she admitted only that, following additional pre-trial discussions with the Bronx District Attorney's Office, she became re-convinced that Mr. Newton was the right man. In short, after an improper pleading, coaching and rehabilitation session engineered by ADA Freund and the Bronx District Attorney's Office, VJ suddenly was able to point out Mr. Newton confidently again – this time to the jury. DNA evidence has proven that VJ had, in fact, misidentified him; that her doubt as to Mr. Newton was legitimate, and that she should not have been persuaded to testify otherwise by ADA Freund and the Bronx District Attorney's Office.

### 2.  **Ms. Aurea Gonzalez**

77.    The superette clerk, Ms. Aurea Gonzalez, reluctantly offered the only other evidence against Plaintiff Alan Newton at the criminal trial.

78.    Ms. Gonzalez was the sole person working at the bodega at the corner of 180th Street and Third Avenue at 4:00 a.m. on June 23, 1984. She was nearing the end of her twelve hour shift when the critical events unfolded. She admitted that the black man that she observed with VJ that night was in her store a total of "more or less one to two minutes"; that he was in front of her at the counter for a fraction of that time, and that she had never seen him before.

79.    Notwithstanding the fact that Ms. Gonzalez admittedly viewed VJ's assailant, for the first time, for less than a minute or so, she somehow identified Alan Newton as the perpetrator from a photo array. DNA evidence has proven now that she misidentified him. Again, NYPD investigators failed to compel Ms. Gonzalez to provide a complete description of the black man she observed in her store before showing her a limited array of six mug shot photos (one of the photos was of Alan Newton).

80.    Ms. Gonzalez claimed that she "more or less" described the black man to NYPD investigators as "black, tall, slender"; she doesn't recall giving any further details about his physical description. Detective Newbert has admitted that she didn't ask Ms. Gonzalez for any description of the man before asking her to examine the limited six-person photo array. At trial, Ms. Gonzalez described VJ's assailant only in the most general of terms: "Black man, short hair, little moustache. He was neither too tall nor too short. He was average and he wasn't heavyset."

81.    Ms. Gonzalez was asked to look at the six-person photo array and advise only "if there was someone who looked like the person that was there at the time in the store." Ms. Gonzalez allegedly picked Alan Newton's photo from the array (his photo was in position number 2). Again, she admitted that she was asked just to pick out a person "who looked like the person" that she had seen in the store. She then subsequently was asked by NYPD investigators to pick Mr. Newton out of a lineup (he was again in position number 2 in the lineup) and she allegedly accomplished that task. Mr. Newton was offered only position number 2 in the lineup, the same position he was in within the photo array.

82.    Interestingly, and most importantly, Ms. Gonzalez, when not surrounded by NYPD investigators, was not able to point out Mr. Newton in a courtroom when asked to do so by ADA Freund -- when Ms. Gonzalez appeared for a [Wade] hearing just prior to trial. After a subsequent improper pleading, coaching and rehabilitation session engineered by ADA Freund and the Bronx District Attorney's Office, Ms. Gonzalez suddenly was able to point out Plaintiff confidently again -- to the jury at trial just a few days later. Ms. Gonzalez explained that her previous inability to make an in-court

identification was due to a "nervous condition." She conceded, however, that nobody had threatened her.

83. DNA evidence has proven that Ms. Gonzalez had, in fact, misidentified Mr. Newton; that her inability to point out Mr. Newton was highly significant, and that she should not have been persuaded to testify otherwise by ADA Freund and the Bronx District Attorney's Office.

**F.    The Alibi Presented By Alan Newton**

84. Through his own testimony and that of two other witnesses, Alan Newton presented an alibi. The gist of the defense was that he was at his girlfriend's home in Queens at the time of the offense: the early morning of June 23, 1984. This information was conveyed to NYPD investigators, ADA Freund and the Bronx District Attorney's Office shortly after Mr. Newton's arrest.

85. On the evening of June 22, 1984, Alan Newton testified that he went to a movie in Brooklyn with Ms. Marva Weston and her two children. He stayed overnight at Ms. Weston's home; he denied that he was in the Bronx on either the evening of Friday, June 22, or Saturday, June 23, 1984. He strenuously denied that he had attacked VJ.

86. Ms. Marva Weston testified that on the evening on June 22, 1984, Mr. Newton went with her and her two children to a movie. Afterwards, they visited Ms. Weston's sister. Mr. Newton, Ms. Weston, and the children then returned to Ms. Weston's two-family home in Queens at 8:45 p.m. They watched television until approximately 10:00 p.m., when the children went to bed. The children got up at midnight to watch "Hottracks," a show her children routinely watched on Friday nights.

They all watched the show until 2:00 a.m., when the children went back to bed. Ms. Weston's 13-year old daughter, Lori Weston, testified in a similar manner.

87.    Ms. Marva Weston and Mr. Newton slept together from 2:00 a.m. until 7:00 a.m. on June 23, 1984. At about 3:00 a.m. that morning, Ms. Weston's parents, who had been playing cards at a neighbor's house, rang the doorbell. Ms. Weston went downstairs and let her parents in. At that time, Mr. Newton was still asleep in Ms. Weston's room. According to Ms. Weston, Mr. Newton could not have left the house without her knowledge, because he would have awakened her; he could not have returned alone because he did not have a key to her home.

### G.    Defendants Made No Attempt to Corroborate The Questionable Eyewitness Identifications

88.    NYPD investigators (Newbert, Galligan, Hartfield, Ryan, Harris, Leho and O'Toole) and ADA Freund improperly, but admittedly, focused on Alan Newton as the "target" of their criminal investigation within forty-eight hours of the crime. They soon (along with the Bronx District Attorney's Office) failed to pursue leads to other suspects and they ignored or refused to examine evidence that would prove definitively whether Mr. Newton was guilty or innocent.

89.    Mr. Newton advised the aforementioned NYPD investigators and the Bronx District Attorney's Office very early in their investigation that he had an alibi that several witnesses would support. These NYPD investigators and ADA Freund, however, callously ignored this information and failed to interview a single one of the alibi witnesses.

90.    No physical evidence was ever found that linked Mr. Newton to the crime, yet there was physical evidence collected that indicated that he was not VJ's assailant.

NYPD investigators and the Bronx District Attorney's Office failed, however, to pursue the testing of this evidence or, worse, failed to disclose the results of testing that indicated that Mr. Newton was not the assailant.

91.    For example, NYPD investigators had VJ's clothing in their possession following the crime. VJ had been savagely slashed and stomped by her assailant; her splattered blood would, no doubt, would have been on her assailant's clothing and footwear. In fact, Mr. Newton was told that sneaker prints were seen on her clothing. When Mr. Newton was approached for questioning, NYPD investigators seized his sneakers so that the NYPD could determine: (a) if the treads on his sneakers matched those on VJ's clothing, and (b) if any blood belonging to VJ was on his sneakers. For some unexplained reason, the blood tests were never performed (according to Detective Newbert), and the results of the sneaker tread print comparison were never disclosed to Mr. Newton or his attorney. The sneakers themselves were never returned to Mr. Newton although he has sought their return for over two decades.

92.    Along these same lines, no search warrant was ever sought or issued to determine: (a) whether the clothing on the assailant described by VJ might be found within Mr. Newton's apartment, or (b) whether any clothing found within Mr. Newton's apartment had VJ's blood on it.

93.    NYPD investigators (along with the Bronx District Attorney's Office) also callously refused to test the physical evidence collected from VJ's body to determine if any of it connected Mr. Newton to the crime. Specifically, the semen collected from VJ could have been tested for blood type; the head and pubic hairs collected from VJ could have been compared to Mr. Newton's head and pubic hair.

### The Suppression Hearing

94.    Even though VJ was no longer convinced that Mr. Newton was her assailant, ADA Freund wrongfully opposed the reopening of the Wade Hearing to allow for questioning on VJ's post-Hearing recantation; the trial judge sided with ADA Freund and refused to reopen the Hearing stating cavalierly "Whatever happens at trial happens at trial."    Unfortunately, the "whatever" did happen at trial -- an innocent man was unjustly convicted.

### The Trial Verdict

95.    Jury deliberations commenced at 3:05 p.m. on May 20, 1985.    At the jury's request, numerous portions of the testimony of VJ and Ms. Gonzalez were read back to the jury.    Deliberations adjourned at 10:45 p.m. and resumed the following morning.    Following requested "readbacks" of testimony referring to "Willie," the jury reached a verdict at 4:30 p.m. on May 21.

96.    Mr. Newton was acquitted of the rape and sodomy charges that stemmed from the incident in the park.    However, he was convicted of rape, assault, and robbery (all in the first degree) in connection with the attack in the abandoned building.

### Sentencing

97.    On May 31, 1985, the court sentenced Mr. Newton to concurrent prison terms of 8 1/3 to 25 years for the rape and robbery charges followed by a consecutive prison term of 5 to 15 years for the assault.

### Mr. Newton's Claim of Innocence & Pursuit of Exoneration

98.    Following his arrest, and throughout his trial, and twenty-two (22) years of incarceration, Mr. Newton steadfastly maintained his innocence.    He repeatedly asked

agents, servants and representatives of the NYPD (specifically, Defendants Haskins, Kiely, McGuire and various John/Jane Does), and agents, servants and representatives of the Bronx District Attorney's Office (specifically, ADA Carroll, ADA Moore and ADA Curbello and John/Jane Does) commencing on August 16, 1994, to produce the DNA evidence relevant to his conviction (along with other evidence, including his confiscated sneakers). He repeatedly requested the rape kit that was used by NYPD investigators to collect semen from VJ so that DNA testing might be performed to establish his innocence.

99.     The aforementioned Defendants repeatedly advised in reply that "extensive searches were conducted" at the NYPD's Property Clerk's Office, but that the rape kit (and other evidence) could not be located. In fact, the rape kit was right where it was supposed to be the entire time; in November 2005, more than eleven (11) years after it was first requested for DNA testing, the rape kit was located in the evidence barrel/bin (84B19041) specified on the evidence voucher referred to by Mr. Newton – the rape kit was right where it was supposed to be throughout those eleven years.

### The Rape Kit Is "Lost" by the NYPD Property Clerk

100.     Mr. Newton's trial for the rape of VJ occurred over two weeks in May, 1985. During the trial, People's Exhibit 13 (the rape kit) was introduced into evidence. This piece of evidence was first entered into the NYPD Property Clerk system by the NYPD Police Laboratory on June 30, 1984; at that time, it was assigned an NYPD storage bin (84B19041), and became attached to a "locator" -- Precinct Voucher Number B744483.

101.   Mr. Newton first requested post-conviction DNA testing, *pro se*, on August 16, 1994. In response to this motion, ADA John F. Carroll stated:

> Intending to consent to defendant's request, your affirmant undertook an extensive investigation in order to determine the whereabouts of the aforementioned physical evidence. It now appears, however, that the physical evidence was never returned to ... the New York City Police Department Property Clerk's Office ... extensive searches were conducted at the New York City Police Department Property Clerk's Office ... The physical evidence was not located.

Affirmation of John F. Carroll, Esq. Submitted in Opposition to Alan Newton's Request for Post-Conviction DNA Testing, dated November 1, 1994.

102.   The Supreme Court of the State of New York, Bronx County, denied Mr. Newton's August 16, 1994 request for post-conviction DNA testing on November 3, 1994, but only because the rape kit, Mr. Newton's sneakers and VJ's clothing allegedly could not be located by the NYPD Property Clerk, the NYPD and the Bronx District Attorney's Office. At this point in time (1994), DNA testing was readily available, and if the rape kit had been located and the slides tested, Mr. Newton would have been exonerated of VJ's rape.

103.   On March 24, 1997, Mr. Newton, again acting *pro se*, submitted renewed discovery requests to Magistrate Judge Sharon E. Grubin, including one for the allegedly lost rape kit, in connection with a *habeas corpus* petition Mr. Newton had filed with the United States District Court for the Southern District of New York. Again, Mr. Newton requested the following items:

1.   Voucher # B744556-Storage # 84B24723-1, pair of men's Sneakers
2.   Voucher # B744483-Storage # 84B19041, cigarette box, mirror, Vitulo Kit
3.   Voucher# B744512-Storage # 85B696, victim's clothing (jeans, maroon sweater, blouse)