# EXHIBIT R

Newbert - for People - Cross

602

Q     I show you Defendant's Exhibit A for Identification and ask you if you recognize it.

THE COURT:  Yes or no?

A     Yes.

Q     And who is the individual who completed that report?

A     It is me I believe.

Q     Well, you have a better copy than that, don't you?

A     I have the original.

Q     Let me look.

A     Yes.

Q     May I see it, please?

A     Sure (handing to Mr. Segal.)

Q     Did there come a time, I direct your attention on the Defendant's Exhibit A for Identification.

THE COURT:  Sure we're not going to refer to a document that is not in evidence.

MR. SEGAL:  I'm not, Judge.

Q     Did there come a time when you spoke to an individual, a person who lived at an address on Marmian Avenue; yes or no?

A     Yes, I believe I did.

Q     Did that person at any time state to you that she knew a person by the name of Willie who drove a similar car to the one V⬛⬛⬛⬛ J⬛⬛⬛⬛ described?

Newbert - for People - Cross                    603

A.     Yes, I did.

Q.     Did that person say that this individual lived at that address, 861 Crotona Park North?

A.     No, she did not.

Q.     And that she had lived at that address at one time also?

A.     Yes, she did.

Q.     Did she also state to you that Willie lived on the third floor where the occurrence took place?

A.     Yes, she did.

Q.     Did she tell you what Willie's last name was or what his true name was?

A.     I would have to read this.

Q.     Would you read it please?

       THE COURT:   See if that refreshes your recollection?

A.     Yes.

       (Short pause.)

I don't believe she gave me Willie's last name.

Q.     Is that the only time you spoke to this person; yes or no?

A.     That is the only time we could find her.

Q.     Did you have an address for you; is that correct?

A.     Yes.

Newbert - for People - Cross                    604

1

2      Q      And this was done in the early — when was this done

3  this interview, what date?

4      A      That was done on the 23rd.

5      Q      Did you get a description from that person as to

6  what Willie looked like; yes or no?

7      A      Yes, we did.

8      Q      Is that noted in your report, the description?

9      A      No, no.

10     Q      Do you have it noted anywhere?

11     A      No.  We went back to talk to her.

12            THE COURT:  Just answer the question.

13            THE WITNESS:  No.

14     Q      My question is, did you complete a description?

15     A      No.

16     Q      From her; yes or no?

17     A      No.

18     Q      And when you spoke to this woman?

19     A      Uh-huh.

20     Q      It was on what, June 24th?

21     A      23rd.

22     Q      The same day that the incident occurred?

23     A      Correct.

24     Q      And you spoke to this woman what time, what hour?

25     A      It was during the canvass of the area in the afternoon

Newbert - for People - Cross

605

1

2  Q    And when you spoke to the woman you had the name

3  Willie; is that correct?

4  A    Yes.

5  Q    You also had the type car; is that correct?

6  A    Yes.

7  Q    And this woman had said to you in fact that Willie

8  had the same car, the blue and white Pontiac whatever it might

9  be; right?

10 A    Uh-huh.

11 Q    And that this guy Willie lives on the third floor

12 at 861 Crotona Park Nort; is that correct?

13 A    Yes.

14 Q    Did you then ask that woman what the description of

15 Willie looked like; yes or no?

16 A    I didn't.

17 Q    Who was with you?

18 A    Detective Galligan, Detective O'Toole.

19 Q    Did Detective --

20 A    I don't know.

21

22     THE COURT:  Please if you're going to ask a

   question let the witness answer.

23     MR. SEGAL:  I will, Judge.

24     THE WITNESS:  Uh-huh.

25 Q    Did Detective Galligan ask the description?

Newbert - for People - Cross

60

```
1
2    A    I can't say that.

3    Q    Were you with Detective Galligan?

4    A    Not every minute.

5         THE COURT:  To your knowledge did Detective

6    Galligan ask for a description?

7         THE WITNESS:  It is a possibility.

8         THE COURT:  To your knowledge.

9         THE WITNESS:  No, not that I remember.

10   Q    Did Detective O'Toole ask for a description?

11        THE COURT:  If you know.

12   A    Not to my knowledge.

13   Q    Who else was there besides the three of you?

14   A    Detective Hartfield.

15   Q    Did Detective Hartfield ask for a description of

16   Willie?

17        THE COURT:  If you know.

18   A    I don't know.

19   Q    Anybody else beside the four of you?

20   A    At that time the emergency service was there at the

21   scene.

22   Q    At this address on Marmian Avenue?

23   A    No.  We never went to her address on Marmian Avenue.

24   She told us that that was her address at Marmian Avenue.

25   Q    Where did you speak to this woman?
```

Newbert - for People - Cross

607

2    A    On the street in front of 851 Crotona Park.

3    Q    You got her name; is that correct?

4    A    Correct.

5    Q    Got an address for her?

6    A    Uh-huh.

7    Q    But you never sought a description from the woman;

8 is that correct?

9    A    I didn't at that time, no.

10    Q    At that time; correct?

11    A    No.

12    Q    Didn't she also tell you, the woman, that this man

13 Willie uses pills, coke and she believes he was arrested in

14 '82 or '83?

15    A    Yes.

16    Q    She was able to give you a -- some other information

17 about the building; is that correct?

18    A    She gave us a lot of information.

19    Q    At no time did you ever inquire of this woman?

20    A    Yes, we did.

21    Q    Wait, please.  Let me finish.

22    THE WITNESS: Uh-huh.

23    Q    Did you at no time inquire on that date and at that

24 time a description of Willie; is that correct?

25    A    I didn't, no.

Newbert - for People - Cross                    -608-

Q      The other three men who were with you didn't either?

           MS. FREUND:  Objection.

           THE COURT:  She can only answer to what she knows.  They might have asked for a description when she was in the ladies room.

Q      Was there a ladies room around?

           MS. FREUND:  Objection.

           THE COURT:  Sustained.  Come on, Mr. Segal.

Q      At any time since this incident occurred have you tried to locate that woman; yes or no?

A      Yes.

Q      When was the last time you tried to locate her?

A      We tried to locate her the next day.

Q      That is June 24th?

A      Correct.

Q      Did you try to locate her after June 24th; yes or no?

A      We tried to locate her through the area, through the people in the area.

Q      When was the next time you tried to locate her?

A      Up until the 26th.

Q      The 26th?

A      Uh-huh.

Q      Did you also have information that the people in

1

Newbert - for People - Cross

2    that building had been relocated by the Red Cross?

3    A.    Correct.

4    Q    Did that woman tell you who she had lived in that

5    building at one time?

6    A.    Correct.

7    Q    Did you go to the Red Cross to try and locate her

8    through the Red Cross?

9    A.    No.  She gave us her new address.

10    Q.    Did you try to locate her through the Red Cross?

11    A.    I didn't have to.  I had her address.

12            THE COURT:  No, Detective.  Did you try to

13        locate her through the Red Cross?

14            THE WITNESS:  No.

15    Q    Did you try any social services, the agencies in

16    the area to try to locate her?

17    A.    No.  I have her BCI check.

18    Q    On the woman?

19    A.    Yes.

20    Q    Could you tell the jury what BCI check is?

21    A.    BCI check is a check on past crimes, do a name check

22    with the date of birth.

23    Q    BCI stands for Bureau of Criminal Investigation?

24    A.    Yes.

25    Q    Did you find out anything about her?

Newbert - for People - Cross

610

1

2    A    Yes.

3    Q    What did you find out?

4    A    She was arrested several times.

5    Q    And you had a name and address for her?

6    A    Yes.

7    Q    Did you go to that address for the woman?

8    A    There was no address.  I got a bogus name.  She has

9    at least, that we counted seven different names.

10   Q    Do you have it in your notes now?

11   A    Uh-huh.

12   Q    Notations, memorandums to indicate the BCI check

13   and the addresses and names used by this woman?  Yes or no.

14   A    These are not my handwritten notes.

15   Q    You have your handwritten notes so we can see them?

16   A    Yes, I do.  Can I say something.  They're not my

17   handwriting.  This was done --

18            THE COURT:  Would this refresh your recollection

19   as to the names the woman used and addresses she

20   had used?

21            THE WITNESS:  This was not done exactly by me.

22            THE COURT:  Detective, I don't care if it is

23   the centerfold of Playboy.  If it refreshes your

24   recollection you can look at it.

25            THE WITNESS:  (Handing to Mr. Segal.)  It is

Newbert - for People - Cross

611

the top part.

Q    The last question you have of that woman, last time she was arrested was in '78; is that correct?

A    Uh-huh.

Q    Okay.  So you have nothing since July of '78; is that right?

A    Uh-huh.

        THE COURT:  You have to answer audibly.

Q    Is that right?

A    No.

        THE COURT:  Is that right, yes?

        THE WITNESS:  I have nothing prior to 1978.

        THE COURT:  Nothing after 1978?

        THE WITNESS:  Nothing after 1978.

Q    What was the name of this woman that she gave you?

A    I don't have the name here.

Q    You do have it somewhere don't you?

A    I believe it is on Detective Galligan's --

        THE COURT:  You can look at anything you want if it will refresh your recollection as to the name of the woman stated was hers.

        THE WITNESS:  I don't have it here.  I believe Detective Galligan has it.

Q    He has the name?

Newbert - for People - Cross                    512

1

2      A.      Yes.

3      Q.      The only way you could have gotten the BCI, Burea

4   of Criminal Investigation check was to have a name and a date

5   of birth?

6      A.      Don't need the date of birth.

7      Q.      Just the name and it will pop up on the computer?

8      A.      Yes.

9      Q.      And you had the woman's name and address of the

10  woman?

11     A.      Yes.

12     Q.      What address did she give you?

13     A.      1783 Marmian Avenue.

14     Q.      And give you an apartment?

15     A.      Yes, apartment 18.

16     Q.      Did you go back to that location?

17     A.      Yes.

18     Q.      The next day?

19     A.      I didn't.

20     Q.      You didn't.  One of your brother officers did?

21     A.      Yes.

22     Q.      So they followed up on it after you got that informa-

23  tion; is that correct?

24     A.      Yes.

25     Q.      The information about this woman while -- withdraw

Newbert - for People - Cross

613

1

2  that.

3      After speaking with this woman — I'll withdraw that

4      Just how long did you speak to the woman for on that

5  date?

6      A    I don't believe that I even spoke to her.  I was

7  present and we were interviewing other people on the street.

8      Q    Okay.

9      A    Okay.  I don't think I directly spoke to her only

10  for a few seconds.

11     Q    But you were part of the conversation?  In other

12  words you were standing there?

13     A    I was speaking to somebody else.

14     Q    But the information on this report is information

15  that you heard from the woman; is that correct, or that was

16  given to you by somebody?

17     A    It was given to me by somebody else, given to me

18  by Detective Galligan.

19     Q    By Galligan?

20     A    Yes.

21     Q    Galligan was part of the investigation in this

22  case; is that correct?

23     A    Correct.

24     Q    And Galligan would have made his own notes as to

25  this woman?

Newbert - for People - Cross

1

2    A    I don't know.  I would assume so.

3    Q    Can you just tell us the name of the woman that you

4    had?

5    A    I don't have it in my notes.  I can't give it to

6    you.

7    Q    By the way --

8    A    Uh-huh.

9    Q    This woman.

10    A    Uh-huh.

11    Q    What she had told the detectives basically was what

12    V██████ J██████ had said; is that correct?

13          MS. FREUND:  Excuse me.  I'm going to object.

14          THE COURT:  Sustained as to form.

15    Q    V██████ J██████ had told you that the man's name

16    was Willie; is that correct?

17    A    Uh-huh.

18    Q    Is that right, ma'am?

19    A    Yes.  That is correct.

20    Q    And this woman had said also that the man's name was

21    Willie who lived in that building?

22    A    Yes.

23    Q    V██████ J██████ had told you she was at 861 Crotona

24    Park North?

25    A    No.  She did not.

Newbert - for People - Cross

615

1

2       Q      She said that she was raped and sodomized?

3       A      In the park.

4       Q      In the park?

5       A      Uh-huh.

6       Q      She told you something about the building?

7       A      She didn't know the address, no.

8       Q      But at that building you found the pool of blood on

9    the third floor?

10      A      Correct.

11      Q      And this woman had said to you this individual by

12   the name of Willie lived on the third floor in that building;

13   is that correct?

14      A      Correct.

15      Q      And this woman, V_____ J_____ had told you about

16   a car; is that correct?

17      A      Correct.

18      Q      Blue and white car?

19      A      Uh-huh.

20      Q      This woman who you met on the street told you about

21   a blue and white car?

22             THE COURT:  Told the police.

23      Q      Told the police about a blue and white car; is that

24   correct?

25      A      Correct.

Proceedings                                                    654

THE COURT:  It deals with the same subject

matter.  Since you elicited through one officer I

will allow the District Attorney to elicit that

same conversation through the officer who actually

had the conversation with this mystery woman.  The

twelve prior arrests, who can't be located and

Willie and his car.

MR. SEGAL:  I have an exception.

THE COURT:  Objection overruled.  Exception

noted.

(Whereupon, the following proceedings takes

place in open court before the jury.)

THE COURT:  Go ahead, Miss Freund.

MS. FREUND:  Thank you, your Honor.

Q     Detective Galligan, does that refresh your recollec-

tion as to a conversation that you had with a female person?

A     Yes, it does.

Q     Does it give you a date and location, Detective?

A     That was on June 23rd.  The location was in front

of the crime scene, Crotona Park North.

Q     Approximately what time during the day was this,

Detective.

A     This was in the afternoon.  I don't recall the

exact time.

Galligan — for People — Direct                    655

1
2      Q      Detective, can you tell us a little bit about that
3    woman?
4             MR. SEGAL:  Objection.
5             THE COURT:  Overruled.
6      A      Yes.  In front of the crime scene there were
7    vehicles from the crime scene unit and other Police Department
8    vehicles.  Three or four of these females came over inquiring
9    what happened.  I told them a female had been assaulted.
10            MR. SEGAL:  I object to anything with anyone
11            else.
12     Q      Detective, I direct your attention just to the
13   conversation that you had with this particular female.
14     A      Yes Ma'am.  Female asked me what happened.  I said
15   a woman had been assaulted in the building.
16     Q      Did you tell her where?
17     A      No, not at that time.  I said do you know anyone
18   from the neighborhood by the name of Willie.  At that time
19   she said, yes.  I do know a Willie.  All right.  This female
20   during the course of the conversation she was nodding out
21   while talking to me and apparantly she was a junkie due to
22   the fact she had tracks up and down both arms.
23            MR. SEGAL:  Objection.
24            THE COURT:  You can testify.  Have you had
25            experience, Officer, with people who are narcotic

Galligan - for People - Direct                    656

addicts?

THE WITNESS:  Yes.  I worked narcotics six and

a half years.

THE COURT:  This woman appeared to be under the

influence of drugs?

THE WITNESS:  Yes.

Q     You observed track marks which from your own

experience indicate they were caused by heroin injection?

A     Yes, sir.

MR. SEGAL:  Objection.

THE COURT:  Overruled.

A     (Continuing.)  I then asked her, she said to me she

did know a Willie.  I said do you know anybody that drives a

Pontiac, Grand Prix.  She said, yes, Willie drives a Pontiac

Grand Prix.  I then told her do you know where Willie lives.

She said Willie lives in this building right here.  She said

where did it happen.

THE COURT:  Was that 861?

THE WITNESS:  That is correct.  I said where

did it happen -- sorry.  She asked me where did it

happen.  I said on the third floor.  She said, well

Willie lived on the third floor.  At that point I

felt she was just feeding me information.  She said

what apartment.  I said I don't remember what

Galligan - for People - Direct                         657

apartment it happened in.  I asked what apartment

Willie lived in.  She pointed to an apartment on

the right.  I asked her to give me a description

of Willie.  She wanted to know what was in it for

her.  I requested what do you mean what is in it

for you.  She said how much money can I get.  I

said if you cooperate and the information you give

me is good and truthful information I can give you

some money.  I don't know how much.  At that point

she said Willie is a male Hispanic.

Q    Hispanic?

A    Hispanic, speaks with a Spanish accent about thirty

years old.

Q    At that point was -- withdrawn.

Can you tell us to your own knowledge how many names

this woman has?

A    Yes.  That woman has at least five aliases.

Q    Can you tell us approximately how many arrests she

has?

A    Approximately ten arrests.

Q    And do you know, Detective, if they include arrests

for prostitution?

MR. SEGAL:  Objection.

Q    Possession of a deadly weapon and drugs?

Galligan - for People - Direct                    658

1

2        MR. SEGAL:  Objection.

3        THE COURT:  Sustained, sustained.

4        MS. FREUND:  Note my exception, your Honor.

5        Q    Did she give you an address of where she was living

6    at the time?

7        A    Yes.  She gave me the address around the corner on

8    Marmian Avenue.

9        Q    Did you check out that address later on?

10       A    Yes.

11       Q    Was that bogus?

12       A    Yes, it was.  The apartment she had given me it does

13   not exist.  It is apartment 18 and the apartments go in

14   alphabet order.

15       Q    And, Detective, as far as the other information that

16   she gave you did that appear to be bogus?

17       A    Yes, it did.

18       Q    Detective, during the investigation you were looking

19   for a particular car or particular description?

20       A    Yes.  That is correct.

21       Q    What other information did you have about that car?

22       A    We had information the car was stolen.

23       Q    Were you present, Detective when Detective Newbert

24   was at the crime scene along with the crime scene unit?

25       A    Yes, I was.

Galligan - for People - Cross                    662

A    Did not.

Q    You just said you did.  Are you sure you did or didn't you?

             THE COURT:  Come on up.  Don't answer.

             (Discussion held off the record at the bench between the Court, Ms. Freund and Mr. Segal.)

Q    Is it correct you did not testify at the Grand Jury?

A    That is correct.

Q    Okay.  You said that you have been a police officer for how many years?

A    Sixteen and a half years.

Q    And how long have you been in the Bronx as of June of '84?  How long have you been in the Bronx Sex Crimes?

A    I came in November of '83.

Q    That would be eight months?

A    That would be about correct.

Q    As of that date?

A    That is correct.

Q    You said, Detective Newbert had been assigned to this case; is that correct?

A    That is correct.

Q    And you said you were present with Detective Newbert up at that location 861 Crotona Park; is that correct?

A    That is correct.

Galligan – for People – Cross                  663

2  Q      And that you and Detective Newbert had a conversa-

3  tion with a female; is that correct?

4  A      That is correct.

5  Q      Was this a Black female, White female, Spanish

6  female?

7  A      Hispanic.

8  Q      A Hispanic woman; is that correct?

9  A      Yes, sir.

10 Q      This Hispanic female did you get her name?

11 A      Yes, sir.

12 Q      What name did she give you, sir?

13 A      I don't recall.

14 Q      You do have notes; don't you, sir?

15 A      I believe there's notes here.

16 Q      Would you look at it, please.

17        MS. FREUND:  You have the notes.

18 Q      Give the name, do you have the name?

19        MS. FREUND:  They were turned over to defense

20 counsel.

21        THE COURT:  All right.

22        Do you have anything in your possession which

23 might refresh your recollection as to the name that

24 this woman gave you on June 23, 1984, in the after-

25 noon when you interviewed her with Detective Newbert?

Galligan - for People - Cross                    654

THE WITNESS:  I believe they're in the folder,
your Honor.

THE COURT:  Okay.  Take a look.

MS. FREUND:  Your Honor, may we approach?

THE COURT:  All right.

(Discussion held off the record at the bench
between the Court, Ms. Freund and Mr. Segal.)

MR. SEGAL:  May we mark this for Identification.

THE COURT:  Right.  Defendant's B for Identifi-
cation.

(Copy of a yellow piece of paper marked Defen-
dant's Exhibit B for Identification.)

COURT OFFICER:  Exhibit is marked Defendant's
B for Identification.

Q    I show you Defendant's B for Identification.  I ask
you to look at it.  Does that refresh your recollection in any
way?

A    Yes, it does.

Q    Is that your handwriting on it?

A    No, it is not my handwriting.

Q    At this point after looking at that piece of paper
does it refresh your recollection as to the name the woman
gave to you, Detective Galligan?

A    Yes, sir.

Galligan - for People - Cross                665

1

2      Q      And what name did she give to you without looking.

3  Put the paper down.  Just to refresh your recollection.  Do

4  you remember the woman's name?

5      A      Deborah Chambrin or Chamberlin.

6      Q      I assume when you were there you came with a memo

7  book or a pad; is that correct?

8      A      Yes.  That's correct.

9      Q      As a detective you do carry a spiral pad; is that

10 correct?

11     A      I carry some type of pad.

12     Q      That is used to take notes and memorandum; is that

13 correct?

14     A      Yes.

15     Q      Especially at a crime scene where everyone makes an

16 investigation?

17     A      That's correct.

18     Q      On this day, June 23rd of 1984 you came with this

19 book to that location; is that right?

20     A      That's correct.

21     Q      And is it fair to say when you spoke to this woman

22 by the name of Deborah?

23     A      That's correct.

24     Q      You spoke to Deborah you were writing down the

25 information she gave to you; is that correct?

Galligan - for People - Cross

666

A.    Yes, sir.

Q.    Is it fair to say that you continued to write as you talked to her?

A.    Not all the time, no.

Q.    You took down information from the woman?

A.    I took down some information.  Correct.

Q.    Do you have that book with you today those notes that you took from this woman?

A.    No, sir.  I do not.

Q.    Do you have them available to you?

A.    They were given to Detective Newbert.

Q.    Is that the file that you were looking through, the blue one that contains all the notes and memorandum concerning this case?

A.    That's correct.

Q.    Detective Newbert was the detective assigned to this matter; is that right?

A.    That's correct.

Q.    And in your assisting her after you have done whatever paperwork you have to do you turned those notes and memorandum over to Detective Newbert; is that correct?

A.    Yes.

Q.    As well if you were doing an investigation of the officers would turn them over to you; is that correct?

Galligan - for People - Cross                    667

A     That's correct.

Q     Would you look at her file which is the case file
and pull out those notes that you gave to her?

        THE COURT:   Regarding this conversation.

Q     Regarding this conversation.

A     Yes.

        THE COURT:   While the officer is looking, come
on up.

        (Discussion held off the record at the bench
between the Court, Ms. Freund and Mr. Segal.)

        THE WITNESS:   I do not see the notes in here.

Q     Excuse me, sir.

A     I do not see the notes in here.

Q     Okay.  This was shown to you earlier which is
Defendant's Exhibit A for Identification.  I ask you to look
at that, sir.  Have you ever seen that before today?

A     Yes, I have.

Q     And where did you see it before today?

A     In the case folder.

Q     In that blue case folder?

A     That's correct.

Q     You have one of those?  You have the original in
your case folder; is that correct?

A     I should have.

Galligan - for People - Cross

668

Q    That report was not prepared by you; is that correct?

A    That's correct.

Q    That is, that was prepared by Detective Newbert; is that correct?

A    That's correct.

Q    After that report was prepared did you review it?

A    No, I did not.

Q    Is any of the information in that report taken from you; yes or no?

A    Yes, sir.

Q    You testified just a few moments ago that you interviewed this female; is that right?

A    That's correct.

Q    And you took her name.  Did you get a date of birth from her, sir?

A    Yes, I did.

Q    Did you ask her for any identification when you spoke to her?

          MS. FREUND:  Objection.

          THE COURT:  Overruled.

A    No, sir.

Q    This woman had given you information that corroborated let's say or giving you information that was the same as

Galligan - for People - Cross                    669

V███████ J█████ had given you; is that correct?

MS. FREUND:  Objection.

THE COURT:  Sustained as to form.

Q    This woman said to you that you asked this woman
about a fellow by the name of Willie; is that correct?

A    That's correct.

Q    You were asking people in the neighborhood about
that; is that correct?

A    Yes, sir.

Q    This woman said to you an individual by the name of
Willie --

A    Yes.

Q    V█████ J█████ said the individual who had assaulted
her and raped her and sodomized her also was named by the name
of Willie; is that correct?

A    Yes, sir.

Q    She had also told you, V█████ J█████ that the man
who did this to her was driving a Grand Prix; is that correct?

A    Yes.

Q    Blue and white, whatever?

A    Yes, sir.

Q    This woman you spoke to also gave you the same
information; is that correct, that Willie had a blue and white
Grand Prix?

Galligan - for People - Cross                    670

1

2    A.    I asked her if she knew a Willie.

3    Q.    And said?

4    A.    She said yes.

5    Q.    And then what?

6    A.    I said does he drive a Grand Prix?

7    Q.    And her answer to you was what?

8    A.    Yes.

9    Q.    So far that matched up with what V████ J████

10   said; is that correct?

11   A.    That is correct.

12   Q.    Did you ask the woman where Willie lived?

13   A.    Yes, sir.

14   Q.    What was her response?

15   A.    She said Central Park North and --

16         THE COURT:    Central --

17   Q.    Central Park North?

18   A.    Yes.

19   Q.    Central Park North?

20   A.    Sorry, Crotona Park North.

21   Q.    We're in the Bronx.

22   A.    Crotona Park North.    861 Crotona Park North.

23   Q.    She said 861 Crotona Park North?

24   A.    Yes.

25   Q.    That also matches up with what V████ J████ said?

Galligan - for People - Cross                                    671

1

2      A      Yes.

3      Q      Did you ask the woman where this fellow Willie lived

4   in that building?

5      A      No, I did not ask her.  She told me.

6      Q      She told you he lived where?

7      A      On the third floor.

8      Q      And that is the floor where V████ J█████ had

9   been assaulted and raped; is that correct, sir?

10     A      That is correct.

11     Q      You also asked about the apartment that the man

12   lived in?

13     A      Yes.

14     Q      And she mentioned somewhere on the right?

15     A      She pointed to an apartment on the right.

16     Q      All of that that she had said matched what V█

17   J█████ said; is that correct?

18     A      That is correct, yes, sir.

19     Q      You said this woman appeared to you to be what you

20   characterized as a junkie; right?

21     A      Yes, sir.

22     Q      And you said she had track marks on her arm; right?

23     A      Arms.

24     Q      On her arms and she was nodding out?

25     A      Yes.

Galligan - for People - Cross                     572

1

2          Q     And, have you ever interviewed witnesses like that

3    before?

4          A     Yes.

5          Q     There have been times, is it fair to say those

6    witnesses gave you good information and there's times when

7    witnesses like that gave you bad information; is that correct?

8          A     That's correct.

9          Q     You never know it until you check it out further;

10   is that correct?

11         A     That's correct.

12         Q     Now, you said that woman also said to you what is

13   in it for me; is that correct?

14         A     That's correct.

15         Q     That is not unusual for you as a detective to hear

16   from somebody in the street; is that correct?

17         A     That's correct.

18         Q     Many people come to you with information and say

19   what is in it for me, how much will I get, what are you going

20   to pay me, what are you going to do for me; is that correct?

21         A     That is correct.

22         Q     And many times in order to get information you as

23   a detective give money to people to help you solve cases; is

24   that correct?

25         A     That's correct.

Galligan - for People - Cross                    673

1

2          Q       It can't always be good police work. It comes from

3    information from the street?

4          A       That's correct.

5          Q       Which helps in good police work?

6          A       That's correct.

7          Q       When this woman said what is in it for her and how

8    much money can I give did that turn you off to her?

9          A       No, it did not turn me off to her.

10         Q       You also said that — withdraw that.

11                 Did you go into 861 Crotona Park North?

12         A       Yes.

13         Q       And did you go through the floors in that building?

14         A       Yes, sir.

15         Q       And did you go further than the third floor?

16         A       Yes.

17         Q       Sorry. Did you stop at the third floor?

18         A       Went to the roof.

19         Q       And you looked in each apartment?

20         A       Yes.

21         Q       Did that appear to be a building that was a shooting

22   gallery?

23                 MS. FREUND:  Objection.

24                 THE COURT:  Overruled.

25         Q       Where people who used narcotics would go to use

Galligan - for People - Cross          574

2   narcotics?

3        A    Yes, sir.

4        Q    Is that correct, it was a shooting gallery?

5        A    Yes, sir.

6        Q    Is that correct what a shooting gallery is?

7        A    Yes, sir.

8        Q    The building appeared to be that; am I right, sir?

9        A    Yes, sir.

10        Q    It also appeared to be a place people stayed in,

11   squatters; is that correct, sir?

12        A    That's correct.

13        Q    You also say that you took -- did you take an

14   address from this woman?

15        A    Yes.

16        Q    What address did the woman give you?

17        A    There was a Marmian Avenue address.  I don't remember

18   the address.

19        Q    And she also gave you an apartment number?

20        A    Yes.

21        Q    Did you inquire about a phone number?

22        A    Yes.

23        Q    And the woman told you what?

24        A    She did not have a phone.

25        Q    Did you feel that this woman at that time -- I'll

Galligan - for People - Cross                    675

withdraw that.  You said you had been a detective for sixteen
years?

A     I have been with the Police Department for sixteen
and a half years.

Q     And a detective for how long?

A     Three years.

Q     And this woman's information to you at that time
was the first lead that you had on this case; is that correct?

A     Possible lead.

Q     A strong lead; is that right?

A     Not based on the description.

Q     Forget the description.  The woman gave you infor-
mation that matched V██████ J██████s; is that right?

A     The woman corroborated the statements I had told
her is what she did.

Q     She corroborated what V██████ J██████ said also; did
she not?

A     Yes.

Q     You said the woman told you this manWillie was a
male Hispanic individual thirty years old?

A     With Spanish accent.

Q     You wrote that down; didn't you?

A     Yes.

Q     Would you look through all the notes that you have,

Galligan - for People - Cross                                    676

even the notes of Detective Newbert or Hartfield or any of the

detectives who did work here and could you show me where it

is written down that this woman gave you a description of

Willie as male Hispanic, thirty years old?  Would you please

look to try to refresh your recollection?

A       When I was looking through my other notes it wasn't

there.

Q       Nothing is there in those notes?

A       Only thing is there in the notes is a copy of the

DD5 you gave me.

Q       And the DD5, this DD5, that paragraph in that DD5

is the information that you say you took from the woman; is

that right?

A       That's correct.

Q       Part of the information was a description of the

man; right?

A       The description was his age, Spanish.

Q       Did you write it down?

A       I wrote it down at the time.

Q       Did you write that; correct?

A       Yes.

Q       Detective Newbert didn't put it down in here; did

she?

A       No, sir.

Galligan - for People - Cross

Q    Did she put it down anywhere else in any of her
other notes or memorandum?

MS. FREUND:  Objection.

THE COURT:  If he knows.

Q    If you know?

A    To my knowledge I have no knowledge of that.

Q    You have no knowledge of it.  You didn't see it
when you were going through your files; did you?

A    No.  I wasn't reading each file.

Q    You sit here today almost a year later and you have
no notes or memorandums with you concerning this investigation?
Is that correct?

A    That's correct.

Q    And you're able to remember that this woman said to
you that this individual Willie was a Hispanic; is that correct?

A    That's correct.

Q    With a Spanish accent?

A    Yes.

Q    And he was thirty years old?

A    Approximately.

Q    You remember that; correct?

A    That's correct.

Q    That was important was it not?

A    Sure it was important.

Galligan — for People — Cross                                   678

Q      It is nowhere in the notes; is it?

A      She had said —

Q      Is it?

A      Nowhere in the notes now.

Q      By the way, after Detective Newbert completed this
complaint followup report did you review it, sir?

        MS. FREUND:  Objection, asked and answered.

        THE COURT:  Once more.   Refer to it document
not in evidence.

Q      Defendant's Exhibit A for Identification.

A      After she prepared it no I didn't.

Q      Didn't look at it?

A      No, sir.

Q      By the way, did you speak to Detective Newbert
yesterday?

A      Yes.

Q      Speak to her day before?

        MS. FREUND:  Objection.

        THE COURT:  Overruled.

A      I don't believe so.

Q      You hadn't spoken to her since Monday or Tuesday or
what?

A      Since sometime last week, probably.

Q      And do you work  out of the same office with her?

Galligan - for People - Cross

679

     A.    Same office, right.

     Q.    You didn't see her yesterday; did you?

     A.    No, sir.

     Q.    Or the day before; is that correct?

     A.    I don't believe so.

     Q.    By the way you say that car, the Grand Prix was stolen?

     A.    Yes, sir.

     Q.    Where did you get that information from?

     A.    From V█████

     Q.    V█████ told you the car was stolen?

     A.    She said Willie had told her.

     Q.    Willie had told her the car was stolen. Did she give you a license plate number?

     A.    She didn't have a license plate number.

     Q.    But you went around looking for a blue and white Grand Prix; is that correct?

     A.    That's correct.

     Q.    Did you ever locate a blue and white Grand Prix with a license plate number 717RDS?

     A.    I don't recall the license plate number. We did observe a car in the area.

     Q.    In that area?

     A.    That's correct.

Galligan - for People - Cross

680

2    Q    Did you ever go up to the bodega?

3    A    What bodega?

4    Q    Where Miss Gonzalez works?

5    A    Yes.

6    Q    Did you ever look around there to see if you could

7    find any blue and white Grand Prixs?

8    A    Yes, sir.

9    Q    And did you?

10   A    No, sir.

11   Q    Do you know an individual, have you ever heard the

12   name of an individual named Robert Lee Dwight?

13   A    What was the name?

14   Q    Robert Lee Dwight.

15   A    No, sir.  Doesn't sound familiar.

16   Q    Excuse me, sir.

17   A    Doesn't sound familiar.

18   Q    Do you know where this bodega was where Miss

19   Gonzalez worked, the address?

20   A    Yes.

21   Q    Where is it?

22   A    Corner of 180th Street and Third Avenue.

23   Q    Do you know where 201 Washington Avenue is?

24   A    No.

25   Q    Do you know if that is within a block or two of

Galligan - for People - Cross                                          581

1    the bodega?

3        A    Washington is -- I don't know the address.

4        Q    You don't know the address.  You never heard the

5   name of Robert Lee Dwight; is that right?

6        A    No, sir.

7        Q    Did ▮▮▮▮▮▮▮ ever once mention the name of

8   Robert Lee Dwight to you?

9            MS. FREUND:  Objection. Ask to approach.

10           THE COURT:  Overruled.  Yes or no.

11       Q    Yes or no.

12       A    No, sir.

13       Q    You don't remember anything about a New Jersey plate

14   717RDS; is that correct?

15       A    No, sir.

16       Q    After this you say the information this woman gave

17   the address of this woman gave you was not a good address; is

18   that right?

19       A    The address was a good address.  The apartment was

20   no good.

21       Q    When did you go back to that address, sir?

22       A    I believe it was the following day during a conver-

23   sation.

24       Q    That was the 25th?

25            THE COURT:  24th.

Galligan - for People - Cross                    682

A       24th I believe it was.

Q       You went back on the 24th.  Okay.  You went back looking for this woman; is that correct?

A       Yes, sir.  Because she was supposed to come in and look at photographs.  She never showed up.

Q       This woman when you went back on that day, sir, when you went back on that date did you canvas the area to see if you could find the woman?

A       Yes.

Q       And where did you go?

A       Around four, five blocks, of the area.

Q       And were you able to find her?

A       No, sir.

Q       Did you go back on the 25th, 26th or 27th?

A       No, sir.

Q       You stopped after the 24th; is that correct?

A       24th I believe it was.

Q       You made no further efforts to locate this woman; is that correct, sir?

A       That's correct.

Q       To this day is it fair to say you made no further efforts to contact this woman or locate her?

A       That's correct.

Q       Have you ever gone back to that address, Marmian

Galligan – for People – Cross

683

1  Avenue?

2  A     No, sir.

3  Q     Did you go back on the 24th?

4  A     Yes, sir.  I did.

5  Q     Did you go to the apartment?

6  A     No apartment 18.

7  Q     You say there's no apartment 18 there?

8  A     That's correct.

9  Q     And did you check with the superintendent of the
10 building?

11 A     I checked with the residents of the building.

12 Q     Did you check with the superintendent?

13 A     No one knew who the superintendent was, sir.

14 Q     You have an address of a building; is that correct,
15 sir.

16 A     That's correct.

17 Q     I do assume you check who the landlord was?

18       MS. FREUND:  Objection.

19       THE COURT:  Overruled.

20 A  No, sir.  I did not.

21 Q     Did you check in any way to see the rent rolls in
22 that building?

23 A     No, sir.  I did not.

24 Q     Did you check to see if there was a superintendent

Galligan - for People - Cross

684

of the building?

A    I checked through the people in the building.

Q    Did you check to see if there was a superintendant in the building?

THE COURT:  Asked and answered.

Q    You checked with the people in the building you're saying?

A    Yes.

Q    How big  a building is that?

A    Five story building.

Q    How many tenants on the floor?

A    I don't recall.

Q    It is not a building where squatters live; am I correct?

A    Not at that time.

Q    It was a regular multiple dwelling in the City of New York?

A    That's correct.

Q    You mean you were unable to find out who the superintendant was?

THE COURT:  Asked and answered several times now.

MR. SEGAL:  Okay, Judge.

Q    You were present you say at the location where

Galligan — for People — Cross

685

1
2  Detective Newbert recovered that cigarette box?

3      A.   That's correct.

4      Q.   And that was done on the 23rd of June?

5      A.   23rd, sir.  Yes.

6      Q.   After that box was recovered Willie — withdraw

7  that.

8           How long did you stay at that location 861 on that

9  day?

10     A.   Between an hour and two hours.

11     Q.   An hour and two hours and oh, yeah, by the way,

12  when that woman, when you finished talking to the woman did

13  you do anything else concerning her after you finished talking

14  to her?  Did you — I'll withdraw that.

15          Did you get a description of that woman?

16     A.   Did I know a description?  I didn't write a descrip-

17  tion down.

18     Q.   What description of her was it.  What did she look

19  like?

20     A.   Female Hispanic, mid-twenties about one hundred

21  sixty pounds, about five foot four.

22     Q.   And she was with other people at the time you spoke

23  to her; is that correct?

24     A.   That's correct.

25     Q.   Did you ever get the other people's names?

Galligan - for People - Cross

586

A    I didn't speak to the other people.

Q    Did anybody in your group speak to the other people?

A    Detective Newbert did.

Q    Do you know if any of those names were written down?

A    I don't know that.

Q    Those individuals were you able to locate them the next day?

A    No, sir.

Q    Imagine you remembered what they looked like or not?

A    Vaguely.

Q    Vaguely. Only saw them a day before the 23rd; is that correct?

A    23rd is the first time I saw them.

Q    You spent time with those individuals?

A    One of the individuals.

Q    One of the individuals and other ones were in a group; is that correct?

A    That's correct.

        THE COURT: I don't see the relevance with this case?

        MR. SEGAL: I am --

Q    After you spoke with those, with this individual -- I withdraw that.

        One other question. Are you familiar with the

Galligan - for People - Cross                          587

2    address    2041 Washington Avenue?

3            MS. FREUND:  Asked and answered.

4            MR. SEGAL:  I didn't ask about 2041.

5            THE COURT:  One more time.  Are you familiar

6        with that address?

7            THE WITNESS:  No, sir.

8            MR. SEGAL:  No further questions.

9    REDIRECT EXAMINATION

10   BY MS. FREUND:

11       Q    Detective Galligan, did you ever testify in this

12   courtroom about this case last week?

13       A    Yes.

14       Q    Is that why you got confused?

15       A    With the Grand Jury, yes, ma'am.

16       Q    When -- Detective when you make notes are those

17   notes transcribed by you or by someone else onto a police

18   report?

19       A    It depends on the case.  If it is my case I trans-

20   cribe them.  Somebody else's case I give it to them.  They

21   transcribe it.

22       Q    Depends if it be, a piece of paper does that reflect

23   a BCI, Bureau of Criminal Investigation check on that woman?

24       A    Yes, it does.

25       Q    Can you please tell us about her arrests?  How

Galligan - for People - Redirect                    688

many arrests she had.

MR. SEGAL:  Objection.

THE COURT:  Sustained.  That is still for Identification.

Q     Would it be fair to say, Detective, when you spoke to this woman she regurgitated the information --

MR. SEGAL:  Objection.

THE COURT:  Sustained as to the word regurgitates.

Q     You gave her a name Willie.  You said do you know a guy Willie and she said back to you yes I know a guy Willie?

A     That's correct.

Q     And you gave her a location and she gave back the same location?

A     That's correct.

Q     Would it be fair to say she was repeating what you were saying?

A     That's correct.

Q     After you spoke with her and received this description from her did you eliminate that information in the investigation of this case?

A     Yes, I did.

Q     Detective during the investigation when you did canvas for cars you saw cars and were they then eliminated

Galligan - for People - Redirect                    689

from the investigation?

    A    They were.

    Q    The defense attorney asked you if last time you looked for this woman was on the 24th. I believe that you said that that was the last time?

    A    I believe it was.

    Q    Is that because this defendant became the target on the 25th?

            MR. SEGAL:  Objection.

            THE COURT:  Sustained.

    Q    Detective, do you have information that that same woman whatever her name is testified falsely at a Supreme Court trial in this building?

            MR. SEGAL:  Objection.

    Q    Was this woman known to your department prior to this case?

            MR. SEGAL:  Objection.

    A    Yes.

            THE COURT:  Wait awhile.

            (Whereupon, the following proceeding takes place in the Court's robing room outside the presence of the jury.  Present is the Court, Ms. Freund and Mr. Segal.)

            THE COURT:  What do you want to establish?

# EXHIBIT S

Newbert - for People - Cross

598

Q     And is that where Mr. Newton lives?

A     Yes, he does.

       THE COURT:  Keep your voice up.

       THE WITNESS:  Yes.

Q     Did you go there with a number of officers?

A     Yes, I did.

Q     Did you ask Mr. Newton to come down for a lineup?

A     Yes, I did.

Q     And did Mr. Newton go with you?

A     Yes, he did.

Q     Did you see something in Mr. Newton's apartment?
Did you take something from his apartment?

A     No, I didn't.

Q     Did somebody take sneakers from Mr. Newton?

A     Yes, we did.

Q     And those sneakers were vouchered?

A     Yes, they were.

Q     And was any tests done on those sneakers?

A     I had requested a test, but the test was never done.
The description of the sneakers were not even -- the color.

Q     The sneakers were siezed; is that correct?

A     Yes.

Q     The sneakers are itself in your custody or Police
Department custody; is that correct?  Am I correct?

Newbert - for People - Cross                599

1

2       A    Yes.

3       Q    They're there?

4       A    Yes.

5       Q    No tests were going to be done on these sneakers;

6  am I correct?

7       A    I had requested one and one was never done.

8       Q    What was the test you requested?

9       A    For possible blood samples.

10      Q    And also the reason for that was because of conver-

11  sations had with the complaining witness; is that correct?

12      A    Yes.

13           THE COURT:  Why weren't the tests done, Detec-

14      tive?

15           THE WITNESS:  I don't know.  I asked.

16           THE COURT:  You requested tests be done and no

17      tests were done.

18           THE WITNESS:  Yes.  I asked if they could be

19      done.

20      Q    At the time you went to Mr. Newton's apartment you

21  had a description of the clothing that the man was wearing?

22  Is that correct?

23      A    Yes.

24      Q    The perpetrator; isn't that right?

25      A    Yes.

# EXHIBIT T

Newbert - for People - Cross                    580

Q      It did; am I correct?

A      Many Willies, Williams, William first name, Williams, William last name.  There are three supposedly in that building

Q      The first time that you had some contact with this case was what time on June 23rd that you received it?

A      Nine o'clock in the morning when I came into work, when I signed in.

Q      And the first time you spoke with Miss ████████ was when?

A      12:30.

Q      That was at Jacobi Hospital, the emergency room?

A      Correct.  No, it wasn't the emergency room.

          THE COURT:  That was the foyer outside the operating room?

          THE WITNESS:  Right.

Q      Okay and you had an interview with her; is that correct?

A      Yes.

Q      She -- you also said she gave you a description of the person who had committed this crime?

A      Yes.

Q      And did you write that description down?

A      Yes, I did.

Q      And what kind of a description was it?

Newbert - for People - Cross                581

A.    She told me he was approximately five foot nine.
She said at first my height. I'm five-four.

Q.    And then she changed to five-nine?

A.    Yes, uh-huh.

Q.    Okay.

A.    She was also lying down. She was severely injured.

Q.    I didn't ask you that. I asked you what description
she gave you.

A.    Pulling a description from her.

Q.    Excuse me. I'm asking what the description is.

        MS. FREUND:  Let her answer it.

        MR. SEGAL:  She doesn't have to give gratuitous
statements to the jury.

        THE COURT:  When you're ready I will rule.
Try to be responsive.

        THE WITNESS:  She gave me a description of
the clothing. Do you want that description of the
clothing.

        THE COURT:  Just tell us to the best of your
recollection what she told you at that time and place.

        THE WITNESS:  She stated the corduroy pants,
beige, a white shirt with stripes on the side. She
told me he had short black hair, dark skinned and
she believed he was approximately one hundred eighty

# EXHIBIT U

Proceedings                                         515

North but the information she received was received
from fellow officers, Officer Galligan, Officer
O'Toole or who was the other officer, Officer
Hartfield.  I assume the District Attorney knows
what she is doing.

MS. FREUND:  Yes.

THE COURT:  I didn't interject and sustain
the objection.

MS. FREUND:  I have no problem with that infor-
mation coming out at this trial.

THE COURT:  There's complete reference to a
document not in evidence and both the witness and
defense counsel were reading from a document not
in evidence.  The witness testified to rankist
hearsay and I want the record to understand I under-
stood what was going on and deliberately refrained
from interjecting in the case.

MR. SEGAL:  Can I make a motion to dismiss
the indictment for prosecutorial misconduct on the
ground that this information about this fellow
Willie even though it was in the discovery that the
People turned over to me, the address of the woman,
her apartment and whatever was whited out so that
information wasn't available to me.  I would think

Proceedings

620

the information is exculpatory material. Her name,
address and where she lives and the information
should have been provided to the defense along with
that discovery material.

THE COURT: What did you get before this? What
information did you get before this?

MR. SEGAL: In what respect?

THE COURT: With respect to this woman did you
know there had been a woman who was interviewed that
gave information?

MR. SEGAL: I had the complaint followup.

THE COURT: You had the DD5. What didn't you
have.

MR. SEGAL: I didn't have the woman's name.

THE COURT: To this day nobody knows the woman's
name.

MS. FREUND: They have several names.

MR. SEGAL: They did a BCI check and address.

THE COURT: Did you ask any judge for it when
it was turned over to you?

MR. SEGAL: No I didn't because they had whited
it out and I assumed they didn't want to turn it over.

THE COURT: Did you go voluntary or involuntary?

MR. SEGAL: I went voluntary.

Proceedings

521

THE COURT: That is one of your problems. That is a matter that is resolved in a civil term of the Supreme Court in an ordinary breach of contract. If you had gone under the statute and made the motion the District Attorney should have very good cause for not disclosing that and I would give you that information. You asked the judge for it, you got the information timely. You didn't have all the information you wanted but you never asked any judge to direct the District Attorney to turn over that information. Had you done so I believe any judge in this building would have turned over that information unless there was some exceptional circumstance which justified being withheld.

MR. SEGAL: Judge, the fact is —

THE COURT: I don't consider that violation of Brady. They gave you the information except the name and address which you never followed up and asked that it be turned over.

MR. SEGAL: I believe the People are under a continuing obligation to turn that information over even though I don't demand it.

THE COURT: They did turn it over to you and told you there was a witness who said there was

Proceedings                                                    622

somebody named Willie that had a car matching the

description of the car described by the complaining

witness who lived in that building.  That information

you had.  If you wanted more specifics of it you

should have pursued it.

MR. SEGAL:  They were under an obligation to

give you that.  That is there obligation.  I don't

have to pursue it as defense.  I believe the People

are under that continuing obligation to provide that.

THE COURT:  You now have the name and you now

have the address that she gave.  We're at the trial.

I don't know of any case, including Brady and it's

progeny which was ever overturned where the infor-

mation was turned over during the course of the

trial.  Brady and Brady progeny involved situations

where after the trial was over counsel discovered

there was information that had not been timely turned

over.  We are now in trial.  It is now shortly before

twelve o'clock.  We will recess for the day and

tomorrow and I will give defense counsel the oppor-

tunity to pursue this matter.

MR. SEGAL:  I will.

THE COURT:  Now you have that information.  The

motion for mistrial is denied.  Anything else?