**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



------------------------------------------------------------X

ALAN NEWTON,

          **Plaintiff,**

  - against -

THE CITY OF NEW YORK, DISTRICT
ATTORNEYS MARIO MEROLA AND ROBERT T.
JOHNSON, INDIVIDUALLY, AND IN THEIR
OFFICIAL CAPACITY; ANDREA FREUND AND
VARIOUS JOHN/JANE DOES, INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITIES AS
EMPLOYEES OF THE CITY OF NEW YORK
WHO ARE/WERE ASSISTANT DISTRICT
ATTORNEYS WITHIN THE OFFICE OF THE
DISTRICT ATTORNEY, COUNTY OF BRONX;
DETECTIVE JOANNE NEWBERT, DETECTIVE
PHILLIP GALLIGAN, DETECTIVE [JOHN DOE]
HARTFIELD, DETECTIVE [JOHN DOE] RYAN,
DETECTIVE [JOHN DOE] HARRIS, POLLICE
OFFICER DOUGLAS LEHO, POLICE OFFICER
WILLIAM SEAN O'TOOLE, LIEUTENANT
MICHAEL SHEEHAN, SERGEANT PATRICK J.
McGUIRE, POLICE OFFICER [JOHN DOE]
HASKINS, POLICE OFFICER [JANE DOE]
KIELY, INSPECTOR JACK J. TRABITZ AND
VARIOUS JOHN/JANE DOES, INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITIES AS
EMPLOYEES OF THE CITY OF NEW YORK
WHO ARE/WERE MEMBERS OF THE POLICE
DEPARTMENT OF THE CITY OF NEW YORK,

          **Defendants.**

------------------------------------------------------------X

**OPINION**
**AND ORDER**

**07 Civ. 6211 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Plaintiff Alan Newton was imprisoned for more than twenty-two years for a crime he did not commit.  He filed this action against the City of New York and certain of its officers and employees alleging violations of his civil rights as a result of defendants' investigation, prosecution, and subsequent failure to examine exculpatory evidence.  Defendants now move to dismiss each and every claim in the Complaint.[1]  For the reasons stated herein, this motion is granted in part and denied in part.

## II.   BACKGROUND

### A.   Facts[2]

On June 22, 1984, the victim of the alleged crime, a twenty-five year-old woman, visited her mother on 158th Street in the Bronx.  She consumed approximately eight or nine glasses of "'Old English' beer,"[3] fell asleep, and woke around midnight.  She then walked to a friend's apartment on 169th Street, where she drank two more glasses of beer, and then proceeded to visit an acquaintance

---

[1]     *See infra* Part V.

[2]     The following factual allegations, taken from the Complaint ("Compl."), are accepted as true for purposes of this motion.

[3]     Compl. ¶ 43.  Presumably the Complaint is referring to *Olde English 800*, a brand of malt liquor produced by the Miller Brewing Company and best known for its distinctive forty-ounce bottle.

on 180th Street.[4]

The victim was approximately five feet tall and weighed about one hundred pounds.[5] In addition to the inebriating effects of ten to eleven glasses of beer, she had taken thirty milligrams of phenobarbital[6] and twenty milligrams of phenytoin,[7] two potent anticonvulsants, to control her epilepsy.[8] She had been warned not to consume alcohol while taking this medication because the combination can cause extreme drowsiness, motor impairment, lightheadedness,

---

[4]    *See id.*

[5]    A one-hundred-pound female who consumes ten glasses of beer over the course of six hours will have a blood alcohol content of approximately .385. *See Blood/Breath Alcohol Concentration (BAC) Calculator*, Wisconsin Department of Safety & Consumer Protection, available at http://www.dot.wisconsin.gov/safety/motorist/drunkdriving/calculator.htm. Every state has passed laws forbidding driving with a BAC in excess of .08. A BAC of .385 causes severe intoxication and can cause memory loss, loss of conscious control over mental and physical functioning, coma, and death.

[6]    Side effects of phenobarbital include dizziness and drowsiness. Combining alcohol with phenobarbital can exacerbate drowsiness. *See* U.S. Nat'l Library of Med. & National Inst. of Health, *MedLine Plus: Phenobarbital* (last updated June 26, 2008), available at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682007.html.

[7]    Side effects of phenytoin include drowsiness, mental confusion, and blurred or double vision. Alcohol can also exacerbate the drowsiness caused by phenytoin. *See id.: Phenytoin Oral* (last reviewed August 1, 2007), available at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682022.html.

[8]    *See* Compl. ¶¶ 44-45.

3

dizziness, and unsteadiness.[9]

At about 4:00 a.m. on June 23, she entered a bodega at Third Avenue and 180th Street intending to purchase more alcohol. The only person in the store was employee Aurea Gonzalez, who had been on duty for nine hours. Gonzalez observed the victim enter the store followed by a black male, whose face she saw for only a few seconds.[10] The man purchased a pack of cigarettes and the victim left shortly after he did.

Gonzalez testified that the man and the victim entered a blue and white two-door Pontiac Grand Prix that was parked outside the bodega with no sign of a struggle, but the victim testified that the man grabbed her from behind, held a razor to her throat, and forced her into the car. He drove her to a nearby park. She could not open the car door because the interior latch was missing.[11]

The man dragged the victim out of the car, threw her to the grass, sodomized and raped her, took her cigarettes and money, and began to walk away. She followed him, pleading for the return of her money; he returned the money and departed. But shortly after, the man returned, grabbed the victim from behind,

---

[9]     See id. ¶ 44.

[10]    See id. ¶ 46.

[11]    See id. ¶ 49.

dragged her into an abandoned building, raped her again, and cut her face and chest repeatedly with a box cutter.[12]  While cutting her, he stated, "I'll fix you so you don't identify me, you bitch."[13]  She was blinded in one eye from the attack.[14] She passed out briefly, but regained consciousness and contacted the police from a call box at 176th Street and Marmian Avenue.  The entire incident, from when she was forced into the car until when she called the police, took about forty-five minutes.[15]

Between 5:13 and 5:21 a.m., Officer Douglas Leho arrived at the call box and found the victim hysterical and bleeding profusely.  She described the assailant as "a male black approximately 27 years of age wearing a beige shirt, pants.  That is about it."[16]

She was taken to Jacobi Hospital, where a rape kit was performed.[17] It was given to the NYPD and assigned to serologist Detective Harris, who for

---

[12]     *See id.* ¶ 51.

[13]     *See id.* ¶ 69.

[14]     *See id.* ¶ 37.

[15]     *See id.* ¶ 51.

[16]     *See id.* ¶ 53.

[17]     A rape kit preserves blood, semen, and hairs collected from the victim's body.

5

unknown reasons did not determine the blood type of the assailant or otherwise study the material.[18] The victim went into surgery, though Detective Joanne Newbert was first able to speak with her briefly, and the victim told Newbert that the assailant was a man named "Willie."[19] The police also secured the victim's clothing, which had sneaker prints from the assailant.[20]

Newbert then proceeded to the call box and followed a trail of blood to the abandoned building, where she found a piece of a mirror and a pack of cigarettes on the third floor landing. The building was not sealed off and the detectives chose not to search for fingerprints because the walls were judged to be too filthy and because there were likely to be "'a slew'" of fingerprints from various people.[21] Plaintiff believes that the NYPD never searched or examined the area of the park where the first attack occurred.[22]

That afternoon, Detectives Phillip Galligan, Newbert, and Hartfield and Officer William Sean O'Toole canvassed the area around the park looking for witnesses. They located a woman, Ms. Chamberlain, who knew someone named

---

[18]   *See id.* ¶ 54.

[19]   *See id.* ¶¶ 55, 58.

[20]   *See id.* ¶ 91.

[21]   *Id.* ¶¶ 56-57 (quoting Detective Newbert).

[22]   *See id.* ¶ 57.

"Willie" who drove a blue and white Pontiac and lived on the third floor of the abandoned building. The police discounted this information, apparently because Chamberlain was a known drug addict who had provided the NYPD with a bogus name and address.[23]  Galligan had taken notes during the interview of Chamberlain, but the notes were never produced to plaintiff.[24]

Detective Galligan returned the next day (June 24) to search for Chamberlain, but was unsuccessful. Galligan ceased searching for Chamberlain after June 25  because by that time Newton had become the "target" of the NYPD investigation.[25]

The victim described her assailant to Newbert as 5'4", but then said he was 5'9" and was "large," weighing approximately 180 pounds.[26]  She said she did not know whether he had a light or dark complexion because it was dark out.[27]

On June 25, 1984, the victim was shown several hundred mug shots, from which she identified plaintiff Newton.[28]  Her description of the assailant then

---

[23]    *See id*. ¶ 58.

[24]    *See id*. ¶ 61.  Defendants alleged that the notes were lost. *See id.*

[25]    *See id*. ¶ 59.

[26]    *See id*. ¶ 64.

[27]    *See id*. ¶ 64.

[28]    *See id*. ¶ 66.

7

became consistent: She described him as a black male with short hair, a mustache, 5'7" to 5'8", and weighing 150 to 160 pounds.[29]

At a police line-up, the victim identified Newton only after each participant repeated the phrase, "I'll fix you so you don't identify me, you bitch." The police then set up a voice identification line-up, but it was performed while the victim could see the participants. After two attempts during which the victim said she could not hear Newton, she identified him as the assailant. He was then arrested.[30]

Newton's sneakers were seized so that they could be compared with the sneaker prints on the victim's clothing and tested for the victim's blood, but the results of these tests were never disclosed to Newton.[31] Newton's home was never searched for the clothing described by the victim or for any other clothing with blood stains on it.[32]

Newton had spent the night of June 22, 1984, including the early morning of June 23, with his girlfriend and her children. His girlfriend testified

---

[29]    *See id.* ¶ 67.

[30]    *See id.* ¶¶ 70-71.

[31]    *See id.* ¶ 91.

[32]    *See id.* ¶ 91.

that he did not leave the house until the next morning. The children were awake

until 2:00 a.m. and testified that Newton did not leave their home. Newton's

girlfriend's parents came to the home at about 3:00 a.m. and testified that Newton

answered the door. His girlfriend testified that he could not have left the house

without her knowledge because he would have awakened her, and he could not

have reentered because he had no key.[33] Neither the NYPD investigators nor

Assistant District Attorney ("ADA") Freund interviewed any of these alibi

witnesses.[34]

Shortly before Newton's trial, the victim informed Freund that she

was not "positive" that Newton was the assailant.[35] However, after a coaching

session with Freund and the Bronx County District Attorney's office, she became

convinced again that Newton was the perpetrator.[36]

Gonzalez also picked Newton out of a photo array and out of a line-

up. At a pretrial hearing on the propriety of the photo identifications, Gonzalez

was not able to identify Newton in court. However, Freund and the Bronx County

---

[33]   *See id.* ¶¶ 86-87.

[34]   *See id.* ¶ 89.

[35]   *See id.* ¶ 74.

[36]   *See id.* ¶ 76.

9

District Attorney's Office coached Gonzalez so that she was able to identify Newton at trial.

Newton was acquitted of the rape and sodomy charges that stemmed from the attack in the park, but was convicted of rape in the first degree, assault in the first degree, and robbery in the first degree in connection with the attack in the building.[37]  On May 31, 1985, he was sentenced to concurrent prison terms of eight and one-third to twenty-five years for the rape and robbery charges, and a consecutive term of five to fifteen years for the assault.[38]  Throughout his term of imprisonment, Newton insisted on his innocence.

The rape kit was entered into the NYPD Property Clerk's system on June 30, 1984, was assigned to storage bin 84B19041, and was given Precinct Voucher No. B744483.[39]  On August 16, 1994, Newton filed a pro se request for DNA testing of the kit and of testing of his sneakers and the victim's clothing. ADA John Carroll responded that the District Attorney's Office had intended to grant the request, but "the physical evidence was never returned to . . . the New

---

[37]    *See id.* ¶ 96.

[38]    *See id.* ¶ 97.

[39]    *See id.* ¶ 100.

10

York City Police Department Property Clerk's Office."[40]

Three years later, in connection with a *habeas corpus* petition filed in the Southern District of New York, Newton filed a discovery request for the rape kit and other physical evidence.[41] ADA Robert Moore informed the court that the rape kit and sneakers were missing, though the victim's clothing had been located.[42] Moore stated that a search had been performed, but this appears to have been false.[43]

On July 9, 1998, Newton's attorneys filed a new motion for DNA testing based on blood from the victim's clothing. ADA Rafael Curbelo responded that rape kits were not routinely preserved before 1988 and that the kit, clothing, and other evidence were likely destroyed.[44] One week later, Curbelo told Newton's attorney that the clothing had been located, but that a fire in 1995 had destroyed their records so they could not determine the location of the rape kit. Curbelo attached a letter from Sergeant Patrick J. McGuire that said the receipts

---

[40]     *See id.* ¶ 101.

[41]     *See id.* ¶ 103.

[42]     *See id.* ¶ 105.

[43]     *See id.* ¶ 106.

[44]     *See id.* ¶¶ 108-09.

11

were not present so the evidence must have been destroyed.[45] The victim's clothing was tested, but experts were unable to find a usable DNA sample.[46]

In June of 2002, Newton filed a pro se request under the New York Freedom of Information Law for the rape kit with the Office of the County Medical Examiner ("OCME"). The request was denied because the Freedom of Information Law does not extend to the OCME. Similar requests to the NYPD and the Bronx County District Attorney's Office proved futile.[47]

In 2005, Newton convinced the Innocence Project to assist him. Attorney Vanessa Potkin contacted ADA Elisa Koenderman and asked her to search for the rape kit. Koenderman requested a physical examination of storage bin no. 84B19041. In November of 2005, an officer looked in this storage bin and located the rape kit.[48] It was submitted to the OCME, which conclusively determined that Newton was not the perpetrator. On July 6, 2006, Newton's conviction was vacated and the indictment was dismissed.[49]

**B.**    **Claims**

---

[45]    *See id.* ¶ 110.

[46]    *See id.* ¶ 112.

[47]    *See id.* ¶ 113.

[48]    *See id.* ¶¶ 118-119.

[49]    *See id.* ¶ 35.

Newton brings the following claims:

- Against defendants Newbert, Galligan, Hartfield, Detective Ryan, Leho, O'Toole, and various unknown officers (the "Officer Defendants") for conducting unduly suggestive identification procedures in intentional or reckless disregard for his constitutional right to a fair trial and for his right not to be deprived of liberty without due process of law in violation of section 1983 of title 42 of the United States Code (claim one).[50]

- Against the Officer Defendants for false arrest under state law (claim eleven).[51]

- Against the Officer Defendants, Harris, District Attorney Mario Merola, Freund, and unknown ADAs for malicious prosecution under state law (claim twelve).[52]

- Against the Officer Defendants and Harris for failing to investigate the crime properly and for deliberately suppressing exculpatory evidence in violation of section 1983 (claim three).[53]

- Against the Officer Defendants, Harris, Lieutenant Michael Sheehan, McGuire, Officer Haskins, Officer Kiely, Inspector Jack J. Trabitz, Merola, District Attorney Robert T. Johnson, Freund, and unknown ADAs for violating section 1983 by failing to preserve critical evidence in reckless disregard for Newton's constitutional rights (claim four).[54]

---

[50]    *See id.* ¶¶ 125-132.

[51]    *See id.* ¶¶ 234-244.  Newton also alleged violations of section 1983 for false arrest, but voluntarily dismissed those claims.  *See id.* ¶¶ 134-146; Pl. Mem. at 21.

[52]    *See* Compl. ¶¶ 244-252.

[53]    *See id..* ¶¶ 147-153.

[54]    *See id.* ¶¶ 154-163.

- Against the Officer Defendants, Harris, Sheehan, Merola, Freund, and unknown ADAs for abuse of process in violation of state law (claim thirteen).[55]

- Against the Officer Defendants, Harris, Sheehan, McGuire, Haskins, Kiely, Trabitz, Merola, Johnson, Freund, and unknown ADAs for negligent loss of evidence in violation of state law (claim fourteen).[56]

- Against Freund and unknown ADAs for violating section 1983 by failing to pursue exculpatory evidence and by manufacturing evidence against him (claim five).[57]

- Against defendants Sheehan, Trabitz, Merola, and Johnson for violating section 1983 and state law by failing to train the officers and ADAs sufficiently (claims six and seven)[58] and against these defendants and others unknown for negligent supervision (claim fifteen).[59]

- Against the Officer Defendants, Harris, Sheehan, McGuire, Haskins, Kiely, Trabitz, Merola, Johnson, Freund, and unknown ADAs for conspiring to violate his civil rights in violation of section 1983 (claim eight)[60] and for intentional infliction of emotional distress in violation of state law (claim sixteen).[61]

---

[55]    *See id.* ¶¶ 253-262.

[56]    *See id.* ¶¶ 263-272.

[57]    *See id.* ¶¶ 164-175.

[58]    *See id.* ¶¶ 176-212.

[59]    *See id.* ¶¶ 273-289.

[60]    *See id.* ¶¶ 213-219.

[61]    *See id.* ¶¶ 290-299.  While the Complaint alleges that these defendants inflicted emotional distress on plaintiff "knowingly, recklessly or

- Against the Officer Defendants, Harris, Merola, Johnson, Freund, and unknown ADAs for violation of his rights under the New York State Constitution (claim nineteen).[62]

- Against the City of New York for the enforcement of a policy or custom that deprived him of his constitutional rights in violation of section 1983 (claim nine),[63] for breach of a "special relationship" in violation of state law (claim seventeen),[64] and for violation of the New York State Constitution (claim eighteen).[65]

## III.  APPLICABLE LAW

### A.    Standard of Review

A Rule 12(c) motion is governed by the same pleading standard as a

---

negligently," *id.* ¶ 292, plaintiff's Memorandum of Law addresses this claim only in the context of intentional infliction of emotional distress. *See* Pl. Mem. at 18.  I therefore do not consider plaintiff's negligence claim in this context.  I express no opinion at this time as to whether plaintiff's damages for emotional distress would be compensable in the context of his other negligence claims.

[62]    *See* Compl. ¶¶ 317-337.

[63]    *See id.* ¶¶ 220-228.

[64]    *See id.* ¶¶ 300-307.

[65]    *See id.* ¶¶ 308-316.  Newton originally pled a demand for punitive damages as two causes of action (claims ten and twenty). *See id.* ¶¶ 229-233, 338-342.  He dropped cause of action twenty because he concedes that punitive damages cannot stand alone as a cause of action, though he continues to demand punitive damages stemming from defendants' actions. *See* Pl. Mem. at 19-20.  For the same reason, I hereby dismiss count ten.  Newton had also requested an injunction preventing the City and DA Johnson from destroying relevant evidence (claim twenty-one), but has dropped this cause of action. *See* Pl. Mem. at 20.

Rule 12(b)(6) motion.[66]  "Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a

short and plain statement of the claim showing that the pleader is entitled to

relief.'"[67]  When deciding a defendant's motion to dismiss under Rule 12(b)(6),

courts must "accept as true all of the factual allegations contained in the

complaint"[68] and "draw all reasonable inferences in plaintiff's favor."[69]  Likewise,

when deciding a motion for judgment on the pleadings, a court "must accept all

allegations in the complaint as true and draw all inferences in the non-moving

party's favor."[70]

　　　　Nevertheless, to survive a Rule 12(b)(6) motion to dismiss, the

allegations in the complaint must meet the standard of "plausibility."[71]  Although

---

[66]　　*See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006)
(citing *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)).

[67]　　*Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007)
(quoting Fed. R. Civ. P. 8(a)(2)).

[68]　　*Bell Atl. Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007).

[69]　　*Ofori-Tenkorang v. American Int'l Group*, 460 F.3d 296, 298
(2d Cir. 2006).

[70]　　*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126
(2d Cir. 2001) (citing *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d
Cir. 1998)).

[71]　　*Bell Atl.*, 127 S. Ct. at 1970.

the complaint need not provide "detailed factual allegations,"[72] it must "amplify a

claim with some factual allegations . . . to render the claim *plausible*."[73]  The test is

no longer whether there is "'no set of facts [that plaintiff could prove] which

would entitle him to relief.'"[74]  Rather, the complaint must provide "the grounds

upon which [the plaintiff's] claim rests through factual allegations sufficient 'to

raise a right to relief above the speculative level.'"[75]

        Although this Court must take the plaintiff's allegations as true, "the

claim may still fail as a matter of law . . . if the claim is not legally feasible."[76]  In

addition, "bald assertions and conclusions of law will not suffice."[77]

---

[72]    *Id*. at 1964.  *See also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d
87, 98 n.2 (2d Cir. 2007) (applying the standard of plausibility outside *Bell
Atlantic*'s anti-trust context) .

[73]    *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (holding that the
plaintiff's complaint adequately alleged the personal involvement of the Attorney
General because it was plausible that officials of the Department of Justice would
be aware of policies concerning individuals arrested after the events of September
11, 2001).

[74]    *Bell Atl.*, 127 S. Ct. at 1968 (quoting *Conley v. Gibson*, 355 U.S. 41,
45-46 (1957)).

[75]    *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Bell Atl.*, 127 S. Ct. at
1965).

[76]    *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006).

[77]    *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atl. Corp.*, 309 F.3d
71, 74 (2d Cir. 2002) (quotation omitted).

Courts may consider documents appended to a defendant's motion to dismiss. A court will usually only do so, however, when the document is undisputedly authentic and when it is central to plaintiff's claims.[78] The Second Circuit has noted that "generally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered."[79] A "plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion . . . ."[80] "Consideration of extraneous material in judging the sufficiency of a complaint is at odds with the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2)" and "risks depriving the parties of a fair adjudication of the claims by examining an incomplete record."[81]

**B.    Section 1983**

---

[78]    *See Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) ("'In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint.'") (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)).

[79]    *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

[80]    *Id.* (citing *Cortec*, 949 F.2d at 47-48).

[81]    *Id.* at 154-55.

18

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[82]  In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[83]

The statute of limitations for an action under section 1983 is three years.[84]  "Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983."[85]  In New York, "the doctrines of equitable estoppel and equitable tolling can prevent a defendant from pleading the statute of limitations as a defense where, by fraud, misrepresentation, or deception, he or she had induced the plaintiff to refrain from filing a timely

---

[82]    *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

[83]    *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004).

[84]    *See Patterson v. County of Oneida*, N.Y., 375 F.3d 206, 225 (2d Cir. 2004).

[85]    *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 2007) (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)).

action."[86]  "Equitable estoppel is applicable where the plaintiff knew of the existence of the cause of action, but the defendant's misconduct caused the plaintiff to delay in bringing suit.  Equitable tolling, on the other hand, is applicable where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action."[87]

## C.    Municipal Liability

The Supreme Court does not interpret section 1983 to impose unbridled liability on municipalities:  "[T]he language of [section] 1983, read against the background of the . . . legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."[88]  As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.  A municipality "may not be held liable on a theory of

---

[86]    *Kotlyarsky v. New York Post*, 757 N.Y.S.2d 703, 706 (Sup. Ct. Kings Co. 2003) (citing *Simcuski v. Saeli*, 44 N.Y.2d 442, 406 (2d Dep't 1978)) (other citations omitted).  *Accord Holmberg v. Armbrecht*, 327 U.S. 392, 396-97 (1946) (explaining that a statute of limitations will be tolled if material facts are concealed).

[87]    *Kotlyarsky*, 757 N.Y.S.2d at 707 (citations omitted).

[88]    *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

respondeat superior."[89]  Moreover, courts apply "'rigorous standards of culpability

and causation'" to ensure that the municipality is not held liable solely for the

actions of its employees.[90]  Thus, in order for an individual deprived of a

constitutional right to have recourse against a municipality under section 1983, he

must show that he was harmed by a municipal "policy" or "custom."[91]  However, a

custom or policy cannot be shown by pointing to a single instance of

unconstitutional conduct by a mere employee of the State.[92]

        The Supreme Court has identified at least two situations that

constitute a municipal policy: (1) where there is an officially promulgated policy

as that term is generally understood (*i.e.*, a formal act by the municipality's

governing body),[93] and (2) where a single act is taken by a municipal employee

---

        [89]    *Jeffes v. Barnes*, 208 F.3d 49, 56 (2d Cir. 2000).  *Accord Monell*, 436
U.S. at 691.

        [90]    *Jeffes*, 208 F.3d at 61 (quoting *Board of County Comm'rs v. Brown*,
520 U.S. 397, 405 (1997)).

        [91]    *Monell*, 436 U.S. at 690-91.  *Accord Brown*, 520 U.S. at 402;
*Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-81 (1986).

        [92]    *See Tuttle*, 471 U.S. at 831 (Brennan, J., concurring in part and
concurring in the judgment) ("To infer the existence of a city policy from the
isolated misconduct of a single, low-level officer, and then to hold the city liable
on the basis of that policy, would amount to permitting precisely the theory of
strict *respondeat superior* liability rejected in *Monell* . . . .").

        [93]    *See Monell*, 436 U.S. at 690.

21

who, as a matter of State law, has final policymaking authority in the area in which the action was taken.[94]

A municipal "custom," on the other hand, need not receive formal approval by the appropriate decisionmaker: "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."[95]  To succeed on this theory, plaintiff must prove the existence of a practice that is permanent.[96]  "[O]ne method of showing custom is to demonstrate that the custom or practice is so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."[97] When either a "policy" or "custom" has been proven, section 1983 imposes liability because the City in its capacity as a municipality – as opposed to mere

---

[94]    *See Pembaur*, 475 U.S. at 480-81.  *See also Walton v. Safir*, 122 F. Supp. 2d 466, 477 (S.D.N.Y. 2001) ("[T]he act of an official with final decision-making authority, if it wrongfully causes the plaintiff's constitutional injury, may be treated as the official act of the municipality . . . .") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)) (other citations omitted).

[95]    *Brown*, 520 U.S. at 404.  *Accord Tuttle*, 471 U.S. at 823-24.

[96]    *See Praprotnik*, 485 U.S. at 127.

[97]    *Silva v. Worden*, 130 F.3d 26, 31 (1st Cir. 1997) (quotation marks and citation omitted).

22

employees of the City – harmed the plaintiff for exercising a constitutionally protected right.[98]

In the context of a claim for municipal liability based on a failure to train, the inference that such a custom or policy existed may be drawn from plaintiff's proffer of circumstantial evidence, such as evidence that the municipality: (1) so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within the jurisdiction,[99] or (2) had notice of but repeatedly failed to make any meaningful investigation into charges of misconduct by lower-level employees.[100]

The Second Circuit has set forth three requirements "for showing that a lack of training manifests deliberate indifference."[101] *First*, "the plaintiff must . .

---

[98]     *See, e.g.*, *Brown*, 520 U.S. at 417 ("The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.") (quoting *Pembaur*, 475 U .S. at 479-80); *Pembaur*, 475 U.S. at 480 ("*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered.").

[99]     *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 387-92 (1989).

[100]     *See, e.g.*, *Fiacco v. City of Rensselaer*, 783 F.2d 319, 327-28 (2d Cir. 1986).

[101]     *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)).

23

. allege that 'a policy-maker knows to a moral certainty that her employees will confront a given situation.'"[102]  *Second*, the situation must "either present[] the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation."[103]  *Third*, mishandling of the situation must "frequently cause the deprivation of a citizen's constitutional rights."[104]

### D.    Identification Procedures

"Suggestive procedures are disapproved 'because they increase the likelihood of misidentification,' and it is the admission of testimony carrying such a 'likelihood of misidentification which violates a defendant's right to due process.'"[105]  However, "[i]n the context of an identification following a police procedure that was impermissibly suggestive, the due process focus is principally on the fairness of the trial, rather than on the conduct of the police, for a suggestive procedure 'does not in itself intrude upon a constitutionally protected

---

[102]    *Id.* at 80-81 (quoting *Walker*, 974 F.2d at 297) (internal quotation marks omitted).

[103]    *Id.*

[104]    *Id.*

[105]    *Wray v. Johnson*, 202 F.3d 515, 524 (2d Cir. 2000) (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

interest.'"[106]

### E.    Prosecutorial Immunity

"'A prosecutor is . . . entitled to absolute immunity despite allegations of his knowing use of perjured testimony and the deliberate withholding of exculpatory information.  Although such conduct would be reprehensible, it does not make the prosecutor amenable to a civil suit for damages.'"[107]  However, "only qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions."[108]

### F.    State Law Claims

#### 1.    Malicious Prosecution

Under New York law, to prevail on a claim of malicious prosecution, a plaintiff must show: "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the

---

[106]    *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13 (1977)).

[107]    *Peay v. Ajello*, 470 F.3d 65, 68 (2d Cir. 2006) (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (internal quotation marks omitted)).

[108]    *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).

prosecution was terminated in the plaintiff's favor."[109]  To establish a claim for malicious prosecution under section 1983, a plaintiff must also allege all of the elements of malicious prosecution under state law.[110]

### a.    Probable Cause

Plaintiff must establish the lack of probable cause for defendant's commencement of the judicial proceeding against him.  The existence of probable cause to arrest is a complete defense to a malicious prosecution claim.[111] "Probable cause is defined as 'such facts and circumstances as would lead a reasonable prudent person in like circumstances to believe plaintiff guilty.'"[112]  A mere mistake with respect to the relevant facts does not establish a lack of probable cause, provided the party "acted reasonably under the circumstances in

---

[109]    *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).

[110]    *See Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002); *Janetka v. Dabe*, 892 F.2d 187, 189 (2d Cir. 1989) ("A claim of malicious prosecution brought pursuant to section[] 1983 . . . is governed by state law in the absence of federal common law.").

[111]    *See Gaskins v. City of New York*, No. 03 Civ. 605, 2004 WL 1777585, at *2 (S.D.N.Y. Aug. 6, 2004) (citing *Hyde v. Arresting Officer Caputo*, No. 98 Civ. 6722, 2001 WL 521699, at *2-4 (E.D.N.Y. May 11, 2001)).

[112]    *Perryman v. Village of Saranac Lake*, 839 N.Y.S.2d 290, 292 (3d Dep't 2007) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).

26

good faith."[113]  "'[T]he issue of probable cause is a question of law to be decided by the court only where there is no real dispute as to the facts or the proper inferences to be drawn from such facts.'"[114]  "Where there is 'conflicting evidence, from which reasonable persons might draw different inferences . . . the question [is] for the jury.'"[115]  Indictment by a grand jury "gives rise to a presumption" of probable cause,[116] but this presumption can be overcome by showing that the police suppressed or misrepresented evidence or otherwise acted in bad faith.[117]

### b.    Malice

To demonstrate malice in a malicious prosecution claim, plaintiff does not have "to prove that the defendant was motivated by spite or hatred . . . ."[118]  Rather, it means that the defendant must have "commence[d] a criminal proceeding 'due to a wrong or improper motive, something other than a desire to

---

[113]    *Allen v. Town of Colonie*, 583 N.Y.S.2d 24, 27 (3d Dep't 1992) (citing *Colon*, 60 N.Y.2d at 82).

[114]    *Lundgren v. Margini*, 817 N.Y.S.2d 349, 350 (2d Dep't 2006) (quoting *Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d 523, 529 (1991)).

[115]    *Parkin*, 78 N.Y.2d at 529 (quoting *Veras v. Truth Verification Corp.*, 451 N.Y.S.2d 761, 764 (1st Dep't), *aff'd*, 57 N.Y.2d 947 (1982)).

[116]    *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006).

[117]    *See Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).

[118]    *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03 (1978).

27

see the ends of justice served.'"[119]  "A lack of probable cause generally creates an

inference of malice."[120]  A plaintiff may also prove this element by demonstrating

that the accuser knew that the action could not succeed.[121]

## 2. Abuse of Process

"'In its broadest sense, abuse of process may be defined as misuse or

perversion of regularly issued legal process for a purpose not justified by the

nature of the process.'"[122]  "In New York, 'a malicious abuse-of-process claim lies

against a defendant who (1) employs regularly issued legal process to compel

performance or forbearance of some act (2) with intent to do harm without excuse

of justification, and (3) in order to obtain a collateral objective that is outside the

legitimate ends of the process.'"[123]

The New York Court of Appeals has made clear that this tort requires

---

[119]    *Maskantz v. Hayes*, 832 N.Y.S.2d 566, 570 (1st Dep't 2007) (quoting *Nardelli*, 44 N.Y.2d at 502-03).

[120]    *Boyd*, 336 F.3d at 78 (citing *Ricciuti*, 124 F.3d at 131).

[121]    *See Munoz v. City of New York*, 271 N.Y.S.2d 645, 649 (1966).

[122]    *Sipsas v. Vaz*, 855 N.Y.S.2d 248, 249 (2d Dep't 2008) (quoting *Board of Ed. of Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Ass'n, Local 1889*, 38 N.Y.2d 397, 400 (1975)).

[123]    *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

a collateral objective, not just a collateral motive.[124]  Regardless of why an

individual was prosecuted, defendants incur no liability unless "they aimed to

achieve a collateral purpose beyond or in addition to his criminal prosecution."[125]

### 3.    Spoliation of Evidence

New York does not recognize the tort of "third-party negligent

spoliation of evidence."[126]  However, the courts appear to permit an action for the

negligent destruction of evidence so long as the plaintiff can meet the

requirements of a standard negligence action.  In rejecting the spoliation cause of

action, the Court of Appeals explained that "plaintiffs seek recognition of a new

cause of action because they cannot meet the traditional proximate cause and

actual damages standards at the foundation of our common-law tort

jurisprudence."[127]

### 4.    Negligence

"Under New York law, the elements of a negligence claim are: (i) a

duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury

---

[124]    *See Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984).

[125]    *Savino*, 331 F.3d at 77.

[126]    *Ortega v. City of New York*, 9 N.Y.3d 69 (2007).

[127]    *Id.* at 80.

29

substantially caused by that breach."[128]  A claim of negligent misrepresentation must satisfy the following five elements: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the defendant knew that the plaintiff desired the information supplied in the representation for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.[129]

To state a claim for negligent supervision, a plaintiff must first plead that an employee was negligent.  The plaintiff must then allege "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels."[130]

---

[128]   *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002).

[129]   *See Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

[130]   *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citing *D'Amico v. Christie*, 71 N.Y.2d 76, 87 (1987)) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 793 (2d Dep't 1997)).

### 5.    Infliction of Emotional Distress

An intentional infliction of emotional distress claim must satisfy the following four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."[131] Courts have limited the first element to include only conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and regarded as atrocious, and utterly intolerable in a civilized community.'"[132] Further, "'the emotional distress suffered by the plaintiff must be so severe that no reasonable man could be expected to endure it.'"[133]

## IV.    DISCUSSION

### A.    Preliminary Matters

#### 1.    Bad Faith

Defendants have moved to dismiss the Complaint in large part based on the assertion that Newton has failed to plead sufficient facts to give rise to a

---

[131]    *Howell v. New York Post Co.*, 81 N.Y.2d 115, 211 (1993).

[132]    *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983) (quoting *Restatement (Second) of Torts* § 46 cmt. d (1965)).

[133]    *Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 122 (S.D.N.Y. 2002) (quoting *Restatement (Second) of Torts* § 46 cmt. j (1965)).

plausible inference that the officers acted in bad faith.  A careful review of the Complaint reveals otherwise.  Newton's allegations must be examined in light of his innocence.  The actions of the NYPD and the Bronx County District Attorney's Office led to the incarceration, for more than two decades, of an innocent man.  At issue is whether this error was caused by simple incompetence, reckless misconduct, conscious malfeasance, or a combination of the three.

Newton alleges that Gonzalez failed to identify him at a pretrial hearing, yet was able to identify him with little difficulty days later at trial.  He alleges that this was the result of coaching sessions by the Bronx County District Attorney's Office.  This allegation is certainly plausible.

Newton alleges that certain officers and the District Attorney's Office "wrongfully pressur[ed] eyewitnesses into falsely identifying him as the rapist . . . ."[134]  Assuming Newton's factual allegations are true, given the lack of evidence of Newton's involvement in the crime and the zeal with which the police pursued him, this allegation is also plausible.

Newton's allegations also give rise to a plausible inference that the police and the District Attorney's office acted with bad faith in failing to investigate the possibility of his innocence.  Defendants summarize plaintiff's

---

[134]    Compl. ¶ 139.

32

allegations as follows:

> (a) the eyewitness identifications were suspect, (b) the police did not test the physical evidence they collected, (c) the victim initially identified a man named "Willie" as her assailant, (d) the man named "Willie" drove a car similar to the one in which [the victim] was driven to the crime scene, (e) Mr. Newton had an alibi, and (f) there was no physical evidence linking Mr. Newton to the crime.[135]

Given the strength of Newton's alibi and the weakness of the prosecution's case, these allegations alone would be sufficient to raise a plausible inference of bad faith.

Plaintiff also alleges that defendants acted in bad faith by failing to perform certain tests on the physical evidence and by seizing the evidence "so no one else could test it."[136]  Defendants respond that "the police do not have 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular case.'"[137]  They further contend that "'the police do not have a constitutional duty to perform any

---

[135]    Defendants' Memorandum of Law in Support of Their Motion for Judgment on the Pleadings ("Def. Mem.") at 4 (citing Compl. ¶ 134).

[136]    Compl. ¶ 134.

[137]    Def. Mem. at 5 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

particular tests.'"[138]  Defendants are correct, but their contentions are irrelevant to

the question of bad faith.  The police have a constitutional duty not to suppress

evidence known or reasonably expected to be exculpatory.[139]  Plaintiff has alleged

that overwhelming evidence indicated his innocence.  Taking his factual

allegations as true, it is plausible that the police maliciously suppressed any

physical evidence that would support his innocence.[140]

## 2.    The Record of Newton's Criminal Trial

The parties dispute the relevance of the record of Newton's criminal

trial for purposes of this motion.  As discussed above, in considering a motion to

---

[138]    *Id.* (quoting *Youngblood*, 488 U.S. at 59).

[139]    *See Youngblood*, 488 U.S. at 58 ("[U]nless a criminal defendant can
show bad faith on the part of the police, failure to preserve potentially useful
evidence does not constitute a denial of due process of law.").  *Cf. Dukes v. City of
New York*, 974 F. Supp. 335, 343 (S.D.N.Y. 1995) ("The mere assertion of an
alibi, and even the failure to investigate such an alibi to plaintiff's satisfaction,
does not overcome the existence of probable cause to prosecute *where there is no
evidence of fraud or suppression of evidence*." (emphasis added)).

[140]    Newton alleges that his sneakers were seized so that the treads could
be compared with tread marks on the victim's clothing and to determine whether
they had traces of the victim's blood, but that the results of this test were not
disclosed.  Defendants respond that "Plaintiff's allegation that defendants[] failed
to disclose the 'sneaker tread print comparison' is not plausible because no such
'tread print comparison' was ever done."  Def. Mem. at 5 n.1.  Putting aside that a
comparison of a sneaker tread to a footprint involves simple observation,
defendants make no effort to explain why the police seized the sneakers if not to
perform the tests.

34

dismiss, a court may consider documents not attached to the complaint if they are integral to plaintiff's claim.

Defendants are correct that it is appropriate to consider the record at this stage in the proceeding. Plaintiff's claims are so intertwined with the criminal proceeding that he cannot assert lack of notice that the materials may be considered. However, given that plaintiff has alleged the record was tainted by defendants' actions and that the parties do not dispute its contents, it has minimal utility at this time.

## B.    Unduly Suggestive Identification Procedures

Newton's first cause of action is for the use of unduly suggestive identification procedures. Assuming the identification procedures were unfairly suggestive, Newton's constitutional rights were violated at trial when he was convicted on the basis of those identifications, not when the identifications were conducted. Defendants argue that the officers cannot be held liable under section 1983 for any violation of Newton's rights because the harm, if any, occurred as a result of the actions of the prosecutors and trial judge.[141]

As discussed above, Newton has plausibly alleged that certain officers and the Bronx County District Attorney's Office coerced eyewitnesses

---

[141]    *See* Def. Mem. at 2-3.

35

into false accusations.  A plaintiff cannot recover for an unduly suggestive identification if there is an intervening cause of his damages, usually the independent decision of the prosecutors and trial judge to admit the evidence.  But if Newton can demonstrate that the officers coerced eyewitnesses into false accusations and then misled prosecutors (and the court) about the reliability of the identification, he may recover under section 1983.[142]  Defendants' motion to dismiss this claim is therefore denied.

### C.    False Arrest and Malicious Prosecution

Defendants argue that Newton's false arrest and malicious prosecution claims must be dismissed because he cannot overcome the presumption of probable cause created by the indictment.[143]  But as discussed above, Newton's allegations raise the specter of bad faith on behalf of the police department in failing to pursue obvious indications of Newton's innocence.  The inference that the police acted in bad faith negates the presumption of probable cause created by the indictment.  Newton has therefore stated a claim for malicious prosecution under state law and under section 1983.

---

[142]    *Cf. Wray v. City of New York*, 490 F.3d 189, 193-95 (2d Cir. 2007) (affirming dismissal of a section 1983 claim for an unduly suggestive identification where "there [was] no allegation that [the officer] misled the persons whose acts effected the constitutional violation").

[143]    *See* Def. Mem. at 3.

Plaintiff concedes that his claim for false arrest under section 1983 is time-barred.[144] However, he asserts that his state law claim for false arrest is timely because it accrued only upon his release from custody. Plaintiff is correct.[145] Defendants' motion to dismiss this claim is therefore denied.

## D.    Failure to Investigate

Newton's third cause of action is for "the deliberate (or reckless) failure to conduct a constitutionally adequate investigation and the deliberate (or reckless) suppression of material favorable evidence . . . ."[146] Defendants correctly observe that there is no constitutional right to an adequate investigation.[147]

---

[144]    *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings ("Pl. Mem.") at 21.  The Supreme Court has explained that "[r]eflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process . . . ." *Wallace v. Kato*, 127 S.Ct. 1091, 1096 (2007).  Newton's false arrest claim thus accrued in 1984.

[145]    *See Pinaud v. County of Suffolk*, 798 F. Supp. 913, 923 (E.D.N.Y. 1992) ("Under New York law, the statute of limitations on a claim for false arrest is one year and the claim accrues when the party is released from prison.") (citing N.Y. C.P.L.R. § 215(3)).  *See also Karen v. State*, 444 N.Y.S.2d 381 (Ct. Cl. 1981) (observing that false arrest is a "continuing" tort that "becomes complete at the end of the restraint, such as on release from custody").

[146]    Compl. ¶ 151.

[147]    *See generally Campbell v. Giuliani*, No. 99 Civ. 2603, 2000 WL 194815, at *3 n.6 (E.D.N.Y. Feb. 16, 2000) ("[I]n the context of § 1983, allegations of officers' failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution.") (citations omitted).

Accepting Newton's allegations as true, his rights were violated as a result of the malicious prosecution, not the failure to investigate. This claim is therefore dismissed.[148]

### E.   Failure to Produce Exculpatory Evidence

Newton alleges that defendants are responsible for failing to produce physical evidence during the period after his incarceration. This evidence includes the rape kit, sneakers, interview notes, criminal background information of Chamberlain,[149] and notes concerning their search for vehicles that matched the description of the vehicle involved in the incident.

### 1.   The Rape Kit

Defendants respond that the statute of limitations has lapsed on any claim relating to the rape kit. They allege that Newton's cause of action accrued when his request for the rape kit was denied on November 3, 1994.[150]

Newton alleges that in 1994, the City informed him that it had intended to grant his request for testing, but that it did not have the physical

---

[148]   To the extent that this claim asserts suppression of evidence, it is duplicative of Newton's malicious prosecution claim.

[149]   Defendants assert that the criminal background information on Chamberlain was produced to plaintiff. *See* Def. Mem. at 12. The Court will not rule on a factual dispute in the context of a motion to dismiss.

[150]   *See id.* at 10.

evidence.[151]  In response to further requests, Newton was informed in 1997 and

again in 1998 that the physical evidence was missing.  It was not until 2005 that

the City revealed it they still possessed the rape kit.  Newton's Complaint can be

read to plead that the City deliberately deceived Newton by inaccurately stating

that it had searched for the evidence.[152]

          Defendants brazenly suggest that Newton should have filed his claim

under section 1983 when he was first denied access to the rape kit.  However, at

that time, Newton had no reason to believe that his constitutional rights had been

violated.  In 1994, Newton could not demonstrate that the rape kit contained

exculpatory evidence and did not know that the City was deceiving him regarding

its efforts to locate the rape kit.  It was not until 2005 that Newton discovered the

City's officers had been lying about their search for the evidence.  The Second

Circuit has ruled that "accrual occurs 'when the plaintiff knows or has reason to

know of the injury which is the basis of his action.'"[153]  But even assuming that

Newton's cause of action accrued in 1994, as defendants insist, the period from

_____

[151]     *See* Compl. ¶ 101.

[152]     *See id*. ¶¶ 105-106.

[153]     *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (quoting
*Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)) (internal
quotation marks omitted).

1994 through 2005 would clearly be tolled as a result of defendants' concealment of material facts.

Defendants assert that this case is indistinguishable from *Savory v. Lyons*, in which the Seventh Circuit ruled that a plaintiff's claim for DNA testing of certain evidence was time-barred.[154]  But in *Savory*, the plaintiff "was notified on a specific day . . . that the state of Illinois had denied his request for testing."[155] Here, by contrast, Newton was not told that his request was denied.  On the contrary, he was told that the City intended to grant his request for testing, but that it had searched for and failed to locate the rape kit.  He later learned that this was not true.[156]

## 2.    The Other Evidence

Defendants argue that the loss of the other evidence does not rise to the level of a constitutional violation because plaintiff has not alleged facts

---

[154]    *See* 469 F.3d 667 (7th Cir. 2006).

[155]    *Id.* at 673.

[156]    Defendants also suggest that even if Newton otherwise had a valid claim under section 1983 for denial of access to the rape kit, it should be dismissed for lack of evidence of bad faith.  *See* Def. Mem. at 12 ("Plaintiff has not alleged facts showing that defendants 'lost' the rape kit *knowing* that it was exculpatory.").  But as discussed above, Newton's allegations suggest that defendants knew or recklessly disregarded the possibility that he was innocent.

40

showing bad faith.[157]  I have already rejected this argument.  Contrary to

defendants' assertions that "the defendant officers could not possibly have known

that the sneakers had exculpatory value,"[158] plaintiff has alleged that defendants

knew of or recklessly disregarded the possibility of his innocence.  They therefore

would have known or suspected that the sneakers would have exculpatory value.

### F.    Fabrication of Evidence

Defendants move to dismiss Newton's claim against Freund and other

unnamed assistant district attorneys for fabrication of evidence on the ground of

absolute immunity.[159]  The ADAs are entitled to absolute immunity for all actions

relating to their functions as advocates.  However, Newton's claims against the

ADAs are based on their conduct during the investigation, not the prosecution.

Newton is entitled to proceed with a claim against the ADAs to the extent that

they violated his civil rights during the investigation before the indictment was

---

[157]    *See id.* Defendants also argue that because the absence of notes of
the Chamberlain interview was disclosed prior to trial, there can be no *Brady*
claim regarding defendants' failure to produce them.  Defendants misstate the law.
Plaintiff has alleged the deliberate destruction of exculpatory evidence.  *See, e.g.,*
Compl. ¶ 161 (alleging that plaintiff's rights were violated "[a]s a direct result of
the deliberate (or reckless) failure to register, store, preserve, maintain and control
material and critical evidence relating to the crime").  Such conduct is a
fundamental violation of plaintiff's constitutional rights.

[158]    *Id.*

[159]    *See* Def. Mem. at 13.

filed, although such claims may be subject to a defense of qualified immunity.

### G.    Supervisory and Municipal Liability

Newton asserts that various supervisors and the City are also responsible for the violation of his constitutional rights. Defendants argue that these claims must be dismissed because he has not pled any such violation.[160] However, as discussed above, plaintiff has stated claims for several violations of his constitutional rights. Defendants' motion to dismiss these claims is therefore denied.

### H.    State Law Claims

#### 1.    Abuse of Process

Defendants argue that plaintiff has failed to allege a plausible collateral purpose for plaintiff's prosecution. Defendants are correct. Plaintiff has alleged that defendants initiated the proceedings "either out of personal animosity towards Mr. Newton, or to advance their respective careers . . . ."[161] Personal animosity is a collateral motive, not a collateral purpose. Plaintiff's allegation that defendants acted to advance their respective careers is not supported by any

---

[160]    *See id.* at 13-14.

[161]    Pl. Mem. at 14.

42

factual allegations in the record.[162] This claim is therefore dismissed.

### 2. Negligence

Plaintiff alleges that the Officer Defendants, Harris, and employees of the Bronx County District Attorney's Office negligently failed to "register, store, preserve, maintain, control and produce material and critical evidence"[163] and that they "negligently or fraudulently misrepresented the whereabouts" of the rape kit.[164] These allegations are examined separately.

### a. Failure to Control Critical Evidence

Defendants first protest that they had no duty to preserve evidence beyond the point where all of Newton's direct appeals were exhausted.[165] This argument entirely misses the point. The City voluntarily took on the role of custodian of the rape kit by preserving it after Newton's direct appeal was exhausted. Arguing now that it had no obligation to do what it did is simply a

---

[162]    Even if this allegation were accurate, it would not support a claim for abuse of process. Such a general purpose can be ascribed to any prosecutor under any circumstance. Permitting a plaintiff to state a claim based on this purpose would essentially remove this element from the tort.

[163]    Compl. ¶ 265.

[164]    Pl. Mem. at 16.

[165]    *See* Def. Mem. at 15-16 ("[P]laintiff must first demonstrate that there existed a *duty* owed by defendants to plaintiff. . . . The state has a duty to preserve evidence in a criminal case *only* until all direct appeals are exhausted.").

waste of this Court's time.[166]

Defendants also argue that this claim is time-barred. But again, the

City concealed the relevant facts from Newton until November of 2005. It was

only then that he discovered that they had in fact preserved the evidence and had

negligently, recklessly, or intentionally failed to produce it. Had the City

destroyed the evidence after Newton's direct appeals were exhausted, Newton

would have no claim for negligent failure to control the evidence. But as he

discovered in November of 2005, they had not destroyed it. It was at this time that

_____

[166]    Defendants' counsel was told in open court that this argument should
not be briefed:

> THE COURT:  In a case where the evidence is truly gone,
> you might have a good argument . . . . But the law is the
> opposite here.  If you happen to have it, you have a duty to
> produce it, if relevant.

> MR. LARKIN, counsel for defendants:  I see the argument.
> . . . But [this is] an important issue for us, for the city. . . .
> And it is an argument that we would like to present to the
> court.

> THE COURT:  You needn't do it in writing, because I'm
> going to deny it on this oral record.  If you have the
> evidence and somebody asks for it, you can't lie.  You have
> a duty to produce it.

2/26/08 Transcript at 17:22-18:16. Further, defendants' counsel was asked to
review this transcript with a supervisor" and then "carefully consider" whether this
motion could be filed pursuant to Rule 11. *Id.* at 24:22-25.

his claim accrued.

### b.    Negligent Misrepresentation

Defendants argue that plaintiff has failed to allege facts that suggests

a special relationship that would impose on defendants a duty not to misrepresent

the status of the rape kit.  The special relationship and duty required for a

negligent misrepresentation claim is based on consideration of the following three

factors: "whether the person making the representation held or appeared to hold

unique or special expertise; whether a special relationship of trust or confidence

existed between the parties; and whether the speaker was aware of the use to

which the information would be put and supplied it for that purpose."[167]

In this case, defendants clearly had unique expertise as to the status of

the rape kit and were aware of plaintiff's intended use of the information.  Plaintiff

has alleged that defendants deliberately falsified incriminating evidence with the

purpose of causing his incarceration.  In such a situation, I have little difficulty

concluding that this creates a special relationship between plaintiff and

defendants.  Further, this claim is clearly not barred by the statute of limitations

because plaintiff did not discover the misrepresentation until 2005.

---

[167]    *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001).

45

### c.    Negligent Supervision

Defendants contend that plaintiff's claim for negligent supervision must be dismissed because he "has not alleged facts suggesting that defendants acted outside the scope of their authority . . . ."[168] However, plaintiff has clearly alleged that defendants falsified evidence against him. Presuming without deciding that the falsification of evidence is not within the scope of defendants' responsibilities, plaintiff has stated a claim.

### 3.    Infliction of Emotional Distress

Defendants assert that the alleged conduct does not rise to the level of intentional infliction of emotional distress. Defendants are simply wrong. Plaintiff alleges that the Officer Defendants and the Bronx County District Attorney's Office maliciously falsified evidence that caused him to spend twenty-two years in prison for a crime he did not commit. There is no question that such conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[169]

---

[168]    Def. Mem. at 17.

[169]    *Murphy*, 58 N.Y.2d at 303.

46

### 4.    Breach of a Special Relationship

Plaintiff alleges that he and defendants had a special relationship that was formed "[a]s a result of the duty and obligation" to preserve the exculpatory evidence.[170] The exact cause of action that plaintiff seeks to plead is unclear. The New York Court of Appeals has "recognized a narrow right to recover from a municipality for its negligent failure to provide police protection where a promise of protection was made to a particular citizen and, as a consequence, a 'special duty' to that citizen arose."[171] This is clearly inapplicable to plaintiff's case. Plaintiff has provided no case law suggesting that any available cause of action exists independent of plaintiff's negligence claim. This claim is therefore dismissed.

### 5.    New York State Constitutional Claims

Plaintiff asserts that defendants' reckless disregard of his constitutional rights "makes these defendants liable . . . for violating the New York State Constitution under *Brown v. New York*."[172] Plaintiff asserts that the rights infringed are his rights "not to be significantly detained pretrial except pursuant to

---

[170]    Compl. ¶ 303.

[171]    *Cuffy v. City of New York*, 69 N.Y.2d 255, 258 (1987).

[172]    Compl. ¶ 335 (citing 89 N.Y.2d 172 (1996)).

a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment."[173]

In *Brown*, the New York Court of Appeals held that "a cause of action to recover damages may be asserted against the State for violation of the Equal Protection and Search and Seizure Clauses of the State Constitution."[174] However, the New York courts do not permit such an action where there is another basis for the relief requested. As the New York Court of Claims has explained, "when an alternative remedy was available, the courts have refused to imply a constitutional remedy."[175] Because plaintiff has adequate remedies under statutory and common law, his claims under the New York State Constitution are dismissed.

## V.    CONCLUSION

For the foregoing reasons, plaintiff's claims for failure to investigate and abuse of process and his claims under the New York State Constitution are

---

[173]    *Id.* ¶ 333.

[174]    *Brown*, 89 N.Y.2d at 188.

[175]    *Remley v. State*, 665 N.Y.S.2d 1005, 1009 (Ct. Cl. 1997) (citations omitted).

48

dismissed.[176] The motion to dismiss the remaining counts is denied. After having reviewed the transcripts of oral arguments in this case, I am compelled to conclude that defendants wasted this Court's time by moving to dismiss counts that they knew would not be dismissed. The importance of these issues to the City of New York is not a sufficient reason to file papers that, in large part, border on frivolous. This is, after all, a motion to dismiss, where defendants well know that all the allegations in the Complaint must be taken as true. Under the circumstances, it is difficult, if not impossible, to believe that the entire case would be dismissed. Causing the Court to engage in unnecessary work does not appear to be of concern to the City. The Clerk of the Court is directed to close this motion (document no. 26 on the docket sheet). A conference is scheduled for July 31, 2008 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           July 16, 2008

---

[176]     As discussed above, plaintiff has voluntarily dismissed his claims for punitive damages and injunctive relief.

49

## - Appearances -

**For Plaintiff:**

John Francis Schutty, III, Esq.
Law Office of John F. Schutty
445 Park Avenue, 9th Floor
New York, NY 10022
(212) 836-4796

**For Defendants:**

Arthur Gabriel Larkin, III
Assistant Corporation Counsel
The New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1599