UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X

| | | |
|---|---|---|
| ALAN NEWTON, | : | Civil Action No. |
| | : | 07-cv-06211 |
| Plaintiff, | : | (Scheindlin) |
| -against- | : | |
| | : | **DECLARATION OF** |
| THE CITY OF NEW YORK, <u>et al</u>., | : | **SHANNON TURNER** |
| | : | <u>**[EXPERT WITNESS]**</u> |
| Defendants. | : | |

---------------------------------------------------------------------------X

Shannon Turner, pursuant to 28 U.S.C. § 1746, declares that the following is true and correct under the penalty of perjury:

1.      I, Shannon Turner, have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would testify competently thereto under oath.

2.      I have been retained by the Law Office of John F. Schutty, P.C. to study materials produced or exchanged in this civil rights action and provide expert opinions on the adequacy of the procedures utilized by the New York City Police Department ("NYPD") in registering, storing, maintaining and producing criminal evidence relating to the rape, robbery and assault of a woman named "VJ."  Specifically, I have been asked to render an opinion, based upon my training, education and experience, as to whether employees of The City of New York (NYPD) and the District Attorney's Office acted with "reckless disregard" or "reckless indifference" to Mr. Newton's right to obtain testing on a Vitullo rape kit collected in the course of the aforementioned criminal investigation.

<u>**My Credentials**</u>

3.      I am currently employed as a "Property & Evidence Specialist" by FileOnQ, Inc., a Seattle Washington company that provides a software product (the EvidenceOnQ software system) to law enforcement agencies.  I have also just recently started the process of establishing

my own private evidence consulting company called "Focus on Evidence." Since 2004, I have worked with law enforcement agencies nation-wide to offer both criticism and advice on how their procedures and systems can be improved through technology. I also advise those police administrations on the inherent liability they are carrying due to inefficient evidence management. I provide on-site evidence management training and assist agencies in establishing new policies and procedures. I have assisted agencies to resolve their inadequate procedures and technology that resulted in internal thefts and lost evidence. I have taken numerous courses on evidence management and have published a number of papers in the field, including but not limited to: **"**10 Reasons to Use Barcode Technology in Evidence Management," <u>The Evidence Log</u>, International Association of Property & Evidence, Vol. 3, 2005, and "From Log Books to Bar Codes: The Technological Evolution of Evidence Management," <u>Law Enforcement Technology</u>, August 2004. I was previously employed as a Crime Specialist/Evidence Technician for the Pasco Police Department in Pasco, Washington (2001-2004) and, before that, was an Evidence Technician for the Kennewick Police Department in Kennewick, Washington (1994- 2001). My current C.V. is attached. The Court will note that I have spent the last 15 years of my professional career managing the registration, storage, control and production of evidence within the criminal justice system. It should also be noted that I worked for the Benton County Prosecuting Attorney, Kennewick, WA (1984-1994). My professional focus has always been in the area of collecting, documenting, and presenting evidence in court in the prosecution of criminal offenses. Given my broad experience in the criminal justice system over the last 25 years, I am qualified to offer opinions on the quality of the evidence management systems employed by particular law enforcement agencies.

4. In connection with the opinions that I have been asked to render in this action, I have reviewed the following: (a) the defendants' "Statement Pursuant to Local Civil Rule 56.1," and (b) "Plaintiff's Rule 56.1 Counter-Statement Filed in Opposition to Defendants' Motion for Summary Judgment" (hereinafter "P.S."), (c) the Declarations of Alan Newton and John F. Schutty, Esq. dated June 25, 2009, and all of the exhibits annexed to the Schutty Declaration. In addition, I have reviewed the Complaint filed by plaintiff, as well as an Opinion & Order issued by Judge Shira A. Scheindlin in this action on July 16, 2008. See Newton v. City of New York, 566 F. Supp.2d 256 (S.D.N.Y. 2008).

## The Facts Relevant to My Opinions

### A. Background on the Evidence (the "Vitullo Rape Kit")

5. On June 23, 1984, a woman whose initials are "VJ" was assaulted by an unknown male in Bronx County, New York. PS: ¶1.

6. She testified that she was sexually assaulted by one man and that he ejaculated inside of her. Declaration of Alan Newton dated June 25, 2009, ¶3.

7. Following the assault, VJ was taken to a hospital where a "Vitullo rape kit" was used to collect critical evidence from VJ's body. Id.

8. The VJ Vitullo rape kit evidence was collected from the hospital by Detective Joanne Newbert of the New York City Police Department ("NYPD") and was logged in with the NYPD's property management system on June 23, 1984 when Detective Newbert completed an NYPD "Property Clerk's Invoice," No. B744483. P.S. ¶57.

### B. Background on the NYPD's Property Management System

9.      Property/Evidence is managed within the NYPD by a division known as the "Property Clerk Division" (hereinafter "PCD").  P.S. ¶70.  The PCD has to manage and control a large volume of newly submitted property on behalf of the NYPD each year.  P.S. ¶71.

10.      Despite the enormous responsibility of managing over 10 million pieces of property currently in storage,[1] the PCD continues to employ a completely paper-based system to register, store and control the property/evidence on behalf of the NYPD.  P.S. ¶¶74-75.  Because of this paper-based evidence management, the success of the PCD to control and produce evidence upon demand is entirely dependent on both the retention and organization of the paper documentation for that evidence and clear and accurate information on that paper.

11.      The basic overview of the NYPD's paper-based property/evidence management system is set forth in paragraph 72 of Plaintiff's Rule 56.1 Counter-Statement.  The ability of the NYPD to efficiently register, store, control and produce evidence is based totally on the NYPD's ability to retain, and maintain the accuracy of information on a document known as the "NYPD Property Clerk's Invoice"[2] (hereinafter "Invoice").  This Invoice is the pivotal document in the NYPD's evidence registration system. However, it is vulnerable to human error because if the Invoice is lost or stored in the wrong location, or if information is not completely and accurately placed on the Invoice, the evidence is easily subject to becoming the proverbial "needle in the haystack" of ten million or more items of stored property.  P.S. ¶¶72-76.  Accordingly, it is vitally important that PCD employees be sufficiently trained and intimately familiar with the written procedures set forth in the PCD's "Property Guide."  P.S. ¶81. A paper-based evidence

---

[1]    Although I understand that the PCD manages "property," throughout this Declaration I shall use the word "evidence" for efficiency purposes.  I expressly understand that evidence is only one of the component items of "property" that is managed/controlled by the PCD.

[2]    "The precincts are responsible for preparing a five-part [actually six-part] carbon copy invoice which describes and categorizes the type of property brought in, the name and address of the owner and claimant, if known, the date and place the property was obtained or found, and the name of the officer who recovered or obtained the property."  See P.S. ¶72.

system requires that all employees obsessively apply the evidence management standards at all times, with no margin for error.

12.     Although the NYPD employee who collects the evidence completes six "original" Invoices (created by carbon), the PCD uses only two of the originals, the White and Yellow Invoices, to manage and control property that comes into its possession.  P.S. ¶¶81-82.  Original White Invoices were/are filed in the local PCD borough offices in a binder *by storage number assigned at the time of intake of the evidence.*  PCD "Property Guide," Procedure No. 201-1, ¶10(a) (Ex. D). It should be noted this storage number is a cataloged number used solely for showing it was received at a specific PCD location and for filing the invoices.  The original Yellow Invoices were/are filed in the local borough office in file folders *by pre-printed [invoice] number.*   PCD "Property Guide," Procedure No. 211-7 (Ex. D).  This invoice number is used solely for numeric filing.  The Yellow Invoice ("working copy") is the equivalent of a "treasure map"; it contains all the pertinent information in order to adequately locate the evidence.  P.S. ¶¶90-91.  If the Yellow Invoice is properly maintained, it will state the last known storage location of the evidence and notations detailing the entire chain of custody for that evidence. (answering the questions "who, what, where, when and how" relating to chain-of-custody).  P.S. ¶¶90-91.  However, if the NYPD was to lose or destroy either the original White or the original Yellow Invoice, they would not be able to state definitively whether the evidence is still in the possession of the PCD, and/or the final disposition (or location) of the evidence.  P.S. ¶¶ 112-14.

13.     While I could provide a detailed, lengthy analysis as to every detail of how the PCD mismanaged the criminal evidence in the VJ rape investigation, the limits set by this Court for Declarations (10 pages) prevent me from elaborating.  Based on the facts set forth in the Plaintiff's Rule 56.1 Statement, and based on my education, knowledge, training and experience

in the field of evidence management, I can state that the PCD absolutely and unequivocally mismanaged the handling of all the evidence on the three invoices in this matter (Newton's sneakers, VJ's soiled clothing and the rape kit) based on the following facts:

(a)   The PCD is still, to this date, unable to provide a definitive answer as to what happened to this evidence while under the PCD's control. The PCD cannot provide documentation or answers as to where they moved it, when they moved it, how they moved it, who moved the evidence, etc.) (P.S. ¶¶128-271);

(b)   The PCD has apparently never been able to produce the original White Invoice for these three items of evidence (P.S. ¶¶139, 147 and 275);

(c)   The PCD cannot provide any knowledge or documentation as to the whereabouts or theorized (and undocumented) destruction of Mr. Newton's sneakers (P.S. ¶136-39).

14.     I am currently preparing (and am continuing to investigate) a detailed study of all the errors made by the PCD in handling the evidence registered by the NYPD in connection with the VJ rape investigation. Based on my findings to date, it is blatantly clear to me that the evidence in this matter was absolutely and unforgivably handled in a reckless and slipshod manner from the time it was collected throughout its entire lifecycle.  From the deposition testimony that I have read and the facts detailed in Plaintiff's Rule 56.1 Counter-Statement, PCD personnel were not provided with proper training in evidence management.  P.S. ¶¶122-24. It is also clear they were not properly supervised as they were clearly (a) not familiar with the written procedures set forth the PCD's "Property Guide (P.S. ¶¶122-24), and (b) not applying the explicit and detailed procedures set forth in the Property Guide (P.S. ¶¶136-39, 145-49, 156, 168, 187-200, 216-221, 248-56).  In fact, the testimony of the three PCD witnesses who played a role in providing information to the Bronx District Attorney's Office regarding alleged searches for

the rape kit (Geraldine Kiely, Stacy Haskins and Patrick McGuire) were completely ignorant of written procedures in the PCD "Property Guide." P.S. ¶¶122-24. This ignorance displays a complete and deliberate indifference by the NYPD to their training and supervision. And notwithstanding the ignorance of these individuals on established PCD procedure, I cannot comprehend why the NYPD would allow these individuals to speak to the District Attorney's Office as NYPD representatives on the subject of missing evidence. P.S. ¶¶250, 254-56.

15.    The most troubling fact in all the material that has been presented to me is that The City of New York/NYPD authorized PCD Borough office supervisors to destroy Yellow Invoices in rape investigation cases "after five years." See PCD "Property Guide," Procedure No. 211-7 (Ex. D) ("All Property Clerk Work Copies (yellow) will be filed in the Borough Office by pre-printed number…For investigatory evidence, file in pre-print order by month of invoicing. *File should be purged after one year with the following exceptions:…(b) Rape Investigations – hold for five years."* If New York State allows for the presentation of post-conviction DNA evidence (as most states do), the destruction of Yellow Invoices would consequently lead, in a paper-based evidence management system, to the complete inability to produce the evidence. Moreover, the Yellow Invoice destruction provision in the "Property Guide" does not require the destruction of the evidence simultaneously with the Yellow Invoice. Id. Essentially the NYPD was allowing the treasure map to be destroyed; yet the evidence might still be in the possession of the PCD, yielding it useless. The NYPD was intentionally and regularly allowing their sole document for finding evidence to be destroyed knowing full well that the evidence was still being stored and would become impossible to find.

C.  **Insufficient Training or Supervision of ADAs Re: Evidence Control Is Evident**

16.    From the deposition testimony that I have read and the facts detailed in Plaintiff's Rule 56.1 Counter-Statement, Assistant District Attorneys ("ADAs") were not provided with any training as to how evidence should be requested from the NYPD in post-conviction situations. P.S. ¶¶4, 18, 31, 210, 232, 242.  It is also clear that the ADAs were not properly supervised by the fact that a photocopy of the Yellow Invoice (Ex. U), containing the precise location of the "missing" rape kit was, in fact, in the District Attorney's file, yet it was not turned over to the NYPD when the rape kit was requested.  P.S. ¶¶5, 20, 28.   When ADA Elisa Koenderman turned over that photocopy to the NYPD in November 2005, the rape kit was "found."  P.S. ¶270 and Ex. H.  The testimony of the three ADAs (Carroll, Moore and Curbelo) who attempted to obtain the evidence, shows that they were so ignorant of proper evidence request procedures; one can only conclude that The City/NYPD/DA's Office must have been deliberately indifferent to the training and supervision of ADAs on this subject.   P.S. ¶¶4, 18, 31, 210, 232, 242.

**D.  <u>Total Lack of Coordination in the Evidence Search</u>**

17. Efficient evidence management requires cooperation and support between all those who participate in the handling of evidence within the system.  If even one participant fails to perform his/her role (especially in an unforgiving paper-based system), the system will fail.  In reviewing the materials relating to the evidence in the VJ rape investigation, it is very clear to me no one was ensuring there was any cooperation extended between the NYPD, the DA's Office and the OCME.  This was apparent starting with the first post-conviction movement made by the rape kit when ADA Edelbaum was ordered to have it independently tested.  There was no chain of custody documentation as to its whereabouts from May 11 until July 27 when it showed up at the OCME. P.S.¶¶155, 166, 171.  The rape kit was not delivered to or picked up from the OCME by ADA Edelbaum, which was a violation of procedure, nor was the rape kit independently

tested pursuant to the court order. P.S. ¶¶169, 163, 175-76. Following the apparent "loss" of the rape kit, it is also evident that many people involved in the previous chain of custody took the position that "it was not their job" to participate in the search for the rape kit. P.S. ¶¶216-18, 222-25, 261-63. The Bronx borough office of the PCD and the OCME extended extraordinarily little cooperation to ADA Carroll (P.S. ¶¶216-18, 222-25); a similar lack of cooperation was extended to ADA Curbelo (P.S. ¶¶261-63). Moreover, ADAs Carroll and Curbelo implicitly fault the PCD and OCME for not finding the rape kit (P.S. ¶¶216-18, 222-25, 261-63), while PCD employee McGuire explicitly blames the DA's Office (P.S. ¶257). The PCD was supposed to have an "Integrity Control Officer" play a role in the investigation of lost evidence and, possibly, act as a liaison with the DA's Office, however there is no evidence that such a vital player extended any such role in the search for the rape kit. P.S. ¶¶191-92.

### E. Destruction of Invoices = Loss of Evidence

18. Equally troubling and shocking to me is that the present Commanding Officer of the PCD, defendant Jack Trabitz, only recently came to the realization that a destruction of NYPD Invoices would subsequently lead to an inability to find evidence. P.S. ¶¶111-18. I have read the deposition testimony of Deputy Chief Trabitz where he testified he was unable to state precisely when he allegedly changed the PCD policy/procedure on Invoice destruction set forth so explicitly in the PCD "Property Guide" at Procedure 211-7. Trabitz Depo. at 260 (Ex. L) (Invoice Destruction: "I changed the policy [of destroying Yellow Invoices after five years]"), 263 ("*Sometime during my tenure* I had instituted a policy that no invoices are to be destroyed.") (P.S. ¶117). I am disturbed by the fact that this change in policy and procedure was not documented in writing and that Trabitz cannot recall the timing of such an important change in policy.

19.     Through their own admission in testimony, the PCD has been destroying Yellow and White Property Invoices for years without simultaneously destroying the evidence to which those Invoices relate. P.S. ¶¶111-18.  This blatant disregard demonstrates that The City of New York has created an evidence management system that is rotten and ineffective at its very core. The City has intentionally allowed it to become impossible to find and secure post-conviction evidence (viz., any rape investigation evidence) that is more than five years old.

20.     I have read with great interest the fact that The Innocence Project has noted that New York City is able to produce far less post-conviction evidence than other cities (P.S. ¶278) and the reason to me is obvious – the NYPD's policy of destroying Invoices leads to an undeniable difficulty in finding evidence that is older than five years.  Deputy Chief Trabitz essentially admitted this during his deposition in addressing Innocence Project cases in which evidence could not be produced by the PCD: "Yes, it was determined that certain working copies, yellows, were not able to be found [or the loss of these Invoices explained]."  Trabitz Depo. at 422, 446 ("there have been orders throughout time allowing the destruction of invoices in the possession of the Property Clerk Division).

I DECLARE UNDER PENALTY OF PERJURY under the laws of the State of New York that the foregoing is true and correct.

Executed this 25th day of June 2009, in __Richland____, Washington.


    ___/s/ S T_____
            Shannon Turner