UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X

ALAN NEWTON,                                                          :
                                                                     :
                    Plaintiff,                                       :     Civil Action No.
          -against-                                                  :       07-cv-06211
                                                                     :        (Scheindlin)
THE CITY OF NEW YORK; DISTRICT ATTORNEYS MARIO         :
MEROLA AND ROBERT T. JOHNSON, INDIVIDUALLY,            :
AND IN THEIR OFFICIAL CAPACITY; ANDREA FREUND          :
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY AND           :
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF THE       :
CITY OF NEW YORK WHO ARE/ WERE ASSISTANT               :
DISTRICT ATTORNEYS WITHIN THE OFFICE OF THE            :
DISTRICT ATTORNEY, COUNTY OF BRONX; DETECTIVE          :
JOANNE NEWBERT, DETECTIVE PHILLIP GALLIGAN,            :
DETECTIVE [JOHN DOE] HARTFIELD, DETECTIVE              :
[JOHN DOE] RYAN, DETECTIVE [JOHN DOE] HARRIS,          :
POLICE OFFICER DOUGLAS LEHO, POLICE OFFICER            :
WILLIAM SEAN O'TOOLE, LIEUTENANT MICHAEL               :
SHEEHAN, SERGEANT PATRICK J. McGUIRE, POLICE           :
OFFICER [JOHN DOE] HASKINS, POLICE OFFICER             :
[JANE DOE] KIELY, INSPECTOR JACK J. TRABITZ            :
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY               :
AND IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES          :
OF THE CITY OF NEW YORK WHO ARE/ WERE MEMBERS          :
OF THE POLICE DEPARTMENT OF THE CITY OF NEW            :
YORK,                                                                :
                                                                     :
                    Defendants.                                      :
------------------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DATED JUNE 5, 2009

LAW OFFICE OF JOHN F. SCHUTTY, P.C.
445 Park Avenue, Ninth Floor
New York, New York 10022
(212) 836-4796

Counsel for Plaintiff Alan Newton

## TABLE OF CONTENTS

STATEMENT OF FACTS ...................................................................................................1

ARGUMENT…………………………………………………………………………………..1

I.      GENUINE ISSUES MATERIAL FACT PRECLUDE A GRANT OF
        SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS………………....1

II.     PLAINTIFF HAD AN ADMITTED STATUTORY RIGHT, & A RESULTING
        CONSTITUTIONAL RIGHT, TO POST-CONVICTION DNA TESTING THAT
         WAS WRONGFULLY THWARTED BY THE DEFENDANTS...........................2

III.    THE ALLEGED DEFENSE OF "QUALIFIED IMMUNITY" DOES NOT
        SHIELD THE DEFENDANTS FROM LIABILITY ...............................................9

IV.     PLAINTIFF'S SIXTH THROUGH NINTH CAUSES OF ACTION ARE
        VIABLE BECAUSE CONSTITUTIONAL VIOLATIONS HAVE BEEN
        SHOWN THAT ESTABLISH THE EXISTENCE OF MUNICIPAL &
        SUPERVISORY LIABILITY ...............................................................................11

        A. Jack Trabitz – Personal Liability, Supervisory Liability & Negligent
           Training Liability ...........................................................................................11

        B. Robert Johnson – Individual Liability, Official Capacity Liability,
           Supervisory Liability & Negligent Training Liability .......................................13

        C. Municipal Liability .........................................................................................15

V.      PLAINTIFF'S PENDENT STATE LAW CLAIMS SHOULD BE RETAINED
        IN THE DISCRETION OF THE COURT IN LIGHT OF THE TIME THAT
        THIS COURT HAS ALREADY INVESTED IN PREPARING THIS CASE
        FOR TRIAL .......................................................................................................19

CONCLUSION.......................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Anderson v. Creighton,
483 U.S. 635 (1987).........................................................................................................9

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986).........................................................................................................1

Arizona v. Youngblood,
488 U.S. 51 (1988)................................................................................................... passim

Buie v. Sullivan,
923 F.2d 10 (2d Cir. 1990)............................................................................................11

Carter v. Hudson,
612 F. Supp. 749 (S.D.N.Y. 1985) ...............................................................................11

Celotex Corp. v. Catrett,
477 U.S. 317 (1986).........................................................................................................1

City of Canton v. Harris,
489 U.S. 378 (1989)................................................................................................16, 17

Daniels v. Williams,
474 U.S. 327 (1986).........................................................................................................8

District Attorney's Office v. Osborne,
No. 08-6, -- U.S. -- (June 18, 2009).................................................................2, 3, 5, 13

Duchesne v. Sugarman,
566 F.2d 817 (2d Cir. 1977)..........................................................................................17

Eagleston v. Guido,
41 F.3d 865 (2d Cir.1994)...............................................................................................6

Evitts v. Lucey,
469 U.S. 387 (1985).........................................................................................................4

Fiacco v. City of Rensselaer,
783 F.2d 319 (2d Cir.1986)...........................................................................................18

Harlow v. Fitzgerald,
457 U.S. 814 (1982)................................................................................................. 9, 10

Harvey v. Horan,
  285 F.3d 298 (4th Cir. 2002) ...............................................................................................4, 5

Hernandez v. Keane,
  341 F.3d 137 (2d Cir. 2003)..................................................................................................12

Jean v. Collins,
  221 F.3d 656 (4th Cir. 2000) ..............................................................................................8, 11

Jones v. Strack,
  99 Civ. 1270 (LAK), 1999 WL 983871 (S.D.N.Y. Oct. 29, 1991) ...........................................1

Kentucky Dep't of Corrections v. Thompson,
  490 U.S. 454 (1989)................................................................................................................6

Mathews v. Eldridge,
  424 U.S. 319 (1976)..............................................................................................................5, 7

Mauro v. Southern New England Telecom., Inc.,
  208 F.3d 384 (2d Cir. 2000)..................................................................................................19

McKithen v. Brown,
  481 F. 3d 89 (2d Cir. 2007), cert. denied, 128 S. Ct. 1218 (2008) .......................................4, 5

McKithen v. Brown, 565 F. Supp. 2d 440 (E.D.N.Y. 2008) ............................................... passim

Monell v. Dep't of Soc. Servs. of the City of New York,
  436 U.S. 658 (1978)..........................................................................................................15, 18

Owen v. City of Independence,
  445 U.S. 622 (1980)..............................................................................................................14

Parratt v. Taylor,
  451 U.S. 527 (1981)................................................................................................................8

People v Pitts,
  4 N.Y.3d 303 (2005) .......................................................................................................2, 3, 16

Poe v. Leonard,
  282 F.3d 123 (2d Cir. 2002)..................................................................................................12

Sorlucco v. New York City Police Dep't,
  971 F.2d 864 (2d Cir. 1992)..................................................................................................17

Sykes v. James,
  13 F.3d 515 (2d Cir.1993)........................................................................................................6

United States v. Nichols,
  912 F.2d 598 (2d Cir. 1990)..................................................................................................11

United States v. United States Currency in the Amount of $228,536.00,
      895 F.2d 908 (2d Cir. 1990)..................................................................................11

Vann v. City of New York,
      72 F.3d 1040 (2d Cir. 1995)................................................................................18

Villasana v. Wilhoit,
      368 F.3d 976 (8th Cir. 2004) ..............................................................................11

Walker v. City of New York,
      974 F.2d 293 (1992)............................................................................................17

Weyant v. Okst,
      101 F.3d 845 (2d Cir. 1996)................................................................................10

Wilkinson v. Austin,
      545 U.S. 209 (2005).............................................................................................7

Wright v. Smith,
      21 F.3d 496 (2d Cir. 1994)..................................................................................12

**STATUTES**

42 U.S.C. § 1983................................................................................................ passim

CPL § 440 ...................................................................................................................2

CPL § 440.10 (g) .......................................................................................................2

CPL § 440.30 .................................................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56...................................................................................................1, 14

1A Martin A. Schwartz, Section 1983 Litigation, § 6.02[a] at 6-4 (2009-1 Supp.) .......................9

Matthew H. Lembke, Note, *The Role of Police Culpability in* Leon *and* Youngblood, 76
      VA. L. REV. 1213 (1990) .....................................................................................9

Norman C. Bay, *Old Blood, Bad Blood, & Youngblood: Due Process, Lost Evidence, And
      The Limits Of Bad Faith* ......................................................................................8

Note, *The Supreme Court, 1988 Term—Leading Cases*, 103 HARV. L. REV. 137 (1989) ..........8

U.S. Constitution..................................................................................................4, 5

## STATEMENT OF FACTS

Plaintiff Alan Newton was released from prison on July 6, 2006 after an incarceration of more than twenty-two years for a crime he did not commit.[1]  The facts germane to defendants' motion are set forth at length in Plaintiff's Rule 56.1 Counter-Statement (hereinafter "P.S.").

## ARGUMENT

### I.  GENUINE ISSUES OF MATERIAL FACT PRECLUDE A GRANT OF SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The moving party[2] bears the heavy burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Here, Plaintiff's Rule 56.1 Counter-Statement and the Declarations of Alan Newton ("Newton Decl.") and Shannon Turner ("Turner Decl."), both dated June 25, 2009, collectively show that there are, at a minimum, genuine issues of material fact concerning the defendants' liability for their failure to produce exculpatory evidence (a Vitullo rape kit) to

---

[1]    The People of the State of New York alleged that he assaulted, robbed and raped a 25-year old woman (hereinafter referred to as "VJ") on June 23, 1984 (Bronx Ind. No. 2441/84).  A long-lost rape kit containing semen collected from VJ was found in November 2005.  P.S. ¶55. Plaintiff's conviction was vacated and the charges against him were dismissed because DNA testing confirmed that Mr. Newton's "DNA profile" did not match the one male "DNA profile" obtained from the spermatozoa within the rape kit.  P.S. ¶68.

[2]    The moving defendants have not each met their burden of proof on this motion -- no affidavit has been filed by *any* defendant and the deposition testimony filed by *some* defendants has not established their alleged lack of culpability.  For example, defendants McGuire, Kiely and Haskins have not set forth any facts establishing their lack of culpability; they did not perform a proper search for the rape kit, and they were admittedly ignorant of vital NYPD procedures.  P.S. ¶¶ 122-24, 250, 254-56.

plaintiff promptly at his request pursuant to state statute; these issues of material fact preclude the grant of summary judgment to any of the defendants herein.

**II.    PLAINTIFF HAD AN ADMITTED STATUTORY RIGHT, & A RESULTING CONSTITUTIONAL RIGHT, TO POST-CONVICTION DNA TESTING THAT WAS WRONGFULLY THWARTED BY THE DEFENDANTS**

By statute,[3] New York State provides criminal defendants with a statutory (post-conviction) right to DNA testing on available biological evidence -- and constitutional rights (and a resulting liberty interest) flow directly from that statutory right.  Here, the defendants do not deny that plaintiff had a statutory right of access to the rape kit, but they spend a considerable portion of their motion papers claiming that plaintiff had no "constitutional [direct] right to DNA testing."  Defendants' Memorandum of Law ("Defts.' Memo.") at 2-4.  The defendants miss the point – plaintiff has not claimed a *direct*, constitutional "right of access" to the rape kit under federal law or constitutional principles.  See, e.g., District Attorney's Office v. Osborne, No. 08-

---

[3]    In 1994, New York adopted a statute that specifically authorizes inmates to obtain post-conviction DNA testing: "[w]here the defendant's motion requests the performance of a forensic DNA test on specified evidence, and upon the court's determination that any evidence containing deoxyribonucleic acid ("DNA") was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant."  N.Y. Crim. Proc. L. § 440.30 (1-a)(a) (McKinney 2004).  In short, plaintiff undeniably had a legal right to obtain the rape kit for DNA testing no later than 1994 when CPL § 440.30 was enacted.  See  People v Pitts, 4 N.Y.3d 303, 311 (2005) ("The amendment further empowered courts to direct prosecutors to inform defendants of any information in the prosecutor's possession regarding the current location of the evidence to be tested, whether the evidence still exists, and the last-known physical location of the evidence.  These statutory requirements -- setting forth a standard different from that applied in other CPL 440 motions to vacate convictions involving newly discovered evidence and expanding the class of defendants to whom testing is available -- reflect the vital importance and potential exonerating power of DNA testing.").  [We submit that the known exculpatory value of the DNA in the rape kit required its production immediately upon plaintiff's request in 1989 (see CPL § 440.10(g)), as there was no legitimate government interest in keeping it from plaintiff.  Plaintiff began requesting the rape kit in 1989 and filed formal requests for it under CPL § 440.30 starting in 1994.  P.S. ¶¶159-271.]

- 2-

6, -- U.S. -- (June 18, 2009) (inmate must seek post-conviction access to State's evidence for DNA testing under state procedures, as no direct right exists under the Due Process Clause to obtain the evidence).[4]

What plaintiff claims here is that he had a statutory right to evidence in the possession of the defendants, who wrongfully thwarted his efforts to obtain that evidence in violation of both state and constitutional law. The denial of due process claimed by plaintiff plainly occurred *after the Bronx District Attorney's Office admitted that plaintiff had a statutory right of access to the evidence for DNA testing under New York State law, yet the People failed to produce that evidence to him for sixteen years.* P.S. ¶¶159-271. Plaintiff has a right now, under the Due

---

[4]    The Osborne case is very different from this case. In Osborne, an inmate chose to "sidestep" established procedures under Alaska state law for requesting evidence in the possession of the State in a post-conviction context. Slip Op. at 10 ("access to evidence is available under Alaska law"). Instead, he chose to file a § 1983 action, ignoring Alaska's established procedures, and sought a judicially-created right to the evidence under the Due Process Clause; the federal courts were being asked "to act as policy makers." Slip op. at 20. The Supreme Court ruled that, while the inmate had "a liberty interest in demonstrating his innocence with new evidence under state law…[and] 'this state created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right'" (Slip Op. at 14), the federal courts will not create a new judicially-created right to evidence in the possession of the State unless and until the inmate can "demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief" (Slip Op. at 18). Plaintiff here has brought this § 1983 lawsuit on this latter point – to "demonstrate the inadequacy of the state-law procedures [as applied to his requests for the rape kit under CPL § 440.30]." CPL § 440.30 did "beget yet other rights to procedures essential to the parental right," namely, that the state officials carrying out the dictates of CPL § 440.30 would do so in accordance with plaintiff's constitutional rights. This they failed to do; they failed to produce evidence in their possession that plaintiff had an admitted right to obtain. Significantly, in People v Pitts, 4 N.Y.3d 303, 311 (2005), the New York Court of Appeals held that under CPL § 440.30 "it is the People, as the gatekeeper of the evidence, who must show what evidence exists and whether the evidence is available for testing" and *"[t]he mere assertion that the evidence no longer exists based on a phone call to a police Property Clerk's office is insufficient as a matter of law under CPL § 440.30 (1-a)…*Supreme Court should take steps to obtain from the People reliable information as to whether or not the evidence exists and the source of that information. *Adequate information from the People might include, for example, an affidavit from an individual with direct knowledge of the status of the evidence or an official record indicating its existence or nonexistence*" (id. at 312) (emphasis added).

Process Clause of the Fifth and Fourteenth Amendments[5] (which act to protect individuals' liberty and to guard them against arbitrary and improper governmental action), to bring an action for money damages because state officials failed to carry out the dictates of the relevant state statute in accordance with plaintiff's constitutional rights.  The defendants seem to suggest that they had some legitimate government interest in withholding the exculpatory DNA evidence from plaintiff when clearly they had none under the law.  The defendants' failure to provide plaintiff with access to the rape kit constituted arbitrary action that offends basic principles of due process.  The procedures employed by the state in producing evidence pursuant to CPL § 440.30 must comport with the demands of the Due Process Clause, see Evitts v. Lucey, 469 U.S. 387, 393 (1985), by providing litigants with a fair opportunity to assert their state-created rights. Here, the defendants by providing and filing inaccurate statements about the existence of the rape deprived Mr. Newton of years of liberty.

The defendants inexcusably fail to even cite or address two very significant decisions in this Circuit that are relevant to the claims at issue here.  See McKithen v. Brown, 481 F. 3d 89, 92 (2d Cir. 2007) (a criminal defendant seeking post-conviction access to evidence for DNA testing may properly bring a § 1983 suit, if state officials fail to comply with the statute requiring production of DNA evidence), cert. denied, 128 S. Ct. 1218 (2008), remanded to, 565 F. Supp. 2d 440, 485 (E.D.N.Y. 2008) (a criminal defendant "has a right to access physical evidence for the purpose of DNA testing" under CPL § 440.30).  In March of 2007, the Second Circuit found

---

[5]     Due to "page limits" imposed by the Court on the lengths of legal briefs (20 pages on this motion), we address the Due Process Clauses of the Fifth and Fourteenth Amendments below, while expressly reserving plaintiff's right to assert the other constitutional violations asserted in the Complaint.  See, e.g., Complaint, ¶¶129 (violations are also claimed to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution).

itself "at this intersection of scientific advance[6] and enduring constitutional values" (McKithen, 481 F. 3d at 92); while the Second Circuit temporarily declined to determine whether the Due Process Clauses of the Fifth and Fourteenth Amendments guarantee a right to post-conviction DNA testing in New York because of the "fact-intensive nature of the inquiry" (id. at 107), in remanding the case to the district court, it provided some detailed guidance – it reminded the district court that "the reality of wrongful convictions challenges us to reaffirm our commitment to the principle that the innocent should be freed" (id. at 92) and that the district court "should begin with the framework established in Mathews v. Eldridge, 424 U.S. 319… (1976), for analyzing procedural due process claims"[7] (id. at 107).

On remand, Judge John Gleeson issued a lengthy and academic opinion addressing the constitutional issues identified by the Second Circuit; he concluded that that the U.S. Constitution guarantees a right to post-conviction DNA testing under CPL § 440.30 and he determined that a failure to produce exculpatory DNA evidence in response to such a demand constitutes an undeniable violation of *both* procedural *and* substantive due process:

> a prisoner has a right to access physical evidence for the purpose of DNA testing if: the physical evidence is in the possession of the government; the testing is nonduplicative; and assuming exculpatory results, the results of the testing would undermine confidence in the outcome of trial.

---

[6]     There is a consensus among the scientific community that DNA technology has the power to distinguish between any two individuals on the planet (saving, of course, identical twins).  Harvey v. Horan, 285 F.3d 298, 305, n.1 (4th Cir. 2002) (Luttig, J., respecting the denial of rehearing en banc).  Due to the statistical improbability of a DNA match between any two individuals, in certain cases, an adequately powered testing procedure is capable of conclusively exonerating an individual to a practical certainty.  Id.  "DNA testing has an unparalleled ability both to exonerate the wrongfully convicted and identify the guilty."  Osborne, Slip Op. at 1.

[7]     "Under *Mathews* the cases inevitably turn on their particular facts - which in the instant case include the availability of statutory avenues of relief, such as state or federal legislation providing for DNA testing, and the seriousness of the crime and sentence involved."  McKithen, 481 F. 3d at 107-08.

565 F. Supp. 2d at 485 (procedural due process violation summary).

> I would find that under certain circumstances, denial of access to physical evidence for DNA testing does shock the conscience [for a substantive due process violation]. The Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government,'" *Sacramento,* 523 U.S. at 845, 118 S.Ct. 1708 (quoting *Wolff,* 418 U.S. at 558, 94 S.Ct. 2963), including protection against "the exercise of power without any reasonable justification in service of a legitimate governmental objective," *Sacramento,* 523 U.S. at 846, 118 S.Ct. 1708.

565 F. Supp. 2d at 488-89.

> I would conclude that if a prosecutor refuses a prisoner's specific request for access to physical evidence for DNA testing, in circumstances where the testing could be performed at negligible cost to the state and the results of the testing, if exculpatory, would prove beyond a reasonable doubt that the prisoner did not commit the crime for which she is incarcerated, *the prosecutor [or other state agent] exhibits deliberate indifference to the possibility that the prisoner is actually innocent….given the negligible cost of actually performing the testing in those circumstances, the most charitable explanation for refusing to allow the testing is deliberate indifference to whether or not the prisoner is actually innocent.*

565 F. Supp. 2d at 489 (substantive due process summary) (emphasis added).

Procedural due process[8] comes into play after it has been determined that there has been a denial of life, liberty or property. A court, therefore, "examine[s] due process in two steps: the first is whether there exists a liberty or property interest that has been interfered with by the state[;] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460

---

[8]    42 U.S.C. § 1983 allows an individual to bring suit against persons who, under color of state law, have caused him to be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993) (citation omitted). In order to state a claim cognizable under section 1983, "'a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States.'" Eagleston v. Guido, 41 F.3d 865, 876 (2d Cir.1994) (citation omitted).

(1989).  As to the first step in the due process examination, plaintiff submits that the well-reasoned opinion of Judge Gleeson in McKithen establishes an appropriate standard[9] in this Circuit for evaluating the defendants' liability in failing to produce the rape kit to Mr. Newton upon his request and pursuant to CPL § 440.30 – under the reasoning of McKithen, plaintiff had a statutory right (and a resulting constitutional right), as a matter of law, to available, exculpatory DNA evidence in the state's possession.  To prevail on the second stage of the due process liability test, plaintiff merely has to show that "the procedures attendant upon that deprivation were [not] constitutionally sufficient,"[10] i.e., that one or more of the defendants unreasonably deprived plaintiff of his constitutional right to the exculpatory evidence without any legitimate government interest (under the Mathews v. Eldridge test – see footnote 10).  Here, the defendants failed to produce a rape kit in their possession to Mr. Newton, upon his request, knowing full

---

[9]    Significantly, Judge Gleeson dismissed the claimed relevance of Arizona v. Youngblood, 488 U.S. 51 (1988), since that decision concerned "destroyed evidence": "Neither of the factors counseling the Court in *Youngblood* to adopt a bad faith test-the difficulty of determining the significance of destroyed evidence and the burdens caused by a requirement that the state preserve all conceivably relevant evidence indefinitely, *id.*- apply to the question whether a defendant may access evidence that the state has chosen to preserve."  565 F. Supp. 2d at 484.

[10]    The procedures required to safeguard against an arbitrary or erroneous deprivation of liberty or property are determined by the application of the test set forth in Mathews v. Eldridge, 424 U.S. 319 (1976), which balances the importance of the private interest and the procedures necessary to protect that interest against the pertinent government interests.  See also Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (emphasis added) ("A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word `liberty,' *or it may arise from an expectation or interest created by state laws or policies*.").  Judge Gleeson performed an exhaustive Mathews test and determined that the withholding of exculpatory DNA evidence from a criminal defendant violates both the procedural (McKithen, 565 F. Supp.2d at 450-485) and substantive (Id. at 485-492) due process rights of that criminal defendant.  This is especially true where there is a statutory right to that evidence.  Here, the defendants can claim no legitimate state interest in their withholding the rape kit from plaintiff (id. at 484-85), while the private interests ("the right to liberty") were substantial (id. at 489: "if a prosecutor refuses a prisoner's specific request for access to physical evidence for DNA testing…the prosecutor [or other state agent] exhibits deliberate indifference to the possibility that the prisoner is actually innocent").

well that DNA in the kit would establish his guilt or innocence; no legitimate state interest

allowed the defendants to keep it from him – that is a constitutional violation.

"Section 1983 does not contain a willfulness or other state of mind requirement…it is

necessary to isolate the particular federal right at issue [*e.g.*, Due Process Clause] and determine

the culpability that gives rise to violations of that right."[11]  1A Martin A. Schwartz, Section 1983

Litigation, § 6.02[a] at 6-4 (2009-1 Supp.).  Here, it will be for the jury to determine which of the

defendants should be held accountable for the failure to produce the rape kit, once this Court

determines the "state of mind"[12] requirement that is appropriate for evaluating the alleged

---

[11]     In Parratt v. Taylor, 451 U.S. 527, 534 (1981), the Supreme Court concluded that
"[n]othing in the language of § 1983 or its statutory history limits the statute solely to intentional
deprivations of constitutional rights…Section 1983 has never been found to contain a state-of-
mind requirement."  In Parratt, the Court left open the question whether "negligent conduct by
persons acting under color of state law may be actionable under 42 U.S.C. § 1983."  451 U.S. at
554-55 (Marshall, J., concurring in part and dissenting in part) (emphasis added).  For a
procedural due process claim, since the underlying question is: "was there a deprivation of
liberty without due process of law," traditional concepts of "negligence," "reckless disregard"
and "deliberate indifference" are, perhaps, not applicable.  See Daniels v. Williams, 474 U.S.
327 (1986) (a violation of the Due Process Clause requires proof of two elements: (1) that the
state official "deprived" (*i.e.*, culpably denied) a citizen of life, liberty, or property and (2) that
the "deprivation" occurred "without due process of law"; if these two requirements are met, a
due process violation is established); see also Jean v. Collins, 221 F.3d 656, 672 (4th Cir. 2000)
(Dissent of Murnaghan, J.: "'deprivation' seems to mean 'infringement,' devoid of any 'bad
faith' connotation").

[12]     The defendants claim that plaintiff has the burden of proving "bad faith" on the part of
the defendants to establish liability for the failure to produce the rape kit citing to Arizona v.
Youngblood, 488 U.S. 51 (1988); their reliance on Youngblood is, however, misplaced.  In
Youngblood, the Supreme Court was asked to determine *whether a sanction was appropriate in
a criminal action for the destruction of evidence*.  The Court determined only that a sanction, *in
a criminal action*, should be imposed if the government officials acted in "bad faith" in
destroying evidence.  That standard is not appropriate in this civil action.  See footnote 9 above.
It is noteworthy that Judge Gleeson determined that, in the context of substantive due process, if
a government actor fails to produce exculpatory DNA evidence in his/her possession pursuant to
CPL § 440.30 (in "unhurried situations"), then the actor has performed with "deliberate
indifference" to the due process rights of the criminal defendant.  McKithen, 565 F.Supp.2d at
489.  It is also significant that Youngblood has been universally criticized as a "pre-DNA"
decision that has been long outdated.  For critical commentary, see Norman C. Bay, *Old Blood,*

procedural and substantive due process violations alleged by plaintiff. The accompanying Rule 56.1 Statement and Declarations show how indifferently and egregiously the defendants acted in response to plaintiff's numerous and relentless requests for the rape kit. P.S. ¶¶159-271. Under the circumstances here, we submit that the Court may even consider entering a summary judgment, *sua sponte*, in plaintiff's favor.

## III.    THE ALLEGED DEFENSE OF "QUALIFIED IMMUNITY" DOES NOT SHIELD THE DEFENDANTS FROM LIABILITY

"Qualified or 'good faith' immunity is an affirmative defense that must be pleaded [and affirmatively proved on this motion] by a defendant official." Harlow v. Fitzgerald, 457 U.S. 814, 815 (1982).[13]  In 1994, with the enactment of CPL § 440.30, plaintiff had the admitted, statutory right to request and receive the exculpatory rape kit, and no state actor performing

---

*Bad Blood, & Youngblood: Due Process, Lost Evidence, And The Limits Of Bad Faith*, 86 Washington University Law Review 241, 247, 273 (2008) ("In place of the bad faith standard, a better, more balanced approach would take into account the overriding concern of due process: adjudicative fairness. Thus, a court would assess both police culpability and the materiality of the lost evidence or prejudice suffered by the accused…in emphasizing bad faith at the expense of materiality or fairness to the accused, the Court ignored the balancing approach in effect in state and lower federal courts [and] disregarded important principles from its own precedent"); Note, *The Supreme Court, 1988 Term—Leading Cases*, 103 HARV. L. REV. 137, 157 (1989) (arguing that "[t]he majority, by adopting a subjective 'bad faith' test and by placing the burden of proof on the [criminal] defendant, needlessly weakened…constitutional assurances"); Matthew H. Lembke, Note, *The Role of Police Culpability in* Leon *and* Youngblood, 76 VA. L. REV. 1213, 1215 (1990) (criticizing "inherently flawed" opinion in *Youngblood* because focusing on police bad faith—and not the materiality of the destroyed evidence—"gives inadequate protection to the rights of the defendant to fundamental fairness").

[13]    "[Q]ualified immunity would be defeated if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]….'" Harlow, 457 U.S. at 415 (emphasis in original).  The defense will not be given effect if the defendant violated "clearly established *statutory or constitutional rights* of which a reasonable person would have known." Id. at 818-819 (emphasis added).  Plaintiff rights arose out of a clear and unequivocal statute.  The availability of the defense depends on whether a "reasonable officer could have believed" his action "to be lawful, in light of clearly established law and the information he possessed. " Anderson v. Creighton, 483 U.S. 635, 641 (1987).   Here, the defendants cannot claim reasonable reliance on any existing law in their withholding of the rape kit from plaintiff.

under New York State law may claim ignorance of that law, or Mr. Newton's statutory (and resulting constitutional) right to that material evidence.  Harlow, 457 U.S. at 819 ("a reasonably competent public official should know the law governing his conduct…[w]here an official could be expected to know that certain conduct would violate *statutory or constitutional rights*, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.") (emphasis added).  Here, the defendants knew that they were being asked to produce material evidence that would either exculpate or inculpate a criminal defendant; they knew or should have known that plaintiff had an absolute right to request this evidence under a New York statute.  No legitimate state interest[14] allowed them to withhold that evidence from plaintiff in light of CPL § 440.30.  Viewing the evidence in a light most favorable to plaintiff, a reasonable jury (or judge) could find that the defendants did not act "reasonably" in light of their statutory, and resulting constitutional, duties.  In sum, at worst, a genuine issue of material fact exists as to whether it was reasonable for the "state actors" here to think that it was proper to deny Mr. Newton's multiple requests for production of the rape kit based on, at best, "half-hearted" and improper searches for the kit when the significance of the DNA evidence was known and plaintiff was deemed entitled to the evidence under CPL § 440.30 – the "searches" by these defendants (viz., McGuire, Kiely, Haskins and certain John/Jane Does) inexcusably failed to follow the written dictates of the NYPD's Property Clerk Division ("PCD") "Property Guide" and the dictates of due process.  P.S. ¶¶159-271.  See, e.g., Weyant v. Okst, 101 F.3d 845, 858

---

[14]    Unlike a "stop and frisk" scenario, where qualified immunity is applied to protect police officers because the law is evolving concurrently with police officers making daily "snap" judgments to protect the public, here there was an "unhurried situation" and no government interest that would justify keeping the rape kit from Mr. Newton (the actions of the defendants were either guided by an improper motive -- uphold the conviction regardless of new evidence -- or were taken with an arbitrary "reckless disregard" of plaintiff's circumstances/rights).

(2d Cir. 1996) (finding facts sharply in dispute and that the matter of qualified immunity could not be resolved as a matter of law).[15]

## IV.   PLAINTIFF'S SIXTH THROUGH NINTH CAUSES OF ACTION ARE VIABLE BECAUSE CONSTITUTIONAL VIOLATIONS HAVE BEEN SHOWN THAT ESTABLISH THE EXISTENCE OF MUNICIPAL & SUPERVISORY LIABILITY

### A.  Jack Trabitz – Personal Liability, Supervisory Liability & Negligent Training Liability

Defendant Jack Trabitz was the Commanding Officer of the NYPD's PCD between 2000 and November 2005, a substantial period during which the rape kit was not produced to plaintiff. P.S. ¶¶111, 217.  During his Command, we now know that *both* the rape kit *and* its tracking document (the Yellow Invoice showing the rape kit's precise location) were undeniably in the possession of the PCD.  P.S. ¶¶7, 217  Due to egregious errors on the part of the PCD, the personnel supervised by Trabitz failed to perform their duty -- produce the rape kit -- in violation of plaintiff's statutory and constitutional rights.   P.S. ¶¶159-271.[16]   Trabitz has admitted that he knew that NYPD Invoices were being wrongfully destroyed, and that valuable DNA evidence

---

[15]     The defendants cite several decisions in support of their claim that the "bad faith" test of Youngblood should be applied here, but the decisions cited are distinguishable, incorrect, and/or not binding here.  See Buie v. Sullivan, 923 F.2d 10, (2d Cir. 1990) (criminal action where a sanction was at issue due to destruction/loss of "potentially useful evidence"); United States v. Nichols, 912 F.2d 598 (2d Cir. 1990) (same); United States v. United States Currency in the Amount of $228,536.00, 895 F.2d 908 (2d Cir. 1990) (same); Jones v. Strack, 99 Civ. 1270 (LAK), 1999 WL 983871 (S.D.N.Y. Oct. 29, 1991) (same); Villasana v. Wilhoit, 368 F.3d 976 (8th Cir. 2004) (an incorrect reliance on Youngblood – not binding here); Jean v. Collins, 221 F.3d 656, 658 (4th Cir. 2000) (equally-divided en banc court) ("plaintiff alleges at most a negligent miscommunication between these [defendant] officers and the prosecutor"), 669 (Dissent of Murnaghan, J.: "The problem with the concurrence's "bad faith" thesis, however, is that *Brady* makes the non-disclosure of exculpatory evidence a violation of the Due Process Clause "irrespective of the good faith or bad faith" of the non-disclosing official.").

[16]     See Carter v. Hudson, 612 F. Supp. 749 (S.D.N.Y. 1985) (Scheindlin, M.J.) (Rule 12/56 motions denied because material issues of fact existed as to whether The City's alleged failure to train and supervise its officers in gathering and handling exculpatory evidence was sufficiently egregious to be labeled grossly negligent or to warrant finding of deliberate indifference to plaintiff's constitutional rights).

would likely be "lost" within the PCD's facilities as a direct result, yet Trabitz has only testified that he stopped this Invoice destruction practice "sometime" (2006) after he took over the Command of the PCD.  P.S. ¶¶109-118.  Trabitz also knew that many other criminal defendants (and the Innocence Project) had complained about the NYPD's inability to produce criminal evidence left in its care, but he did little or nothing to stop the chaotic practices of the PCD.  P.S. ¶¶274-80.

> Case law clearly establishes that a supervisor may be liable for failing to screen or otherwise inquire about his subordinates or into their actions. See, e.g., Fiacco v. City of Rensselaer, 783 F.2d 319, 329-31 (2d Cir.1986) (finding sufficient evidence to support a jury's finding that a police chief was deliberately indifferent to his officers' use of excessive force because the evidence showed that the chief failed to exercise reasonable care in investigating several claims of police brutality and instead conducted only a superficial questioning of the accused officers)…for a supervisor to be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior.  Such notice could be actual (for example, awareness of prior deprivations in a related context), or it could be constructive (for instance, notice arising from a preexisting duty).

Poe v. Leonard, 282 F.3d 123, 141 (2d Cir. 2002).

Trabitz was responsible for the training and supervision of the employees of the NYPD PCD employees under his command.[17]  The employees deposed to date have shown that they were either ignorant or deliberately indifferent to the explicit terms of the PCD's "Property Guide."  P.S. ¶¶120-26, 255-56.  Trabitz was on notice of the poor practices of the PCD and, yet,

---

[17]    For supervisory liability to exist under § 1983, for someone who does not directly participate in the constitutional violation, that person must have: (1) failed "to remedy a wrong after being informed through a report or appeal," (2) created a policy or custom "that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue," (3) was "grossly negligent" in supervising "subordinates who committed a violation," or (4) failed "to act on information indicating that unconstitutional acts were occurring." Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  Plaintiff submits that the conduct of the PCD Defendants was so egregious that Trabitz may be held liable under any one of these categories of wrongdoing.   P.S. ¶¶109-118, 274-80.

he has not shown on this motion that he did anything to improve those unacceptable practices before plaintiff's lawsuit was commenced.   P.S. ¶¶109-118, 274-80.  Since his employees were undeniably responsible for the failure to produce the rape kit between 2000 and November 2005, and since he was, at a minimum, on constructive notice of the poor practices employed by his personnel, he remains liable to plaintiff.

**B. Robert Johnson – Individual Liability, Official Capacity Liability, Supervisory Liability & Negligent Training Liability**

First, defendant Johnson has been sued both in his personal and official capacities.  As to his personal liability, plaintiff can show that a "tracking" document (a copy of a Yellow Invoice – Ex. U) was present within the files of the Bronx District Attorney's Office, containing a handwritten notation setting forth the precise location of the "missing" rape kit, but for some unexplained reason this document was not presented to the NYPD until November 2005.   P.S. ¶¶5, 20, 28, 270 and (Ex. H).   According to the NYPD defendants, if this document had been presented to the NYPD prior to November 2005, the rape kit would have been located and produced.   Trabitz Depo. at 222 (Ex. L) ("once the property clerk invoice B744483…was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property").   DA Johnson is responsible for this failure, both personally and in his official capacity.  Plaintiff has elected not pursue his claim against the estate of ex-DA Mario Merola.

Second, for the reasons set forth above relating to Trabitz, the "failure to supervise/train" claims set forth against District Attorney Robert T. Johnson also should survive.  The Assistant District Attorneys ("ADAs") under his command were simply not provided with any guidance as to how to request for post-conviction DNA sought from the NYPD (viz., what documents and information needed to be supplied to ensure a proper and complete search for evidence).   The

- 13-

testimony of the three ADAs (Carroll, Moore and Curbelo) who attempted to obtain the rape kit between 1994 and 1999, shows that they were so ignorant of proper evidence request procedures, one can only conclude that The City/NYPD/DA's Office must have been deliberately indifferent to the training and supervision of ADAs on this subject. P.S. ¶¶4, 18, 31, 210, 232, 242. Contrary to the defendants' claim, an ADA is not entitled to "absolute immunity" for the "alleged failure to produce evidence." Defts. Memo. at 12, citing to Van de Kamp v. Goldstein, -- U.S. --, 129 S. Ct. 855 (2009).[18] Here, the acts of the ADAs in question relate solely to the manner in which they sought and requested a rape kit from the NYPD and the OCME – these acts were ministerial or administrative tasks that clearly were not "intimately associated with the judicial phase of the criminal process."

Third, plaintiff was advised by Magistrate Judge Debra Freeman that she would not allow the deposition of DA Johnson. See Declaration of John F. Schutty, Esq. dated June 25, 2009, ¶¶11-13. Plaintiff requests an opportunity to depose DA Johnson before any claim asserted against him is dismissed (pursuant to Fed. R. Civ. P. 56(f)).

---

[18]    The Van de Kamp case reiterates prior precedent that a prosecutor enjoys "absolute" immunity "for prosecutorial actions that are "intimately associated with the judicial phase of the criminal process," id. at 860, and reiterates "that absolute immunity may not apply when a prosecutor is not acting as "an officer of the court," but is instead engaged in other tasks, say, investigative or administrative tasks," id. at 861. In Van de Kamp, the Court determined that plaintiff's "failure to supervise and training" claim was subject to "absolute" prosecutorial immunity because the supervision and training was "intimately associated with the judicial phase of the criminal process" (it concerned the training and supervising of evidence "presented at trial"). Id. at 862 (citation omitted). Here, the ADAs were carrying out "administrative tasks" (merely requesting evidence); they were not taking action that was "intimately associated with the judicial phase of the criminal process" (i.e., "directly connected with the prosecutor's basic trial advocacy duties").

### C. Municipal Liability

First, The City of New York ("The City") claims plaintiff's "municipal liability" claim (that part relating only to loss of the rape kit for 16 years) is not viable because "there was no violation of Mr. Newton's constitutional rights in connection with the City's inability to locate or produce the rape kit." Defts.' Memo. at 13. We know that is an incorrect premise from what has been revealed above and in Plaintiff's Rule 56.1 Counter-Statement because employees of The City undeniably violated plaintiff's statutory and constitutional rights. See Section II above.

Second, The City claims that "plaintiff cannot satisfy 'the rigorous standards of culpability and causation' necessary to establish municipality liability. Defts.' Memo. at 13. The City, however, has the burden of proof in establishing entitlement to summary judgment -- and The City has offered no proof that plaintiff will not be able to satisfy the requisite standard[19] at trial. The PCD has been admittedly destroying Yellow and White Property Invoices for years (an explicit municipal policy)[20] without simultaneously destroying the evidence to which those Invoices relate. P.S. ¶¶111-18. "This blatant disregard demonstrates that The City of New York has created an evidence management system that is rotten and ineffective at its very core. The City has intentionally allowed it to become impossible to find and secure post-conviction evidence (viz., any rape investigation evidence) that is more than five years old." Turner Decl.

---

[19]    Under Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658 (1978), a municipality may held liable for an employee's enforcement of a municipal policy or custom that caused the deprivation of plaintiff's rights. And, the fact that The City's employees may have acted in good faith will not now shield The City from either prospective relief or compensatory damages. See Owen v. City of Independence, 445 U.S. 622, 651 (1980).

[20]    Deputy Chief Trabitz testified he was unable to state precisely when he allegedly changed the PCD policy/procedure on Invoice destruction set forth so explicitly in the PCD "Property Guide" at Procedure 211-7. Trabitz Depo. at 260 (Ex. L) (Invoice Destruction: "I changed the policy [of destroying Yellow Invoices after five years]"), 263 ("*Sometime during my tenure* I had instituted a policy that no invoices are to be destroyed."). P.S. ¶117.

¶19. In a paper-based registration system, when you destroy the paper that tracks the evidence, you lose the ability to locate the evidence.[21] P.S. ¶¶77, 109-19; Turner Decl. ¶11. Within the PCD an environment had been created where employees, knowing that Invoices were being destroyed (or otherwise unavailable), came to accept that they would likely not find "old" evidence; these employees would, therefore, make only "half-hearted" searches for post-conviction Invoices or evidence; and these employees learned that if they simply reported to the District Attorney's Office that they could not find the Invoice or the evidence (without showing proof of destruction), there was no penalty or sanction to them. In People v Pitts, 4 N.Y.3d 303, 312 (2005), the Court of Appeals recognized what was likely a recurring, but wrongful, pattern in CPL § 440.30 cases and provided some explicit guidance – the Court acknowledged that unacceptable searches were being performed by property clerks for post-conviction evidence and therefore instructed: "[t]he mere assertion that the evidence no longer exists based on a phone call to a police Property Clerk's office is insufficient as a matter of law under CPL § 440.30 (1-a)."

In short, the policy of the PCD that encouraged the destruction of PCD Invoices over time has created a criminal evidence management system without "evidence maps" and without penalties. Who knows how many innocent men remain behind bars today in New York State because "maps" (Invoices) to exculpatory evidence have been destroyed? [22] The municipal policy of destroying Invoices, has left The City (years later) without the ability to state,

---

[21] The Supreme Court established in City of Canton that a municipality can be liable for inadequately training its employees where the municipality is deliberately indifferent toward whether its employees will unconstitutionally apply its policies without more training. City of Canton v. Harris, 489 U.S. 378, 387-90 (1989).

[22] In New York, there is no time limit for bringing a post-conviction motion requesting the production of criminal evidence and the performance of forensic DNA testing. See People v. Pitts, 4 N.Y. 3d 303 (2005).

definitively, whether it still has DNA evidence in its possession that has been requested pursuant to CPL § 440.30.[23]  The Newton cases shows that elaborate tales/lies are being spun to excuse the NYPD's inability to find evidence or prove its destruction.  See Sgt. McGuire's letter to ADA Curbello dated August 26, 1998 (P.S. ¶254).  In sum, if The City has the evidence in its possession, it has an absolute duty to produce that evidence under the conditions set forth in the aforementioned statute, so as not to deprive incarcerated individuals of their statutory, and resulting constitutional, right to that evidence.  The Innocence Project has been claiming for some time that the City has been producing post-conviction evidence at a lower rate than other cities (P.S. ¶¶278-80), and the evidence in this case would support that there are serious problems with the NYPD evidence registration system based on the PCD practice of destroying Invoices.  Turner Decl. ¶20; P.S. ¶¶272-85

Beyond the destruction of Invoices, plaintiff also can show that so many PCD regulations and procedures were violated by the PCD Defendants[24] (P.S. ¶¶136-39, 145-49, 156, 168, 187-200, 216-221, 248-56; Turner Decl. ¶¶14, 16) that there is only one inescapable conclusion – these City employees were operating within a system that condoned or encouraged indifferent behavior and that there was "deliberately indifferent training or supervision."  See City of Canton v. Harris, 489 U.S. 378, 387 (1989) ("the inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to a deliberate indifference to

---

[23]    The § 1983 claimant need not show that an officially adopted municipal policy (e.g., destroying Invoices) was directed at any particular individual; it is sufficient to show that the policy sanctioned the type of conduct that caused the violation of the federal or constitutional right.  Duchesne v. Sugarman, 566 F.2d 817 (2d Cir. 1977).

[24]    See Sorlucco v. New York City Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992) ("a § 1983 plaintiff may establish municipality's liability by demonstrating that the actions of subordinate officers are sufficiently widespread to constitute constructive acquiescence of senior policymakers).

the rights of persons with whom the police come into contact"); <u>Walker v. City of New York</u>, 974 F.2d 293 (1992) (§ 1983 claimant properly pleaded municipal liability -- inadequate training and supervision claims -- against the district attorney's office with respect to both the use of perjured testimony and exculpatory evidence).   Here, the NYPD "dumped" employees "in trouble" like defendant Stacy Haskins in the PCD (P.S. ¶123); and the NYPD allowed defendants Haskins, Kiely & McGuire to speak as its representatives to the District Attorney's Office, yet the NYPD provided these employees with virtually no training or supervision (P.S. ¶¶122-24, 250, 254-56.).[25]   In sum, the NYPD/City acted with "deliberate indifference" as to how these individuals might handle legitimate and deserving evidence requests like those repeatedly presented by plaintiff.

Plaintiff will be able to establish <u>Monell</u> liability on the party of The City for the actions of the PCD Defendants and DA Defendants under well-established Second Circuit precedent:

> We have no doubt that, in the context of a theory that the City negligently supervised its officers in their use of force [in their storage and control of criminal evidence], the evidence that a number of claims of police brutality [of loss of, or secretion of, evidence] had been made by other persons against the City, together with evidence as to the City's treatment of these claims, was relevant. *Whether or not the claims had validity,* the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force [had not handled criminal investigations properly].

<u>Fiacco v. City of Rensselaer</u>, 783 F.2d 319, 328 (2d Cir. 1986) (emphasis added).[26]

---

[25]    The same is true as to the employees of the DA's Office.  Turner Decl. ¶16.

[26]    Nine years after the <u>Fiacco</u> decision, the Second Circuit reaffirmed that even invalid prior complaints may be relevant to prove a <u>Monell</u> claim: "deliberate indifference may be inferred if the complaints" (substantiated or not) "are followed by no meaningful attempt on the part of the municipality to investigate or forestall further incidents."  <u>Vann v. City of New York</u>, 72 F.3d 1040, 1049 (2d Cir. 1995).

**V.    PLAINTIFF'S PENDENT STATE LAW CLAIMS SHOULD BE RETAINED IN THE DISCRETION OF THE COURT IN LIGHT OF THE TIME THAT THIS COURT HAS ALREADY INVESTED IN PREPARING THIS CASE FOR TRIAL**

In presenting their position, the defendants state the "general" rule that "where federal claims are dismissed before trial, any pendent state law claims should be dismissed as well." Defts.' Memo. at 15.   The rule in this Circuit is, however, that a district court judge has the discretion to entertain pendent state law claims even if the sole federal claim is dismissed.  See Mauro v. Southern New England Telecom., Inc., 208 F.3d 384, 388 (2d Cir. 2000) ("We review a district court's exercise of supplemental jurisdiction for abuse of discretion…and find here that the court did not err in retaining jurisdiction over Mauro's state claims after dismissing his sole federal cause of action.  Declining jurisdiction over the state-law claims in this case would have furthered neither fairness nor judicial efficiency….").  Plaintiff submits that the time this Court has invested in bringing this matter through a Rule 12 motion to dismiss and two separate Rule 56 motions for summary judgment ensures that this Court is best-equipped to provide the parties fairness and judicial efficiency through trial (in the remote event only state law claims survive the defendants' motions for summary judgment).

## CONCLUSION

For the reasons set forth above, plaintiff respectfully requests that the Court:

(1)     refuse the application for summary judgment by defendant Robert T. Johnson pursuant to Rule 56(f), or order a continuance until his deposition is taken;

(2)     deny the remainder of defendants' Rule 56 motion; and

(3)     grant any other or further relief that the Court deems just and proper.

Dated:  New York, New York
        June 26, 2009

                                Respectfully submitted,



                                By:____/s/_____
                                     John F. Schutty, Esq.
                                        (JS2173)
                                Law Office of John F. Schutty, P.C.
                                445 Park Avenue, Ninth Floor
                                New York, New York 10022
                                Tel:  (212) 836-4796

                                Counsel to Plaintiff Alan Newton