UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
ALAN NEWTON,                                                       :
                                                                  :
                                    Plaintiff,                    :    Civil Action No.
            -against-                                             :    07-cv-06211
                                                                  :    (Scheindlin)
THE CITY OF NEW YORK; DISTRICT ATTORNEYS MARIO          :
MEROLA AND ROBERT T. JOHNSON, INDIVIDUALLY,             :    **PLAINTIFF'S**
AND IN THEIR OFFICIAL CAPACITY; ANDREA FREUND          :    **RULE 56.1**
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY AND            :    **COUNTER-**
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF THE        :    **STATEMENT**
CITY OF NEW YORK WHO ARE/ WERE ASSISTANT               :    **FILED IN**
DISTRICT ATTORNEYS WITHIN THE OFFICE OF THE             :    **OPPOSITION TO**
DISTRICT ATTORNEY, COUNTY OF BRONX; DETECTIVE           :    **DEFENDANTS'**
JOANNE NEWBERT, DETECTIVE PHILLIP GALLIGAN,             :    **MOTION FOR**
DETECTIVE [JOHN DOE] HARTFIELD, DETECTIVE               :    **SUMMARY**
[JOHN DOE] RYAN, DETECTIVE [JOHN DOE] HARRIS,           :    **JUDGMENT**
POLICE OFFICER DOUGLAS LEHO, POLICE OFFICER             :
WILLIAM SEAN O'TOOLE, LIEUTENANT MICHAEL                :
SHEEHAN, SERGEANT PATRICK J. McGUIRE, POLICE           :
OFFICER [JOHN DOE] HASKINS, POLICE OFFICER              :
[JANE DOE] KIELY, INSPECTOR JACK J. TRABITZ             :
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY                :
AND IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES           :
OF THE CITY OF NEW YORK WHO ARE/ WERE MEMBERS          :
OF THE POLICE DEPARTMENT OF THE CITY OF NEW             :
YORK,                                                            :
                                                                  :
                                    Defendants.                   :
-------------------------------------------------------------------------------X

Plaintiff Alan Newton, by and through his attorneys, The Law Office of John F. Schutty,

P.C., submits this Local Civil Rule 56.1 Counter-Statement of Material Facts in opposition to the

Motion for Summary Judgment (dated June 5, 2009) filed by certain defendants seeking a

dismissal of various "federal law claims" arising out of the defendants' failure to produce an

exculpatory rape kit in their possession for over sixteen (16) years:

## TABLE OF CONTENTS

**Subject**                                                                      **Page**

I.  Plaintiff's Response to Defendants' Rule 56.1 Statement ...............................................4

II. Plaintiff's Rule 56.1 Counter-Statement ........................................................16

    A.  Background on Alan Newton & This Litigation..................................................16

    B.  Background on the NYPD's Property Clerk Division ("PCD").........................19

    C.  Criticism of the PCD's Paper-Based System Used to Track Criminal
        Evidence.................................................................................................21

    D.  PCD Procedures Used to Register, Control, Produce & Destroy Evidence .......22

        1.  Significance of the Original White & Yellow NYPD Invoices....................23

        2.  Initial Registration of Criminal Evidence by the PCD ................................24

        3.  PCD's Handling of Vitullo Rape Kits ...........................................................25

        4.  Production of Criminal Evidence by the PCD for "Out to Court"
            Testing.......................................................................................................26

        5.  Routine Receipt of Criminal Evidence by the PCD Following "Out to
            Court" Testing ..........................................................................................27

        6.  OCME's Return of Criminal Evidence to PCD in "DOA Barrels"..............28

        7.  PCD's Destruction of Criminal Evidence....................................................30

    E.  Supervision & Training Provided to PCD Employees ........................................33

    F.  Criminal Evidence Collected in the "VJ/Newton" Rape Investigation ..............36

        1.  Newton's Sneakers.........................................................................................37

        2.  VJ's Soiled Clothing.....................................................................................38

        3.  The Vitullo Rape Kit.....................................................................................40

    G.  Newton's Requests for the Rape Kit & the Defendants' Failure to
        Produce It ..........................................................................................................42

1.  1988 - Request for Blood-Type Testing on the Rape Kit .............................42

    a.  1988 Testing on the Rape Kit ................................................................45

    b.  The Rape Kit Is Returned to the PCD in December 1988 ......................46

    c.  The PCD Failed to Record the Receipt of the Rape Kit Properly ..........46

    d.  The PCD/DA's Office Fail to "Follow Up" on a Search for the
       Rape Kit ...............................................................................................51

2.  1989 - FOIL Request for the Rape Kit..........................................................52

3.  1991 - Informal Attorney Request for the Rape Kit ......................................53

4.  1994 – Motion Filed Under CPL § 440.30 for the Rape Kit ........................53

5.  1995 - *Habeas Corpus* Petition Request for the Rape Kit ............................59

6.  1998 – New Motion Filed Under CPL § 440.30 for the Rape Kit................61

7.  1999 – OCME Refuses to Produce Its Chain-of-Custody Documents.........71

8.  2002 – FOIL Request for the Rape Kit..........................................................71

9.  2005 – Innocence Project Request for the Rape Kit......................................72

H.  The Rape Kit Is Finally Found in November 2005.............................................72

I.  Newton Is Exonerated by DNA Testing on the Rape Kit & Freed on
   July 6, 2006.........................................................................................................73

J.  The City Knew that Evidence Was Being Lost Because Invoices Were
   Destroyed .............................................................................................................73

K.  In New York, There Is No Time Limit on Requesting
   Post-Conviction DNA Testing............................................................................80

L.  Plaintiff Has Filed a Motion to Join/Add Additional Defendants to
   the Complaint.......................................................................................................81

## I.  Plaintiff's Response to Defendants' Rule 56.1 Statement

1.    *Not disputed.*[1]

2.    *Not disputed.*

3.    *Not disputed, but supplemented.*   The Bronx District Attorney's Office did, indeed, concede that plaintiff Alan Newton satisfied the requirements of CPL § 440.30 (*i.e.,* plaintiff established his statutory right to DNA testing on the biological evidence in the possession of the NYPD).  The so-called "consent" to testing proved to be worthless, as the NYPD and Bronx District Attorney's Office arbitrarily failed to produce the material (exculpatory) DNA evidence in their possession to plaintiff upon this request in 1994 – it was produced more than a decade later.

4.    *Disputed.*   Assistant District Attorney John Carroll ("ADA Carroll") was not properly trained with respect to the NYPD's property/evidence management system; he was ill-equipped to undertake the "task of locating and producing these items for testing."  Carroll Depo. at 28-30 ("Q. Did you back in August of 1994 know how the Property Clerk's Office used the voucher [or invoice] system to track the movement of evidence within the Property Clerk Division?  Mr. Weiler: Objection.  A. I don't think so.") (Ex. P).

---

[1]   Defendants Joanne Newbert, Phillip Galligan, "John Doe" Hartfield, Bernard Ryan, Douglas Leho, William Sean O'Toole, and various unknown "John/Jane Doe" New York City Police Department (hereinafter "NYPD") officers will all be collectively referred to hereinafter as the "Officer Defendants."  According to defense counsel, Defendants Galligan and Hartfield passed away several years ago (plaintiff has not served their estates).  Defendants Jack Trabitz, McGuire, Geraldine Kiely, Stacey Haskins and various other "John/Jane Does," who were employed by the NYPD's Property Clerk Division (hereinafter "PCD"), will be collectively referred to hereinafter as the "PCD Defendants."   Defendants Marion Merola, Esq. (decesased – his estate has not been served), Robert T. Johnson, Esq., and various other "John/Jane Does," who were employed by the Bronx District Attorney's Office, will be collectively referred to hereinafter as the "DA Defendants."

5.      *Disputed.*  A photocopy of the relevant NYPD Invoice/Voucher (B744483) used to track the movement of the rape kit (while the rape kit was in the possession of the NYPD) was in the "Appeals File" of the Bronx District Attorney's Office and was produced to plaintiff from that file in this litigation.  Compare Ex. U (*photocopy of Yellow Invoice No. B744483 produced by the District Attorney's Office*) with Ex. H (Invoice attached to Koenderman letter to Trabitz). The photocopy of NYPD Invoice No. B744483 within the aforementioned "Appeals File" contains a patently obvious handwritten notation setting forth the precise location ("DOA Barrel #22 1989") of the rape kit that was requested by Mr. Newton in 1989, 1991, 1994, and subsequent years.  Id.  For some unexplained reason, ADA Carroll and other DA Defendants failed to forward this relevant document to the NYPD to assist the NYPD in its search for the rape kit.  Trabitz Depo. at 222 (Ex. L) ("once the property clerk invoice B744483…was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property").  The photocopy of the Invoice, if it had been dispatched to the NYPD promptly, would have led the NYPD to find the rape kit in 1994.  Id.

6.      *Not disputed, but supplemented.*  The Invoice/Voucher number was not, alone, enough to help the NYPD find the rape kit, because the NYPD had "misplaced" the original NYPD Yellow Invoice (No. B744483) (Ex. A) that contained a handwritten notation setting forth the precise location of the rape kit.  See Declaration of Sgt. Thomas O'Connor dated April 13, 2009 (hereinafter "O'Connor Decl."), ¶¶3-4 (Ex. E).

7.      *Not disputed, but supplemented.*  Representatives of the Bronx Property Clerk's Office may have told ADA Carroll that they could not find the Invoice for the rape kit, but we know today that they had the original NYPD Yellow Invoice (No. B744483) (Ex. A) in their possession (since May 11, 1988 when the rape kit was released to ADA Stacey Edelbaum for

testing) in an "Out to Court Yellows File." See O'Connor Decl. ¶3 (Ex. E). This original

Yellow Invoice, then in the possession of the Bronx Property Clerk's Office, contained a patently

obvious handwritten notation on its face setting forth the precise location of the rape kit. See Ex.

A (NYPD Yellow Invoice No. B744483 produced by the NYPD in February 2009).

8.    *Not disputed, but supplemented.*  It is for this reason that plaintiff seeks to add

several new defendants who were employed by the Bronx borough office of the NYPD's PCD.

See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.  Individuals employed by

the Bronx borough office of the PCD not only did not locate the original Yellow Invoice in their

Office files, they apparently also did not take appropriate action with the information allegedly

conveyed by ADA Carroll.  On the latter point, these individuals failed to research and

thoroughly trace the chain-of-custody for the rape kit after it was tested by the OCME in 1988.

The individuals employed by the Bronx borough of the PCD should have checked both their

"Evidence to Court Book" for log entries relating to the 1988 testing, as well as any 1988 "Out to

Court Yellows File" maintained by that office.  See infra ¶¶188-89.  These individuals may,

therefore, be held accountable for their reckless action and/or reckless indifference. Id.

9.    *Not disputed, but supplemented.*  See response to paragraph 8 above.

10.    *Not disputed, but supplemented.*  See response to paragraph 8 above.

11.    *Disputed.* No witness has testified that ADA Carroll was told by the Office of the

Chief Medical Examiner for the City of New York ("OCME") that "the OCME had sent the

[rape] kit back to the Pearson Place facility [of the NYPD's PCD]."  ADA Carroll has testified

merely that the representatives of the OCME advised him that the OCME had returned the rape

kit to "the NYPD."  Carroll Depo. at 50:5-21 (Ex. P).  It is for this reason that plaintiff seeks to

add several new defendants who were employed by the OCME to this action.  See Plaintiff's

Motion to Amend the Complaint dated June 16, 2009.  Various individuals employed by the OCME apparently did not properly handle the information/questions allegedly conveyed by ADA Carroll and failed to trace their chain of custody for the rape kit and/or produce their chain of custody documents.  The OCME did, in fact, have chain of custody documents in their possession showing a transfer of the rape kit to the PCD's Pearson Place Warehouse in 1988.  See Ex. J (OCME "Property Clerk Book" excerpt).  These individuals at the OCME who spoke with ADA Carroll, and who failed to respond properly to his inquiries, may be held accountable for depriving plaintiff of his statutory right to the evidence.  See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.

12.  *Not disputed, but supplemented.* See responses to paragraphs 4 and 8 above.  ADA Carroll received no training on the NYPD's property/evidence management system, so he was not competent to review "ledger books or index cards in search of the voucher for the rape kit."  See response to paragraph 4 above.

13.  *Not disputed.*

14.  *Not disputed, but supplemented.* See response to paragraph 12 above.

15.  *Not disputed.*

16.  *Not disputed.*

17.  *Not disputed.*

18.  *Disputed.*  Assistant District Attorney Robert Moore ("ADA Moore") was not properly trained with respect to the NYPD's property/evidence management system.  Moore Depo. at 18:15-20 (Ex. Q) (Q. Did you ever receive any formal or on-the-job training regarding the New York City Police Department's use of what we refer to as a voucher [or invoice]?  A. No, not that I recall, I don't think so.").

19.    *Not disputed.*

20.    *Not disputed, but supplemented.*    A photocopy of the relevant NYPD Invoice/Voucher (B744483) used to track the movement of the rape kit (while it was in the possession of the NYPD), was in the "Appeals File" of the Bronx District Attorney's Office and was produced to plaintiff from that file.    Compare Ex. U (*photocopy of Yellow Invoice No. B744483 produced by the District Attorney's Office*) with Ex. H (Invoice attached to Koenderman letter to Trabitz).    The photocopy of NYPD Invoice No. B744483 within the aforementioned "Appeals File" contains a patently obvious handwritten notation setting forth the precise location ("DOA Barrel #22 1989") of the rape kit that was requested by Mr. Newton in 1989, 1991, 1994, 1998, and subsequent years.    Id.    For some unexplained reason, ADA Moore and other DA Defendants failed to forward this relevant document to the NYPD to assist the NYPD in its search for the rape kit.    Trabitz Depo. at 222 (Ex. L) ("once the property clerk invoice B744483…was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property").    The photocopy of the Invoice, if it had been dispatched to the NYPD promptly, would have led the NYPD to find the rape kit in 1994.    Id.

21.    *Not disputed.*

22.    *Not disputed, but supplemented.* Representatives of the Bronx Property Clerk's Office may have told ADA Moore that they could not find the rape kit or the Invoice for the rape kit, but we know today that they had the original NYPD Yellow Invoice (No. B744483) (Ex. A) in their possession in a "Out to Court Yellows File."    See O'Connor Decl. ¶3 (Ex. E).    This original Yellow Invoice, then in the possession of the Bronx Property Clerk's Office, contained a handwritten notation on its face setting forth the precise location of the rape kit.    See Ex. A (NYPD Yellow Invoice No. B744483).    It is for this reason that plaintiff seeks to join/add several

new defendants who were employed by the Bronx borough office of the NYPD's PCD to this action.  See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.  These individuals apparently did not handle the information allegedly conveyed by ADA Moore properly; these individuals failed to trace a chain-of-custody for the rape kit and its tracking document.  These individuals may, therefore, be held accountable for arbitrarily depriving plaintiff of his statutory right to the evidence.  Id.

     23.    *Not disputed.*

     24.    *Not disputed*.

     25.    *Not disputed*.

     26.    *Not disputed*.

     27.    *Not disputed*.

     28.    *Not disputed, but supplemented*.  A photocopy of the relevant NYPD Invoice/Voucher (B744483) used to track the movement of the rape kit (while it was in the possession of the NYPD), was in the "Appeals File" of the Bronx District Attorney's Office and was produced to plaintiff from that file.  Compare Ex. U (*photocopy of Yellow Invoice No. B744483 produced by the District Attorney's Office*) with Ex. H (Invoice attached to Koenderman letter to Trabitz).  The photocopy of NYPD Invoice No. B744483 within the aforementioned "Appeals File" contains a patently obvious handwritten notation setting forth the precise location ("DOA Barrel #22 1989") of the rape kit that was requested by Mr. Newton in 1989, 1991, 1994, 1998, and subsequent years.  Id.  For some unexplained reason, Assistant District Attorney Rafael Curbelo ("ADA Curbello") and other DA Defendants failed to forward this relevant document to the NYPD to assist the NYPD in its search for the rape kit.  Trabitz Depo. at 222 (Ex. L) ("once the property clerk invoice B744483…was provided to me, it gave

me the investigative tool that I needed to go and look for and positively retrieve the property"). The photocopy of the Invoice, if it had been dispatched to the NYPD promptly, would have led the NYPD to find the rape kit in 1994 and 1998. Id.

29.     *Not disputed, but supplemented*. See response to paragraph 28.

30.     *Not disputed*.

31.     *Disputed*.  ADA Curbelo was not properly trained with respect to the NYPD's property/evidence management system; he was ill-equipped to obtain post-conviction evidence from the Bronx borough office of the NYPD's PCD.  Curbelo Depo. at 31-32 (Ex. P) (Q. What training were assistant district attorneys provided about requesting evidence from the New York City Police Department in a postconviction context?  A. I don't recall any formal training on that particular topic.  Q. Do you recall any written material provided to any employee of the Bronx district attorney which provided guidance as to how to request criminal evidence from the New York City Police Department in a postconviction context?  A. No, I don't.").

32.     *Not disputed, but supplemented*.  The Invoice/Voucher number was not, alone, enough to help the NYPD find the rape kit, because the NYPD had "misplaced" the original NYPD Yellow Invoice (No. B744483) that contained a handwritten notation setting forth the precise location of the rape kit.  Representatives of the Bronx Property Clerk's Office may have told ADA Curbello that they could not find the rape kit or the Invoice for the rape kit, but we know today that they had the original NYPD Yellow Invoice (No. B744483) (Ex. A) in their possession in a "Out to Court Yellows File."  See O'Connor Decl. ¶3 (Ex. E).  This original Yellow Invoice, then in the possession of the Bronx Property Clerk's Office, contained a handwritten notation on its face setting forth the precise location of the rape kit.  See Ex. A (NYPD Yellow Invoice No. B744483).  It is for this reason that plaintiff seeks to add several

new defendants who were employed by the Bronx borough office of the NYPD's PCD.  These individuals apparently did not handle the information allegedly conveyed by ADA Curbelo properly; these individuals failed to trace a chain-of-custody for the rape kit and its tracking document.  These individual may, therefore, be held accountable for arbitrarily depriving plaintiff of his statutory right to the evidence.  See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.

33.    *Not disputed*.

34.    *Not disputed, but supplemented.*  See responses to paragraphs 28 and 32 above.

35.    *Not disputed, but supplemented.*  See response to paragraph 28 above.  See also infra paragraphs 51-52, regarding the incompetence of defendants Kiely and Haskins to express any opinions on what may have happened to the rape kit or the original Yellow Invoice.

36.    *Not disputed, but supplemented*.  See response to paragraph 35 above.

37.    *Not disputed, but supplemented.*  See response to paragraph 35 above.  ADA Curbelo and the NYPD have failed to identify, even today, the "standard NYPD procedure" for destroying "the rape kit and the other items of evidence."  Trabitz Depo. at 272:25 and 273:11-12 (Ex. L) ("I can't recall the location….Off the top of my head at this moment, no.").  In short, no "standard" (or written) destruction policy for evidence was ever in effect within the NYPD's PCD between 1989 and 2005.  Id.

38.    *Not disputed, but supplemented*.  Defendant Patrick McGuire's (ex-Sgt. within the NYPD's PCD) letter to ADA Curbelo displays a total ignorance of the procedures employed by the Bronx borough office of the PCD as set forth in the PCD's "Property Guide."  McGuire admitted during his deposition that he was not at all familiar with the PCD "Property Guide."  McGuire Depo. at 16-17 (Ex. M).   He also admitted that he was unfamiliar with the procedures

employed by the Bronx borough office of the PCD.  Id. at 204-05 ("I was not aware of that type of system [for handling "out to court" evidence]…I don't know what they [Bronx PCD] did at that time.  I see now what they did.") (Ex.M), but he (McGuire) was the NYPD representative providing opinions on the availability of the rape kit and its tracking document in August 1998 (to the great prejudice of Mr. Newton).  Defendants' Rule 56.1 Statement ¶¶38-39.

39.    *Not disputed*.

40.    *Admitted.*  The search for the rape kit by the NYPD PCD Defendants and the DA Defendants was abandoned based on the misleading representations made by defendant McGuire and John/Jane Does in the Bronx borough office of the PCD.  Defendants' Rule 56.1 Statement ¶¶38-39.  See also Plaintiff's Motion to Amend the Complaint dated June 16, 2009.

41.    *Not disputed*.

42.    *Not disputed, but supplemented.*  Defendant McGuire testified that he had to perform "just about everything" that was done by the PCD at the Pearson Place Warehouse.  McGuire Depo. at  21-22 (Ex.M).

43.    *Disputed.*  McGuire expressly admitted that he was not familiar with the procedures employed at the "intake window" of the Bronx borough office of the PCD and the "out to court" procedures employed by the Bronx borough office of the PCD.  McGuire Depo. at 16-17, 204-05, 53-54 (Ex. M) ("I wasn't in these borough offices on a regular basis…I don't know if it ["out to court" procedure] was done in this manner.").

44.    *Not disputed*, *but supplemented.*  See response to paragraph 43 above.

45.    *Not disputed*.

46.    *Not disputed, but supplemented.*  The original NYPD Yellow Invoice No. B744483 contains *three* separate storage numbers on its face (front page).  No "single" storage

number exists on the face of the Invoice in question, nor is there any documentation or notation as to the specific location(s) where the rape kit was retrieved from or returned to each time it was checked out from the Bronx Property Clerk. See original Yellow NYPD Invoice No. B744483 (Ex. A).

47.    *Disputed.* McGuire admitted during his deposition that he was unfamiliar with the "out-to-court" procedures employed by the Bronx borough office of the PCD. See response to paragraph 43 above. McGuire was unaware that, when a rape kit left the possession of the latter office for "out to court" testing, the employees of the borough office would remove the Yellow Invoice (the document used to track the movement of the evidence, a/k/a the "working copy" of the Invoice) from the "Yellow Actives File" and place it in an "Out to Court Yellows File." Compare Trabitz Depo. at 187 (Ex. L) (Q. Can you explain to me physically where the yellow copy [of the Invoice] would be placed while awaiting return of the property?  A. It would go into a file for yellow copies...Q. There is a special folder for out to court yellows?  A. Yes, there is.  Q. Does that file folder have any particular name?  A. It is the out to court yellows."), with McGuire Depo. at 16-17, 53-54, 204-05, 201 (Ex. M) ("again, in 1998 we don't know for sure that there was an out-to-court file [in the Bronx borough office], although you are saying that now that they found it in this [file]."). See also infra, ¶¶255-56. The original Yellow Invoice for the rape kit was recently (Feb. 2009) found in an "Out to Court Yellows File" at the PCD's Bronx borough office; the storage location of the kit between 1988 and 2005 is set forth on its face. See O'Connor Decl. ¶3 (Ex. E); NYPD Invoice B 744483 (Yellow Original) (Ex. A).

48.    *Disputed.* See response to paragraph 47 above. The NYPD has never produced any proof that the original White Invoice (B744483) was "destroyed per NYPD document-destruction procedures." The NYPD also previously claimed that the original Yellow Invoice

was destroyed (B744483), but it was found recently, after a more thorough search was undertaken for it.  O'Connor Decl., ¶3 (Ex. E).

49.    *Disputed.* The fact that there may have been a fire that destroyed some records relating to Pearson Place records is irrelevant.  McGuire knew or should have known that that Pearson Place Warehouse of the PCD would never have had an original White or Yellow Invoice for a piece of property originally stored in the Bronx borough office of the PCD.  Trabitz Depo. at 60-61 (Ex. M).  The borough office of the PCD, where the evidence was originally received, would always, thereafter, maintain the original White and Yellow Invoices for the evidence (unless the evidence was sent to Pearson Place for destruction).  Id.  Accordingly, McGuire would have simply been wasting time looking for the original White and Yellow Invoices at the Queens warehouse.  Id.

50.    *Not disputed.*

51.    *Disputed.*  Defendant Geraldine Kiely testified that she received no training when she joined the NYPD's PCD and that she had virtually no familiarity with the "Property Guide" that sets forth the procedures that the NYPD's PCD employees were required to know.  Kiely Depo. at 11 (Ex. N) ("Q. What training, if any, did you receive when you joined the Property Clerk's Division?  A. None.), 13 (Q. There are a multitude of forms and documents used by the Property Clerk Division to register and track criminal evidence; correct?  A. Yes.  Q. Did you receive training as to the use and procedures that should be used when these documents are employed, these forms are employed?  Mr. Weiler: Objection, you can answer.  A. I don't remember.  I know two years ago we did in the Police Academy, they showed us, but whether it was an extensive course, no, before that, no), 15-16 (Q. As part of your job responsibilities, are you supposed to be familiar with the [PCD's] Property Guide?  Mr. Weiler:  Objection, you can

-14-

answer.  A.  I assume so, but I don't know.  Q.  Do you recall when the last time was that you looked at your Property Guide?  A. No, I don't know when.").  See also Trabitz Depo. at 116 (Ex. L) (I can tell you that all members of the Property Clerk Division have gotten a copy of the Patrol Guide, and are responsible for the contents of the provisions for property in the Patrol Guide and the [PCD's] Property Guide.").  Moreover, defendant Kiely admitted that she was not familiar at all with the procedures employed at the Bronx borough office of the PCD.  Kiely Depo. at 30 (Ex. N) ("Q. Do you have any understanding as to how evidence was processed at the borough office of the Bronx Property Clerk?  A. No, I don't.").  Kiely was, therefore, ill-equipped to offer opinions on the operation of that office.  Id.  Accordingly, her opinions relating to the whereabouts of evidence that had last been registered and last possessed by the Bronx borough office of the PCD should not have been relied upon by anyone (as those opinions would have no reliability); and Kiely should not, therefore, have been acting as an NYPD representative in conducting and/or reporting on the "search" for the rape kit and its tracking document.

52.    *Not disputed, but supplemented by the comments to paragraph 51 above.* Defendant Haskins was a police officer who was "administratively reassigned" to the Bronx borough office of the PCD for disciplinary reasons (threatening a tow truck driver); she was dismissed from the NYPD for her improper behavior shortly after taking part in the "search" for the rape kit requested by Mr. Newton.  Haskins Depo. at 12-15 (Ex. S).  Haskins had even less training and familiarity with PCD operations and procedures than Kiely, as she worked with the PCD at the Pearson Place Warehouse for less than one year before she was fired by the NYPD. Id. at 17-24.  Again, McGuire, Kiely and Haskins knew or should have known that the Pearson Place Warehouse of the PCD would never have an original White or Yellow Invoice for a piece of property originally stored in the Bronx borough office of the PCD.  Trabitz Depo. at 60-61

(Ex. L). The borough office of the PCD, where the evidence was originally received (The Bronx borough office of the PCD), would always thereafter maintain the original White and the original Yellow Invoices for the evidence (unless the evidence was sent to Pearson Place for destruction). Id. Accordingly, these defendants would have simply been wasting time looking for the original White and Yellow Invoices at the Queens warehouse. Moreover, defendant Haskins admitted that she was not familiar at all with the procedures employed at the Bronx borough office of the PCD (Haskins Depo. at 31-37) (Ex. S), and that she was, therefore, also ill-equipped to offer opinions on the operation of that office (Id.). Accordingly, her opinions relating to the whereabouts of evidence that had last been registered and last possessed by the Bronx borough office of the PCD should not have been relied upon by anyone, and she should not, therefore, have been acting as an NYPD representative reporting on the results of the "search" for the rape kit and its tracking document.

53. *Not disputed, but supplemented by the comments to paragraph 52 above.*

## II.    Plaintiff's Rule 56.1 Counter-Statement

### A.    Background on Alan Newton & This Litigation

54. Plaintiff Alan Newton was released from prison on July 6, 2006 after an incarceration of more than twenty-two years for a crime he did not commit. See Declaration of Alan Newton dated June 25, 2009 (hereinafter "Newton Decl.") ¶3.

55. The People of the State of New York alleged that Mr. Newton assaulted, robbed and raped a 25-year old woman (hereinafter referred to as "VJ") on June 23, 1984 (Bronx Ind. No. 2441/84). [This Court has previously summarized the facts surrounding the criminal investigation and trial in response to the defendants' Rule 12 Motion. See Newton v. City of New York, 566 F.Supp.2d 256, 273 (S.D.N.Y. 2008).]

56.     The complaining witness, VJ, gave inconsistent accounts of what occurred that evening to the police, but she claimed generally that she was physically and sexually assaulted in The Bronx on June 23, 1984 by one male assailant who ejaculated inside of her.  See Plaintiff's Opposition to the Defendants' Motion for Summary Judgment re Malicious Prosecution Claims.

57.     Shortly after the assault, a "Vitullo rape kit" was used to collect critical physical evidence from VJ's body.  The "rape kit," containing among other things, blood, semen and hairs collected from VJ's body, was delivered to NYPD investigators for processing and testing.  See Newton v. City of New York, 566 F.Supp.2d 256, 273 (S.D.N.Y. 2008).]

58.     No physical evidence connected plaintiff Alan Newton to VJ's assault.  Id.

59.     NYPD investigators (along with the Bronx District Attorney's Office) refused to test the physical evidence collected from VJ's body to determine if any of it connected Mr. Newton to the crime.  Id.

60.     Specifically, the semen collected from VJ could have been tested for blood type; the head and pubic hairs collected from VJ could have been compared to Mr. Newton's head and pubic hair.  Id.

61.     The only "evidence" linking plaintiff to VJ's assault were two alleged eyewitness identifications – one by VJ and one by a Ms. Aurea Gonzalez.  Id.

62.     After Mr. Newton's arrest, the NYPD investigators closed their file and ceased their investigation, based solely on the questionable and tainted eyewitness identifications.  Id.

63.     NYPD Investigators (along with the Bronx District Attorney's Office) failed to pursue leads to other suspects; they ignored or refused to examine evidence that would prove definitively whether Mr. Newton was guilty or innocent, and they concealed evidence that might

have proved his innocence. See Plaintiff's Opposition to the Defendants' Motion for Summary Judgment re Malicious Prosecution Claims.

64.    Plaintiff was, thereafter, unjustly convicted of rape, robbery and assault under Bronx Indictment No. 2441/84. Id.

65.    On May 31, 1985, the court sentenced Mr. Newton to concurrent prison terms of 8 1/3 to 25 years for the rape and robbery charges followed by a consecutive prison term of 5 to 15 years for the assault. Newton Decl. ¶8.

66.    The pre-conviction taints and flaws were only enhanced by the separate, wrongful post-conviction acts of certain defendants while plaintiff was incarcerated – intentional withholding and/or reckless loss/mishandling of critical exculpatory evidence (and "tracking" documents) in violation of plaintiff's constitutional rights. See infra ¶¶127-69.

67.    The first positive thing that happened to Mr. Newton in twenty-two years was that, in 2005, the Bronx District Attorney's Office located the long-missing "rape kit" containing semen collected from VJ shortly after she was assaulted on June 23, 1984 rape; Mr. Newton had requested this evidence more than sixteen (16) years earlier (in 1989). Newton Decl. ¶10.

68.    A DNA test on the semen evidence conclusively established that: (1) Mr. Newton was not the rapist (DNA testing confirmed that Mr. Newton's "DNA profile" did not match the one male "DNA profile" obtained from the spermatozoa within the rape kit), and (2) Mr. Newton had been misidentified by the victim (and another witness). Id.

69.    Mr. Newton was exonerated of the assault, robbery and rape charges brought against him under Bronx County Indictment No. 2441/84 on July 6, 2006. See Justice John J. Byrne's July 6, 2006 Order vacating the latter conviction (and dismissing the accusatory instrument). Id.

**B.       Background on the NYPD Property Clerk Division ("PCD")**

70.      "The mission of the New York City Police Department's (NYPD) Property Clerk Division (PCD), is to accept, catalog, store and safeguard, have available for presentation in court, return to legal owner or otherwise legally dispose of all property which comes into the possession of the NYPD."  See NYPD's Request for Proposals for "Property Evidence Tracking System (PETS)" dated April 27, 2007, p.6 (Ex. F).

71.      "The PCD possesses approximately 1.6 million invoices per year for property and evidence in hand, and it has over 10 million pieces of property currently in storage.  Almost two-thirds of these items are received as evidence from criminal cases…."  Id.

72.      The Comptroller for the City of New York recently summarized how the NYPD's PCD registers all criminal evidence taken into the possession of the NYPD:

> The types of property accepted by PCD include cash, narcotics, rifles, handguns, and general property of varying description.  In addition, property is categorized as arrest evidence, investigatory, safekeeping, or decedent's property.  The NYPD has established five PCD offices, one in each borough to accept and safeguard the property….
>
> In general, property is first brought to neighborhood police precincts.  The precincts are responsible for preparing a five-part [actually six-part] carbon copy invoice which describes and categorizes the type of property brought in, the name and address of the owner and claimant, if known, the date and place the property was obtained or found, and the name of the officer who recovered or obtained the property.  The property, with the accompanying five-part [six-part] invoice, is delivered to the Manhattan [or other local borough office of the PCD in The Bronx, Queens, Brooklyn, or Staten Island] PCD office.  Before accepting and signing for the property, the Manhattan [or other borough office] PCD clerk at the intake window matches the information on the invoice with the actual property and enters the invoice number and a storage number in the intake logbook [at that borough office].  The property, together with the yellow and white copies of the invoice, remains with and is now in custody of the PCD [borough] office.[2]

---

2    The remaining green copy [of the invoice] is sent to the District Attorney's (DA) office; the blue copy is maintained by the police precinct, and the pink copy is given to the claimant, where appropriate.

> The PCD does not maintain an electronic database of the property in its custody. Its control systems are completely manual. All information and any action taken with the property is recorded on the yellow copy of the invoice [most of the "tracking" information is placed on its back], which is considered the working copy and kept on file until the associated property is processed, depending on the action taken on the property. The type of action taken on property maintained by the PCD includes property that is returned to its owner, property taken out to court, and property that is sent out for destruction. The white copy of the invoice represents the PCD control copy of all property in its custody and is filed in a binder according to borough storage number.

See William C. Thompson, Jr., Comptroller of the City of New York "Audit Report on the Cash & Firearm Custody Controls of the Manhattan Property Clerk Division of the Property Clerk Division of the Police Department," MH07-127A (June 30, 2008) at p. 3 (available at http://www.comptroller.nyc.gov/bureaus/audit/PDF_FILES/MH03_159A.pdf).

73.    Over a decade after web and network based cataloging became commonplace, and seemingly eons after computers and bar coding permeated inventory control systems, the NYPD continues to use a paper-based system for storing and retrieving arrest evidence. Trabitz Depo. at 9-10 (Ex. L).

74.    At its core, the NYPD's evidence storage system is incredibly simplistic: store evidence on a shelf and write down its location on a piece of paper so that it can be found later. Trabitz Depo. at 11-12 (Ex L).

75.    The NYPD's paper-based registration system is a patchwork of paper "Invoices" and log books. As arrest evidence makes its way from the street through the precinct and ultimately into one of NYPD storage facilities, multiple numbering systems attach cataloging information, creating a paper trail of the evidence's path. Trabitz Depo. at 11-12, 14 (Ex. L).

76.     Following the paper trail for the evidence is absolutely dependent upon accurate and complete information handwritten or typed onto the evidence's primary identification tag, the NYPD "Invoice." Id.

77.     The NYPD's evidence registration system is vulnerable to human error because if the Invoice is lost, misfiled, or stored in the wrong location, or if information is not completely and accurately placed on the Invoice, criminal evidence is easily subject to becoming the proverbial "needle" in The City's "haystack" of millions of items of stored evidence. Trabitz Depo. at 449-51 (Ex. L).

C.     **Criticism of the PCD's Paper-Based System Used to Track Criminal Evidence**

78.     When the City of New York was considering a computerized property management system for the NYPD back in 1991, the consulting company responding to the NYPD's Request for Proposal stated very clearly in its responsive Proposal that there was a "problem" with the paper-based system employed by the NYPD's PCD. See Excerpt from the "Automated Management of Property System" ("AMPS") Proposal presented by CGI Consulting dated May 13, 1991), "Statement of the Problem" at 1-2 (Ex. G). Among other things, The City's chosen vendor wrote prophetically (emphasis added):

> The task of controlling this large inventory [of property] with all the numerous records that are needed to make the system work are labor intensive and creates a great deal of duplication. A system like this is extremely prone to clerical errors and makes the task all the more difficult. Valuable time is taken away from normal activities when problems arise (such as an all out search for missing property), which may result in those tasks never being completed. At some later time, those omitted tasks, tend to create additional and often more severe problems….

79.     More recently, certain people within the employ of the NYPD and The City of New York have referred to the paper-based property management system as "antiquated." The Comptroller for the City of New York compiled an "Audit Report" regarding the handling of

-21-

firearms and cash by the Manhattan PCD borough office and repeatedly recommends, throughout the report, that the NYPD upgrade to a computer management system.  See William C. Thompson, Jr., Comptroller of the City of New York "Audit Report on the Cash & Firearm Custody Controls of the Manhattan Property Clerk Division of the Property Clerk Division of the Police Department," MH07-127A (June 30, 2008) at p. 2 and 15 (available at http://www.comptroller.nyc.gov/bureaus/audit/PDF_FILES/MH03_159A.pdf).

80.    A letter dispatched to the Deputy Comptroller of the City of New York (John Graham) by NYPD Deputy Chief John P. Gerrish dated June 12, 2008 states: "*We recognize that our property management system is an antiquated paper-based system of invoices and logbooks*, and we are currently in the process of automating the entire system.  We have selected a vendor and hope to soon begin implementing the *Property Evidence Tracking System (PETS)*, an automated tracking system for all property, including firearms.  This system will improve and strengthen controls over property, provide for better documentation, and increase efficiency regarding the intake, storage and transfer of property.  It will also eliminate the need for logbooks, prevent duplication of information, and ensure the timely destruction of firearms."  Id., Audit Report, Addendum, p. 1 of 10 (emphasis added).

**D.    PCD Procedures Used to Register, Control, Produce & Destroy Evidence**

81.    The NYPD's PCD has a myriad of procedures relating to the registration and storage of criminal evidence.  These procedures are set forth in a written manual called the "Property Guide," which is allegedly used to train and guide PCD employees.  Trabitz Depo. at 116 (Ex. L).; but see infra ¶¶122-26 (PCD employees deny knowledge of Guide).  Excerpts from the "Property Guide" produced by the NYPD are annexed to the Schutty Decl. as Exhibit D.

### 1.      Significance of the Original White & Yellow Invoices

82.     As seen above, the system used by the PCD to register, store and track criminal evidence is a "paper-based" system. A police officer who collects evidence in the course of a criminal investigation completes a six-part NYPD Invoice that is thereafter divided into its component parts – the different color originals designate their purpose:

| | |
|---|---|
| White: | Property Clerk File |
| 2d White: | Inventory Unit (PCD) File [used as necessary, at storage warehouse] |
| Yellow: | Property Clerk "Working Copy" [used to "track" property's movement] |
| Blue: | Police Officer Copy (Investigation File) |
| Green: | Evidence Release/Investigation Copy [for DA] |
| Pink: | Prisoner/ Finder Receipt Copy. |

Trabitz Depo. at 36-37 (Ex. L).

83.     The NYPD's PCD uses the original White Invoice and the original Yellow Invoice to register, store, control and track the movement of property that comes into its possession. The Commanding Officer of the PCD recently admitted that if even one of these two originals (the original White or the original Yellow) is lost or misplaced, PCD employees might not be able to determine if the evidence in question is still in the possession of the PCD. See Trabitz Depo. at 428-29 (Ex. L) ("If a member of the Property Clerk Division doesn't have one of these items, we may not be able – one of the invoices, white or yellow, we may not have the information to locate the physical evidence.").

84.     Criminal evidence is typically received by the PCD at one of five local borough offices (the exception is a very large item, because large items are dispatched directly to a warehouse – *e.g.*, the "Pearson Place Warehouse"); if the evidence is, for example, collected by a police officer in The Bronx, an NYPD Invoice would be completed by that officer at his local precinct and then would be delivered to the PCD's Bronx borough office. Trabitz Depo. at 42-43 (Ex. L).

## 2. Initial Registration of Criminal Evidence by the PCD

85. At the local PCD borough office, the evidence is presented at a PCD "intake window" and the "window clerk" is obliged to apply the procedures set forth in the PCD Property Guide at Procedure No. 201-1 (Ex. D).

86. Among other things, the "window clerk" is obliged to: "(4) "[a]ssign and place next Borough Storage Number on the bottom of all invoice copies…(7) [i]ndicate storage area on invoice…(8) [e]nter borough storage number and location on Property Transfer  Receipt (PD521-145)…(9) [f]orward property for storage (place in assigned storage area)…(10) "[d]istribute [file] invoices: a. Property Clerk File Copy (White) – file in binder by Borough Storage Number [in borough office]… c. Property Clerk Work Copy (Yellow) – file in Borough Office by preprinted number, (11) [m]ake entry in cross reference index book…and (12) file Property Transfer Receipt." Id.

87. Since the original White and original Yellow Invoices were used by the PCD to track the movement of criminal evidence, the filing and movement of these documents at the local borough offices are very critical actions by PCD employees; the handling of these two versions of the Invoice have to be performed properly (or there is a serious risk that evidence, if moved from its original location, will not be found). Trabitz Depo. at 428-29 (Ex.L).

88. Original White Invoices were filed in the local PCD borough offices in a binder *by storage number assigned at the time of intake of the evidence.* PCD "Property Guide," Procedure No. 201-1, ¶10(a) (Ex. D).

89. Original Yellow Invoices were filed in the local borough office in file folders *by pre-printed [invoice] number.* PCD "Property Guide," Procedure No. 211-7 (Ex. D).

90.     The original Yellow Invoice (the "working copy") invoice thereafter becomes the piece of paper that the NYPD/PCD uses to track the movement of the evidence.  Trabitz Depo. at 83 (Ex. L); see supra ¶72.

91.     Anytime evidence is moved by the PCD, either within the PCD (*e.g*., to a PCD warehouse) or to anyone outside the PCD (*e.g*., to court or to a lab, and back), the movement is noted on the front and/or back of the original Yellow Invoice.  Trabitz Depo. at 83 (Ex. L); see supra ¶72.

92.     Any new storage location for the evidence (if it is moved) is noted on the front of the original Yellow Invoice, and any chain-of-custody movement of the evidence away from or back to the PCD is recorded on the back of the original Yellow Invoice.  Trabitz Depo. at 83 (Ex. L); see supra ¶72.

### 3.     PCD's Handling of Vitullo Rape Kits

93.     Vitullo rape kits (and similar small items containing biological evidence) were routinely taken in and stored on shelves within the PCD borough offices in 1984, and for a few years thereafter.  McGuire Depo. at 133-34 (Ex. M).

94.     Sometime after 1984 (perhaps in 1986), with the spread of AIDS and a general fear of contact with unknown bodily fluids, the NYPD began to send blood and semen evidence directly to the PCD's Pearson Place Warehouse to be stored in "DOA Barrels" (containers that would seal and contain "fluid" evidence); older blood and semen evidence, already on the shelves of the borough offices, was not necessarily moved by borough office supervisors to the Pearson Place Warehouse and a DOA barrel.  Id. at 133.

95.     Finally, in the early 1990's, with the advent of DNA testing on bodily fluids, the PCD began storing newly-invoiced biological evidence (including rape kits) in newly-installed

refrigerators at the Pearson Place Warehouse (again, older blood and semen evidence might or might not be removed from the borough offices shelves [or DOA Barrels] by borough office supervisors – transfers were made on a discretionary basis). Id. at 132.

### 4.    Production of Evidence by the PCD for "Out to Court" Testing

96.    When the borough offices of the PCD were called upon to produce criminal evidence for use in court (or for court-ordered testing), a detailed set of procedures were supposed to be followed. See PCD "Property Guide," Procedure No. 211-2 (Ex. D). [These procedures are very significant in this action as the rape kit was lost after it was produced by the PCD for "out to court" testing in 1988.]

97.    The most significant duties of the "window clerk" of the borough office of the PCD in delivering "out to court" evidence are set forth below (emphasis added):

1.    Remove the yellow invoice from file ["Yellows Active File"] and replace it with an out of custody card."

\*                \*                \*

9.    Make entries in the Evidence to Court Book.

10.    Give property to officer or person assigned and issue a receipt slip (blue) PD521-170 in all cases. Persons other than Police Officers removing property by authority of subpoena will complete court receipt slip (blue) prior to leaving. Attach receipt to yellow file copy.

\*                \*                \*

12.    Maintain work copy of invoice (yellow) at the public window ["Out to Court Yellows File"] awaiting return of property from court. *Evidence, for which the court has authorized examination by an independent laboratory will only be released to the vouchering/assigned officer or a member of the District Attorney's Office. They will be responsible for notifying the A.D.A. concerned, witnessing the examination and informing the A.D.A. of the results and the status of the property and its ultimate return to the Property Clerk…."*

See PCD "Property Guide," Procedure No. 211-2 (Ex. D).

-26-

98.     Thus, the original Yellow Invoice (the "working copy") is used by the PCD used to record the delivery of the evidence/property to a particular individual for "out to court" testing, and the original Yellow Invoice is maintained "at the public window [in an "Out to Court Yellows File"] awaiting the return of the property." See PCD "Property Guide," Procedure No. 211-2 (Ex. D). If the property is not returned to the PCD, the Yellow Invoice will, theoretically, remain in the "Out to Court Yellows File" at the intake window of that PCD borough office indefinitely. Id.; see also Trabitz Depo. at 176, 187 (Ex. L).

### 5.     Routine Return of Evidence to the PCD After "Out to Court Testing"

99.     When court-ordered testing is completed on a piece of evidence and is returned to the PCD, the intake clerk within the borough offices of the PCD receiving that evidence is, once again, obliged to follow a detailed set of procedures. See PCD "Property Guide," Procedure No. 211-2 (Ex. D). [These procedures are also very significant in this action as the rape kit was lost after it was returned to the PCD after "out to court" testing in 1988 (see infra ¶¶168-69, 182-200).]

100.     The most significant duties of the "window clerk" of the borough office of the PCD in receiving "out to court" evidence are set forth below (emphasis added):

1.     Compare the property being returned with the yellow invoice maintained at the window and insure that packaging and seals are intact. Remove the yellow invoice from file ["Yellows Active File"] and replace it with an out of custody card.

      *            *            *

2.     Complete captions on rear of the yellow [Invoice] note: photo and signatures are required but not fingerprint.

3.     *Complete the return portion in the Evidence to Court Book.*

4.     Return property as follows:

-27-

a.  For safe/security items, deliver property with the invoice to safe/security clerk

b.  For general storage items, return directly to storage location.

\*              \*              \*

8.      *Return Charge Out Card and yellow invoice to the Window Clerk.*

9.      *Re-file yellow invoice [in the "Yellows Active File"].*

See PCD "Property Guide," Procedure No. 211-3 (Ex. D); see also Trabitz Depo. at 176, 187 (Ex. L).

## 6.      OCME Return of Evidence to the PCD in "DOA Barrels"

101.    The OCME would often return evidence/property to the PCD in what was known as "DOA Barrels."  McGuire Depo. at 80 (Ex. M).

102.    If anyone failed to claim NYPD property/evidence that was left with the OCME after testing there, OCME staff would pack the unclaimed evidence in "DOA Barrels."  Patricia Ryan Depo. at 108 (Ex. O).

103.    The OCME filled DOA Barrels simultaneously for the five boroughs of New York; after testing was completed and the evidence remained unclaimed, OCME personnel would pack the evidence in the DOA Barrel for the borough where the evidence originated from. Patricia Ryan Depo. at 114 (Ex. O).

104.    When a DOA Barrel for a particular borough was filled, the Barrel would be picked up the NYPD's PCD.  Patricia Ryan Depo. at 109-10 (Ex. O).

105.    All DOA Barrels were stored at the NYPD's Pearson Place warehouse because they were large sealed containers containing bodily fluids.  The borough offices of the PCD were

not equipped to store items of that size (or bodily fluids).  Trabitz Depo. at 165 (Ex. L); McGuire Depo. at 80 (Ex. M).

106.    The PCD's "Property Guide" contains no written instructions for PCD employees at either the Pearson Place Warehouse or the local borough offices of the PCD as to how the evidence (and accompanying documents) received in DOA Barrels at the Pearson Place Warehouse was supposed to be processed by the PCD.  See PCD "Property Guide," Table of Contents & Excerpts Produced by The City (Ex. D).

107.    Defendant Patrick McGuire has testified, however, about the procedures that PCD employees were obliged to perform at the Pearson Place Warehouse upon receiving a DOA Barrel from the OCME.  McGuire Depo. at 85-88, 229-32 (Ex. M).  The Pearson Place Warehouse clerk who received the DOA Barrel from the OCME was obliged to:

   a. Inspect the contents of the DOA Barrel and perform an inventory of the contents (Id. at 85-86);

   b. Inspect the photocopies of the Invoices that accompanied the DOA Barrel (Id. at 79);

   c. Ensure that the contents of the DOA Barrel matched the photocopies of the Invoices that accompanied it (Id. at 86);

   d. Complete an NYPD "Transfer Sheet/Receipt" acknowledging the receipt of the individual items within the Barrel (the original "Transfer Sheet/Receipt" would be delivered to the OCME agent who delivered the Barrel and: (1) one copy would be taped to the outside of the Barrel to show its contents, (2) a second copy would be dispatched to the local borough office of the PCD where the evidence was originally registered by the PCD, along with a

photocopy of the Yellow Invoice (so that the local borough office could note its return on the original Yellow Invoice), and (3) a third copy would be retained at the Pearson Place Warehouse, along with photocopies of all the Invoices received with the DOA Barrel (Id. at 85-88)[3]; and

e. The DOA Barrel would be sealed and then dispatched to a storage location within the Pearson Place Warehouse (Id. at 85-88).

108.    No witness from The Bronx borough office of the PCD has yet appeared in this action to explain what procedures were employed at that office when it received notice that a DOA Barrel had arrived at the Pearson Place Warehouse (containing evidence/property described on an original Yellow Invoice maintained at The Bronx borough office of the PCD in the "Yellows Out to Court File").  Plaintiff is seeking to amend his Complaint to add at least three individuals employed by the Bronx borough office of the PCD at or around the time of the events in question; plaintiff hopes to identify other involved Bronx PCD employees through the service of Interrogatories.  See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.

## 7.    PCD's Destruction of Criminal Evidence & Invoices

109.    While the NYPD witnesses testified generally that criminal evidence could be destroyed in the discretion of PCD supervisors after a criminal defendant's "direct appeals had been exhausted," not a single witness could point to written regulations on this particular subject

---

[3]    Plaintiff has asked The City to produce the "Transfer Sheet/Receipts" that would have been created and distributed when "DOA Barrel #22 1989" was received and processed at the PCD's Pearson Place Warehouse in late 1988 or early 1989 (requests have been made in both a Rule 34 request and a separate letter).  The significance of these "Transfer Receipts" is undeniable.  See McGuire Depo. at 85-88 (Ex. M).  To date, The City has refused even to produce a copy of the Transfer Receipt that would be attached to the DOA Barrel.  Additional copies of this document (and an attached photocopy of the original Yellow Invoice) would also be in the possession of (1) OCME, (2) the Bronx borough office of the PCD, and (3) the PCD's Pearson Place Warehouse.  Id. at 85-88.  Plaintiff will ask that an appropriate inference be drawn against The City for its failure to produce *any* copy of this document.

– when criminal evidence could be permissibly destroyed or how PCD employees would know when direct appeals were exhausted. McGuire Depo. at 142 (Ex. M) (Q. Did you ever see during tenure with the Property Clerk Division a written procedure relating to the destruction of arrest evidence. A. No."); Trabitz Depo. at 272-73 (Ex. L).

110. As a result of the PCD's failure to reduce criminal evidence destruction procedures to a coherent written procedure, evidence was apparently being destroyed in a rather random manner by PCD supervisors -- when space was needed at various PCD facilities. Id.

111. The present Commanding Officer of the PCD, Defendant Jack Trabitz, has testified that "sometime" after he took over his present position in 2000, he instituted two new PCD policies: (1) rape kits would no longer be destroyed, and (2) invoices would no longer be destroyed. Trabitz Depo. at 269-272 (Ex. L).

112. PCD employees were unquestionably unable to render a definitive opinion on whether a given piece of evidence had been, in fact, destroyed if an original White or an original Yellow Invoice was lost -- because there was no formal, predictable evidence destruction procedure instituted by the Commanding Officers of the PCD. Trabitz Depo. at 436 (Ex. L).

113. The original White Invoice allows the PCD to determine whether the evidence has been destroyed; the original Yellow Invoice allows the PCD to determine the location of the evidence within the PCD's facilities (if it has not yet been destroyed). Trabitz Depo. at 436 (Ex. L) (Q: But if we have both of those invoices, we can find the property, or know where it is, and we can immediately determine whether it has been destroyed or not; correct? A: If I have both of these, I can accomplish both of those tasks.").

114. Defendant Trabitz, the Commanding Officer of the PCD has also admitted, however, that if the PCD destroyed either the White or the Yellow Invoices (before the PCD

destroyed the evidence itself) and the evidence had been moved from its original location, the PCD would not be able to state, definitively, whether the evidence was still in the possession, custody and control of the PCD (or find it).  Id. at 442 ("you [PCD] may not be able to [state whether the PCD still has it]").

115.    The PCD's own internal regulations instructed PCD Borough office supervisors to destroy ("purge") Yellow Invoices after five years in rape investigation cases.  See PCD "Property Guide," Procedure No. 211-7 (Ex. D) ("All Property Clerk Work Copies (yellow) will be filed in the Borough Office by pre-printed number…For investigatory evidence, file in pre-print order by month of invoicing.  *File should be purged after one year with the following exceptions:…(b) Rape Investigations – hold for five years."*

116.    Trabitz has further admitted that, before he took over as the Commanding Officer of the PCD, supervisors in the borough offices of the PCD had the discretion to destroy original Invoices even if the property itself had not yet been destroyed.  Trabitz Depo. at 448 (Ex. L) ("I am aware that invoices in the control of the Property Clerk Division were destroyed prior to 2000, and property may have been in our custody at that time").

117.    Thus, "sometime" after taking over as the Commanding Officer of the PCD, Trabitz changed the destruction policies of the PCD, namely: (1) he ordered that original Invoices would no longer be destroyed, and (2) that Vitullo rape kits would no longer be destroyed.  Trabitz Depo. at 260 (Ex. L) (Invoice Destruction: "I changed the policy [of destroying Yellow Invoices after five years]"), 263 ("Sometime during my tenure I had instituted a policy that no invoices are to be destroyed."); 270 (Rape Kits: "Prior to my assignment as the commanding officer of the Property Clerk Division in late 2000, and prior to my issuing this

memo, which is administrative memo 2006-19, there were times when rape kits were destroyed."). He admittedly did not issue a memo on the subject to his staff until 2006. Id.

118. In sum, up to and through the time Trabitz issued Administartive Memo 2006-19 in 2006, the PCD: (1) was destroying invoices on a discretionary basis (pursuant to NYPD destruction procedures), even though that could lead to an inability to find evidence still in the possession of the PCD, and (2) was destroying rape kits based on the individual whims of borough office PCD supervisors. Id.

119. Any Commanding Officer of the PCD that allowed original NYPD Invoices to be destroyed (without destroying the corresponding evidence) should have known that such an action would lead to an inability to state whether the PCD still had custody of the evidence (the original White Invoice relating to the "Newton rape kit" has never been found – Trabitz Depo. at 445). Id. See Plaintiff's Motion to Amend the Complaint dated June 16, 2009 (plaintiff seeks to add prior Commanding Officers of the PCD).

E.    Supervision & Training Provided to PCD Employees

120. Deposition testimony has been taken from three PCD employees who were actively involved in the search for the rape kit requested by Mr. Newton: Ms. Geraldine Kiely, Police Officer Stacy Haskins, and Sergeant Patrick McGuire.

121. The deposition testimony of these three witness revealed that the supervision and training provided to PCD staff was, at best, minimal and clearly insufficient. See infra (paragraphs immediately following).

122. Defendant Geraldine Kiely testified that she received no training when she joined the PCD. Kiely Depo. at 11 (Ex. N) ("Q. What training did you receive when you joined the Property Clerk Division? A. None."), 13 (Q. There are a multitude of forms and documents

used by the Property Clerk Division to register and track criminal evidence; correct?  A.  Yes. Q.  Did you receive training as to the use and procedures that should be used when these documents are employed, these forms are employed?...A. I don't remember.  I know two years ago [in 2007], we did in the Police Academy, they showed us, but whether it was an extensive course, no, before that [2007], no."), 15-16 (Q.  As part of your job responsibilities, are you supposed to be familiar with the [PCD's] Property Guide?...A.  I assume so, but I don't know. Q.  Do you recall when the last time was that you looked at your Property Guide?  A. No, I don't know when.").

123.    Defendant Stacy Haskins was employed by the PCD for only a very short while. Haskins was accused of assaulting a tow truck operator while she was an "active" NYPD police officer; her gun and badge were taken from her and she was temporarily assigned to the PCD's Pearson Place Warehouse while the NYPD considered whether her employment should be terminated.  Haskins Depo. at 12-14 (Ex. S).  Her employment was terminated by the NYPD on November 9, 1999, after a brief, one-year tenure at the Pearson Place Warehouse.  Id. at 14, 21. Ms. Haskins admitted a total lack of recall about PCD procedures.  Haskins Depo. at 26-27 (Ex. S) (Q. Were you aware that the Pearson Place Warehouse did not keep yellow copies of the vouchers? Mr. Weiler:  Objection.  A.  No, I mean I don't recall.  I'm not going to say no.  I don't recall.  Q. You don't recall seeing the yellow vouchers at Pearson Place being stored in binders and files; correct?  A. I actually need to see a voucher.  I don't recall a complete voucher.  Q. I'll show you what has been previously marked as Plaintiff's Exhibit 51, and I'll let you know that we had a police officer or an official at the Police Department testify that this is a voided copy of a voucher that's presently in use at the Police Department (handing).  A. You are asking me about this copy?  Q. Yes.  A. What is your question?  Q. That Pearson Place was not storing or

maintaining the yellow copies of the voucher?  A. Was I aware of it, you are asking me?  Q. Yes, that they were not using the yellow copy of the voucher to denote the location of evidence within the Pearson Place Warehouse?  A. I don't recall, I don't remember.  I remember the voucher, but I don't remember like all the different, you know, I don't remember.  Q. Do you recall whether the yellow copy of the voucher was known as the working copy of the voucher?  A. I don't recall.), 23 ("Q. When evidence was requested at Pearson Place, and it could not initially be found, was there a particular person at the warehouse who took on that responsibility of looking for it? A. You know, I -- I'm not really – I really can't, I mean like if something was brought up to me, I don't remember, I can't recall.  I really can't, I honestly, I'm trying to think what happened in incidents like that.").

124.    Defendant Patrick McGuire, an ex-NYPD Sergeant and a PCD Supervisor at the Pearson Place Warehouse expressed a similar lack of understanding about PCD procedures and a total lack of recall of the PCD Property Guide.  McGuire Depo. at 11 (Ex. M) (he received "on-the-job training"),  14-15 (Q.  You had to learn about things like an out-of-custody card, you had to learn about transit receipt forms, documents of that type, correct?  A. That's correct.  Q.  Who taught you about those documents within the Property Clerk Division?  A. I don't recall specifically who.  Q. Were you ever provided with a list of the forms used by the Property Clerk Division?  A. Not at one point, not at one place."), 16 (Q. Are you familiar with a document known as the New York City Police Department Property Guide?  A.    Not really. * * *  Q. Were you ever provided with any written material related to the procedures that the employees of the Property Clerk Division were supposed to employ when handling criminal evidence?  Mr. Weiler:  Objection.  You can answer.  A.  I don't recall if there was or not.  Q. Let me show you something that's been previously marked in this case.  It's a number of documents allegedly from

something known as the [P]roperty [C]lerk [G]uide.   Let me see if this refreshes your recollection. * * *  You can take your time and review that, but my question is, does this refresh your recollection as to whether there was a manual for procedures within the Property Clerk Division?  (Question read)  A. I have never seen this before.").

125.    Defendant Trabitz, the present Commanding Officer of the PCD, testified that all of his employees were obliged to be intimately familiar with the PCD's Property Guide.  Trabitz Depo. at 116 (Ex. L) ("all members of the Property Clerk Division have gotten a copy of the [NYPD] Patrol Guide, and are responsible for the contents of the provisions for property in the Patrol Guide and the [PCD] Property Guide.  Q. Are those the two documents that you require the personnel under your command be familiar with, namely the Patrol Guide and the Property Guide?  Mr. Larkin:  Objection to form.  A. Those two documents contain the information that I require them to know.").

126.    Based on the deposition testimony quoted above (of the three PCD employees involved in the search for the rape kit requested by Mr. Newton), it is undeniable that these PCD employees were not familiar with or knowledgeable about the procedures set forth within the PCD's Property Guide.  See supra (paragraphs immediately above)

F.    **Criminal Evidence Collected & Registered in the VJ Rape Investigation**

127.    Various items of physical evidence were collected and registered during the NYPD's investigation of an alleged rape, assault and robbery of a woman known as "VJ" during the early morning hours of June 23, 1984.  Since each of the items collected and stored with the PCD was lost, misplaced or destroyed at some time after Mr. Alan Newton's conviction for VJ's alleged rape, assault and robbery, the manner in which each of the three Invoices (and associated evidence) were handled by the PCD is discussed immediately below.

### 1. **Newton's Sneakers**

128.     Mr. Newton has advised that NYPD detectives confiscated his sneakers approximately one hour after he was allegedly picked out from a lineup by VJ on June 28, 1984. Newton Decl. ¶6

129.     Mr. Newton was told that that the NYPD planned: (1) to compare the tread marks on his sneakers to tread marks found on VJ's clothing and (2) to test to see if VJ's blood might be found on the sneakers. Id.

130.     On July 3, 1984, Detective Joanne Newbert completed an NYPD Property Clerk's Invoice No. 744556 to register the sneakers, and in the "Remarks" section typed: "Property listed above was removed from deft. to have soles analized [sic] and processed to determine is [sic] traces of blood." See copy of original Yellow Invoice No. B744556 (Ex. C).

131.     In the lower left hand side of the Invoice, a "Bronx Boro Storage No." was stamped "84B24723" indicating that the property was, indeed, received by the Bronx borough office of the PCD sometime in 1984, and was assigned a Bronx "Storage No." Id.

132.     Testing apparently was never performed on the sneakers – no lab reports were ever produced to Mr. Newton. Newton Decl. ¶6.

133.     The back of the original Yellow Invoice for the sneakers shows that the sneakers were released to Detective Newbert on May 13, 1985 (for trial) and were returned to the PCD on May 29, 1985. See copy of original Yellow Invoice No. B744556 (Ex. C).

134.     Mr. Newton requested the production of the sneakers on numerous occasions after his conviction, but they were never produced to him. Newton Decl. ¶6.

135.     The NYPD only recently located the original Yellow Invoice for the sneakers; it apparently had been missing for years. O'Connor Decl. ¶3 (Ex. E).

136.    The original Yellow invoice contains no information about the disposition or present location of the sneakers.  See copy of original Yellow Invoice No. B744556 (Ex. C).

137.    An August 7, 1990 letter from the Commanding Officer of the Bronx PCD to the Commanding Officer of the Bronx Sex Crimes Unit (attached to the original Yellow Invoice) shows only an expressed intention of the Bronx PCD to dispose of the property "within 30 days of this notification" if the Sex Crimes Unit did not request the preservation of the property.  See copy of original Yellow Invoice No. B744556 (Ex. C).  [These "intent to dispose" letters did not always lead to evidence destruction.  See paragraphs 148-49 below.]

138.    No document has been produced by the NYPD to show that any copy of the original White or Yellow Invoice for the sneakers was stamped "Destroyed" in accordance with PCD policy to confirm the destruction of evidence.

139.    The NYPD's PCD only recently located the original Yellow Invoice for Mr. Newton's sneakers; the original Yellow Invoice for the sneakers had been missing for years.  O'Connor Decl. ¶5 (Ex. E).

### 2.    VJ's Soiled Clothing

140.    On June 26, 1984, Detective Joanne Newbert completed an NYPD Property Clerk's Invoice No. B744512 to register the clothing collected from VJ after her post-assault hospitalization.  See copy of original Yellow Invoice No. B744512 (Ex. B).

141.    In the lower left hand side of the Invoice B744512, a "Bronx Boro Storage No." was handwritten on the Invoice -- "85B6966," "indicating that the property was, indeed, received by the Bronx borough office of the PCD sometime in 1985, and was assigned a Bronx "Storage No."  See copy of original Yellow Invoice No. B744512 (Ex. B).

142.    Interestingly, on the right hand side of this original Yellow Invoice someone wrote "PP" – indicating that the clothing was dispatched to the Pearson Place Warehouse at some unknown date and time.  See copy of original Yellow Invoice No. B744512 (Ex. B) *received from the NYPD in February 2009*.

143.    A photocopy of Invoice No. B744512, produced by the Bronx District Attorney's Office contains additional handwritten notations – what appears to be another Bronx Storage No., "84-11257," and what appears to be a Pearson Place Warehouse storage location, "2002-1." See photocopy of original Yellow Invoice No. B744512 *received from the Bronx District Attorney's Office* (Ex. T).  In other words, the District Attorney's Office apparently was advised about the transfer of the clothing to the Pearson Place Warehouse (the clothing was stored in Queens at some point, rather than stored within the Bronx borough office of the PCD).  Id.

144.    Testing apparently was never performed on VJ's clothing prior to trial – as no pretrial lab reports have ever been produced by the NYPD or the District Attorney's Office.

145.    Mr. Newton requested the production of VJ's clothing for DNA testing in 1994, but it could not be located by the PCD after "extensive searches."  Defendants' Rule 56.1 Statement ¶¶3 and 15.  In 1998, the clothing was located after a renewed application for its production by Mr. Newton.  Newton Decl. ¶29.

146.    How the soiled clothing was located in 1998 (and not in 1994), no one has been able to explain. McGuire Depo. at 116-17, 164-65 (Ex. M); Curbelo Depo. at 76 (Ex. R).

147.    As with the sneakers, the NYPD's PCD only recently located the original Yellow Invoice for VJ's soiled clothing; the original Yellow Invoice had been missing for years. O'Connor Decl. ¶5 (Ex. E).

148.    Interestingly, among the papers attached to the original Yellow Invoice for the soiled clothing is another August 7, 1990 letter from the Commanding Officer of the Bronx PCD to the Commanding Officer of the Bronx Sex Crimes Unit showing an expressed intention of the Bronx PCD to dispose of the property "within 30 days of this notification" if the Sex Crimes Unit did not request the preservation of the property. See copy of original Yellow Invoice No. B744512 (and attachments) (Ex. B).

149.    We now know that VJ's soiled clothing was not "disposed of" because it was found by the NYPD in 1998 – eight years after the "notice of intention to dispose" was sent by the PCD (and four years after it had been first requested by plaintiff under CPL § 440.30 in 1994). Defendants' Rule 56.1 Statement ¶¶1, 3, 15, 39 and 40.

### 3.  The Vitullo Rape Kit

150.    On June 23, 1984, Detective Joanne Newbert completed an NYPD Property Clerk's Invoice No. 744483 to register the following items of evidence collected in the course of her investigation into VJ's assault: (1) a Vitullo rape kit, (2) a container of blood samples, (3) a piece of mirrored glass, and (4) a Newport cigarette pack. See copy of original Yellow Invoice No. B744483 (and attachments) (Ex. A).

151.    In the lower left hand side of Invoice No. B744483, two "Bronx Boro Storage Nos." appear to be handwritten on the Invoice -- "84B19041" and "84-10559" -- indicating that the property was, indeed, received by the Bronx borough office of the PCD sometime in 1984; the property storage location box contains the handwritten notation: "Misc," indicating a specific storage location within the Bronx borough office. See copy of original Yellow Invoice No. B744483 (and attachments) (Ex. A).

152.    The front of the original Yellow Invoice also contains a very significant piece of information – someone made a patently obvious notation on the face of the Invoice: "DOA Barrel #22 1989."  [The significance of this notation is revealed below.]  See copy of original Yellow Invoice No. B744483 (and attachments) (Ex. A).

153.    The back of this original Yellow Invoice also contains very important "tracking" information.  See copy of original Yellow Invoice No. B744483 (and attachments) (Ex. A).

154.    The first box at the upper left hand side of the back page shows that the evidence was taken from the PCD by Detective Joanne Newbert on May 13, 1985 (for trial) and was returned on May 29, 1985.  See copy of original Yellow Invoice No. B744483 (and attachments) (Ex. A).

155.    The next box, located at the upper right hand side of the back page shows that the evidence was signed out by "ADA [Stacey] Edelbaum" on May 11, 1988 with no indication that it was ever returned (logged back in) by the PCD.  See copy of original Yellow Invoice No. B744483 (and attachments) (Ex. A).

156.    The NYPD only recently located the original Yellow Invoice for the Vitullo rape kit (on or after January 30, 2009); it apparently had been missing for years.  O'Connor Decl. ¶3 (Ex. E).

157.    The original Yellow Invoice for the rape kit was located in what allegedly is known as an "Out to Court Yellows" folder created by the Bronx PCD borough office to note that evidence was still "out-to-court," i.e., not yet returned to the PCD.  Trabitz Depo. at 187. (Ex. L); O'Connor Decl. ¶3 (Ex. E).

158.    The Yellow Invoice, the documents attached to it, and recent deposition testimony show how the rape kit and its "tracking" document became "lost."  <u>See</u> paragraphs that follow immediately below.

**G.    <u>Newton's Requests for the Rape Kit & the Defendants' Failure to Produce It</u>**

159.    While he was incarcerated, Mr. Newton followed the dramatic advancements in the serological testing of blood, semen and other evidence; as an innocent man, unjustly incarcerated, he began to file numerous motions and applications to obtain serological/DNA testing on the biological evidence collected from VJ after her assault.  Newton Decl. ¶7.

160.    Mr. Newton began to file numerous applications for the biological evidence in the possession of the NYPD; the NYPD, *et al*., began a consistent and repeated pattern of denying him the evidence and testing that he requested.  <u>Id</u>.

**1.    <u>1988 – Request for Blood-Type Testing on Rape Kit</u>**

161.    On or about January 29, 1988, Mr. Newton's then-attorney (Philip L. Weinstein, Esq.) filed a motion in the Supreme Court of the State of New York, County of Bronx, requesting permission for "independent" laboratory testing (by Dr. Robert Shaler) on VJ's soiled clothing and the Vitullo rape kit.  Newton Decl. ¶8.

162.    Mr. Newton's attorneys hoped to determine whether semen collected from VJ and/or semen stains from her clothing were produced by a "secretor" or a "non-secretor" (and thereafter determine if Mr. Newton was a match or not as a "secretor" or a "non-secretor").  <u>Id</u>.

163.    In response to the aforesaid motion, on April 6, 1988, Justice Burton Roberts issued a two-page Order holding that an independent expert (Dr. Robert Shaler of Lifecodes, Inc.) was authorized to inspect two trial exhibits (including the rape kit) and "to supervise and

perform serological tests of semen found on the exhibits." See copy of original Yellow Invoice No. B744483 (and attached Order of Justice Burton Roberts dated April 6, 1988 ) (Ex. A).

164.    Justice Roberts ordered the Bronx District Attorney "to arrange with Dr. Shaler to secure and deliver the exhibits to the Medical Examiner of the City of New York where such test shall be conducted." Id.

165.    On May 11, 1988, in response to the April 6, 1988 Order of Justice Roberts, ADA Stacey Edelbaum visited the Bronx borough office of the PCD and took possession of the rape kit evidence for the testing ordered by Justice Roberts.  See copy of original Yellow Invoice No. B744483 (notations on back) (Ex. A).

166.    The back of Yellow Invoice No. B744483 show that the property was delivered to ADA Edelbaum by an NYPD employee named "Monroe" at "1550" hours on May 11, 1988.  Id.

167.    ADA Edelbaum's right thumbprint was applied to the invoice to note that she had taken the property, and a copy of the court order requiring its retrieval from the PCD was attached to the Yellow Invoice.  Id.

168.    In accordance with PCD written procedures, the following additional acts should have been performed by the PCD "window clerk" to effect the property transfer and record the chain-of-custody and movement of the evidence:

> (1) the original Yellow Invoice would have been retrieved from the "Active Yellows Folder" (they are organized by pre-printed Invoice number) and an "out of custody" card should have replaced it [Property Guide, Proced. No. 211-2 (1)];
>
> (2) the back of the Yellow Invoice would have been completed to note the transfer of the property to Edelbaum (it was) [Property Guide, Proced. No. 211-2 (7)];

(3) a copy of the court order requiring transfer from the PCD would have been attached to the Yellow Invoice (it was);

(4) an entry would have been made in the "Evidence to Court" book [Property Guide, Proced. No. 211-2 (9)];

(5) a blue "court receipt" receipt would have been completed by Edelbaum prior to her departure (it was), and a copy of the "court receipt" would have been attached to the Yellow Invoice (it was) [Property Guide, Proced. No. 211-2 (10)];

(6) a copy of the Yellow Invoice would have been supplied to the person taking possession of the evidence; and

(7) the original Yellow Invoice would have been retained in an "Out to Court Yellows" file "at the public window awaiting return of the property from court" [Property Guide, Proced. No. 211-2 (12)].

See PCD "Property Guide," Procedure No. 211-2 (Ex. D).

169.   The PCD's "Property Guide" explicitly states that the person removing the evidence from the PCD's possession (here, Edelbaum of the Bronx DA's Office) bears responsibility for the loss of the property if it is not returned to the NYPD.   See "Property Guide," Proced. No. 211-2 (Ex. D) ("Evidence, for which the court has authorized examination by an independent laboratory will only be released to the vouchering/assigned officer or a member of the District Attorney's Office.  *They will be responsible for notifying the A.D.A. concerned, witnessing the examination and informing the A.D.A. of the results and the status of the property and its ultimate return to the Property Clerk….*").

### a. 1988 Testing on the Rape Kit

170. OCME Laboratory Director, Patricia Ryan completed a "Serology Laboratory" log book entry indicating that she "received" the Vitullo rape kit on "7/27/88." Patricia Ryan Depo. at 69 (Ex. O).

171. The defendants have not produced any documents yet showing where the rape kit was between May 11 and July 27, 1988. Upon information and belief, the rape kit was with ADA Stacey Edelbaum, who has yet to be deposed (or added as a party to this litigation). See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.

172. Testing was performed on the rape kit by the OCME's Patricia Ryan on August 1 and September 8, 1988. Patricia Ryan Depo. at 70, 81 (Ex. O).

173. Patricia Ryan has testified that she found no semen within the Vitullo rape kit. Patricia Ryan Depo. at 81 (Ex. O).

174. She has admitted that although certain tests for the presence of semen were "inconclusive," she did not report the latter finding to the Bronx District Attorney's Office. Patricia Ryan Depo. at 77-81 (Ex. O)

175. Patricia Ryan has admitted that she performed the testing without requesting the 'independent" laboratory supervision of Dr. Robert Shaler or any of his colleagues at Lifecodes, Inc. Patricia Ryan Depo. at 20 (Ex. O).

176. Patricia Ryan claims that the Bronx District Attorney's Office failed to deliver a copy of Justice Burton's April 8, 1988 Order to her, or advise her that Dr. Robert Shaler was supposed to supervise all testing performed on the evidence. Patricia Ryan Depo. at 60 (Ex. O).

177.    Patricia Ryan has testified that, when she completed her testing, she returned the rape kit to a storage room and she placed it into a DOA Barrel; an employee of the NYPD would have picked up the DOA Barrel.  Patricia Ryan Depo. at 109 (Ex. O).

### b.    The Rape Kit Is Returned to the PCD in Late 1988

178.    When biological evidence tested by the OCME was not claimed promptly by the DA's Office or NYPD, the OCME would place the unclaimed evidence in DOA Barrels (when a borough Barrel was full, the NYPD would pick it up).  Patricia Ryan Depo. at 108 (Ex. O).

179.    DOA Barrels were always stored at the NYPD's Pearson Place Warehouse (rather than the borough offices of the PCD) because the DOA Barrels were large sealed containers containing bodily fluids.  Trabitz Depo. at 165 (Ex. L);McGuire Depo. at 80 (Ex. M).

180.    A "Property Clerk Logbook" maintained by the OCME contains an entry for NYPD Invoice No. B744483 indicating that the rape kit, travelling under Invoice No. B744483, was picked up by the NYPD on "12/27/88."  Patricia Ryan Depo. at 111-12 (Ex. O).

181.    The Vitullo rape kit was apparently packed in a DOA Barrel at the OCME because no one (*e.g*., ADA Edelbaum) claimed it in a timely manner.  Patricia Ryan Depo. at 113-14 (Ex. O).

### c.    The PCD Failed to Record Its Receipt of the Rape Kit Properly

182.    When DOA barrels were received at the PCD's Pearson Place Warehouse, there were specific procedures for registering the contents.  McGuire Depo. at 85-88, 229-32 (Ex. M).

183.    Normally, when evidence was returned to the borough office of the PCD office from which it originated, after being "out to court," a clerk working at the intake window of the PCD borough office would note the return of the property on the back of the Yellow Invoice that was then being maintained in a "Out to Court Yellows" folder at that intake window and the

original Yellow Invoice would be returned to the "Yellows Active File" (and an "out of custody card" would be removed from the location where the original Yellow Invoice was being returned).  See PCD "Property Guide," Procedure No. 211-3 (Ex. D); see supra ¶¶ 99-100.

184.   If evidence was not returned to the PCD borough office from where it originated, but was, instead, returned in a DOA Barrel to the Pearson Place Warehouse, a slightly different set of procedures was supposed to take place to ensure that the "tracking" document (the original Yellow Invoice) recorded the return of the property and to ensure that the chain-of-custody was maintained.  McGuire Depo. at 85-86 (Ex. M); see supra ¶107.

185.   Defendant (ex-Sgt.) Patrick McGuire described the procedures that would be employed by an "intake clerk" at the NYPD's Pearson Place Warehouse when DOA Barrels were received from the OCME:

> Whoever was doing the invoice would
> open up the barrel and they would inventory every
> piece of property in that barrel to insure that
> whatever is listed on the transfer sheet, the
> property is actually there and it matches what's
> on the actual voucher.
> If there was any discrepancies it
> would be handled at that time.  The barrel would
> then be sealed, a copy of the transfer sheet would
> be taped on to the barrel and would remain with
> the barrel so you can always look at a barrel and
> know what's inside there.  In big spray paint or
> letters the barrel number would be listed on the
> side of it so you can see it from a distance.
> The transfer sheet would be given to
> the [OC]ME's office as a receipt that they dropped off
> these pieces of property.  The copies of the
> vouchers would be placed in a folder with the
> storage – with the transfer sheet for our future
> reference as our records –
> Q.   These would be photocopies?
> A.   Photocopies.
> Q.   Of the vouchers, correct?
> **A.   Right.  And a copy of these, the copy**

00087

P. J. McGuire

of the transfer sheet would be sent to the borough office so that they would indicate on their copy of the voucher [Yellow Invoice] where the location is.

\*          \*          \*

Q.    When the transfer receipt and photocopies were sent to the borough office of, say, the Bronx property clerk's office, what would the employees do with the transfer sheet and photocopies of the invoices?

\*          \*          \*

A.    The reason why we send them that copy

00088

P. J. McGuire

is so that they can indicate on their copies of the voucher [Invoice] that we have now received these pieces of property, so that this way if someone was to come in for it they would have listed on there that it is in DOA barrel 89-22, because up until that point, the last thing that they know is that it went to the ME's office.

Q.    Was it the practice of the Property Clerk Division to attach copies of transfer receipts and photocopies of invoices that have new storage location numbers to attach it to the yellow copy of the invoice?

A.    I can't speak for what the procedure was at the [Bronx] borough office there.  One way of doing it is to actually make – let's say there is thirty pieces of property in that barrel, make thirty copies of this transfer sheet and attach one to each of the original vouchers.  That's one way of doing it.  Or you could go to the yellow working copy and indicate on the back that it was received at Pearson Place on this date with this storage number.  One of the two.

\*          \*          \*

Now, as it appears, it [the rape kit] was never returned to the Bronx property clerk office.  The

00231

P. J. McGuire

ME's office, they are not going to deliver it to the precinct or the Bronx property clerk office. When they have the occurrence of unclaimed or

unpicked up property, they would store that in barrels and they would get the barrel number from Pearson, and once they had a full barrel, they would bring it to Pearson Place for storage. That was their way of cleaning out their room and putting it back into the property clerk. Was it the best way? That's, you know, to be argued. Once it comes back to Pearson Place, we now on a transfer sheet, with the list of all the items that are in there [DOA barrel], we assign -- we have that barrel number, we give them a receipt that we accepted it. We have copies of every single -- copies, not originals, photocopies of every piece of property that's in that barrel. We make a copy of that. So now we have two copies of every single piece of property that's in that barrel, the cover sheet and one copy -- one set of copies we keep at Pearson Place as a file of everything that's in that barrel. The other copies we send to the

00232

P. J. McGuire borough office to let them know that the property is here. At that time, someone from their office would probably, and again, this is an assumption because, again, you don't know what people did at the time and you don't know what actually happened to evidence and all that stuff unless you are, you know, you have a tracking device with it, you know. It appears that probably at that time they wrote this information on their yellow copy of the voucher which was somewhere in their facility. And that's an assumption, obviously.

McGuire Depo. at 86-88 (Ex. M).

186. The defendants have not yet produced copies of any transfer receipts showing how and when the PCD's Pearson Place Warehouse received "DOA Barrel #22 1989" from the OCME -- with the property described under Invoice No. B744483 (including the rape kit). Copies of the transfer receipt(s) have been requested by plaintiff. See footnote 3, page 30 above.

187.    A copy of the transfer receipt should still be attached/taped to "DOA Barrel # 22 1989"; another copy should be in the possession of the Bronx borough office of the PCD; another copy should be with the Pearson Place Warehouse, and the original should be in the possession of the OCME.  McGuire Depo. at 85-88 (Ex. M).

188.    Someone in the Bronx borough office of the PCD apparently received information from the Pearson Place Warehouse PCD personnel about the return of the rape kit to the PCD because the original Yellow Invoice, recently found in the Bronx borough office of the PCD does, indeed, contain a handwritten notation on its face stating "DOA Barrel #22 1989."   See copy of original Yellow Invoice No. B744483 (front page) (Ex. A).

189.    For some unexplained reason, the Bronx borough office employee who placed the "DOA Barrel #22 1989" notation on the original Yellow Invoice failed: (1) to remove the original Yellow Invoice from the "Out to Court Yellows File" and place it back into the "Yellows Active File"; (2) to log the evidence back into the PCD properly by noting the return of the invoice on the back upper right hand corner of the Yellow Invoice (where it shows that the evidence was delivered to ADA Edelbaum); (3) to attach the transfer receipt to the Yellow Invoice showing that the evidence was delivered back to the PCD by the OCME on a certain date, and (4) to note the return of the property in the "Evidence to Court Book."  See "Property Guide," Proced. No. 211-3 ("Property Returned from Court" Procedure) (Ex. D); see also Trabitz Depo. at 176, 187 (Ex. L).

190.    If the aforementioned procedures had been performed properly, the original Yellow Invoice would have been found in the "Yellows Active File."  In fact, if any one of those four procedures had been done correctly it would have led to the location of the rape kit.  Id.

191.    The Commanding Officer of the PCD borough office, the PCD's "Integrity Control Officer," and someone from the District Attorney's Office were supposed to become involved when there were "overdue invoices" (in the "Out to Court Yellows" file).  Defendant Trabitz has testified that "the [PCD's] Integrity Control Officer is charged with checking compliance of the members of the Property Clerk Division, of conducting in-house investigations and monitoring."  Trabitz Depo. at 324 (Ex. L).  He further testified that that: "Q… If an item of evidence…goes out to court, and is not returned in a short period of time…is the Integrity Control Officer to get involved on behalf of the Property Clerk Division.  A. He could get involved in it [the request for its return]."  Id.

192.    No evidence has been produced by the defendants showing that any PCD "Integrity Control Officer" ever became involved in any search for the rape kit requested by Mr. Newton.

### d.  The PCD/DA's Office Fail to "Follow Up" on a Search for the Rape Kit

193.    On June 30, 1988, NYPD Deputy Chief John P. Higgins, the Commanding Officer of the PCD, wrote a letter to ADA Stacey Edelbaum requesting that she respond (to Sgt. George Kuttler of the Bronx Property Clerk's Office), in writing, on the "status of outstanding property" that ADA Edelbaum removed from the PCD on May 11, 1988 under Invoice No. B744483.  See attachments to original Yellow Invoice No. B744483 (Ex. A).

194.    Upon information and belief, ADA Edelbaum apparently did not respond to this inquiry.  See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.

195.    On August 31, 1988, NYPD Deputy Chief John P. Higgins, the Commanding Officer of the PCD, wrote a "second notice" letter to ADA Stacey Edelbaum requesting that she respond (to Sgt. George Kuttler of the Bronx Property Clerk's Office), in writing, on the "status

of outstanding property" that ADA Edelbaum removed from the PCD on May 11, 1984 under Invoice No. B744483.  See attachments to original Yellow Invoice No. B744483 (Ex. A).

196.    ADA Edelbaum responded to the latter inquiry by stating that "Justice Roberts ordered the DA's Office to turn over said evidence to Lifecodes Inc. to Dr. Robert Shaler."  See attachments to original Yellow Invoice No. B744483 (Ex. A).

197.    The evidence was, in fact, turned over to the OCME; Dr. Shaler never participated in the testing.  Patricia Ryan Depo. at 20 (Ex. O).

198.    In response to the question of when the evidence would be returned to the PCD, ADA Edelbaum responded with a "?".  See attachments to original Yellow Invoice No. B744483 (Ex. A).

199.    On July 7, 1992, NYPD Deputy Inspector Bruce J. Major, the Commanding Officer of the PCD, wrote a letter to ADA Stacey Edelbaum requesting that she respond (to Sgt. Bruce Kessler of the Bronx Property Clerk's Office), in writing, on the "status of outstanding property" that ADA Edelbaum removed from the PCD on May 11, 1984 under Invoice No. B744483.  See attachments to original Yellow Invoice No. B744483 (Ex. A).

200.    Upon information and belief, ADA Edelbaum apparently did not respond to this inquiry (she had apparently left the employ of the Bronx DA's office by 1992).

### 2.   1989 – FOIL Request for the Rape Kit

201.    On September 25, 1989, Mr. Newton served a "Freedom of Information Law" ("FOIL") request upon the NYPD seeking the production of a number of items of evidence (including the rape kit).  Newton Decl. ¶10.

202.    This FOIL request, and a subsequent "Article 78" legal action filed *pro se* by Mr. Newton to compel the production of the evidence, was dismissed on procedural grounds. Newton Decl. ¶11.

### 3.    1991 – Attorney Request for the Rape Kit

203.    In 1991, Mr. Newton's family retained an attorney, Stephen A. Somerstein, Esq., to assist in obtaining DNA testing on the evidence surrounding Mr. Newton's rape conviction. Newton Decl. ¶12.

204.    Attorney Somerstein reported in a June 7, 1994 letter that he contacted the DA's Office *in 1991* to "have them locate the rape kit and any other sperm or blood samples from articles of clothing worn by the victim."  Newton Decl. ¶13.

205.    Unfortunately, while plaintiff has a copy of the June 7, 1994 letter, Attorney Somerstein cannot locate his "Newton file" and the DA's appeals file contains no mention of Mr. Somerstein's request.  Newton Decl. ¶14.

206.    Ultimately, Mr. Newton's family could not afford to pay Mr. Somerstein to complete his work in 1991.  Newton Decl. ¶15.

### 4.    1994 – Motion Filed Under CPL § 440.30 for the Rape Kit

207.    Following the enactment of new legislation (CPL § 440.30) that allowed for post-conviction testing of DNA criminal evidence under certain circumstances, on August 16, 1994, Mr. Newton filed a *pro se* motion demanding serological/DNA testing on both the rape kit and VJ's soiled clothing.  Newton Decl. ¶16; Defendant's Rule 56.1 Statement, ¶1.

208.    The defendants concede, in their motion papers, that Mr. Newton satisfied the conditions established under CPL § 440.30 for obtaining post-conviction DNA testing on the

rape kit and VJ's soiled clothing.  Defendant's Rule 56.1 Statement, ¶3 ("The Bronx DA's Office consented to the plaintiff's request for testing of the rape kit and clothes").

209.   ADA John Carroll attempted to secure the rape kit and the victim's clothing for the testing requested by Mr. Newton pursuant to CPL § 440.30.  Id.

210.   ADA Carroll has admitted that he received virtually no training on how the PCD stored criminal evidence and that he, therefore, relied entirely on the NYPD's PCD personnel in helping him determine what might have happened to the "missing" evidence.  Carroll Depo. at 28-30 (Ex. P).

211.   ADA Carroll claims that, in requesting the rape kit from the PCD, he provided the "voucher" or Invoice number for the rape kit, but he can't recall providing a copy of the rape kit's Invoice to the PCD.  Carroll Depo. at 47-48, 57 (Ex. P).

212.   A photocopy of the relevant NYPD Invoice/Voucher (B744483) used to track the movement of the rape kit (while the rape kit was in the possession of the NYPD) was, however, in the "Appeals File" of the Bronx District Attorney's Office and was produced to plaintiff from that file in this litigation.  Compare Ex. U (*photocopy of Yellow Invoice No. B744483 produced by the District Attorney's Office*) with Ex. H (Invoice attached to Koenderman letter to Trabitz).

213.   The photocopy of NYPD Invoice No. B744483 within the aforementioned "Appeals File" contains a handwritten notation setting forth the precise location ("DOA Barrel #22 1989") of the rape kit that was requested by Mr. Newton in 1989, 1991, 1994, and subsequent years.  Id.

214.   For some unexplained reason, ADA Carroll and other DA Defendants failed to forward this relevant document to the NYPD to assist the NYPD in its search for the rape kit.

Trabitz Depo. at 222 ("once the property clerk invoice B744483…was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property").

215.    The photocopy of the Invoice, if it had been dispatched to the NYPD promptly, would have led the NYPD to find the rape kit in 1994. Id.

216.    ADA Carroll testified that he received very little cooperation from the Bronx borough office of the PCD in his attempt to secure the rape kit and VJ's soiled clothing.  Carroll Depo. at 66 (Ex. P) ("They became impatient with my visits, and at some point they said we can't find it, you can come back here and look for yourself.  So – which is what I did, and I looked on a shelf where they sort of gave me some idea of where things might be, and that was, I think, kind of just well, I won't characterize it, but they also gave me either the ledger books or index cards that had – were supposed to show when evidence came back, and I sat there for hours going through either these index cards or those ledger books."), 91 (Q. tell me about your experience looking for DNA evidence in 1994 in older post-conviction cases?  Mr. Weiler: Objection.  A. It was difficult…I have a specific recollection of being surprised when I went to the Property Clerk's Office, that they handed me these kind of Dickensian ledger books…I thought that it was strange [in 1994] that the property clerk was still dealing in paper instead of using some kind of computerized system.").[4]

---

[4]    ADA Carroll's reference to Dickens is appropriate.  In Bleak House, Dickens suggests that the law and the uses to which it are put are the basis of a nightmare – people are always writing and building mountains of paper to both conceal facts and make money.  Attorneys and their underlings produce prodigious piles of paper: "bills, cross-bills, answers, rejoinders, injunctions, affidavits…mountains of costly nonsense…Over which bee-like industry, these benefactors of their species linger."  Charles Dickens, Bleak House, (Ch. 1) 14, (Ch. 32) 568 (Penguin Classics, 3d ed. 1996, 1st pub. 1853).  For Dickens, oppressive paperwork becomes the hallmark of an inefficient and corrupt business.  ADA Carroll's reference to Dickens is, thus, a very profound and appropriate reference to the inefficient paper-based work of the PCD.

217.    Among other things, ADA Carroll has testified that he had discussions with both the Bronx PCD office and the OCME inquiring who had custody of the rape kit and VJ's soiled clothing.  Carroll Depo. at 50  (Ex. P) ("It was a series of back and forths between the medical examiner and the [Bronx] property clerk…there were several visits to the [Bronx] Property Clerk's Office… and several phone calls to the medical examiner… and they would say we don't have it, we sent it back.  So then I go back to the [Bronx property] clerk's office and I'd say well, the medical examiner says you have it, they sent it back, and they would say no, we don't have it, blah, blah, blah…that went on for several months….").

218.    At one point, ADA Carroll was, in fact, invited into the Bronx PCD storage area to look for the evidence himself on the shelves (which he did).  Carroll Depo. at 67 (Ex. P).

219.    ADA Carroll has testified that he spoke to *two* female supervisors the Bronx borough office of the PCD in requesting the rape kit: "two female officers, one of whom I think was a sergeant, and she, as I recall, had a short blond hair, and then I think there was another female officer who was – another -- first one maybe who was like five-four, five-five, and the second one was maybe five – a little shorter…."[5]  Carroll Depo. at 55  (Ex. P).

220.    The Bronx Property Clerk's Office may have told ADA Carroll that they could not find the Invoice for the rape kit, but we know today that this Office had the original NYPD Yellow Invoice (No. B744483) in its possession in an "Out to Court Yellows File."  See O'Connor Decl. ¶3 (Ex. E).

---

[5]    Plaintiff has asked The City to identify these two females so that they might be added /joined as defendants in an Amended Complaint, but The City has refused to respond.  Plaintiff has asked Magistrate Judge Freeman to compel The City to respond to plaintiff's Interrogatories, but no ruling has been forthcoming and the statute of limitations on claims that may be asserted against these individuals may expire on or before July 6, 2009.  See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.

-56-

221.    This original Yellow Invoice, then in the possession of the Bronx Property Clerk's Office, contained a handwritten notation on its face setting forth the precise location of the rape kit.  See Ex. A (NYPD Yellow Invoice No. B744483 received from NYPD in February 2009).[6]

222.    ADA Carroll testified that he contacted the OCME to request information about the 1988 testing on the rape kit, but he claims the OCME also provided him with virtually no information.  Carroll Depo. at 86 (Ex. P) ("they [OCME] were not able to say to me, you know, we turned it over to them [NYPD] on such a date, and here is the receipt, because if they had, that would have been a completely different story.").

223.    A log in an OCME file shows that ADA Carroll contacted the OCME looking for the rape kit, but the log entry fails to state what action was taken in response to the Carroll inquiry.  See Excerpt from OCME File re 1988 testing performed on the rape kit (Ex. V).

224.    ADA Carroll doesn't recall receiving any chain-of-custody documents from the OCME.  Carroll Depo. at 110-111 (Ex. P) (Q: You don't recall receiving anything [re: chain-of-custody] back from the OCME in '94; correct?  A: That's fair.  I can live with that.").

225.    In fact, we know that the OCME had a "Property Clerk Log Book" with an entry showing delivery of the rape kit to the NYPD on "12/27/88."  See paragraph 223 above.

---

[6]    It is for this reason that plaintiff seeks to add several new defendants who were employed by the Bronx borough office of the NYPD's PCD. See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.  Individuals employed by the Bronx borough office of the PCD not only didn't find the original Yellow Invoice in their Office files, they apparently also did not handle the information allegedly conveyed by ADA Carroll properly; on the latter point, these individuals failed to trace the chain-of-custody for the rape kit after it was tested by the OCME in 1988.  The individuals employed by the Bronx borough of the PCD should have checked both their "Evidence to Court Book" for log entries relating to the 1988 testing, as well as any 1988 "Out to Court Yellows" folder maintained by that office. See paragraphs 188-89 above.  These individuals may, therefore, be held accountable for their action and/or failure to act. Id.

226.    In an Affirmation dated November 1, 1994, ADA Carroll reported to the Supreme Court of the State of New York, Bronx County (and Mr. Newton): "Intending to consent to defendant's request, your affirmant undertook an extensive investigation in order to determine the whereabouts of the aforementioned evidence [rape kit and victim's clothing].  It now appears, however, that this physical evidence was never returned to either the District Attorney's Office or the New York City Police Department's Property Clerk's Office.  A thorough search of the District Attorney's Office archives was conducted.  In addition, extensive searches were conducted at the New York City Property Clerk's Office, Bronx County, and at the Office of the Chief Medical Examiner, the site of all post-conviction analysis.  The physical evidence was not located."  See Affirmation of John Carroll, Esq. dated November 1, 1994, a copy of which is annexed to the Declaration of Fred Weiler dated June 5, 2009 (hereinafter "Weiler Decl.") as Ex. C.

227.    Based on ADA Carroll's Affirmation (and the inability of the NYPD to locate either the rape kit or the victim's clothing), Mr. Newton's 1994 request for serological/DNA testing on evidence in his rape case was denied by Justice John Byrne on November 17, 1994. Defendant's Rule 56.1 Statement ¶15.

228.    Thus, although Mr. Newton had an admitted statutory right to obtain access to the rape kit under CPL § 440.30, he was arbitrarily denied access to it in 1994 by the NYPD and the Bronx District Attorney's Office (and the named defendants in this action, and in the proposed Amended Complaint).

### 5.  1995 - *Habeas Corpus* Petition Request for the Rape Kit

229.    In 1995, Mr. Newton filed a *pro se* "*habeas corpus*" petition in the United States District Court for the Southern District of New York (Newton v. Coombe) seeking to overturn his rape conviction.  Newton Decl. ¶21; Defendant's Rule 56.1 Statement ¶16.

230.    In the course of that proceeding (on August 6, 1996), Mr. Newton requested that the NYPD be compelled to produce the following evidence:

1.  Voucher # B744556-Storage # 84B24723-1, pair of men's sneakers
2.  Voucher # B744483-Storage # 84B19041, cigarette box, mirror, Vitulo Kit
3.  Voucher# B744512-Storage # 85B696, victim's clothing (jeans, maroon sweater, blouse)

Newton Decl. ¶22.

231.    In response to this request, ADA Robert L. Moore wrote to Magistrate Judge Sharon E. Grubin on April 23, 1997 and advised (emphasis added):  "Upon information and belief, property retained as evidence by the New York City Police Department (for cases prosecuted in Bronx County) is either stored within the Property Clerk's facility at 4715 Pearson Place, Queens New York, or in the facility located within the Bronx County Criminal Court at 215 East 161st Street, Bronx, New York.  According to a representative of the Police Department Property Clerk at the Queens facility, items (1) and (2), listed above, were not found at the location following a search on this date and records of disposition are not available. *According to a representative of the Bronx Borough Property Clerk, those items were not found in the Bronx facility following a search on this date, and records of disposition are not available.  As previously noted, the petitioner has been advised, in prior state proceedings, that the Rape Kit (as listed above), could not then be located.*  I have been advised that item (3) [victim's clothing], as listed above, is presently stored at the Pearson Place facility.  I have requested on

this date, by fax, that the property (item [3]) be maintained, pending final disposition of this petition." Weiler Decl., Ex. G.

232.    Assistant District Attorney Robert Moore ("ADA Moore") was not properly trained with respect to the NYPD's property/evidence management system.  Moore Depo. at 18:15-20 (Ex. Q) (Q. Did you ever receive any formal or on-the-job training regarding the New York City Police Department's use of what we refer to as a voucher [or invoice]?  A. No, not that I recall, I don't think so.").

233.    A photocopy of the relevant NYPD Invoice/Voucher (B744483) used to track the movement of the rape kit (while it was in the possession of the NYPD), was in the "Appeals File" of the Bronx District Attorney's Office and was produced to plaintiff from that file. Compare Ex. U (*photocopy of Yellow Invoice No. B744483 produced by the District Attorney's Office*) with Ex. H (Invoice attached to Koenderman letter to Trabitz).

234.    The photocopy of NYPD Invoice No. B744483 within the aforementioned "Appeals File" contains a very clear, obvious, handwritten notation on the front setting forth the precise location ("DOA Barrel #22 1989") of the rape kit that was requested by Mr. Newton in 1989, 1991, 1994, 1998, and subsequent years.  Id.

235.    For some unexplained reason, ADA Moore and other DA Defendants failed to forward this relevant document and/or handwritten information to the NYPD to assist the NYPD in its search for the rape kit.  Trabitz Depo. at 222 ("once the property clerk invoice B744483…was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property").

236.    The photocopy of the Invoice, if it had been dispatched to the NYPD promptly, would have led the NYPD to find the rape kit in 1994 and following years.  Id.

237.    Ultimately, Mr. Newton's *habeas* petition was dismissed on procedural grounds, before he could gain possession of the rape kit.  Newton Decl. ¶24.

### 6.    1998 – New Motion Filed Under CPL § 440.30 for the Rape Kit

238.    On July 9, 1998, attorneys representing Mr. Newton filed a new motion under CPL § 440.30 seeking DNA testing on: "(a) the defendant's sneakers, (b) the cigarette box, (c) mirror, (d) Vitullo kit, and (e) the victim's clothing."  Newton Decl. ¶25; Defendant's Rule 56.1 Statement ¶25.

239.    ADA Rafael Curbelo was assigned to respond to the latter motion on behalf of the Bronx DA's Office.  Defendant's Rule 56.1 Statement ¶26.

240.    The defendants do not dispute that Mr. Newton satisfied the conditions established under CPL § 440.30 for requesting post-conviction DNA testing on the rape kit, sneakers and VJ's soiled clothing in 1998.  Defendant's Rule 56.1 Statement, ¶27 ("Mr. Curbelo's first task was trying to track down the rape kit").

241.    ADA Curbelo attempted to secure the rape kit, sneakers and the victim's clothing for the testing requested by Mr. Newton pursuant to CPL § 440.30.  Id.

242.    ADA Curbelo has admitted that he received virtually no training on how the PCD stored criminal evidence and that he, therefore, relied entirely on the NYPD's PCD personnel in helping him determine what might have happened to the "missing" evidence.  ADA Curbelo was not properly trained with respect to the NYPD's property/evidence management system; he was ill-equipped to obtain post-conviction evidence from the Bronx borough office of the NYPD's PCD.  Curbelo Depo. at 31-32 (Ex. R) (Q. What training were assistant district attorneys provided about requesting evidence from the New York City Police Department in a postconviction context?  A. I don't recall any formal training on that particular topic.  Q. Do you

recall any written material provided to any employee of the Bronx district attorney which provided guidance as to how to request criminal evidence from the New York City Police Department in a postconviction context?  A. No, I don't."), 110 ("from an appellate ADA's perspective, we hardly ever find ourselves in a position to request evidence from the NYPD, which is one of the reasons the Newton case is memorable, because it was one of the few times that I had to do it").

243.    ADA Curbelo claims that he gave the NYPD's PCD the "voucher" or Invoice number for the rape kit in requesting the production of the rape kit, but that he doesn't recall providing a copy of an Invoice to the PCD.  Curbelo Depo. at 53. (Ex. R)

244.    A photocopy of the relevant NYPD Invoice/Voucher (B744483) used to track the movement of the rape kit (while the rape kit was in the possession of the NYPD) was, however, in the "Appeals File" of the Bronx District Attorney's Office and was produced to plaintiff from that file in this litigation.  Compare Ex. U (*photocopy of Yellow Invoice No. B744483 produced by the District Attorney's Office*) with Ex. H (Invoice attached to Koenderman letter to Trabitz).

245.    The photocopy of NYPD Invoice No. B744483 within the aforementioned "Appeals File" contains a handwritten notation setting forth the precise location ("DOA Barrel #22 1989") of the rape kit that was requested by Mr. Newton in 1989, 1991, 1994, 1998 and subsequent years.  Id.

246.    For some unexplained reason, ADA Curbelo and other DA Defendants failed to forward this relevant document to the NYPD to assist the NYPD in its search for the rape kit. Trabitz Depo. at 222 ("once the property clerk invoice B744483…was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property").

247.    The photocopy of the Invoice, if it had been dispatched to the NYPD promptly, would have led the NYPD to find the rape kit in 1994. Id.

248.    While representatives of the Bronx borough office of the PCD allegedly told ADA Curbelo that they could not find the Invoice for the rape kit in their files in 1998, and that they believed that the documents and rape kit had been destroyed (see Weiler Decl. Ex. J, 37:5-25; 43:8-10), the original Yellow Invoice was in their office at that time in a "Out to Court Yellows File." See O'Connor Decl. ¶3 (Ex. E).

249.    This original Yellow Invoice, then in the possession of the Bronx Property Clerk's Office, contained a handwritten notation on its face setting forth the precise location of the rape kit. See Ex. A (NYPD Yellow Invoice No. B744483 *produced by the NYPD in February 2009*).

250.    On August 17, 1998, ADA Curbello signed (and filed) an "Affirmation" in response to Mr. Newton's request for the DNA testing. In paragraph 12 of the Affirmation, ADA Curbello advised: ""Upon information and belief, the source being a telephone call from Ms. Kiely of the Property Clerk's Office at Pearson Place, Queens County, none of the above items [of evidence] could be located. Upon information and belief, the source being the same, Vitulo Kits were preserved starting in 1988, and the other items were most likely destroyed in accordance with standard Police Department procedure." See Affirmation of Rafael Curbelo dated August 17, 1998, a copy of which is annexed to the Weiler Decl. as Ex. K.

251.    No proof of destruction was supplied by ADA Curbello or the NYPD regarding the items of evidence that allegedly were destroyed. Newton Decl. ¶28.

252.    On August 25, 1998, ADA Curbello signed (and filed) a "Supplemental Affirmation." In paragraph 12 of the Supplemental Affirmation, ADA Curbello advised: "Upon

information and belief, the source being a telephone call from Ms. Kiely of the Property Clerk's

Office at Pearson Place, Queens County, on August 20, 1998, the third item, the victim's

clothing, is presently located at Pearson Place.   This is contrary to information previously

received by your affirmant and provided to this Court in the affirmation filed on August 19,

1998, concerning this matter.   Upon information and belief, the source being the same, Vitulo

Kits were preserved starting in 1988, and the other items were most likely destroyed in

accordance with standard Police Department procedure."   See Affirmation of Rafael Curbelo

dated August 17, 1998, a copy of which is annexed to the Schutty Decl. as Ex. I.

253.    Again, no proof of destruction was supplied by Curbello regarding the other items

of evidence (viz., the rape kit and smeakers) that were allegedly "destroyed."  Newton Decl. ¶30.

254.    The results of the alleged "search" were reiterated and reinforced in a letter from

Sgt. Patrick J. McGuire of the NYPD on August 26, 1998, in response to ADA Curbelo's request

for the evidence sought by Mr. Newton:

> Storage # 85B696
> Preprint #B744512 [this is the same as the voucher #]
> Type: clothing
>
> The above voucher is currently in storage at the Property Clerk Storehouse located at Pearson Place (Bin # 2002-1)
>
> storage # 84B24723                                        storage #84B19041
> preprint#B744556                                          preprint # B744423
> [Men's sneakers.]                                         [Cigarette box, mirror and rape kit.]
>
> The above two vouchers are currently not in its last listed storage location.  Property generally is removed from its storage location for one of two reasons.  The first is "out to court," and the second is destruction.  Items that go out to court are indicated on the original invoice which is stored in the active files.  Currently there is no original voucher in the active file, therefore it must have been destroyed.  Items that are destroyed are indicated on the original voucher and then filed in the closed files.  Unfortunately there was a fire in our facility during the summer of 1995 which destroyed these files.  This makes it impossible to say when and if the above property was destroyed.  The only other means of researching the final disposition of these vouchers is through the Bronx Property Clerk office.  Unfortunately, this is

also a dead end.  The N.Y.P.D. Records Section in connection with the Legal Bureau authorizes the Property Clerk to destroy inactive records more than six (6) years old. As you well know, the Bronx Property Clerk Office has a lack of space and therefore they keep to that procedure.

See defendant Patrick McGuire's August 26, 1998 letter to ADA Curbelo, a copy of which is annexed to the Weiler Decl. as Ex. L.

255.   During his deposition, McGuire retreated from many of his positions in the aforementioned letter.  Pertinent excerpts from his deposition testimony are set forth below:

00196

P. J. McGuire

Q.   Do you recall whether you asked any Property Clerk Division employee at the borough office for the Bronx whether the yellow voucher might be in the out-to-court file?

A.   I don't specifically remember talking to anybody about that, but as far as inquiring about the property, certainly when they are looking for the property or the paperwork, it would -- you know, that's something that would be done, I would have asked them to do or they would have done on their own, but either way my letter indicates that there was no paperwork there as far as the yellow goes.

**Q.   You are aware, are you not, that in the local borough offices of the property clerk, that yellows that are active are kept in one of two locations, correct?**

**A.   Yellows that are active are -- I thought it was only in one, but you are telling me that it could be in a second location out to court, and this -- what you are saying could be the way it is now, it's not necessarily the way it was back then.  But, again, I wasn't an expert at the borough offices now or then.**

00197

P. J. McGuire

Q.   In the course of your investigating whether the evidence requested by Mr. Newton was in the possession of the property clerk's office, Property Clerk Division, did you confer with anyone at the borough office of the Bronx property clerk as to where the yellow might be within that

office?

A.   As indicated in my letter, I have been informed that it's not in the active yellow file and -- or any active file which would be whether it is the yellow folders or the court folders. There is -- the paperwork was not in the active files which would be any one of those two, which means that it is in the -- the yellow is not in any one of those locations, then it must have gone with the property to Pearson for destruction. Yellows remain in those active files until the time it is ready for destruction, then it is pulled.

Q.   Let me clarify why I am asking this question. **We have had testimony from Deputy Chief Trabitz that in the Bronx borough office of the property clerk, when evidence was sent out to court, the yellow voucher would be removed from**

00198

P. J. McGuire

**the active yellows file and would be placed somewhere up front in an out-to-court yellows file, are you aware of that?**

**A.   I'm not aware of that.**

**Q.   Are you learning that for the first time today?**

**A.   Yes, I am.**

Q.   So that if a phone call was made to the Bronx borough property clerk back in August of 1998 inquiring whether there was a yellow copy of the invoice B744483 in their actives file and they replied no, that the yellow copy of the invoice may in fact have been in the out-to-court yellows file, do you understand what I am asking?

A.   I understand what you are asking, but you are also assuming that in 1998 that was the procedure, that the -- that there was this out-to-court folder which may or may not have been there at 1998.

But the fact that I had -- either was there or I called there and the response was that the yellow is not in the active folder, because even if it is out to court it is still active, so if it is not in the active files and they

00199

P. J. McGuire

concluded that it had to have been sent for destruction, which is something that I concluded also, it means that it is nowhere there, it's -- has already left the office.

Q. But if in fact there were two active yellow files at the Bronx property clerk's office, one an actives yellow file and one an out-to-court yellow actives file, you would agree with me, would you not, that both of those files would have to be checked to determine if the voucher in fact existed, correct?

A. Correct.

00203

BY MR. SCHUTTY:

Q. Let me take it a step further and let's get further into the procedures. As Deputy Chief Trabitz explained to me and as set forth in the property guide excerpts that have been provided to me, it was explained to me, and tell me if you are wrong or tell me if you just didn't know the answer to this, that the activities ["Actives"] were maintained in a file, active yellows. **When something would go out to court it was explained to me that the yellow voucher would be pulled from there, put into a separate file near the intake window so that followup could be performed, so that if the property was missing**

**00204**

**P. J. McGuire**

**for an extended period of time, letters could be sent to people.**

**Does that deviate at all from your recollection of the way things were done at the Bronx property clerk's office?**

**A. In 1998 I was not aware of that type of a system. I think it is a great system. And for the purpose, like you said, to follow up, right, in 1998 I didn't -- wasn't aware that there was a system like that. All right?**

00205

P. J. McGuire

\*    \*    \*

Q. Let me ask you a further question, because among the material produced to me as an excerpt from the property guide is a section

procedure No. 211-2 which details how property removed to court was to be documented by the window clerk. And among the procedures on Plaintiff's Exhibit 45 I would like you to look at is paragraph No. 1 which reads: "Remove the yellow invoice from file and replace with an out-of-custody card."
Do you see that?

00206

P. J. McGuire

A.    Right.
Q.    Are you familiar with that procedure of remove the yellow invoice from file and replace with an out-of-custody card?
A.    I was aware that they did that at the borough offices. That's not how it was done at Pearson Place.
Q.    Now, if the yellow invoice was removed and placed in an out-to-court file, there still should have been an out-of-custody card where the yellow invoice was taken from according to that procedure, correct?
A.    That's correct.
Q.    So someone within the Bronx property clerk should have reported to you when you provided the invoice number and the storage number with the fact that an out-of-custody card was in the location where the yellow invoice should have been, correct?
MR. WEILER: Objection. You can answer.
A.    Well, for one of the two vouchers.
Q.    For B744483?
A.    That's correct.

McGuire Depo. at 196-206 (emphasis assed) (Ex. M).

256.    In short, the individual who assumed the duty of looking for the rape kit (or was charged with that duty) in 1998 at the PCD, Sgt. Patrick McGuire, was not familiar with the written procedures for handling original Yellow Invoices at the borough offices of the PCD and he was not competent to render opinions as to what may have happened to the original Yellow Invoice or the rape kit. Id.

-68-

257.    Sgt. McGuire testified, however, that he would have found the rape kit in 1998, if

he had been supplied with proper information by the Bronx District Attorney's Office:

00216

P. J. McGuire

*          *          *

Q.    Let me ask you again so the record is clear.

Have you seen any documents indicating that Assistant District Attorney Curbelo provided you with information relating to what was being requested under the vouchers and what had previously been done with that evidence?

00217

P. J. McGuire

A.    I don't recall any conversations with ADA Curbelo or any correspondence with ADA Curbelo.

Q.    And you don't recall sitting here today what information may have been provided to you by your fellow employees in the Property Clerk Division relating to these invoices and what evidence was being requested?

A.    Well, based on my letter, I can tell certain things that I must have done prior to actually writing this down.

Q.    Correct.  But this letter doesn't indicate what information or what documents you were relying upon for initiating your search?

A.    Obviously.  Certain things you can automatically assume were not given to me. Obviously that it went out to the ME's office, if I would have gotten that information, again, I would have found the property right away.  So certain things you can tell I didn't have.

Q.    If you knew the property went out to the ME's office under invoice number B744483, you knew that that property went out to the OCME in May of 1988, what steps would you have taken to

00218

P. J. McGuire

try to locate the property?

MR. WEILER:  Objection, you can answer.

A.    Well, in August of 1998 when it came

-69-

to my attention that this property was being seeked and they were told to me that in 1988 it went to the ME's office for testing, well, then, I would have known that it was moved from its original location and may not have been put back in its original location, it may have been. But what -- there would be a tracking now that we can go through through the ME's office to find out what they did with it and maybe who picked it up from there and so forth. **And if I would have known that in 1988 that it was tested, I have numerous connections in the ME's office and we work great together and I would go right to them or I would get on the phone to them and I would give them that information, the storage number or the voucher number, 1988, the Bronx, and they would have told me at that time that it was put in DOA barrel 89-22 and I would have went right to that barrel and recovered the property.**

McGuire Depo. at 216-19 (emphasis added) (Ex. M).

258.    While ADA Curbelo (and the Bronx District Attorney's Office) subsequently contested Mr. Newton's legal right to have VJ's soiled clothing tested under CPL § 440.30, the Court ruled that Mr. Newton had established a statutory right to the testing.  Curbelo Depo. at 77-79 (Ex. R).

259.    ADA Curbello subsequently and successfully argued in Supreme Court, Bronx County, that if DNA testing on the VJ's clothing failed to exclude Mr. Newton as VJ's assailant, the balance of Mr. Newton's motion (for testing on the rape kit) and sneakers, should be denied "given the unavailability of the sneakers, cigarette case, mirror, and Vitulo kit."  See Affirmation of Rafael Curbelo dated August 17, 1998 (Schutty Decl., Ex. I).

260.    No semen was found on the victim's clothing, so Mr. Newton's CPL § 440.30 motion to vacate his conviction in 1998 (based on new DNA testing evidence) was denied. Defendant's Rule 56.1 Statement ¶40.

### 7.  1999 – OCME Refuses to Produce Its Chain-of-Custody Documents

261.    In connection with his work on the 1998 CPL § 440.30 litigation, ADA Curbello sent a fax cover sheet to Mr. Pat Buffalino of the OCME on April 12, 1999 (which forwarded a letter sent by Mr. Newton's attorney) requesting, among other things: "All chain-of-custody documents and laboratory notes/photographs from the NYC Medical Examiner's Office and Life Codes, Inc. generated to fulfill the requirements of the Court Order of April 6, 1988…This should include, but not limited to, all chain-of-custody documents and laboratory notes/photographs generated to produce the report signed 9/2/88 for Lab No. 585/88." See April 12, 1999 fax from ADA Curbelo to Mr. Pat Buffalino of the OCME (Ex. K).

262.    ADA Curbello has testified that Mr. Buffalino never responded to his fax. Curbello Depo. at 126 ("Q: To the best of your knowledge, were those chain of custody documents ever secured by the Bronx District Attorney's Office?  A: Not by me.").

263.    If the chain of custody documents from the OCME had been produced, ADA Curbello would have learned that the rape kit had been picked up from the OCME in a DOA Barrel and delivered to the Pearson Place Warehouse on or about December 22, 1988.  See OCME's "Property Clerk Logbook" Excerpt (Ex. J).

### 8.  2002 – FOIL Request for the Rape Kit

264.    On June 21, 2002, Mr. Newton sent a handwritten Freedom of Information Law (FOIL) request to the OCME for the "Vitullo Rape Kit received for testing on July 2, 1998, received from S. Zander, and tested on September 2, 1988.  This test was performed by Patricia Ryan, Director of Laboratory."  Newton Decl. ¶35.

265.    The OCME denied Mr. Newton's FOIL request on procedural grounds on July 9, 2002 claiming that the records of the OCME "are not open to public inspection." Newton Decl. ¶36.

### 9.    2005 – Innocence Project Request for the Rape Kit

266.    The Innocence Project agreed to try to help Mr. Newton in 2005. Newton Decl. ¶37.

267.    An attorney with the Innocence Project, Vanessa Potkin, Esq., sent an email to ADA Elisa S. Koenderman of the Bronx DA's Office requesting a fresh search for the rape kit. Newton Decl. ¶38.

268.    On July 15, 2005, ADA Koenderman sent a letter to defendant Jack Trabitz of the PCD requesting a new search for the rape kit. Koenderman's letter states that she has "attached a copy of the voucher [Invoice] for your convenience." See July 15, 2005 letter sent by ADA Koenderman to Jack Trabitz (Ex. H).

269.    The copy of the voucher dispatched to Trabitz was a photocopy of the original Yellow Invoice containing the 1989 storage location of the rape kit: "DOA Barrel #22 1989." Id.

### H.    The Rape Kit Is Finally Found in November 2005

270.    Defendant Trabitz recognized that the photocopy of the original Yellow Invoice provided by ADA Koenderman had a handwritten storage location written on its front page. Trabitz Depo. at 222 (Ex. L) ("once the property clerk invoice B744483…was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property").

271.    Trabitz had one of his colleagues track down the location of "DOA Barrel # 22 1989"; the missing rape kit was found within that DOA Barrel at a PCD storage facility.  Id. at 461-62.

I.    **Newton Is Exonerated by DNA Testing on the Rape Kit & Freed on July 6, 2006**

272.    A DNA test on the semen evidence within the rape kit conclusively established that: (1) Mr. Newton was not VJ's assailant (DNA testing confirmed that Mr. Newton's "DNA profile" did not match the one male "DNA profile" obtained from the spermatozoa within the rape kit), and (2) Mr. Newton had been misidentified by the victim (and another witness).  Newton Decl. ¶42.

273.    Mr. Newton was exonerated of the assault, robbery and rape charges brought against him under Bronx County Indictment No. 2441/84 on July 6, 2006.  See Justice John J. Byrne's July 6, 2006 Order vacating the latter conviction (and dismissing the accusatory instrument).  Newton Decl. ¶43.

J.    **The City Knew that Evidence Was Being Lost Because Invoices Were Destroyed**

274.    Although the paper-based evidence registration system was dependent on the NYPD accurately recording storage location information on Invoices, and although the system was totally dependent on the preservation of Invoices, The NYPD inexplicably instructed PCD personnel to destroy ("purge") Invoices in rape investigations after five years.  Trabitz Depo. at 423 (Ex. L) ("There has been a time in the course of the history of the New York City Police Department where invoices have been destroyed….").

275.    Today, the NYPD apparently does not even know what Invoices they have destroyed as the NYPD does not keep accurate records relating to Invoice destruction:

> Q.   Have you ever secured the original
> white copy of the invoice that would have been

maintained at The Bronx Borough Property Clerk's Office?

MR. LARKIN: Objection to the form.

Go ahead.

A.   No, I don't believe we ever got an original white, the invoice for the rape kit for Mr. Newton.

Q.   Has a search been undertaken for the original white copy of the invoice?

A.   Yes, there has.

Q.   What has been the result of that search?

A.   We were not able to produce an original white copy of the invoice.

MR. LARKIN: Off the record.

(Discussion off the record.)

(Recess taken.)

Q.   Does the New York City Police

00446

Dep Chief J. Trabitz

Department keep a record of when it stores, when it destroys an original white copies of invoices?

MR. LARKIN: Objection, form.

A.   There may have been paperwork regarding the destruction of white invoices.

Q.   Have you undertaken a search or an investigation to determine if there is any paperwork within the New York City Police Department to confirm when the original white invoice B 744483 was destroyed?

MR. LARKIN: Objection to form, foundation also.  Go ahead.

A.   I have conducted an investigation.

Q.   What has been the result of that investigation?

A.   The results of the investigation are there have been orders throughout time allowing the destruction of invoices in the possession of the Property Clerk Division.

Trabitz Depo. at 445-46 (Ex. L).

276.   Defendant Trabitz admitted that he realized "sometime" during his Command of the PCD that NYPD Property Invoices were being destroyed while the evidence related to those

Invoices was still in the possession, custody and control of the PCD (which would lead,

naturally, to an inability to find that evidence in the future):

> Q.   Would you agree with me that it would be a bad practice to destroy an original white invoice, if evidence is still in the possession, custody and control of the Property Clerk Division?
>
> 00447
>
> Dep Chief J. Trabitz
>
> MR. LARKIN:  Objection to form.  You can answer.
>
> A.   I would state that I have already gone on the record that since taking over as commanding officer of the Property Clerk Division, I have instructed my subordinates not to destroy any invoices regarding property in the custody of the Property Clerk Division.
>
> Q.   I recall that testimony, and let me ask you this question:  Were you aware that the New York City Police Department was destroying original white invoices when evidence was still in the possession, custody and control of the Property Clerk Division?
>
> MR. LARKIN:  Objection.
>
> A.   I'm aware of the fact that the NYPD was destroying invoices in the custody of the Property Clerk Division.
>
> Q.   While property was still in the possession of the Property Clerk's Office?
>
> MR. LARKIN:  Objection, foundation, go ahead.
>
> A.   I'm aware they have destroyed -- that the NYPD has destroyed invoices while they -- the
>
> 00448
>
> Dep Chief J. Trabitz
>
> invoices were in the custody of the Property Clerk Division.  I can't testify what they knew at the time.

Trabitz Depo. at 446-48 (Ex. L) (emphasis added); see also McGuire Depo. at 223 ("NYP[D]

records section in connection with the legal bureau authorizes the property clerk to destroy

inactive records more than six years old").

277.    In short, the NYPD has known, for many years, that it has been unable to produce biological evidence in response to post-conviction demands under CPL § 440.30 because the NYPD has been unable to locate the original White and Yellow Invoices relating to that evidence.  Trabitz Depo. at 421 (Ex. L).

278.    For example, the Innocence Project has advised the NYPD that it has had to close an unusually high number of its cases in New York because the NYPD has been unable to produce requested biological evidence left in NYPD's possession, custody and control. Defendant Trabitz was evasive in responding to questions on this subject:

MR. SCHUTTY:  Let's mark a two page
letter as Plaintiff's Exhibit 220, a letter
dated July 17, 2006 signed by Peter Neufeld
and Barry Scheck, and it is addressed to the
Honorable Raymond W. Kelly.
(Plaintiff's Exhibit 220, a two page
letter dated July 17, 2006 signed by Peter
Neufeld and Barry Scheck, addressed to the
Honorable Raymond W. Kelly, marked for
identification, as of this date.)
*               *               *
A.    I have read the document.
Q.    Have you seen this document before?
A.    I'm not sure if I have seen this
00407
Dep Chief J. Trabitz
before or not.
Q.    Do you know whether this letter
prompted the investigation that you undertook in
connection with the Innocence Project's request
for DNA evidence in older cases?
MR. LARKIN:  Objection to form.
A.    I'm not sure if this is the letter
that prompted that or not.
Q.    Do you know whether you have a copy of
this letter in any file that you maintain at your
office?
MR. LARKIN:  Objection.
A.    I'm not even sure I have ever seen
this document before.  I may have, I may not.  I

don't know if I have a copy of this, therefore.

Q.   Let me refer you to the third paragraph of the first page of this letter.

A.   Starting with what word?

Q.   Unfortunately.

A.   Okay.

Q.   This quote says, "Unfortunately Mr. Newton's case is not an aberration.  The Innocence Project recently conducted a preliminary analysis of its closed cases, and found that while

00408

Dep Chief J. Trabitz

nationally 32 percent of cases were closed because evidence was lost or destroyed, in New York, 50 percent of cases were closed for this reason."  Do you see that?

A.   I do see it.

Q.   Has anyone at the Innocence Project ever conveyed that factual information to you before, as commanding officer of the Property Clerk Division?

MR. LARKIN:  Objection to form.

A.   I'm not sure whether they ever sent me a letter with that information on it.  The Innocence Project has sent me letters, though.

Q.   Have they ever told you that they are experiencing lost evidence more frequently in New York than in the other states where they perform work?

MR. LARKIN:  Objection.

A.   I'm not sure they ever said that in any of the letters.

Q.   Has the Innocence Project ever conveyed to you that they have experienced problems in requesting post conviction DNA evidence from the New York City Police Department?

00409

Dep Chief J. Trabitz

MR. LARKIN:  Objection, form.

A.   They have sent me letters, but I'm not sure if they have stated that exactly.

Q.   Were you aware that they were claiming, the Innocence Project, are claiming that there is a problem that occurs when they request biological evidence that was usually collected more than a decade ago by the New York City Police

Department?

MR. LARKIN:  Objection, form.

A.    I'm aware they make requests for biological evidence that was collected more than a decade ago.

Q.    Were you aware that the Innocence Project had requested commissioner Raymond Kelly to address the "Problem of locating critical evidence from old cases in New York City"?

MR. LARKIN:  Objection to form.

(Record read.)

MR. LARKIN:  Objection to form.

A.    I'm not privy to all the communications that go to the police commissioner. The Innocence Project does send me letters.  This information may have been on it.  This letter may
00410

Dep Chief J. Trabitz

or may not have been one of them, but I know I have read letters from them.

Q.    You testified earlier you did undertake an investigation at the request of the Innocence Project for biological evidence in some older cases; correct?

MR. LARKIN:  Objection to form.

A.    I testified that I conducted an investigation for persons delineated by the Innocence Project.  Whether they sent it to me or to the police commissioner and it got to me, I don't think you asked me that, but I did conduct an investigation regarding people that they delineated.

Q.    What precipitated your investigation? What started that off, to the best of your recollection?

MR. LARKIN:  Objection to form.  Go ahead.

A.    A communication would have been forwarded to the Police Department, the NYPD, from the Innocence Project, requesting information regarding persons that they had.

Q.    Do you recall what that written
00411

Dep Chief J. Trabitz

material was that was received from the Innocence Project that precipitated your investigation?

-78-

MR. LARKIN:  Objection to form.

A.   I would say it would have to have been a letter from the Innocence Project, with either the individual's names or a request for us to contact them.

Q.   Did you maintain a file concerning the investigation you performed on behalf of the Innocence Project?

MR. LARKIN:  Objection to form, you can answer.

A.   We maintained a file on things that we did for people that were delineated by the Innocence Project.

Q.   When was this investigation performed by you or your colleagues?

A.   This investigation encompassed several months.  I don't know the exact start date, or the exact ending date, but I do remember that there was an exchange of information on more than one occasion between the start date and the ending date.

Q.   Can you summarize what was requested

00412

Dep Chief J. Trabitz

by the Innocence Project from the Property Clerk Division or from you?

MR. LARKIN:  Objection to form.

A.   Without going into specific cases, the spirit of it was a request for evidence, or property that had been invoiced that was regarding clients that they represented.

Q.   How many cases did the Innocence Project ask you to investigate?

MR. LARKIN:  Objection.

A.   I'm not sure of the exact number, because during the investigation the Innocence Project kept adding individuals to that request. So it started with one number, and it kept growing during the investigation, until it got to its final number.

Q.   Approximately how many cases did you ultimately investigate?  Was it less than 50, was it more than 20?

MR. LARKIN:  Objection, go ahead.

A.   I think it was less than 50.

Q.   Did all these cases that you

-79-

investigated, were they similar in any manner?

MR. LARKIN:  Objection to form.

00413

Dep Chief J. Trabitz

A.   The predominant similarity is that they were all post conviction requests.

Trabitz Depo. at 406-13 (Ex. L).

279.    Thus, the Innocence Project made the NYPD aware that Mr Newton's case is not an "aberration" or a "one-off."  Id.  A host of other criminal defendants have been told, for years, that their evidence could not be located post-conviction.  Id.

280.    In many or most cases, the evidence could not be found because the NYPD could not locate the NYPD Property Invoices relating to that evidence.  Trabitz Depo. at 422 (Ex. L) ("Q. Were searches performed in the course of this Innocence Project investigation, for both white and yellow working copies of the invoices?  Mr. Larkin: Objection, form.  A. Searches were done for both white and yellow copy.  Q. Was it determined that certain yellow working copies of the invoices could not be found?  Mr. Larkin: Objection, form.   A. Yes, it was determined that certain working copies, yellows, were not able to be found [or the loss of these Invoices explained].")

**K.    In New York, There is No Time Limit on Requesting Post-Conviction DNA Testing**

281.    In New York, there is no time limit for bringing a post-conviction motion requesting the production of criminal evidence and the performance of forensic DNA testing. See People v. Pitts, 4 N.Y. 3d 303 (2005).

282.    Various criminal defendants in New York State have had a post-conviction, statutory right to the production of DNA evidence (in the possession of the NYPD) in their criminal cases under CPL § 440.30, but the NYPD has been unable to produce the evidence

because NYPD Invoices had been destroyed and there was a resulting inability to find the evidence.  See paragraph 280 above.

283.    The aforementioned criminal defendants have had no recourse or remedy against the State, the NYPD, or The City under the explicit terms of CPL § 440.30.

284.    The aforementioned criminal defendants have had to accept the NYPD's claim that their evidence was "destroyed" or "likely destroyed," even though the NYPD is actually unable to state definitively whether their evidence is still in the possession of the PCD or not. Trabitz Depo. at  442 ("you [PCD] may not be able to [state whether the PCD still has it]").

285.    The NYPD's policy of destroying Invoices has deprived many individuals of their right to establish their innocence under CPL § 440.30 (commencing in 1994, when the latter statute was enacted).  Id.

286.    The NYPD was admittedly destroying Invoices ("evidence maps') up until the time defendant Trabitz issued "Administrative Memo 2006-19" in 2006.  See paragraph 117 above.

**L.    Plaintiff Has Recently Filed a Motion to Join/Add Additional Defendants**

287.    On June 16, 2009, plaintiff filed a motion for leave to file an Amended Complaint to, among other things, join/add several new defendants to the action.  See Plaintiff's Motion to Amend the Complaint dated June 16, 2009.

288.    Plaintiff seeks to add the following new defendants who were involved in some way with the mishandling of the VJ rape kit (and its "tracking" document – the Yellow Invoice) that caused plaintiff to spend an additional sixteen (16) years unjustly incarcerated: Stacey Edelbaum, Rafael Curbelo, John Carroll, and John Moore of the Bronx DA's Office; John P. Higgins, Bruce J. Major, Donald Hackson and Gerard Nathason, former Commanding Officers

of the PCD; George Kuttler, Bruce Kessler and Adrian Merrrick, former Commanding Officers

of the Bronx borough office of the PCD; and Patricia Ryan and Patrick Buffalino of the OCME.

Id.

289.    Among other things, plaintiff hopes to learn the identities of all the Commanding

Officers of the PCD between 1988 and 2000 (pre-Trabitz), and the identities of the employees of

the Bronx borough office of the PCD who dealt with ADAs Carroll, Curbelo and Moore between

1994 and 1998, so that these individuals can be added to the Amended Complaint.  Id. (see

Schutty Declaration to Motion to Amend, Ex. E, p. 5).[7]

Dated:  New York, New York
        June 25, 2009

                                        Respectfully submitted,


                                        By:  /s/_____
                                               John F. Schutty, Esq.
                                               (JS2173)
                                        Law Office of John F. Schutty, P.C.
                                        445 Park Avenue, Ninth Floor
                                        New York, New York 10022
                                        Tel:  (212) 836-4796

                                        Counsel to Plaintiff Alan Newton

---

[7]   Plaintiff has served Interrogatories requesting the identification of these individuals, but The City has, thus far, refused to answer the interrogatories.  Plaintiff has not yet been able to obtain a ruling on the latter issue from Magistrate Judge Debra Freeman.  Plaintiff hopes to file a full and complete Amended Complaint before the statute of limitations expires on plaintiff's claims – on or before July 6, 2009.