USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/31/09

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------X

ALAN NEWTON,

          Plaintiff,

   - against -

THE CITY OF NEW YORK; DISTRICT ATTORNEYS
MARIO MEROLA AND ROBERT T. JOHNSON,
INDIVIDUALLY, AND IN THEIR OFFICIAL CAPACITY;
ANDREA FREUND AND VARIOUS JOHN/JANE DOES,
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES
AS EMPLOYEES OF THE CITY OF NEW YORK WHO
ARE/WERE ASSISTANT DISTRICT ATTORNEYS
WITHIN THE OFFICE OF THE DISTRICT ATTORNEY,
COUNTY OF BRONX; DETECTIVE JOANNE NEWBERT,
DETECTIVE PHILLIP GALLIGAN, DETECTIVE [JOHN
DOE] HARTFIELD, DETECTIVE [JOHN DOE] RYAN,
DETECTIVE [JOHN DOE] HARRIS, POLICE OFFICER
DOUGLAS LEHO, POLICE OFFICER WILLIAM SEAN
O'TOOLE, LIEUTENANT MICHAEL SHEEHAN,
SERGEANT PATRICK J. McGUIRE, POLICE OFFICER
[JOHN DOE] HASKINS, POLICE OFFICER [JANE DOE]
KIELY, INSPECTOR JACK J. TRABITZ AND VARIOUS
JOHN/JANE DOES, INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITIES AS EMPLOYEES OF THE CITY
OF NEW YORK WHO ARE/WERE MEMBERS OF THE
POLICE DEPARTMENT OF THE CITY OF NEW YORK,

          Defendants.

--------------------------------------------------------------------X

**OPINION**
**AND**
**ORDER**

**07 Civ. 6211**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Alan Newton was imprisoned for more than twenty-two years for a crime that DNA testing has proved he did not commit.  A year after he was exonerated, he filed this action against the City of New York and over a dozen of its officers and employees, alleging violations of his civil rights as a result of defendants' investigation, prosecution, and subsequent failure to examine exculpatory evidence.  This lawsuit addresses the police practices that led to Newton's wrongful conviction, the bureaucratic failings that left exculpatory evidence unexamined, and the constitutional guarantees that failed to protect him from a lengthy term of unwarranted imprisonment.

Defendants now move for summary judgment on Newton's claims relating to his arrest and prosecution.[1]  For the reasons that follow, defendants' motion is granted.

---

[1]      Defendants have also moved for summary judgment on Newton's claims relating to the failure to produce exculpatory evidence.  Those claims will be addressed in a separate opinion.

1

## II.   BACKGROUND[2]

### A.   The Parties

Twenty-two years after he was convicted of rape, robbery, and assault, DNA evidence exonerated Newton, and the conviction was vacated.[3] Defendant Joanne Newbert was the lead detective assigned to investigate the attack on V.J.; in 1984 she was employed by the New York City Police Department ("NYPD").[4] Defendants Phillip Galligan, Roland Harris, Bernard Ryan, and "John Doe" Hartfield were NYPD detectives who also participated in the 1984 V.J. investigation.[5] Defendants William O'Toole and Douglas Leho were NYPD officers who participated in the 1984 V.J. investigation.[6] Defendant Michael Sheehan was the commanding officer of the Bronx Sex Crimes Squad in

---

[2]      A great number of facts in this case remain hotly contested.  Facts recited here are only those that meet the standard required for summary judgment.

[3]      *See* Complaint ¶¶ 5, 33-35.  These basic facts – though drawn from the Complaint – are undisputed.

[4]      *See* 4/7/09 Declaration of Joanne Newbert ¶ 1, Ex. H to 4/16/09 Declaration of Arthur G. Larkin, defendants' counsel ("Larkin Decl.").

[5]      *See* 4/22/09 Declaration of John F. Schutty, plaintiff's counsel ("Schutty Decl."), ¶ 6.

[6]      *See id.*

1984.[7]  Defendant City of New York was the defendants' employer during the

relevant time period.[8]

### B.     The Assault of V.J.

In the early morning hours of June 23, 1984, a woman whose initials

are V.J. was raped, robbed, and assaulted in the area of Crotona Park, in the

Bronx.[9]  V.J. was an epileptic and an alcoholic, and on the evening in question,

she had consumed substantial quantities of alcohol.[10]  Some time between 4:00

and 5:15 a.m., V.J. entered a convenience store on Third Avenue and 180th Street;

---

[7]     *See id.* ¶ 7.

[8]     *See id.* ¶ 8.

[9]     *See* Statement Pursuant to Local Civil Rule 56.1 ("Def. 56.1") ¶¶ 1-2;
Rule 56.1 Statement Filed in Opposition to Defendants' Motion for Summary
Judgment ("Pl. 56.1") ¶¶ 1-2.  The victim's full name is undisclosed pursuant to
New York law.  Newton repeatedly questions whether it is possible to rape a
prostitute. *See, e.g.,* Pl. 56.1 ¶¶ 1-2, 12; Plaintiff's Memorandum of Law in
Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") at 8, 12.
Although this Court does not intend to dignify this offensive argument by
addressing it, Newton has presented no evidence that brings the fact of the rape
into question.

[10]     *See* Def. 56.1 ¶¶ 3-5; Pl. 56.1 ¶¶ 3-5.  Although alcohol interacted
dangerously with V.J.'s epilepsy medication, V.J. did not specifically testify that
she had taken her epilepsy medication on the date of the assault. *See* New York
Supreme Court *Wade* Hearing and Trial Transcript ("Tr.") at 399-400, Ex. A to
Schutty Decl.

a black male entered either with her or very shortly after her.[11]  V.J. bought a can of beer, and the black male bought a pack of cigarettes.[12]  V.J. then got into a car with the black male.[13]

The black male then took V.J. to the area of Crotona Park, Bronx, where he raped and robbed her.[14]  During the assault, the black male cut V.J.'s face with a razor and said, "Now, bitch, I'm going to fix it so you can't identify me."[15]  V.J. called the police at a call box some time between 5:13 a.m. and 5:21 a.m. to report the assault.[16]

## C.    The First Day of Investigation

Officers who arrived on the scene observed V.J. leaning on the call box, bleeding from multiple cuts on her face, crying, screaming, bruised and

---

[11]     *See* Def. 56.1 ¶¶ 6-7; Pl. 56.1 ¶¶ 6-7.

[12]     *See* Def. 56.1 ¶¶ 8-10; Pl. 56.1 ¶¶ 8-10.  There is a dispute as to whether V.J. or the black male paid for V.J.'s beer. *See* Pl. 56. ¶ 9.

[13]     *See* Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.

[14]     *See* Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.  V.J. claimed that she was raped both in the park and in a nearby building, but Newton was convicted only for the rape in the abandoned building. *See* Pl. 56.1 ¶ 12.

[15]     Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13.  The assailant may have said an approximate variation on that phrase. *See* Def. 56.1 ¶ 13.

[16]     *See* Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.

4

beaten.[17]  V.J. was taken to Jacobi Hospital, where she was treated for injuries

including the loss of her left eye and four broken ribs.[18]  At approximately 12:30

p.m., Detective Newbert interviewed V.J. in the foyer of the operating room where

V.J. was being taken for surgery.[19]  V.J. appeared to be in severe pain and was

falling in and out of consciousness, so Newbert conducted the interview

immediately out of fear that V.J. would die.[20]  V.J. told Newbert that her assailant

had been a black male, approximately five feet, nine inches tall, twenty five to

twenty-seven years old, with a moustache, and a short neat afro.[21]  V.J. also told

Newbert that her assailant had told her that his name was Willie.[22]

---

[17]     *See* Def. 56.1 ¶¶ 15-17; Pl. 56.1 ¶¶ 15-17.

[18]     *See* Def. 56.1 ¶¶ 18-19; Pl. 56.1 ¶¶ 18-19.

[19]     *See* Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20.

[20]     *See* Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24; 2/24/09 Deposition of Joanne C.
Newbert at 50, Ex. K to Larkin Decl.

[21]     *See* Def. 56.1 ¶ 21.  From a prone position, V.J. first told Newbert –
who is five feet, four inches tall – that her attacker had been approximately
Newbert's height.  She then corrected her description. *See* Tr. at 580-81, Ex. A to
Schutty Decl. *See also* 6/23/84 Notes of Detective Newbert, Ex. C to Schutty
Decl. (recording height as five feet nine inches tall after initial interview).

[22]     *See* Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23. *See also* Notes of Detective
Newbert ("Poss name Willie"); Tr. at 579 ("Q: Did Miss [J] ever tell you that the
person who had assaulted her, raped her and sodomized her had *told her* his name
was Willie; yes or no? A: Yes.") (emphasis added).

Newbert then proceeded to the crime scene, where she directed the collection of physical evidence from the scene of the attack.[23]  While Newbert was at the scene, Detective Galligan interviewed a woman who said her name was Deborah Chambrin or Chamberlin.[24]  The woman told Galligan that she knew someone in the neighborhood named Willie and that he was a thirty-year old Hispanic male with a Spanish accent.[25]  The woman had track-marks on her arms, appeared to be under the influence of drugs, and specifically asked Galligan, "How much money can I get?"[26]  Galligan soon ceased interviewing the woman on the basis that she was simply repeating information he had disclosed.[27]  Moreover, the woman provided a false address, preventing the NYPD from showing her a

---

[23]     *See* Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.

[24]     *See* Def. 56.1 ¶¶ 27-28; Pl. 56.1 ¶¶ 27-28.

[25]     *See* Def. 56.1 ¶¶ 30, 37; Pl. 56.1 ¶¶ 30, 37.  Newton contests the admissibility of Galligan's deposition testimony, on the basis that Galligan's failure to include some statements in his official NYPD report renders his testimony inherently unreliable. *See, e.g.*, Pl. 56.1 ¶ 37.  Galligan provided these statements under oath.  Failure to create contemporaneous written records does not disqualify a witness from testifying at a later date.

[26]     Def. 56.1 ¶¶ 31-33, 35; Pl. 56.1 ¶¶ 31-33, 35.

[27]     *See* Def. 56.1 ¶ 34.  Newton contests the admissibility of Galligan's statements concerning his impression of the woman's truthfulness. *See* Pl. 56.1 ¶ 34.  Galligan's rationale for disbelieving the woman is admissible to demonstrate his state of mind, rather than to attack woman's veracity.

photo array at a later date.[28]  A later background check showed that the woman had

numerous aliases and prior arrests.[29]

That evening, Detective Galligan interviewed Aurea Gonzalez, the

clerk of the convenience store where V.J. and her assailant had been prior to the

attack.[30]  Mrs. Gonzalez told Galligan that a woman fitting the description of V.J.

and a man fitting the description that V.J. had given of her assailant had been in

the store between four and five a.m.[31]

### D.    The Photo Arrays

The next day – June 24 – Newbert and Galligan went to the hospital

to show V.J. photographs of five foot, nine inch tall black men who had previously

been arrested in Bronx County.[32]  V.J. picked out photos that were similar to her

assailant, but she did not select a photo.[33]  Newbert and Galligan returned a day

---

[28]     *See* Def. 56.1 ¶¶ 39-42; Pl. 56.1 ¶¶ 39-42.

[29]     *See* Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38.  Although Newton claims that defendants did not produce discovery to support this assertion, he has provided no evidence to undermine Galligan's trial testimony.  *See* Tr. at 657, Ex. O to Larkin Decl.

[30]     *See* Def. 56.1 ¶ 43; Def. 56.1 ¶ 43.

[31]     *See* Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44.

[32]     *See* Def. 56.1 ¶¶ 46-48; Pl. 56.1 ¶¶ 46-48.

[33]     *See* Def. 56.1 ¶ 51; Pl. 56.1 ¶ 51.

later – June 25 – with another batch of photographs, from which V.J. selected an arrest photo of Newton and identified him as the attacker.[34]  Newbert asked V.J. if she was certain that the photo showed her attacker, and V.J. replied that she was sure.[35]

On June 27, Newbert and Galligan returned to the convenience store to show a six-person photo array to Mrs. Gonzalez – the convenience store clerk – which included the photo of Newton that V.J. had selected two days earlier.[36] Mrs. Gonzalez gave police officers a limited description of the man she had seen in the store at the same time as V.J., and then she selected Newton's photo from the array.[37]  Officers neither told Mrs. Gonzalez that the person who was in the store was in the photo array; nor did they tell her that a suspect's photo was in the photo array.[38]  Mrs. Gonzalez assured the officers that she "was sure that it was the

---

[34]     *See* Def. 56.1 ¶¶ 52-55; Pl. 56.1 ¶¶ 52-55.

[35]     *See* Def. 56.1 ¶¶ 58-59; Pl. 56.1 ¶¶ 58-59.

[36]     *See* Def. 56.1 ¶¶ 64-65; Pl. 56.1 ¶¶ 64-65.

[37]     *See* Def. 56.1 ¶¶ 66-68, 72; Pl. 56.1 ¶¶ 66-68.  Newton attempts to draw into dispute the fact that Gonzalez identified Newton's photograph on the basis of Mrs. Gonzalez's husband's deposition testimony. *See* Pl. 56.1 ¶ 72. This dispute is discussed at length in Part IV.A, *infra*.

[38]     *See* Def. 56.1 ¶¶ 69-70. *See also* Tr. at 279-280, Ex. D to Larkin Decl.; 3/19/09 Deposition of Aurea Gonzalez ("A. Gonzalez Dep.") at 77, 94, Ex. L to Larkin Decl.  Newton again attempts to draw Mrs. Gonzalez's statements into

person that went to the store."[39]

### E.   The Lineup

The next day – June 28 – Newbert took Newton into custody to stand in a lineup.[40]  Mrs. Gonzalez viewed the first lineup at approximately 1 p.m.[41]  In the first lineup, officers assigned Newton seat number two of six, the same position he had occupied in the photo array presented to Mrs. Gonzalez the day before.[42]  Newbert instructed Mrs. Gonzalez to say if she saw the man who had been in her store in the early morning of June 23.[43]  Mrs. Gonzalez was not told that the man who she had identified in the photo array was in the lineup or that a

---

dispute through her husband's deposition testimony.  This dispute is discussed at length in Part IV.A, *infra*.

[39]     Def. 56.1 ¶ 73; Pl. 56.1 ¶ 73.  Although Newton asserts that Mrs. Gonzalez merely stated that the photo looked like the person who came in the store, *see* Pl. 56.1 ¶ 73, this argument appears to cross the line separating zealous advocacy from dishonesty.  Mrs. Gonzalez was instructed to show officers any photo that looked like the man who had been in the convenience store.  *See* Tr. at 281, Ex. D to Larkin Decl.  That instruction does not change the fact that once she saw Newton's photo, Mrs. Gonzalez positively identified him as the individual who *had* been in the store.  *See id.*

[40]     *See* Def. 56.1 ¶ 74; Pl. 56.1 ¶ 74.

[41]     *See* Def. 56.1 ¶ 75; Pl. 56.1 ¶ 75.

[42]     *See* Def. 56.1 ¶ 76; Pl. 56.1 ¶ 76.

[43]     *See* Def. 56.1 ¶ 77; Pl. 56.1 ¶ 77.

9

suspect was in the lineup.[44]  Mrs. Gonzalez positively identified Newton as the person who had been in her store.[45]

At 2 p.m., V.J. was brought from the hospital to the 48th Precinct to view a observe a lineup.[46]  Newton sat in seat number five, alongside the same five fillers.[47]  Newbert brought V.J. to a room with a one-way mirror – which allowed V.J. to view the lineup participants but prevented the lineup participants from viewing V.J – and was told to tell detectives if she recognized the person who had assaulted her among the individuals in the lineup.[48]  V.J. was not told that the person she had selected from the photo array would be in the lineup; nor was she told that the person she had selected had been arrested.[49]  The facility allowed those in the lineup room to hear what was being said in the viewing room and

---

[44]     *See* Def. 56.1 ¶¶ 78-79.  Newton contests that Mrs. Gonzalez was told that the suspect would be in the lineup.  *See* Pl. 56.1 ¶¶ 78-79.  This dispute is again addressed in Part IV.A, *infra*.

[45]     *See* Def. 56.1 ¶¶ 81-82; Pl. 56.1 ¶¶ 81-82.

[46]     *See* Def. 56.1 ¶¶ 83, 85; Pl. 56.1 ¶¶ 83, 85.

[47]     *See* Def. 56.1 ¶ 84; Pl. 56.1 ¶¶ 84, 87(a).

[48]     *See* Def. 56.1 ¶ 86; Pl. 56.1 ¶ 86.

[49]     *See* Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87.

vice-versa.[50]  It is unknown if a supervisor was present during the lineup.[51]

After the shade in front of the one-way mirror was raised, V.J. identified the man in seat number five – Newton – as her assailant.[52]  She then told officers that she wasn't *entirely* certain that the man in seat number five was the attacker, and she requested that each participant in the lineup say the one sentence that the assailant had said to her.[53]  As a result, officers did not initially record a positive identification.[54]  A detective in the lineup room then instructed all six participants in the lineup to say, "I'll fix you so you don't identify me, you bitch."[55]  Many of the fillers laughed upon hearing the phrase, while Newton did not.[56]  The shade in front of the one-way mirror remained up, allowing V.J. to see

---

[50]     *See* Pl. 56.1 ¶ 87(a).

[51]     *See id.* ¶ 87(b).

[52]     *See* Def. 56.1 ¶ 88; Pl. 56.1 ¶ 88.

[53]     *See* Pl. 56.1 ¶ 88.

[54]     *See id.*

[55]     *See* Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89.

[56]     *See* Pl. 56.1 ¶ 89(e).  Although defendants assert that this testimony should not be believed because neither Newton nor any other witness described the fillers laughing at the *Wade* hearing, *see* 5/11/09 Declaration of Arthur G. Larkin, defendants' counsel ("2d Larkin Decl."), at 28, this Court cannot discount Newton's sworn affidavit – in which he described the fillers' reaction – on a motion for summary judgment.

the lineup participants' reactions.[57]

Each person in the lineup first said the statement once from a seated position.[58]  V.J. told police that the man in seat five had spoken too softly to hear, so Newton was told to say the phrase a second time.[59]  At the time, V.J. had not told police that she had difficulty hearing any of the other lineup participants.[60]

Accounts of the middle of the voice identification procedure are disputed.  According to Newton, he alone was then asked to approach the viewing window and show his mouth and teeth.[61]  Police then carried out a second round of voice identifications, with each member of the lineup standing only a few inches from the lineup mirror.[62]  It is undisputed that after one or two rounds of voice

---

[57]     See Pl. 56.1 ¶¶ 89(d), 89(f).

[58]     See Def. 56.1 ¶ 90; Pl. 56.1 ¶ 90.

[59]     See Def. 56.1 ¶ 91; Pl. 56.1 ¶ 91.

[60]     See Def. 56.1 ¶ 92.  Newton asserts that V.J. could not hear other participants in the lineup.  See Pl. 56.1 ¶ 92.  However, the trial testimony cited by Newton describes a later point in the lineup procedure.  See Tr. at 143, Ex. A to Schutty Decl. (describing V.J.'s statement to police after a *second* complete voice identification procedure had been conducted).

[61]     See Pl. 56.1 ¶ 94(b).

[62]     See Pl. 56.1 ¶ 94(c)-94(d).  See also Def. 56.1 ¶ 93 (noting that "[a]t least one other voice identification procedure" was conducted after lineup members spoke the phrase from a seated position).

identification procedures, V.J. left the viewing room, telling police that she still could not hear the man in seat five.[63]  Police then had each lineup member repeat the phrase through the partially opened door to the lineup room.[64]  V.J. continued to complain that she could not hear Newton properly.[65]  Despite the problems with individual components of the lineup, afterward, V.J. told Detective Hartfield that she was certain it was number five, Newton.[66]  Newbert then formally placed

---

[63]     *See* Pl. 56.1 ¶ 94(f).

[64]     *See* Def. 56.1 ¶ 93; Pl. 56.1 ¶¶ 94(g)-(j). Although V.J. could not recall at trial that the voice identification procedure had been carried out through an open door, *see* Pl. 56.1 ¶ 94(i), neither party contests that this procedure occurred.

[65]     *See* Pl. 56.1 ¶ 94(j). *See also* Tr. at 98, Ex. A to Schutty Decl. ("She said to . . . Detective Hartfield that . . . she still didn't hear, still couldn't hear.").

[66]     *See* Def. 56.1 ¶ 94; Pl. 56.1 ¶ 94(s). *See also* Tr. at 103, Ex. A to Schutty Decl. ("She said yes. She said, 'It is definitely number five. No doubt in her mind."); *id.* at 167, Ex. A to Schutty Decl. ("I told her I said, 'I'm positive it is number five.'"). The time-frame for V.J.'s identification remains in dispute. According to Newbert and Galligan, Newbert entered the lineup room and initially told Newton that he had been picked out. *See* Tr. at 98-99, Ex. A to Schutty Decl. (Newbert); *id.* at 146-147, Ex. A to Schutty Decl. (Galligan). According to Newton, Newbert initially told him that he had not been picked. *See* 4/22/09 Declaration of Alan Newton, ¶ 13. In either case, Newbert did not formally arrest Newton until after she received confirmation from Hartfield that V.J. had positively identified number five. *See* Pl. 56.1 ¶ 94(s); Tr. at 99-104, Ex. A to Schutty Decl. As Newton has put forward no evidence tending to show that V.J. failed to make a definitive identification at the conclusion of the lineup, these differences are immaterial.

13

Newton under arrest.[67]  After police officers placed Newton in a cell, he began to

scream and yell.[68]  Although fifty feet away from Newton in an office, V.J. could

hear Newton and confirmed that the man yelling was her assailant.[69]

**F.**     **Further Investigative Activities**

Newbert made additional efforts to locate an alternative suspect

named Willie by contacting the Red Cross and the Bronx Narcotics Squad to ask if

anyone named Willie was known to live in the abandoned building where V.J. had

been raped.[70]  No one named Willie who lived in the building was ever

identified.[71]  Police provided Newton's defense attorney with a copy of the

background check of Deborah Chambrin or Chamberlin, which the defense

attorney accepted with the witness's name and address redacted.[72]

---

[67]     *See* Def. 56.1 ¶¶ 95, 97; Pl. 56.1 ¶¶ 94(s)-94(t), 97.

[68]     *See* Def. 56.1 ¶ 95; Pl. 56.1 ¶ 95 ("Detectives Newbert and Galligan and Mr. Newton agree on one point – that shortly after Mr. Newton was placed in a jail cell in the 48th Precinct . . . he became loud and boisterous.") (internal citations omitted).

[69]     *See* Def. 56.1 ¶ 96; Pl. 56.1 ¶¶ 95-96.

[70]     *See* Def. 56.1 ¶¶ 61-62; Pl 56.1 ¶¶ 61-62.

[71]     *See* Def. 56.1 ¶ 63; Pl. 56.1 ¶ 63.

[72]     *See* Def. 56.1 ¶ 111.  The witness's name and address were not disclosed until midway through trial, *see* Pl. 56.1 ¶ 111, but the presiding judge delayed trial for a day and a half so that the defense attorney could attempt to

Officers additionally spoke to Marva Weston, Newton's girlfriend, who told police that she had been with Mr. Newton in Queens at the time the crime had occurred.[73] There is no evidence that police officers spoke with any other alibi witnesses to corroborate Weston's story.[74]

Police collected several items of physical evidence from V.J., from the crime scene, and from Mr. Newton, and Newbert recorded voucher numbers for the evidence and noted that it was to be sent to the NYPD crime lab for analysis.[75] Specifically, Newbert seized Newton's sneakers to test if the treads matched treads found on the scene or if V.J.'s blood was on them. However, there is no evidence that tests were ever performed.[76] In addition, a rape kit containing pubic and head hair, three cotton swabs, and four microscope slides were collected

---

locate the purported witness. *See* Tr. at 619-622, Ex. V to Larkin Decl.

[73]     *See* Def. 56.1 ¶¶ 98-99; Pl. 56.1 ¶¶ 98-99. Newton asserts – without support – that defendants failed to interview a single one of the alibi witnesses. *See* Pl. 56.1 ¶ 99. This is flatly contradicted by Newbert's contemporaneous report describing an interview with Weston. *See* 6/28/84 Follow Up Report, Ex. H to Larkin Decl.

[74]     *See* Pl. 56.1 ¶ 99.

[75]     *See* Pl. 56.1 ¶ 100; Def. 56.1 ¶ 100.

[76]     *See* Def. 56.1 ¶¶ 100(I)(a)-(e).

15

from V.J.[77] Although the NYPD was capable of performing limited types of serological tests in 1984, Newbert did not order any testing to be performed.[78] The rape kit was merely tested to determine the existence of spermatozoa.[79]

### G.     Indictment, *Wade* Hearing, and Trial

On June 29, 1984, Newton was arraigned, and his attorney stated on the record that Newton would not testify before the grand jury.[80] That same day, the grand jury heard testimony from V.J. and Newbert.[81] V.J. first testified at length concerning her recollection of the night of her attack.[82] She then provided very simple testimony concerning the lineup: that she had viewed a lineup, that she selected a number, and that the number had been five.[83] Newbert's testimony was strictly limited to her identity, her presence at the lineup, and the identity of the individual who had been in the number five position in the second lineup.[84]

---

[77]     *See id.* ¶ 100(II)(a).

[78]     *See id.* ¶¶ 100(II)(b)-(j).

[79]     *See id.* ¶¶ 100(II)(k)-(*l*).

[80]     *See* Def. 56.1 ¶ 101; Pl. 56.1 ¶ 101.

[81]     *See* 6/29/84 Grand Jury Transcript, Ex. A to Larkin Decl.

[82]     *See id.* at 1IS-10IS.

[83]     *See id.* at 11IS.

[84]     *See id.* at 12IS.

On July 2, 1984, the Grand Jury indicted Newton for two counts of First Degree Rape, one count of First Degree Assault, and multiple weapons charges.[85]

Newton was tried in the New York Supreme Court for Bronx County before Justice Jerome Reinstein. From May 7 to May 9, 1985, Justice Reinstein conducted a *Wade* hearing to assess the admissibility of witness identification evidence.[86] V.J., Mrs. Gonzalez, Newbert, Newton, Galligan, O'Toole, and at least one of the fillers testified.[87] There is no evidence that Mr. Gonzalez – a witness to the presentation of a photo array to Mrs. Gonzalez – testified at the *Wade* hearing. After the hearing, Justice Reinstein ruled that police had not used suggestive identification procedures and allowed the identifications by both V.J. and Mrs. Gonzalez to be used at trial.[88] There is no evidence that any police officer ever told Mrs. Gonzalez who to pick from the lineup or how to testify.[89]

---

[85]    *See* Def. 56.1 ¶ 106; Pl. 56.1 ¶ 106; 7/2/84 Grand Jury Transcript at 1CP, Ex. A to Larkin Decl.

[86]    *See* Def. 56.1 ¶ 102; Pl. 56.1 ¶ 102.

[87]    *See* Def. 56.1 ¶ 107 (noting that Mrs. Gonzalez testified); Larkin Decl. (presenting excerpted transcripts of each witness's testimony at the *Wade* hearing).

[88]    *See* Def. 56.1 ¶ 103.

[89]    *See* Def. 56.1 ¶ 108; Pl. 56.1 ¶ 108 (failing to note any contrary evidence).

## H.     Claims

Newton's Complaint asserts twenty-one distinct causes of action.[90]

Seven of the remaining categories of claims are relevant to this motion. *First*,

Newton claims that the detective defendants conducted unduly suggestive

interrogations in violation of his due process rights.[91] *Second*, Newton asserts a

state-law false arrest claim against the detective defendants.[92] *Third*, Newton

asserts a malicious prosecution claim against these defendants under both the

---

[90]     This Court previously dismissed claims ten and twenty, which
asserted stand-alone causes of action for punitive damages. *See Newton v. City of
New York*, 566 F. Supp. 2d 256, 268 n.65 (S.D.N.Y. 2008). Prior to the motion to
dismiss, Newton voluntarily dismissed claim twenty-one, which had requested an
injunction preventing the City and ADA Johnson from destroying relevant
evidence, *see id.* at 268 n.65, and his Fourth Amendment false arrest claim, a
subpart of claim two. *See id.* at 267 n.51. On defendants' motion to dismiss, the
Court dismissed claim three (constitutionally inadequate police investigation),
claim thirteen (abuse of process), claim seventeen (breach of special relationship),
and claims eighteen and nineteen (New York State constitutional claims). *See id.*
at 282. On March 25, 2009, Newton voluntarily dismissed claim five (fabrication
of evidence by ADAs during the investigation). *See* 3/25/09 Letter from John
Schutty, plaintiff's counsel, to the Court, Docket No. 47. Schutty has also
represented to the Court that the dismissal of claim five additionally results in the
dismissal of claim seven (supervisory liability concerning fabrication of evidence
by ADAs). Therefore prior to consideration of this motion, Newton continued to
assert claims one, two, four, six, eight, nine, eleven, twelve, fourteen, fifteen, and
sixteen. This motion only addresses a subset of those claims.

[91]     *See* Complaint ¶¶ 125-132 (claim one).

[92]     *See id.* ¶¶ 234-244 (claim eleven).

18

Fourth Amendment and New York state law.[93] *Fourth*, Newton claims that

detective defendants failed to preserve exculpatory evidence in violation of the

Due Process Clause.[94] *Fifth*, Newton asserts a claim of supervisory liability

against Sheehan related to each of the previously stated causes of action, under

both federal constitutional law and state negligence law.[95] *Sixth*, Newton claims

that a conspiracy existed among defendants to deprive him of his constitutional

rights under the color of state law.[96] *Seventh*, Newton claims that the City of New

York must be held separately liable for enforcement of a policy or custom that

deprived him of his constitutional rights.[97]

## III.   APPLICABLE LAW

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

---

[93]    *See id.* ¶¶ 134-146 (claim two); ¶¶ 244-252 (claim twelve).

[94]    *See id.* ¶¶ 253-262 (claim four).

[95]    *See id.* ¶¶ 176-193 (claim six); 273-289 (claim fifteen). A portion of
this claim relates to the post-trial portion of this case.

[96]    *See id.* ¶¶ 213-219 (claim eight).  A portion of this claim relates to the
post-trial portion of this case.

[97]    *See id.* ¶¶ 220-228 (claim nine).  A portion of this claim relates to the
post-trial portion of this case.

any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."[98]  An issue of fact is genuine "'if

the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'"[99]  A fact is material when it "'might affect the outcome of the

suit under the governing law.'"[100]

To defeat a motion for summary judgment, the non-moving party

must raise a genuine issue of material fact.  "Summary judgment is properly

granted when the non-moving party 'fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial.'"[101]  To do so, the non-moving party must do

more than show that there is "'some metaphysical doubt as to the material

facts,'"[102] and it "'may not rely on conclusory allegations or unsubstantiated

---

[98]     Fed. R. Civ. P. 56(c).

[99]     *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[100]    *Ricci v. DeStefano*, 530 F.3d 88, 109 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

[101]    *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[102]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

speculation.'"[103]  However, "'all that is required [from a non-moving party] is that

sufficient evidence supporting the claimed factual dispute be shown to require a

jury or judge to resolve the parties' differing versions of the truth at trial.'"[104]

       In determining whether a genuine issue of material fact exists, the

court must construe the evidence in the light most favorable to the non-moving

party and draw all justifiable inferences in that party's favor.[105]  However, "[i]t is a

settled rule that '[c]redibility assessments, choices between conflicting versions of

the events, and the weighing of evidence are matters for the jury, not for the court

on a motion for summary judgment.'"[106]  Summary judgment is therefore "only

appropriate when there is no genuine issue as to any material fact, making

judgment appropriate as a matter of law."[107]

    **B.**    **Section 1983**

---

[103]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)
(quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[104]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199,
206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

[105]    *See Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008)
(quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)).

[106]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl
v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

[107]    *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (citing *Tocker v.
Philip Morris Cos.*, 470 F.3d 481, 486-87 (2d Cir. 2006)).

Section One of the Civil Rights Act of 1871 – colloquially known as

Section 1983 – states in relevant part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in
> an action at law, suit in equity, or other proper proceeding
> for redress.[108]

Section 1983 "does not create a federal right or benefit; it simply provides a

mechanism for enforcing a right or benefit established elsewhere."[109] "The

purpose of § 1983 is to deter state actors from using the badge of their authority to

deprive individuals of their federally guaranteed rights and to provide relief to

victims if such deterrence fails."[110]

Any form of liability under section 1983 requires the defendant's

---

[108]    42 U.S.C. § 1983.

[109]    *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*,
423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808,
816 (1985)). *Accord Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("'[O]ne
cannot go into court and claim a 'violation of § 1983' – for § 1983 by itself does
not protect anyone against anything.'" (quoting *Chapman v. Houston Welfare
Rights Org.*, 441 U.S. 600, 617 (1979))).

[110]    *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

22

direct involvement to have caused damages. "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must p[rove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[111]  Similarly, "[t]o prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal *causing damages*."[112] Finally, in order for an individual deprived of a constitutional right to have recourse against a municipality under section 1983, the plaintiff must show that he or she was harmed by a municipal "policy" or "custom."[113]

## C.    Suggestive Identification Procedures

"Suggestive procedures are disapproved 'because they increase the likelihood of misidentification,' and it is the admission of testimony carrying such a 'likelihood of misidentification which violates a defendant's right to due

---

[111]    *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) (internal citations omitted).

[112]    *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citing *Carson v. Lewis*, 35 F. Supp. 2d 250, 271 (E.D.N.Y. 1999) (emphasis added)).

[113]    *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  *Accord Board of County Comm'rs v. Brown*, 520 U.S. 397, 402 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-81 (1986).

23

process.'"[114]  However, "[i]n the context of an identification following a police

procedure that was impermissibly suggestive, the due process focus is principally

on the fairness of the trial, rather than on the conduct of the police, for a

suggestive procedure 'does not in itself intrude upon a constitutionally protected

interest.'"[115]  Where an intervening decision-maker has permitted the admission of

eyewitness testimony resulting from suggestive identification procedures, in order

to preserve causality a plaintiff must prove that the "wrongdoer misled or coerced

the intervening decision-maker."[116]  "'Knowledge by a complainant that the

suspect is in a lineup does not, of itself, taint the lineup.'"[117]

---

[114]     *Wray v. Johnson*, 202 F.3d 515, 524 (2d Cir. 2000) (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

[115]     *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13 (1977)).

[116]     *Wray v. City of New York*, 490 F.3d 189, 194 (2d Cir. 2007). *Accord id.* at 195 ("It is always possible that a judge who is not misled or deceived will err; but such an error is not reasonably foreseeable . . . ."); *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) ("[T]he trial court's failure to suppress the evidence . . . constituted a superseding cause of . . . conviction and imprisonment.").

[117]     *Jenkins v. City of New York*, 478 F.3d 76, 92 (2d Cir. 2007) (quoting *People v. Ferrer*, 613 N.Y.S.2d 865, 865 (1st Dep't 1994)) (applying New York law). *Accord id.* (citing *Sales v. Harris*, 675 F.2d 532, 538 (2d Cir. 1982)) (applying the Due Process Clause of the Fourteenth Amendment). *Cf. id.* (finding an identification where police told a witness "that he *had* to pick someone" problematic because police "took the option to not pick anyone off the table") (emphasis added).

24

## D.    New York False Arrest

"Under New York law, the elements of a false imprisonment claim are: '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'"[118] "[T]he existence of probable cause is an absolute defense to a false arrest claim."[119]

"'Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.'"[120] "'[I]t cannot be doubted that the actual identification . . . by the victim through photographs goes beyond mere suspicion and would . . . be sufficient to warrant a prudent man in believing that [the identified individual] had

---

[118]    *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)).

[119]    *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (applying New York law).

[120]    *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)).

committed . . . an offense.'"[121]  Even if a victim is "hospitalized and under the

influence of medication," "[w]hen the victim identif[ys a] photo from an array, this

provide[s] the police with probable cause to arrest . . . ."[122]

### E.    Malicious Prosecution

"Under New York law, '[t]he elements of an action for malicious

prosecution are (1) the initiation of a proceeding, (2) its termination favorably to

plaintiff, (3) lack of probable cause, and (4) malice.'"[123]  "In order to allege a

cause of action for malicious prosecution under § 1983, [a plaintiff] must assert, in

addition to the elements of malicious prosecution under state law, that there was

(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth

Amendment rights."[124]  "[T]he existence of probable cause is a complete defense

---

[121]     *Rush v. Astacio*, 159 F.3d 1348 (2d Cir. 1998) (unpub.) (quoting *Mayer v. Moeykens*, 494 F.2d 855, 858 n.2 (2d Cir. 1974)).  *Accord Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity.").

[122]     *People v. Radcliffe*, 808 N.Y.S.2d 22, 22 (1st Dep't 2005) (citing *People v. Gloster*, 572 N.Y.S.2d 370, 370 (2d Dep't 1991)).

[123]     *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 50 N.Y.2d 78, 82 (1983)).

[124]     *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (citing *Murphy v. Lynn*, 118 F.3d 938, 944-46 (2d Cir. 1997)).

to a claim of malicious prosecution in New York."[125]

"Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty."[126] "[I]ndictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"[127] Bad faith may be established through evidence that "police witnesses 'have not made a complete and full statement of facts . . . .'"[128] However, "[t]he government ha[s] no obligation to present exculpatory material to a grand jury."[129]

### F.   Failure to Preserve Evidence

Destruction of evidence by the government only rises to a

---

[125]   *Savino*, 331 F.3d at 72 (citing *Colon*, 50 N.Y.2d at 82).

[126]   *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (citing *Colon*, 50 N.Y.2d at 82).

[127]   *Savino*, 331 F.3d at 72 (quoting *Colon*, 60 N.Y.2d at 83). *Accord id.* at 73 ("[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." (citing *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994))).

[128]   *McClellan*, 439 F.3d at 146 (quoting *Boyd*, 336 F.3d at 76).

[129]   *United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (citing *United States v. Williams*, 504 U.S. 36, 51-52 (1992)).

constitutional violation when three requirements are met:
(1) the government must have acted in bad faith in
destroying the evidence, (2) the "evidence must . . . possess
an exculpatory value that was apparent before [it] was
destroyed," and (3) the defendant must be "unable to obtain
comparable evidence by other reasonably available
means."[130]

### G.   Rule 56(f)

Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, "If a

party opposing [a motion for summary judgment] shows by affidavit that, for

specified reasons, it cannot present facts essential to justify its opposition, the

court may deny the motion, order a continuance . . . , or issue any other just order."

"Rule 56(f) requires the opponent of a motion for summary judgment who seeks

discovery to file an affidavit explaining: (1) the information sought and how it is

to be obtained; (2) how a genuine issue of material fact will be raised by that

information; (3) what efforts the affiant has made to obtain the information; and

(4) why those efforts were unsuccessful."[131]  "'In seeking a denial of summary

---

[130]     *United States v. Tyree*, 279 Fed. App'x 31, 33 (2d Cir. 2008) (internal
citations omitted). *See generally Arizona v. Youngblood*, 488 U.S. 51, 57 (1988)
("[T]he Due Process Clause requires [a bad faith showing] when we deal with the
failure of the State to preserve evidentiary material of which no more can be said
than that it *could* have been subjected to tests, the results of which *might* have
exonerated the defendant." (emphasis added)).

[131]     *Sage Realty Corp. v. Insurance Co. of N. Am.*, 34 F.3d 124, 128 (2d
Cir. 1994).

judgment under Rule 56(f), however, "a bare assertion that the evidence

supporting a plaintiff's allegation is in the hands of the defendant is insufficient

. . . ."[132]

## IV.   DISCUSSION

### A.   Unduly Suggestive Identification - Violation of Due Process

Defendants first move for summary judgment on Newton's claim that

the use of unduly suggestive identification procedures led to a violation of his

federal due process rights.  It is not the duty of this Court to second-guess the

decision of the trial court at a *Wade* hearing.  Newton's claim survives summary

judgment only if defendants misled or coerced the intervening decision-maker,

Justice Reinstein.  Defendants have met their burden to show that no material

dispute of fact exists as to whether they misled or coerced the trial judge.

Moreover, Newton has not successfully contravened defendants' showing.

Newton has presented only two pieces of evidence that were not

presented at the *Wade* hearing: the deposition testimony of Miguel Gonzalez –

---

[132]     *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566,
573 (2d Cir. 2005) (quoting *Contemporary Mission, Inc. v. United States Postal
Serv.*, 648 F.2d 97, 107 (2d Cir. 1981)).

Aurea Gonzalez's husband – and Newton's own declaration.[133]   Newton first

argues that Mr. Gonzalez's testimony draws into question whether defendants

misled the criminal trial court by stating that Mrs. Gonzalez selected Newton's

photograph from the photo array on June 27, 1984.  Mr. Gonzalez was in the

convenience store at the time that the detectives brought in the photo array.[134]

When asked what police had told Mrs. Gonzalez when they showed her the photo

array, Mr. Gonzalez responded, "I believe she didn't recognize them, I'm not

sure."[135]  Newton's attorney then asked, "Is it your recollection that your wife

didn't select anyone in the photographs during that meeting?"  Mr. Gonzalez

answered, "No, I believe not.  I believe not, but I'm not sure.  I'm not so sure."[136]

This uncertain response is insufficient to generate a genuine dispute of material

fact in the face of the clear, contemporaneous trial testimony of Mrs. Gonzalez and

---

[133]   Although defendants' deposition transcripts were not before Judge
Reinstein at the *Wade* hearing, there are no significant differences between
defendants' recent and prior testimony.

[134]   *See* 3/19/09 Deposition of Miguel Gonzalez ("M. Gonzalez Dep.") at
12, Ex. I to Schutty Decl., at 12.  *But see id.* at 11, Ex. CC to 2d Larkin Decl. ("Q.
Mr. Gonzalez, so the record is clear, were you present during that meeting with
your wife and the police officers? A. No, then not.").  There is – at a minimum – a
dispute of fact concerning whether Mr. Gonzalez was in the convenience store
when defendants showed the photo array to Mrs. Gonzalez.

[135]   *Id.* at 13, Ex. I to Schutty Decl.

[136]   *Id.* at 14.

Detective Newbert.[137]  Had Mr. Gonzalez definitively stated that Mrs. Gonzalez

had not selected a photo from the array, there would be a genuine dispute

concerning Mrs. Gonzalez's selection of Newton's photo.  He did not.

      Newton next argues that defendants deceived Justice Reinstein by

testifying that the officers did not provide suggestive instructions when they

presented the photo array to Mrs. Gonzalez.  At Mr. Gonzalez's deposition,

Newton's attorney asked, "[W]hat were the instructions that she was provided by

the police officers?"  Mr. Gonzalez answered, "I don't remember."[138]  Newton's

attorney then asked, "Do you recall when you met with me back on February 27,

[2009] that you told me the police officer advised your wife, quote, 'I want you to

pick out the person who was in your store that night.  The person who was in the

store that night is in this book, pick him out.' Closed quotes.  Do you recall that?"

Mr. Gonzalez responded, "Yes.  Yes of course."[139]  Although couched in language

suggesting the use of documents to refresh a witness's recollection, this was no

more than impermissible leading.  Counsel for Newton did not produce any

---

    [137]    *See* Tr. at 24, Ex. I to Larkin Decl. (Newbert); *id.* at 281, Ex. D to
Larkin Decl. (Mrs. Gonzalez).

    [138]    M. Gonzalez Dep. at 15, Ex. I to Schutty Decl.

    [139]    *Id.* at 15-16.

document for Mr. Gonzalez to review and then ask him a permissible, non-leading

question. Nor did counsel for Newton produce a copy of the document to counsel

for defendants, claiming privilege.[140] Counsel for defendants timely objected, and

that objection is now sustained. Absent the stricken deposition testimony, there is

no admissible evidence that creates a genuine, contested issue of fact as to whether

defendants misled the trial court concerning the instructions given to Mrs.

Gonzalez.

Newton presents a third argument based on a conversation Mr.

Gonzalez's claims to have had with his wife when he drove her home from the

precinct after the lineup.[141] During Mr. Gonzalez's deposition, Newton's attorney

asked, "Do you recall your wife telling you that the police advised her before the

lineup procedure that the man who was in her bodega would be in the lineup?"

Gonzalez replied, "I don't remember."[142] Newton's attorney then asked, "And did

the police officers advise her not to be nervous because the suspect would be in

---

[140]    See Fed. R. Evid. 612 (requiring production of a document used to refresh a witness's recollection); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 612.04[3] (2d ed. 2007) ("Production of documents used to refresh witness's recollection while testifying is mandatory.").

[141]    See M. Gonzalez Dep. at 17, Ex. I to Schutty Decl.

[142]    *Id.* at 18.

the lineup but the rest of the people in the lineup would be police officers?" He responded, "That's what they told her."[143]  Counsel for defendants timely objected, and that objection is now sustained.  It is beyond cavil that Newton's attorney engaged in leading questioning.  Moreover, Mr. Gonzalez's recitation of his wife's statements concerning what the officers told her is hearsay.  Therefore, Mr. Gonzalez's testimony is inadmissible.[144]  There is no contested issue as to whether defendants deceived the criminal trial court concerning the instructions given to Mrs. Gonzalez prior to the lineup.

Newton's affidavit creates a disputed issue of fact as to whether – after police instructed lineup participants of the phrase they were required to speak – V.J. observed the fillers laughing while Newton stood silent and visibly uneasy. However, there is still no dispute of fact concerning the material issues: whether defendants deceived Justice Reinstein during the *Wade* hearing and whether the withheld facts demonstrate that the lineup procedures were impermissible.  There is no evidence that V.J. relied on the contrast between Newton's reaction to the voice instructions and the reaction of the fillers.  Rather, V.J. focused on attempting to hear Newton's voice and repeatedly complained that Newton spoke

---

[143]     *Id.*

[144]     *See* Fed. R. Evid. 802.

more softly than the other participants in the lineup. Only after the voice

identification procedure was carried out without a wall in between Newton and

V.J. did V.J. confirm her earlier uncertain identification of Newton. In that

context, V.J.'s ability to see the fillers laugh at the instructions did not give rise to

a strong likelihood of misidentification.[145]

Newton additionally presents an expert affidavit signed by Thomas

Streed, an expert on police procedures.[146] Although this affidavit documents

several instances in which the identification procedures utilized by defendants

were less than ideal,[147] it is entirely irrelevant to the question faced by this Court.

The independent judgment of a state court judge severed the chain of causality

between defendants and any violation of Newton's due process rights resulting

from the admission of identification evidence derived from suggestive procedures.

An expert's criticism of the trial court's decision does not result in defendants'

liability for a violation of Newton's due process rights. Defendants' motion for

---

[145]     Moreover, Newton testified at the *Wade* hearing, and as a witness to
the events detailed in his affidavit, he was capable of testifying to any essential
details omitted by defendants.

[146]     *See* 4/22/09 Declaration of Thomas Streed.

[147]     *See, e.g., id.* ¶ 19 (noting that Newbert failed to request an NYPD
supervisor to oversee the lineups, which deviated from NYPD Patrol Guide
procedures).

34

summary judgment on Newton's claim that unduly suggestive interrogation procedures violated his due process rights is granted.

## B. False Arrest

Defendants first took Newton into custody to force him to participate in the lineup. The question of whether defendants had probable cause to detain him – and thus a complete defense to a false arrest claim – must be assessed prior to the lineup. At that time, defendants had presented photo arrays to both V.J. and Mrs. Gonzalez. Both had selected Newton's photograph. After the only two known eye-witnesses had selected the same individual from photo arrays, defendants had "sufficient . . . reasonably trustworthy information to justify a person of reasonable caution in believing that an offense ha[d] been . . . committed by" Newton.[148] Although defendants' belief was ultimately proved wrong, probable cause is a mere probability; the Constitution does not require infallibility from law enforcement officers. Defendants have shown that no genuine dispute of material fact exists as to whether there was probable cause to arrest Newton prior to the lineup.

Newton attempts to undermine the existence of probable cause by attacking both the identification procedures and defendants' reasonableness in

---

[148]     *Valentine*, 539 F.3d at 93.

relying on V.J.'s identification.[149]  Newton presents only one argument distinct

from his factual assertions concerning his due process claim.  With regard to the

photo array shown to Mrs. Gonzalez, Newton argues that Mrs. Gonzalez could not

have properly responded to defendants' questioning, as there was no Spanish

interpreter present.  However, Mrs. Gonzalez specifically testified that one of the

two detectives who showed her the photo array spoke Spanish.[150]  Based upon the

undisputed facts described at length above, defendants reasonably relied on the

identification of Newton by Mrs. Gonzalez.

 Nor has Newton shown that there is a genuine dispute of material fact

as to whether the police acted reasonably in relying on V.J.'s selection of

Newton's photograph from the array.  Newton attempts to discredit V.J. on the

basis that 1) she was likely a prostitute, 2) that when she initially spoke to police

officers at the call box she provided a description of the timing and location of her

---

[149] When assessing the reasonableness of defendants' reliance on the
photo array identifications, Judge Reinstein's decision rendered at the *Wade*
hearing does not serve as an intervening causal factor.  Thus this Court must
independently assess whether the identification procedures were unduly
suggestive.

[150] *See* A. Gonzalez Dep. at 22, Ex. AA to 2d Larkin Decl.  Although
Newbert could not speak Spanish, *see* Pl. 56.1 ¶ 68, Newton offers no evidence
that the second detective could not properly communicate with Mrs. Gonzalez in
Spanish.

initial encounter with her attacker that varied from her later, consistent testimony, and 3) V.J. was an alcoholic and had been drinking.  Whether or not V.J. was a prostitute in no way discredits her.  Nor does the inconsistency of her initial statement.  At the time that V.J. initially spoke with the officers, she was severely wounded and coping with the shock of having been brutally raped and assaulted. Any inconsistency could reasonably be attributed to that shock, rather than deficient memory.

The fact that V.J. had been drinking on the night of the incident does damage the reliability of her identification of Newton and the reasonableness of defendants' having relied on her selection of Newton's photo from the photo array.  Had defendants relied on V.J.'s selection alone, there would be a more legitimate question as to the existence of probable cause.  But defendants showed another photo array to Mrs. Gonzalez and got a consistent result.  Based on the totality of facts known to defendants, there is no genuine dispute of material fact that defendants had probable cause to arrest Newton prior to the lineup.  Probable cause is an absolute defense to a claim of false arrest.  Therefore, summary judgment is granted to defendants on Newton's New York false arrest claim.

## C.    Malicious Prosecution

Prior to Newton's prosecution, a grand jury indicted him on all counts

for which he was charged.  Therefore, to prevail on summary judgment,

defendants must show that there is no genuine dispute of material fact concerning

whether the grand jury indictment was obtained by "'fraud, perjury, the

suppression of evidence or other police conduct undertaken in bad faith.'"[151]

Defendants argue that – given the small amount of testimony presented to the

grand jury – there can be no genuine dispute of material fact that the indictment

was based on any police conduct undertaken in bad faith.

> Newton claims that defendants suppressed substantial facts that – in

sum – create a genuine dispute of material fact as to whether defendants

suppressed evidence in order to secure an indictment.  However, incomplete

testimony from *any* witness does not prove that an indictment was secured through

bad faith.  Rather, the presumption of probable cause is eliminated only when

*police officers* give incomplete accounts through partial answers to questions

posed before a grand jury.[152]  Newbert's presentation to the grand jury was

---

[151]    *Savino*, 331 F.3d at 72 (quoting *Colon*, 60 N.Y.2d at 83).

[152]    *See McClellan*, 439 F.3d at 146 (finding that plaintiff offered
evidence that the defendant police officer "was the instigator of the altercation;
may have been intoxicated; [and] lied to the arresting officer about [plaintiff's]
responsibility for the altercation," alongside vindictive and personally motivated
actions taken to secure an indictment); *Boyd*, 336 F.3d at 77 (noting that police
officers gave testimony inconsistent both with plaintiff's testimony and with their
own written reports).

extremely limited.  There is no genuine dispute of material fact as to whether

Newbert responded in bad faith to the three questions asked of her.

Any incompleteness in the grand jury presentation did not stem from

law enforcement officers.  It is possible that V.J. was untruthful.  However, an

assistant district attorney may presume that a witness will not lie under oath, and

she is not required to impeach the victim, even if she can.[153]  Nor does an assistant

district attorney need to present the chronology of every lineup or photo array to a

grand jury.  As the three-day hearing in this case demonstrated, proper assessment

of identification procedures is a lengthy and complicated exercise best carried out

in a *Wade* hearing.  The assistant district attorney was not required to present

exculpatory evidence; there was no need to elicit testimony from Newbert

concerning physical evidence and efforts taken to test such evidence.

As there is no dispute of material fact concerning whether the grand

jury indictment rested on bad faith testimony by law enforcement officers, there is

in turn no genuine dispute concerning the existence of probable cause to

---

[153]    Of course a malicious prosecution claim can be brought against
anyone who testifies falsely and in bad faith before a grand jury.  *See White v.
Frank*, 855 F.2d 956, 962 (2d Cir. 1988) ("[T]he public prosecutor's role in a
criminal prosecution will not necessarily shield a complaining witness from
subsequent civil liability [for malicious prosecution] where the witness's
testimony is knowingly and maliciously false.").  However, V.J. died many years
ago, and whether or not she testified in good faith is not at issue here.

prosecute.  Probable cause to prosecute is presumed on the basis of a grand jury

indictment, and probable cause is an absolute defense to malicious prosecution.

Therefore, summary judgment must be granted in defendants' favor on Newton's

state and federal malicious prosecution claims.

### D.   Failure to Preserve Evidence

There is no evidence in the record concerning numerous elements of

Newton's claim concerning a failure to preserve evidence during the period at

issue in this motion – from the attack on V.J. until Newton's conviction.

Specifically, there is no evidence of bad faith on the part of defendants; nor is

there evidence that Newton's sneakers or defendants' handwritten notes contained

exculpatory evidence.  Although the moving party bears the burden to establish

that there is no genuine dispute of material fact on summary judgment, the moving

party cannot be forced to prove a negative.[154]

In opposition to defendants' motion to dismiss the claim that

defendants failed to preserve evidence, Newton has misapprehended a crucial

aspect of summary judgment.  He argues that his allegations of bad faith –

assumed to be true when considering defendants' motion to dismiss – must still be

---

[154]    *Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning
an essential element of the nonmoving party's case necessarily renders all other
facts immaterial.").

assumed to be true by this Court.  On summary judgment, the allegations in a

complaint do not suffice to create a genuine issue of material facts.  A complaint is

not evidence, except insofar as it contains admissions.  On a motion for summary

judgment, each party must proceed on the basis of admissible evidence.  There is

no genuine dispute of material fact concerning the absence of proof of Newton's

failure to preserve evidence claim, and summary judgment must be granted to

defendants on that claim.

### E.     Supervisory Liability, Conspiracy, and Municipal Liability

I have already held that summary judgment must be granted in

defendants' favor on each of Newton's constitutional claims stemming from the

investigation and prosecution of his case.  In the absence of constitutional injury,

there can be no claim of supervisory or municipal liability.  Moreover, there is no

evidence that Lieutenant Sheehan – the head of the Bronx Sex Crimes Squad –

took direct action concerning Newton, and passive failure to train claims pursuant

to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft

v. Iqbal*.[155]  Finally, Newton has offered no evidence of any agreement among

---

[155]     *See* 129 S. Ct. at 1948 (holding that there is no liability absent each
defendant violating a plaintiff's constitutional rights through his or her own
actions). *See also Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL
1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third
*Colon* categories pass *Iqbal*'s muster – a supervisor is only held liable if that

defendants to violate his constitutional rights.[156]  Therefore, summary judgment

must be granted in defendants' favor on the conspiracy, supervisory liability, and

municipal liability claims.

> ### F.    Rule 56(f)

Newton argues in the alternative that resolution of this motion should

be stayed pursuant to Rule 56(f) so that he may conduct further discovery.

However, Newton fails to describe how the information he seeks will generate a

material dispute of fact.  Newton first argues that he was unable to depose

Detective Ryan.  However, he admits that Ryan "played a very limited role in the

criminal investigation."[157]  Thus there is no reason to believe that Ryan's

testimony will generate a genuine dispute of material fact.

Similarly, Newton requests unredacted copies of records concerning

defendant Sheehan's demotion from his position as head of the Bronx Sex Crimes

---

supervisor participates directly in the alleged constitutional violation or if that
supervisor creates a policy or custom under which unconstitutional practices
occurred.").

[156]    Newton fails to defend the conspiracy claim in his brief.

[157]    Schutty Decl. ¶ 10.  Moreover, Newton canceled the scheduled
deposition of Ryan and did not attempt to depose Ryan again prior to the close of
fact discovery.  *See* 2d Larkin Decl. ¶ 100.  This Court has the power to manage
discovery and parties lose the opportunity to conduct depositions if they fail to
schedule them during the time allotted.

Squad.[158] However, there is no evidence of that Sheehan violated Newton's

constitutional rights. Thus any claim of supervisory liability must fail, as there is

no way that additional evidence concerning poor training and supervision will

generate a genuine dispute of material fact concerning any of Newton's claims.

Newton's motion for a stay of summary judgment proceedings pursuant to Rule

56(f) is denied.

## V.    CONCLUSION

As the outcome of this motion has shown, the protections enshrined

in the Constitution and developed by the courts did not prevent the conviction of

an innocent man. But no system can be perfect. The real question is: Can it be

better? Must police departments, district attorneys, and citizen participants in

grand juries put in place additional protections to prevent the wrongful conviction

of innocent defendants? Developments such as increasing police

professionalism[159] and increased public expectation of physical and scientific

---

[158]    Prior to this Court's entry of a confidentiality order, defendants
produced redacted copies of Sheehan's personnel file.

[159]    *See Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("Another
development over the past half-century that deters civil-rights violations is the
increasing professionalism of police forces, including a new emphasis on internal
police discipline.").

evidence[160] lead to the hope that had Newton been prosecuted today, all physical evidence would have been tested and Newton would not have been prosecuted, let alone convicted. Nonetheless, despite the lessons that can be learned from this unhappy case, Newton has failed to demonstrate any actionable violation of his constitutional rights stemming from the investigation and prosecution.

For the foregoing reasons, defendants' motion for partial summary judgment is granted. Claims one, two, four, eleven, and twelve are dismissed in their entirety. Claims six, eight, nine, and fifteen are dismissed in part, insofar as they claim harms resulting from investigatory activities. Newton still maintains numerous constitutional and tort claims against both the City and individual defendants concerning the loss of the rape kit after trial.[161] The Clerk of the Court is directed to close this motion (docket no. 49).

---

[160]     *See, e.g.*, Tom R. Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction*, 115 Yale L.J. 1050, 1053 (2006) ("'[S]hows such as CSI are affecting action in courthouses across the USA by, among other things, raising jurors' expectations of what prosecutors should produce at trial.'" (quoting Richard Willing, *'CSI Effect' Has Juries Wanting More Evidence*, USA Today, Aug. 5, 2004, at 1A).

[161]     Specifically, claims six, eight, nine, fourteen, fifteen, and sixteen remain.

44

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 31, 2009

## - Appearances -

**For Plaintiff:**

John Francis Schutty III, Esq.
Law Office of John F. Schutty
445 Park Avenue, 9th Floor
New York, New York 10022
(212) 836-4796

**For Defendants:**

Arthur Gabriel Larkin III, Esq.
Fred Michael Weiler, Esq.
The New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-1599