USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/13/09_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------X

ALAN NEWTON,

        Plaintiff,

   - against -

THE CITY OF NEW YORK; DISTRICT ATTORNEYS
MARIO MEROLA AND ROBERT T. JOHNSON,
INDIVIDUALLY, AND IN THEIR OFFICIAL CAPACITY;
ANDREA FREUND AND VARIOUS JOHN/JANE DOES,
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES
AS EMPLOYEES OF THE CITY OF NEW YORK WHO
ARE/WERE ASSISTANT DISTRICT ATTORNEYS
WITHIN THE OFFICE OF THE DISTRICT ATTORNEY,
COUNTY OF BRONX; DETECTIVE JOANNE NEWBERT,
DETECTIVE PHILLIP GALLIGAN, DETECTIVE [JOHN
DOE] HARTFIELD, DETECTIVE [JOHN DOE] RYAN,
DETECTIVE [JOHN DOE] HARRIS, POLICE OFFICER
DOUGLAS LEHO, POLICE OFFICER WILLIAM SEAN
O'TOOLE, LIEUTENANT MICHAEL SHEEHAN,
SERGEANT PATRICK J. McGUIRE, POLICE OFFICER
[JOHN DOE] HASKINS, POLICE OFFICER [JANE DOE]
KIELY, INSPECTOR JACK J. TRABITZ AND VARIOUS
JOHN/JANE DOES, INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITIES AS EMPLOYEES OF THE CITY
OF NEW YORK WHO ARE/WERE MEMBERS OF THE
POLICE DEPARTMENT OF THE CITY OF NEW YORK,

        Defendants.

----------------------------------------------------------------------------X

**OPINION
AND
ORDER**

**07 Civ. 6211
(SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

Alan Newton was released from prison on July 6, 2006, after more than twenty-two years of incarceration for a rape and assault that DNA testing proved he did not commit.  For eleven of those years, Newton repeatedly requested access to the rape kit that contained the ultimately exonerating DNA to no avail – not because Newton was not entitled to the rape kit, but because the government could not find it.  As it turned out, the rape kit was in a safe storage location and within the City of New York City's (the "City") possession the entire time.  What had actually been "lost" was the paper on which the rape kit's storage location had been written – also later found in the City's possession, but misfiled.  Misfiling, or "losing," this paper was tantamount to "losing" the rape kit.  Without it and its notation of the rape kit's storage location, the rape kit may never have been found.  Newton now brings this action against the City, and over a dozen of its officers and employees, on the basis of his erroneous conviction, alleging violations of his civil rights as a result of defendants' investigation, prosecution, and subsequent failure to examine exculpatory evidence.  Defendants now move for summary judgment on Newton's six federal claims stemming from the City's "loss" and subsequent discovery of the rape kit, which contained, among other things, semen taken from

1

the body of the victim.[1]  For the reasons that follow, defendants' motion is granted

in part and denied in part.

## II.    FACTS[2]

### A.    The Parties

In the early morning hours of June 23, 1984, a woman whose initials

are V.J.[3] was raped, robbed, and assaulted in the area of Crotona Park, in the

Bronx.[4]  On May 21, 1985, Newton was convicted by a jury of raping, assaulting,

and robbing V.J on the basis of eyewitness testimony and V.J.'s identification of

him as her assailant.[5]  On May 31, 1985, the court sentenced Newton to concurrent

---

[1]     Defendants seek partial summary judgment to dismiss plaintiff's fourth, sixth, seventh, eighth, ninth and fifteenth causes of action to the extent they survived this Court's July 31, 2009 Opinion and Order granting defendants' partial motion for summary judgment. *See Newton v. City of New York*, No. 07 Civ. 6211, 2009 WL 2365412 (S.D.N.Y. July 31, 2009).

[2]     The facts in this section are not in dispute and are drawn from Defendants' Rule 56.1 Statement ("Def. 56.1"), Plaintiff's Counterstatement Pursuant to Rule 56.1 ("Pl. 56.1"), from the evidence submitted to this Court with respect to this motion, including declarations and exhibits, and Newton's Complaint ("Compl."). Only the facts relating to this motion have been included. Additional facts were summarized in this Court's July 31, 2009 Opinion and Order. *See Newton,* 2009 WL 2365412, at *1-5.

[3]     The victim's full name is withheld pursuant to New York's rape shield law.

[4]     *See* Compl. ¶¶ 50-51.

[5]     *See id.* ¶ 95.

2

prison terms of 8 1/3 to 25 years for the rape and robbery charges, followed by a consecutive prison term of 5 to 15 years for the assault.[6]  Twenty-two years later, DNA evidence exonerated Newton and his conviction was vacated.[7]

Defendants Sergeant Patrick J. Maguire, civilian clerk Geraldine Kiely, police officer Stacy Haskins, Inspector Jack J. Trabitz – a senior police officer and supervisor – and other "John/Jane Does" were employed by the Property Clerk Division ("PCD") of the New York City Policy Department ("NYPD") (collectively, the "PCD Defendants").[8]  Defendants Mario Merola and Robert T. Johnson[9] were the elected District Attorneys of Bronx County during the relevant time period (together, the "DA Defendants").[10]  Defendants John F. Carroll, Robert Moore, and Rafael Curbelo were Assistant District Attorneys in the Office of the District Attorney, Bronx County ("DAO") (collectively, the "ADA

---

[6]     See id. ¶ 97.

[7]     See id. ¶¶ 5, 33-35.

[8]     See id. ¶¶ 22-26.

[9]     Newton requests that this motion be stayed pursuant to Federal Rule of Civil Procedure Rule 56(f) so that he may depose Johnson. See Plaintiff's Memorandum of Law in Opposition ("Newton Opp.") at 14.  This request is rejected for the same reasons this Court rejected the same request previously made by Newton with regard to certain other individuals – i.e., failure to describe the information he seeks and how obtaining such information will generate a genuine issue of material fact. See Newton, 2009 WL 2365412, at *12.

[10]    See Compl. ¶ 8.

3

Defendants," and together with the PCD and DA Defendants, the "Individual

Defendants"). The ADA defendants were responsible for conducting the searches

for the rape kit.[11] The City was the Individual Defendants' employer at all relevant

times.[12]

## B.     The NYPD's Invoicing and Transfer Procedures

The NYPD's Property Guide contains written procedures pertaining to

the intake and invoicing of property in the NYPD's possession, including items

collected in connection with criminal investigations.[13] According to these

procedures, a detective must complete an invoice upon the receipt of evidence and

submit it to the PCD for logging and storage.[14] The PCD file clerk then distributes

a white carbon copy of the invoice to be indexed by borough storage number,

another white carbon copy to the Inventory Unit for storage, and a yellow

"working copy"– the invoice copy critical to Newton's case – to the PCD to be

---

[11]      *See id.* ¶ 9.

[12]      *See id.* ¶ 11.

[13]      *See* NYPD Property Guide, Property Clerk Division, Ex. D to 6/25/09
Declaration of John Schutty, plaintiff's counsel ("Schutty Decl.") ("Property
Guide").

[14]      *See id.* at Procedure Number ("Proc. No.") 201-1.

4

filed in the "Active Yellows File" by invoice number.[15]  The yellow invoice

thereafter becomes the sole piece of paper that the NYPD and PCD use to track the

movement of the evidence.[16]  The PCD file clerk then makes an entry in a cross

reference index book and files the property transfer receipt.[17]  When a piece of

evidence is removed from the PCD – either for testing by the Office of the Chief

Medical Examiner for the City ("OCME") or for court proceedings – a notation is

to be made on the back of the yellow invoice, which is then moved to the "Out-to-

Court" file to await the evidence's return.[18]  A similar notation of removal is made

in the Evidence to Court Book.[19]  Along with giving the evidence to the removing

person, the window clerk gives the removing person a photocopy of the yellow

invoice.[20]  Upon return of the evidence, the window clerk makes a notation of its

return on the back of the yellow invoice, notes the return in the Evidence to Court

---

[15]     *See id.*  In addition to these three copies, the PCD clerks distribute a
green Evidence Release/Investigatory Copy, a blue Police Officer's Copy, and a
pink finder's/prisoner's copy, none of which are relevant to Newton's claims.  *See
id.*

[16]     *See* 2/4/09 Deposition of Jack Trabitz, Ex. L to Schutty Decl. ("2/4/09
Trabitz Dep."), at 83.

[17]     *See* Property Guide at Proc. No. 201-1.

[18]     *See id.* at Proc. No. 211-2.

[19]     *See id.*

[20]     *See id.*

book, returns the yellow invoice to the Active Yellows File, and returns the

evidence to its storage location.[21]

Sometime after 1984 (possibly 1986), because of the increasing

concern of contact with unknown bodily fluids, the NYPD began to send blood and

semen evidence from borough offices to the PCD's Pearson Place Warehouse

("Pearson Place") to be stored in "DOA Barrels" – containers that would safely

seal and contain fluid evidence.[22]  After that date, when evidence was removed

from the PCD for testing by the OCME, the OCME would pack the evidence in

DOA Barrels and contact the person who removed the evidence from the PCD to

retrieve it from the OCME and return it to the PCD.[23]  If the person who brought

the evidence to the OCME never retrieved it, the OCME staff would contact the

PCD to transfer the DOA Barrel to Pearson Place.[24]

Although the Property Guide contains no written procedures for

---

[21]     See id. at Proc. No. 211-3.

[22]     See 2/9/09 Deposition of Patrick McGuire, Ex. O to Declaration of
Fred Weiler, Assistant Corporation Counsel ("Weiler Decl.") and Ex. M to Schutty
Decl. ("2/9/09 McGuire Dep."), at 133.  The parties have not provided an
explanation for the term "DOA," but do not dispute that these barrels are referred
to as "DOA Barrels."

[23]     See id. at 80; 3/31/09 Deposition of Patricia Ryan, OCME laboratory
director, Ex. O to Schutty Decl. ("Ryan Dep."), at 108.

[24]     See 2/9/09 McGuire Dep. at 80; 3/31/09 Ryan Dep. at 165.

6

intake at Pearson Place or how evidence received in DOA Barrels was to be processed and recorded by the PCD,[25] a systematic practice was in place. Upon receipt of the DOA Barrel from the OCME, the Pearson Place clerk would complete an NYPD "Transfer Sheet/Receipt" acknowledging receipt of the DOA Barrel and the items within it.[26] Then, the clerk would deliver the original Transfer Sheet/Receipt to the OCME agent who delivered the DOA Barrel, tape one copy to the outside of the Barrel to show its contents, dispatch a second copy to the local borough office of the PCD where the evidence was originally registered, and retain a third copy at Pearson Place, along with photocopies of all invoices received with the DOA Barrel.[27] As early as 1991, the City was aware that its paper invoice system was "extremely prone to clerical errors and omissions" making the tasks involved in storing, maintaining, and locating evidence in the City's possession "all the more difficult."[28]

---

[25]     *See generally* Property Guide.

[26]     *See* 2/9/09 McGuire Dep. at 85-88.  Although plaintiff has requested the Transfer Sheet/Receipt that would have been created and distributed when DOA Barrel #22 1989 was received at Pearson Place, no such document has been produced. *See* Pl. 56.1 at 30 n.3.

[27]     *See* 2/9/09 McGuire Dep. at 85-88.

[28]     5/13/91 CGI Consulting, Inc. Memorandum to the NYPD, Ex. G to Schutty Decl., at 2.

**C.    Newton Requests Access to the Rape Kit**

Shortly after V.J.'s assault on June 23, 1984, a "Vitullo rape kit" was used to collect physical evidence from V.J.'s body.[29]  The rape kit contained pubic and head hair, three cotton swabs, and four microscope slides collected from V.J.[30]  The same day the samples were collected in the rape kit, NYPD Detective Joanne Newbert completed invoice number 744483 to register the rape kit.[31]

Newton first requested testing on the rape kit on or about January 29, 1988.[32]  At the time, Newton filed a motion in the Supreme Court of the State of New York, Bronx County, requesting only that an independent laboratory test whether semen collected from V.J. and semen stains from her clothing were produced by a "secretor" or a "non-secretor" (and thereafter determine if Newton was a match).[33]  On April 6, 1988, Justice Burton Roberts granted Newton's

---

[29]    *See* 6/25/09 Declaration of Alan Newton ("Newton Decl.") ¶ 4.

[30]    *See* 7/30/84 Police Laboratory Analysis Report, Ex. O to 4/23/09 Declaration of John Schutty, submitted with plaintiff's opposition to defendants' first motion for summary judgment.

[31]    *See* Property Clerk Division Yellow Invoice No. B744483, Ex. A to Schutty Decl. ("Yellow Invoice") The face of the invoice indicates that the rape kit was received by the PCD and assigned storage numbers. *See id.* (including in the bottom left hand corner of the Yellow Invoice two Bronx Borough Storage Numbers– 84B19041 and 84-10559); Pl. 56.1 ¶ 151.

[32]    *See* Newton Decl. ¶ 8.

[33]    *See id.*

8

request and ordered DA Merola to "secure and deliver" the rape kit to the OCME, where the independent laboratory could conduct the testing.[34]  Pursuant to the court's order, ADA Stacey Edelbaum took possession of the rape kit on May 11, 1988.[35]  The rape kit was delivered to the OCME on July 27, 1988.[36]  Defendants have not provided an explanation for the rape kit's location from May 1988 to July 1988.[37]  Tests on the rape kit were inconclusive for semen within the rape kit.[38]  Although it was ADA Edelbaum's responsibility to retrieve the rape kit from the OCME and return it to the PCD, and despite three written requests for return by the PCD to Edelbaum,[39] there is no record that Edelbaum ever retrieved the rape kit from OCME or that the PCD followed up on these requests.  Finally, in or around December 1988, the OCME packed the rape kit into DOA Barrel #22 1989 and sent it to Pearson Place for DOA Barrel storage as indicated in the OCME's

---

[34]     See 4/6/88 Order of Judge Roberts, Ex. A to Schutty Decl., ¶ 3.

[35]     See Yellow Invoice (indicating that the rape kit was delivered to ADA Edelbaum by an NYPD employee named "Monroe" at "1550" hours on May 11, 1988 along with ADA Edelbaum's thumb print, indicating that she took possession).

[36]     See 3/31/09 Ryan Dep. at 69.

[37]     See Pl. 56.1 ¶ 171.

[38]     See 3/31/09 Ryan Dep. at 77-81.

[39]     See 6/30/88, 8/31/88, and 7/7/92 Status of Outstanding Property Letter from the PCD to ADA Edelbaum, Ex. A to Schutty Decl.

Property Clerk Book.[40]  In addition, a notation to this effect was made on the

Yellow Invoice, but the Yellow Invoice was never moved from the Out-to-Court

file to the Active Yellows file.  It was in DOA Barrel #22 1989 that the rape kit

was ultimately found in 2005.[41]  The Yellow Invoice was found in the Out-to-Court

file in 2009.

In 1994, New York enacted subdivision 1-a to New York Criminal

Procedure Law section 440.30 ("section 440.30(1-a)(a)"), permitting a

postconviction defendant to "request the performance of a forensic DNA test on

specified evidence" when moving to vacate a judgment and set aside a sentence.

The request "shall" be granted upon a court's "determination that if a DNA test had

been conducted on such evidence, and if the results had been admitted in the trial

resulting in the judgment, there exists a reasonable probability that the verdict

would have been more favorable to the defendant."[42]  When section 440.30(1-a)(a)

was enacted, the DAO adopted a practice of consenting to requests by defendants

to test DNA evidence and its ADAs would endeavor to find the evidence and get it

---

[40]      *See* 1988 OCME Property Clerk Log Book, Ex. J to Schutty Decl., at
Entry 585; 3/31/09 Ryan Dep. at 111-12.

[41]      *See* 2/4/09 Trabitz Dep. at 222 ("once the property clerk invoice
B744483 . . . was provided to me, it gave me the investigative tool that I needed to
go and look for and positively retrieve the property.").

[42]      N.Y. Crim. Proc. L. § 440.30 (1-a)(a).

tested.[43]

      After section 440.30(1-a)(a) was enacted, Newton made three

additional requests to obtain a DNA test of the rape kit that resulted in multiple

searches for the rape kit.[44]  In each instance, the DAO consented to a search for the

rape kit or began a search without objection in accordance with DAO policy and

assigned a different ADA to undertake each search.[45]  Each of the three ADAs –

Carroll, Moore and Curbelo – have testified that they were generally familiar with

how to retrieve evidence at the PCD using an invoice or invoice number.

However, none of the ADAs were familiar with, or had received any formal

training or written materials on, the PCD's system of tracking evidence via

invoice.[46]  To begin their search, each ADA consulted the DAO Appeals File to

---

[43]    *See* 4/27/09 Deposition of ADA John Carroll, Ex. B to Weiler Decl. ("4/27/09 Carroll Dep."), at 45-46.

[44]    *See* Newton Decl. ¶¶ 16-20 (1994 motion filed pursuant to section 440.30(1-a)(a)), 21-24 (1995 habeas corpus petition resulting in 1997 search), 25-34 (1998 motion filed pursuant to section 440.30(1-a)(a)).  Newton also made FOIL requests for the rape kit in 1989 and 2002, both of which were denied on procedural grounds.  *See id.* ¶¶ 10-11, 35-36.  Newton also claims his attorney made a letter request to the Bronx ADA in 1991, but he cannot locate this letter. *See id.* ¶¶ 12-15.

[45]    *See* Def. 56.1 ¶¶ 3, 17, 26; Pl. 56.1 ¶¶ 3, 17, 26, 208, 231, 239.

[46]    *See* 4/27/09 Carroll Dep. at 12, 28-30; 4/7/09 Deposition of ADA Robert Moore, Ex. F to Weiler Decl. ("4/7/09 Moore Dep."), at 14; 3/26/09 Deposition of ADA Rafael Curbelo, Ex. J to Weiler Decl. and Ex. P to Schutty

identify the Newton Invoice Number.[47]  None of the ADAs recalled whether they

saw a photocopy of the Yellow Invoice in the Appeals File.  Instead, they

speculated that they may have determined the Newton Invoice Number from court

documents, briefs and memoranda in the folder.[48]  Armed with the Newton Invoice

Number, each ADA made several phone calls and/or visits to the PCD, OCME,

and Pearson Place to locate the rape kit.[49]  Ultimately each search was

unsuccessful for either the rape kit *or* the Yellow Invoice.  Thus, each ADA

submitted an affirmation or letter summarizing his unsuccessful efforts to find the

Decl. ("3/26/09 Curbelo Dep."), at 29-32.

[47]     *See* 4/27/09 Carroll Dep. at 47; 4/7/09 Moore Dep. at 70; Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.

[48]     *See* 4/27/09 Carroll Dep. at 47; 4/7/09 Moore Dep. at 70; Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.

[49]     *See* 4/27/09 Carroll Dep. at 50, 68 (Carroll made "several" telephone calls to the PCD and Pearson Place, between three and five visits to the PCD, had a "series of backs and forths" with OMCE, but was unable to locate the rape kit or the Yellow Invoice); 4/7/09 Moore Dep. at 70 (Moore reviewed Carroll's affirmation describing previous efforts to locate the rape kit, made telephone calls to the PCD and Pearson Place, but learned that the rape kit was still missing and no tracking receipts or invoices could be found); 3/26/09 Curbelo Dep. at 25-26, 37, 43, 47, 61, 72-73 (Curbelo reviewed Carroll's affirmation and spoke with Moore regarding their unsuccessful attempts to locate the rape kit, visited the PCD several times, and called and wrote employees at Pearson Place a number of times, speaking to police officer Haskins and property clerk Kiely).

rape kit to the respective court assigned to rule on Newton's requests.[50]  Based on

the unsuccessful searches and affirmations submitted to the court, Newton's

requests for a DNA test were denied.[51]

Sergeant McGuire, police officer Haskins, and civilian property clerk

Kiely also assisted in the 1998 search for the rape kit.[52]  Although McGuire was

responsible for the intake and storage of evidence, he testified that he had "never

seen [the Property Guide] before" when it was shown to him during his 2009

deposition.[53]  Kiely – who considered herself an out to court specialist at Pearson

Place[54] – and Haskins – a police officer who was "administratively reassigned" to

---

[50]     *See* 11/1/94 Affirmation of John Carroll, Ex. C to Weiler Decl., ¶¶ 6,
7 (noting that he "intend[ed] to consent to defendant's request" and "undertook an
extensive investigation" to find the rape kit, but recommended denial of Newton's
motion "given the unavailability of the physical evidence"); 4/23/97 Letter from
Moore to Magistrate Judge Sharon Grubin, Ex. G to Weiler Decl. (summarizing his
unsuccessful attempts to locate the rape kit); 8/17/98 Affirmation of Rafael
Curbelo, Ex. K to Weiler Decl., ¶¶ 12, 13 (recommending denial of the motion
"given the unavailability of the physical evidence," the source for which was
"numerous telephone conversations with" Kiely and Haskins and stating that "rape
kits were preserved starting in 1988").

[51]     *See* 11/17/94 Order of Justice John Byrne, Ex. D to Weiler Decl.;
9/9/98 Order of Justice Byrne, Ex. N to Weiler Decl.

[52]     *See* 2/9/09 McGuire Dep. at 7, 21-23; Def. 56.1 ¶ 52.

[53]     *See* 2/9/09 McGuire Dep. at 17.

[54]     2/10/09 Deposition of Geraldine Kiely, Ex. N to Schutty Decl.
("2/10/09 Kiely Dep."), at 11.

the PCD for disciplinary reasons and subsequently dismissed from the NYPD[55] –

were also involved in the search for the rape kit under McGuire's supervision.

Although Kiely and Haskins was generally familiar with the invoice system and

intake procedures, they did not receive any formal training when they joined the

PCD.[56]  Kiely also never received any training regarding the use or storage of the

various copies of invoices or any other documents used to register and track

evidence and was not familiar with the procedures employed by the PCD.[57]

At the conclusion of their unsuccessful search for the Yellow Invoice

or the rape kit, McGuire sent the DAO a letter, in which he stated that the Yellow

Invoice was:

> currently not in its last listed storage location.  Property
> generally is removed from its storage location for one of
> two reasons.  The first is 'out to court,' and the second is
> destruction.  Items that go out to court are indicated on the
> original invoice which is stored *in the active files.*
> Currently there is no original voucher in the active file,
> *therefore it must have been destroyed.*[58]

---

[55]     *See* 2/10/09 Deposition of Stacy Haskins, Ex. S to Schutty Decl. ("2/10/09 Haskins Dep."), at 12-15.

[56]     *See* 2/10/09 Kiely Dep. at 11; 2/10/09 Haskins Dep. at 19-20.

[57]     *See* 2/10/09 Kiely Dep. at 13, 30.

[58]     8/26/98 Letter from Sgt. McGuire to Curbelo, Ex. L to Weiler Decl. (emphasis added).

McGuire also explained that had the evidence been destroyed, a notation to that effect would have been made on the Yellow Invoice, which would have then been filed in the closed files.[59]  However, there was no way to confirm destruction because a fire in the facility in 1995 destroyed the closed files.[60]  McGuire also stated that searching for any additional copies of the invoice at the PCD would be a "dead end" because the PCD "destroys inactive records more than six (6) years old."[61]  At his deposition, however, McGuire testified that he was not aware that yellow invoices were also kept in the Out to Court File or that such a file existed.[62]

### D.    The Rape Kit and Invoice Are Found

On July 15, 2005, pursuant to a request from the Innocence Project, ADA Elisa Koenderman sent a letter to Inspector Trabitz of the PCD requesting a new search for the rape kit, attaching a copy of the Yellow Invoice "for [Trabitz's] convenience."[63]  The copy was a photocopy of the Yellow Invoice that could not be

---

[59]    *See id.*

[60]    *See id.*

[61]    *Id.*

[62]    *See* 2/9/09 McGuire Dep. at 197-98.

[63]    7/15/05 Letter from ADA Koenderman to Trabitz, Ex. H to Schutty Decl.

15

located in any of the three prior attempts to find the rape kit.[64]  On the front of this

photocopy appears a large, legible, handwritten note: "DOA Barrel #22 1989."[65]

The record is not clear as to how ADA Koenderman came into possession of this

photocopy.  Trabitz instructed a colleague to search for the rape kit in DOA Barrel

#22 1989; it was in this exact location that the rape kit was found.[66]  The evidence

was then tested, the results of which led to Newton's exoneration on July 6, 2006.[67]

On or about January 2009, Trabitz received a photocopy of an "out-to-

court" log from the City's Corporation Counsel, indicating that the last notation in

the PCD's files of the rape kit's removal was 1988.[68]  Trabitz then directed

Sergeant Thomas O'Connor to look for the missing Yellow Invoice in the 1988

Out to Court File at the PCD.[69]  It was here that O'Connor found the Yellow

---

[64]    *See id.*

[65]    *Id.*

[66]    *See* 2/4/09 Trabitz Dep. at 222 ("once the property clerk invoice
B744483 . . . was provided to me, it gave me the investigative tool that I needed to
go and look for and positively retrieve the property.").

[67]    *See* 7/6/06 Order of Justice John J. Byrne.

[68]    *See* 2/4/09 Trabitz Dep. at 213-14.

[69]    *See id.*; 4/13/09 Declaration of Sergeant Thomas O'Connor, Ex. E to
Schutty Decl. ("O'Connor Decl."), ¶¶ 2-3.

Invoice on or about January 31, 2009.[70]  No one had previously searched the "out-to-court" files for the Yellow Invoice "because there had been no indication that the Vitullo rape kit was signed out to court until the recent production of the 'out-to-court' receipt."[71]  On the front of the Yellow Invoice appears the same handwritten notation "DOA Barrel #22 1989" as the photocopy Koenderman sent to Trabitz.  A photocopy of the Yellow Invoice with the DOA Barrel number notation was also found in the Appeals File of the DAO.[72]

### E.    Claims

Newton's Complaint asserts twenty-one causes of action.  All but eight have since been withdrawn or dismissed.  Six of those causes of action allege that the Individual Defendants and the City failed to ensure that the rape kit was properly registered, stored, preserved, maintained, and produced in a timely manner in violation of Newton's constitutional rights.[73]  These six causes of action include claims: (1) against the Individual Defendants for losing, misplacing and/or

---

[70]    See 2/4/09 Trabitz Dep. at 213-14; O'Connor Decl. ¶¶ 2-3.

[71]    O'Connor Decl. ¶ 4.

[72]    See Photocopy of Property Clerk Division Yellow Invoice No. B744483, produced from DAO Appeals File, Ex. U to Schutty Decl. ("DAO Photocopy of Yellow Invoice").

[73]    See Compl. ¶ 13.

17

secreting the rape kit and conspiring to do so in violation of Newton's due process rights,[74] (2) against Trabitz, Merola, and Johnson for supervisory liability and negligent supervision,[75] and (3) against the City for its policymakers' maintenance of unconstitutional customs, decisions, policies and indifferent employee training or supervision in maintaining, controlling, and producing the rape kit in violation of Newton's due process rights.[76]  Defendants move for summary judgment on these six claims and Newton opposes.[77]  On June 16, 2009, Newton also moved to amend his Complaint to add certain additional individual defendants and facts learned through discovery, and to modify the Complaint to reflect those claims that have been withdrawn or dismissed.  Newton does not seek to add new claims.

## III.   APPLICABLE LAW

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions,

---

[74]   *See id.* ¶¶ 154-163 (claim four), 213-219 (claim eight).

[75]   *See id.* ¶¶ 176-193 (claim six), 194-212 (claim seven), 273-289 (claim fifteen).

[76]   *See id.* ¶¶ 220-228 (claim nine).

[77]   The remaining two causes of action are state-based claims against all defendants for negligence and intentional infliction of emotional distress.  *See id.* ¶¶ 263-272 (claim fourteen), ¶¶ 290-299 (claim sixteen).  These causes of action are not at issue in this motion.

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[78]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[79]  "[T]he burden of demonstrating that no material fact exists lies with the moving party. . . ."[80]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[81]

---

[78]     Fed. R. Civ. P. 56(c).

[79]     *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[80]     *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[81]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).

19

To do so, the non-moving party must do more than show that there is
"'some metaphysical doubt as to the material facts,'"[82] and it "'may not rely on
conclusory allegations or unsubstantiated speculation.'"[83]  However, "'all that is
required [from a non-moving party] is that sufficient evidence supporting the
claimed factual dispute be shown to require a jury or judge to resolve the parties'
differing versions of the truth at trial.'"[84]

In determining whether a genuine issue of material fact exists, the
court must "constru[e] the evidence in the light most favorable to the non-moving
party and draw all reasonable inferences" in that party's favor.[85]  However, "[i]t is
a settled rule that '[c]redibility assessments, choices between conflicting versions
of the events, and the weighing of evidence are matters for the jury, not for the
court on a motion for summary judgment.'"[86]  Summary judgment is therefore

---

[82]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting
*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[83]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)
(quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[84]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206
(2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49
(1986)).

[85]     *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*,
477 U.S. at 247-50, 255).

[86]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl
v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

"appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[87]

## B.    Section 1983

Section One of the Civil Rights Act of 1871 – colloquially known as

section 1983 – states, in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.[88]

Section 1983 "does not create a federal right or benefit; it simply provides a

mechanism for enforcing a right or benefit established elsewhere."[89]  "The purpose

of § 1983 is to deter state actors from using the badge of their authority to deprive

individuals of their federally guaranteed rights and to provide relief to victims if

---

[87]     *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[88]     42 U.S.C. § 1983.

[89]     *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). *Accord  Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("'[O]ne cannot go into court and claim a 'violation of § 1983' – for § 1983 by itself does not protect anyone against anything.'" (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979))).

such deterrence fails."[90]

Any form of liability under section 1983 requires the defendant's direct involvement in causing the alleged damages. "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must p[rove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[91]

## C. Procedural Due Process

"The Due Process Clause of the Fourteenth Amendment requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest."[92]  However, "procedural due process protects only important and substantial expectations in life, liberty and property."[93]  "[A]lthough 'liberty and property are broad and majestic terms,' . . . 'the range of interest protected by procedural due process is

---

[90]    *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

[91]    *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) (internal citations omitted).

[92]    *Patterson v. City of Utica*, 370 F.3d 322, 329 (2d Cir. 2004).

[93]    *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 164 (2d Cir. 2001).

22

not infinite.'"[94]  In order to establish a due process violation under the Fourteenth

Amendment, a plaintiff "must show that he has a 'liberty . . . interest which has

been interfered with by the State' and that 'the procedures attendant upon that

deprivation were [not] constitutionally sufficient.'"[95]

### D.     Municipal Liability

For a person deprived of a constitutional right to have recourse against

a municipality under section 1983, he or she must show harm that results from a

municipal "policy" or "custom."[96]  "'[T]he inadequacy of police training may serve

as the basis for § 1983 liability only where the failure to train amounts to deliberate

indifference to the rights of persons with whom the police come into contact.'"[97]

---

[94]     *Spanierman v. Hughes*, 576 F. Supp. 2d 292, 301-02 (D. Conn. 2008)
(quoting *Board of Regents v. Roth*, 408 U.S. 564, 571-72 (1972)).

[95]     *Williams v. Town of Greenburgh*, 535 F.3d 71, 74-75 (2d Cir. 2008)
(quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989))
(alterations in original).

[96]     *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91
(1978).  *Accord Board of County Comm'rs v. Brown*, 520 U.S. 397, 402 (1997);
*Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-81 (1986).

[97]     *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting
*City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).  *Accord Walker v. City
of New York*, 974 F.2d 293, 300 (2d Cir. 1992) (holding that a section 1983
claimant properly pleaded municipality liability on the basis of inadequate training
and supervision against the district attorney's office with respect to both the use of
perjured testimony and exculpatory evidence).

For a municipality's failure to train to constitute a "policy or custom" actionable under section 1983, a plaintiff must establish that the municipality's failure to train reveals a "'deliberate indifference'" to the citizen's rights.[98]

### E.   Qualified Immunity

Government officials performing discretionary functions are generally granted qualified immunity and are immune from suit provided that "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[99] The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful."[100]

## IV.   DISCUSSION

### A.   Due Process

In June of this year, the Supreme Court decided *District Attorney's Office for the Third Judicial District v. Osborne,* addressing a question sharing

---

[98]     *Jenkins*, 478 F.3d at 94; *Harris*, 489 U.S. at 388.

[99]     *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)).

[100]     *Id.* (quotation marks and citation omitted).

some similarities to the one presented here.[101]  Osborne brought a section 1983

action to compel the release of biological evidence so that it could be subjected to

DNA testing.[102]  Osborne claimed both a substantive and procedural due process

right to the evidence under the Federal Constitution and a procedural due process

right stemming from an Alaskan state statute that provided for postconviction

access to evidence.[103]  The Supreme Court expressly rejected Osborne's argument

that postconviction defendants have a substantive or procedural due process right

to postconviction DNA testing.[104]  However, the Court found that when a state

enacts a statute providing postconviction defendants access to evidence and a

procedure for accessing such evidence, the state has created a liberty interest that is

entitled to due process protection.[105]  However, federal courts are only to intervene

in the state's administration of access where the state's procedures for

---

[101]     *See* 129 S. Ct. 2308, 2320 (2009).

[102]     *See id.* at 2315.

[103]     *See id.*

[104]     *See id.* at 2322.

[105]     *See id.* at 2320. *Accord Williams*, 535 F.3d at 75 ("Liberty interests 'may arise from two sources – the Due Process Clause itself and the laws of the States.'") (quoting *Thompson*, 490 U.S. at 460); *Meachum v. Fano*, 427 U.S. 215, 226 (1976) (holding that once a state imposes limitations on its own discretion and requires that a specific standard prevail for decisionmaking, it creates a liberty interest "regardless of whether the limits stem from statute, rule or regulation").

postconviction relief "'offend[ ] some principle of justice so rooted in the traditions

and conscience of our people as to be ranked as fundamental,' or 'transgress[ ] any

recognized principle of fundamental fairness in operation.'"[106]

The Supreme Court further determined that fault could not be found

with Alaska's procedures, noting that there was "nothing inadequate about the

---

[106]     *Osborne*, 129 S. Ct. at 2320 (quoting *Medina v. California*, 505 U.S.
437, 446 (1992)). *See also id.* ("Federal courts may upset a State's postconviction
relief procedures only if they are fundamentally inadequate to vindicate the
substantive rights provided."). Newton argues that the Second Circuit's decision in
*McKithen v. Brown*, 481 F.3d 89 (2d Cir. 2007), mandates the application of the
less burdensome standard of *Mathews v. Eldridge*, 424 U.S. 319 (1976). The
*Mathews* standard arose from a due process challenge to the adequacy of
administrative procedures prior to terminating disability benefits. It requires the
court to balance three factors: "First, the private interest that will be affected by the
government action; second, the risk of an erroneous deprivation of such interest
through the procedures used, and the probable value, if any, of additional or
substitute procedural safeguards; and finally, the Government's interest, including
the function involved and the fiscal and administrative burdens that the additional
or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. In
*McKithen*, the Second Circuit – after holding that the district court had subject
matter jurisdiction to adjudicate similar claims under section 1983 – directed the
district court to evaluate whether section 440.30(1-a)(a) gave rise to a liberty
interest and, if so, to apply *Mathews* – not *Medina* – to determine whether the state
had infringed on that liberty interest in violation of the plaintiff's procedural due
process rights. *See McKithen*, 481 F.3d at 107. Because the Second Circuit's
direction to apply *Mathews* was not necessary to its determination that the district
court had subject matter jurisdiction, it is dicta. *See Alsol v. Mukasey*, 548 F.3d
207, 218 (2d Cir. 2008) (finding a portion of a prior Second Circuit decision
dictum where it was "not necessary to [the Second Circuit's] holding"). As a
result, I am bound by the Supreme Court's decision in *Osborne* that the higher
*Medina* standard applies. Given, however, that Newton satisfies the *Medina*
standard, he would likely satisfy the lesser *Mathews* standard.

procedures Alaska has provided to vindicate its state right to postconviction relief

in general, and nothing inadequate about how those procedures apply to those who

seek access to DNA evidence."[107]  The Supreme Court expressly noted that its

ability to evaluate Alaska's procedures was limited because Osborne had not

pursued those procedures to test their adequacy.[108]  The Court noted that

> [i]t is difficult to criticize the State's procedures when
> Osborne has not invoked them . . . . [I]t is Osborne's
> burden to demonstrate the inadequacy of the state-law
> procedures available to him in state postconviction relief.
> These procedures are adequate on their face, and *without
> trying them, Osborne can hardly complain that they do not
> work in practice.*[109]

There is no question after *Osborne* that section 440.30(1-a)(a)

conferred on Newton a liberty interest in vacating his conviction by accessing

evidence in the state's possession for the purpose of DNA testing.  Furthermore, as

---

[107]     *Osborne*, 129 S. Ct. at 2320.

[108]     *See id.* at 2321 (noting that Osborne had "sidestep[ed]" state
procedures in favor of a federal cause of action).

[109]     *Id.* (citations omitted) (emphasis added). *Accord In re Smith*, No. 07
Civ. 1220, 2009 WL 3049202, at *2 (6th Cir. Sept. 24, 2009) ("[*Osborne*] held
that, at most, a prisoner *may* have a *procedural* due process right to the proper
application of a state-created right." (citing *Osborne*, 129 S. Ct. 2319-20)); *Jackson
v. Clarke*, No. 07 Civ. 56510, 2009 WL 2222592, at *1 (9th Cir. July 27, 2009)
("[T]o state a due process claim, [plaintiff] must allege that he has a substantive
right to postconviction relief under state law, and that the state's post conviction
relief procedures 'are fundamentally inadequate to vindicate' that right." (quoting
*Osborne*, 129 S. Ct. at 2320)).

in *Osborne*, New York's procedures for obtaining such access, on their face, appear to comport with recognized principles of fundamental fairness. Under New York law, a postconviction defendant need only make a motion requesting access to evidence for DNA testing. The DAO then consents to access or a court must make a determination as to whether the defendant can show a "reasonably probability that the verdict would have been more favorable to him had the DNA test results been admitted into evidence at trial."[110]

However, on the question of procedural adequacy in operation, Newton's case and *Osborne* sharply diverge. In *Osborne*, the plaintiff failed to test, in practice, Alaska's procedures for accessing the requested evidence. Newton has tested New York's procedures and has shown them to fail. The Supreme Court has recognized that fundamental fairness requires that once a state creates a statutory right and puts procedures in place to protect that right, those

---

[110]    *Id. Accord Fuentes v. Superintendent, Great Meadow Corr. Facility*, No. 04 Civ. 0737, 2009 WL 2424206, at *9 (E.D.N.Y. Aug. 5, 2009) (finding no procedural due process violation in light of *Osborne* where state court denied postconviction defendant's request for access to evidence for DNA testing under section 440.30(1-a)(a) upon the state court's determination that the defendant had failed to show the requisite reasonable probability and noting that the Alaskan procedures considered in *Osborne* were "less friendly to convicted criminals than the New York procedures at issue here").

procedures must comport with due process in application.[111]  The Supreme Court

has also recognized in well-known cases such as *California v. Trombetta* and

*Brady v. Maryland* that fundamental fairness requires that when the government is

in possession of material exculpatory evidence, it must disclose the existence of

such evidence and produce it to the defendant.[112]  However, *Osborne* held that

---

[111]     *See Evitts v. Lucey*, 469 U.S. 387, 399-401 (1985) (holding that if a
state chooses to dismiss an appeal when an incompetent attorney has violated local
rules, it may do so only if such action does not intrude upon the client's due
process rights, noting that "when a State opts to act in a field where its action has
significant discretionary elements, it must nonetheless act in accord with the
dictates of the Constitution – and, in particular, in accord with the Due Process
Clause"); *Morrissey v. Brewer*, 408 U.S. 471, 488-89 (1972) (recognizing that
states have the responsibility of establishing procedure regarding parole revocation
hearings, but that such procedures must comport with "the minimum requirements
of due process"); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (recognizing that
although a state may choose whether to institute a welfare program, it must operate
whatever programs it does establish subject to the protections of the due process
clause).

[112]     *See, e.g., Trombetta*, 467 U.S. 479, 485 (1984) ("[C]riminal
prosecutions must comport with prevailing notions of fundamental fairness.  We
have long interpreted this standard of fairness to require that criminal defendants
be afforded a meaningful opportunity to present a complete defense.  To safeguard
that right, the Court has developed what might loosely be called the area of
constitutionally guaranteed access to evidence.") (quotation marks omitted)
(collecting cases); *United States v. Agurs*, 427 U.S. 97, 112 (1976) (holding that
even in the absence of a defendant's specific request, the prosecution has a
constitutional duty to produce exculpatory evidence that would raise a reasonable
doubt about the defendant's guilt); *Brady*, 373 U.S. 83, 87 (1963) (holding that a
defendant has a constitutionally protected right to request and obtain from the
prosecution evidence that is either material to the guilt of the defendant or relevant
to the punishment to be imposed).

these preconviction cases are not an appropriate framework for determining

whether a state's procedures are adequate under the Due Process Clause.[113]

Although *Osborne's* holding does not necessarily mean that the principle of

fundamental fairness these preconviction cases seek to protect no longer exists

postconviction, it does call into question the appropriateness of relying on this

principle of fundamental fairness in Newton's case.  I therefore rely on the

principle of fundamental fairness that arises when a state creates procedures to

protect a statutory right that implicates constitutional rights.

   Viewing all evidence in a light most favorable to Newton, a

reasonable jury could conclude that New York's postconviction access to evidence

procedures transgress in operation.  Newton had a right of access pursuant to the

DAO's policy of consent and the stated intent of each ADA to consent in Newton's

case.[114]  Nevertheless, Newton was denied access to the rape kit for DNA testing –

---

[113] *See Osborne*, 129 S. Ct. at 2320 ("Osborne's right to due process is
not parallel to a trial right, but rather must be analyzed in light of the fact that he
has already been found guilty at a fair trial, and has only a limited interest in
postconviction relief. *Brady* is the wrong framework.").

[114] Defendants do not dispute that Newton had a legal entitlement to the
rape kit under section 440.30(1-a)(a) as required for a due process claim. *See N.Y.
State Nat'l Org. for Women*, 261 F.3d at 164 ("'Process is not an end in itself. Its
constitutional purpose is to protect a *substantive interest* to which the individual
has a legitimate claim of entitlement.'") (quoting *Olim v. Wakinekona*, 461 U.S.
238, 250-51 (1983)). Defendants' argument is that this legal entitlement did not
give rise to a federal cause of action under section 1983. *See* Defendants' Reply

not because a state court made a fully informed determination that he was not entitled to it – but because the City and the Individual Defendants could not find the rape kit even though it was always in the City's possession.

Newton raises a material question of fact as to whether the rape kit could not be found because City employees failed to follow, or were not adequately trained in, the City's written invoicing procedures – the necessary "tool," in Trabitz's words,[115] to finding the rape kit. The handwritten notation on both the Yellow Invoice found by Trabitz in the Out to Court File and the photocopy found in the DAO Appeals File in 2009 suggests that at some point after the OCME completed its testing on the rape kit in 1988, the PCD was informed that the rape kit had been moved to Pearson Place in DOA Barrel #22 1989.[116] For some unexplained reason, whoever made the notation on the front of the Yellow Invoice and provided this copy to the DAO – and no such person has been identified[117] – failed to move it back into the Active Yellows File. Instead, he or she left the Yellow Invoice in the Out to Court File – in direct violation of the

---

Memorandum of Law at 1.

[115]   *See* 2/4/09 Trabitz Dep. at 222.

[116]   *See* Yellow Invoice; DAO Photocopy of Yellow Invoice.

[117]   *See* Pl. 56.1 ¶ 108.

City's written procedures – where it remained hidden for the next twenty years.[118] This employee also failed to log the evidence back into the PCD by noting its return on the upper right hand corner of the Yellow Invoice, attaching the transfer receipt to it showing that the evidence was delivered back to the PCD by the OCME on a certain date, or noting the return of the property in the Evidence to Court Book.[119]

Were the evidence limited to merely the "mistakes" of this one unidentified individual, perhaps the City would be entitled to summary judgment. However, further facts indicate widespread ignorance of City invoicing and storage procedures and a total lack of coordination in the search for the rape kit and its invoice. For example, each ADA Defendant testified that he began his search for the rape kit by reviewing the DAO Appeals File.[120] It was in this very file that a photocopy of the Yellow Invoice with the large, legible, handwritten notation of the rape kit's storage location was later found.[121] A reasonable jury could conclude

---

[118]    4/13/09 O'Connor Decl. ¶¶ 2, 3.

[119]    *See* Property Guide at Proc. No. 211-3; Yellow Invoice; Trabitz Dep. at 176, 187.

[120]    4/27/09 Carroll Dep. at 12, 28-30; 4/7/09 Moore Dep. at 14; 3/26/09 Curbelo Dep. at 29-30, 31-32.

[121]    DAO Photocopy of Yellow Invoice.

that each ADA Defendant saw the invoice and, at best, lacked the proper training

and familiarity with City invoicing procedures to understand the invoice and the

notation's significance, or, at worst, deliberately ignored the storage location in

bad faith. The PCD Defendants' conduct further illustrates that, at a minimum,

they lacked proper training and supervision. None of the PCD Defendants

examined the Out to Court File for the rape kit's missing Yellow Invoice because

they did not know it existed separately from the Active Yellows File.[122]  Instead,

once he or she determined the Yellow Invoice could not be found in the Active

Yellows file, the PCD Defendants either abandoned the search altogether, or

worse, erroneously and baselessly informed the ADA Defendants that the invoice,

and potentially the rape kit itself, had been destroyed.[123]  Neither the PCD and

ADA Defendants, nor employees working at the OCME, provided each other with

the correct and complete information or asked the right questions – either because

they did not know the correct questions to ask or because they did not care about

the answers. Either way, these facts illustrate a complete and utter breakdown in

the City's evidence management system, the culmination of which resulted in

Newton's continued, wrongful, imprisonment for twelve years after his first

---

[122]    *See* 8/26/98 Letter from Sgt. McGuire to Curbelo, Ex. L to Weiler
Decl.

[123]    *See id.*

33

request for the rape kit in 1994.  They also raise a question of material fact as to

whether New York's procedures for access to evidence for DNA testing transgress

principles of fundamental fairness in operation.  Accordingly, defendants' motion

for summary judgment is denied on this ground.

This holding does not confer a due process right to access evidence

for DNA testing on all postconviction defendants.  To do so would directly

contradict *Osborne*.  Rather, once a state determines that a postconviction

defendant is entitled to evidence under section 440.30(1-a)(a), the defendant's due

process rights have been violated if attempts to locate the evidence are

unsuccessful due to inadequate training, supervision, and instruction in the

procedures necessary to locate the evidence or deliberate ignorance of the storage

location in bad faith.

Contrary to defendants' assertion,[124] *Arizona v. Youngblood* does not

apply and Newton is not required to provide evidence from which a jury could

reasonably conclude that defendants acted in bad faith.  Expressly distinguishing

*Brady v. Maryland* – which makes the good or bad faith of the State irrelevant

when the State fails to disclose to the defendant *known* materially exculpatory

evidence – *Youngblood* deals exclusively with the due process implications of "the

---

[124]     *See* Defendants' Memorandum of Law in Support at 4-9 (citing
*Arizona v. Youngblood*, 488 U.S. 51 (1988)).

failure of the State to preserve evidentiary material of which no more can be said

than that it *could have been* subject to tests, the results of which *might have*

exonerated defendant."[125]   This case is wholly distinguishable from the facts and

rationale in *Youngblood* as the evidence in Newton's case *was preserved* and there

is no question as to the exculpatory value of the rape kit – the bodily fluids it

contained were tested for DNA and the results exonerated Newton.  As a result,

there is no need for an assessment of bad faith under *Youngblood*.

### B.    Qualified Immunity

Although the Individual Defendants are assumed to have been aware

that section 440.30(1-a)(a) required them to locate the rape kit for DNA testing

upon court order or DAO consent, at the time the Individual Defendants were

searching for the rape kit, Newton's procedural due process right to access the rape

kit had not yet been clearly established by the Second Circuit or the Supreme

Court.  In 2007 – two years after the rape kit was found – the Second Circuit

declined to address whether a federal due process right was created by the rights

conferred by section 440.30(1-a)(a) and, instead, tasked the district court with this

---

[125]    488 U.S. at 57 (emphasis added) (noting that part of the Court's
rationale for treating a destruction of evidence case differently from a *Brady* case is
that "'[w]henever potentially exculpatory evidence is permanently lost, courts face
the treacherous task of divining the import of materials whose contents are
*unknown and, very often, disputed.*'" (quoting *Trombetta*, 467 U.S. at 486)
(emphasis added)).

determination.[126]  The Supreme Court did not address this question until *Osborne*

in 2009.  Without clear Supreme Court or Second Circuit authority on point, the

Individual Defendants cannot be said to have been on notice of Newton's federal

due process rights or the fact that they faced potential personal liability for

violating those rights – thus, entitling all Individual Defendants to qualified

immunity.  Newton erroneously argues that the Individual Defendants are not

entitled to qualified immunity because "with the enactment of CPL § 440.30,

plaintiff had the admitted, statutory right to request and receive the exculpatory

rape kit, and no state actor performing under New York State law may claim

ignorance of that law . . . ."[127]  However, the existence of a state statutory right is

irrelevant – the inquiry is whether a *federal* right had yet been recognized.[128]  As a

result, the Individual Defendants are entitled to qualified immunity and their

---

[126]     *See McKithen v. Brown*, 481 F.3d 89, 106 (2d Cir. 2007) ("The
district court, on remand, must, therefore, first consider whether this residual post-
conviction liberty interest encompasses an interest in accessing or possessing
potential exonerative biological evidence.").

[127]     Newton Opp. at 9.

[128]     *See Davis v. Scherer*, 468 U.S. 183, 190-91 (1984) ("Officials sued
for constitutional violations do not lose their qualified immunity merely because
their conduct violates some statutory or administrative provision.").

36

respective motions for summary judgment are granted in their entirety.[129]

## C.   Municipal Liability

Newton asserts that the City is subject to liability because of the

multitude of ways that its evidence management regulations and procedures were

violated by its employees in connection with the search for the rape kit and its

corresponding invoice, amounting to deliberate indifference to Newton's due

process rights.[130]  The Second Circuit has identified three requirements for a

municipality's failure to train or supervise to constitute actionable deliberate

---

[129]     Because supervisory liability imposes personal liability, Newton's
Sixth and Seventh claims for supervisory liability against Sheehan, Trabitz, Merola
and Johnson are also dismissed under qualified immunity. *See Poe v. Leonard*,
282 F.3d 123, 124 (2d Cir. 2002) (finding that a supervisory official is protected by
qualified immunity unless both the federal right and the basis of supervisory
liability were clearly established).  The dismissal of Newton's federal claims
against the Individual Defendants on qualified immunity grounds has no bearing
on the question of whether the Individual Defendants are entitled to qualified
immunity for Newton's state law claims.  As a result, Newton's state law claims
against the Individual Defendants remain.

[130]     *See* Compl. ¶¶ 220-228 (claim nine); Newton Opp. at 15-18. *See also
City of Canton*, 489 U.S. at 387 ("We hold today that the inadequacy of police
training may serve as a basis for § 1983 liability only where the failure to train
amounts to deliberate indifference to the rights of persons with whom the police
come into contact."); *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871
(2d Cir. 1992) ("[A] § 1983 plaintiff may establish a municipality's liability by
demonstrating that the actions of subordinate officers are sufficiently widespread
to constitute the constructive acquiescence of senior policymakers.") (citing *St.
Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) (plurality) and *Krulik v. Board of
Educ. of the City of New York*, 781 F.2d 15, 23 (2d Cir. 1986)).

indifference.[131]

> First, the plaintiff must show that a policymaker knows to
> a moral certainty that her employees will confront a given
> situation. Second, the plaintiff must show that the situation
> either presents the employee with a difficult choice of the
> sort that training or supervision will make less difficult or
> that there is a history of employees mishandling the
> situation.[132] Finally, the plaintiff must show that the wrong
> choice by the city employee will frequently cause the
> deprivation of a citizen's constitutional rights. In addition,
> at the summary judgment stage, plaintiffs must identify a
> specific deficiency in the city's training program and
> establish that the deficiency is closely related to the
> ultimate injury, such that it actually caused the
> constitutional deprivation.[133]

After New York's enactment of section 440.30(1-a)(a), a reasonable

jury could conclude that City policymakers "kn[e]w to a moral certainty" that City

employees would be confronted with requests to locate and produce evidence

stored within the PCD. Because section 440.30(1-a)(a) expressly provides for

DNA testing, it is even more likely that the requested evidence would be found

sealed in DOA Barrels at Pearson Place.

In addition, it cannot be said that any of the procedures the City

---

[131]   *See Jenkins*, 478 F.3d at 94 (citing *Walker*, 974 F.2d at 297).

[132]   A choice may be considered difficult where "more than the
application of common sense is required. . . ." *Walker*, 974 F.2d at 297.

[133]   *Jenkins*, 478 F.3d at 94 (quotation marks and citations omitted).

employees were required to follow comported with common sense.  The City had

in place procedures requiring the proper distribution of multiple carbon copies of

the same invoice, each with its own use and place of distribution.  The City also

had procedures requiring that invoices be moved from one file to another

depending on the location of the evidence, and that certain evidence be moved

from the PCD shelves to a DOA Barrel for safer storage.  Making the proper

choice at each stage of the intake, storage, maintenance of, and search for, the

invoice and rape kit – from deciding where to search, what to look for, who to

contact, when to assume that the evidence and/or the invoice had been destroyed,

and when to abandon the search – required substantially more knowledge of the

procedures than common sense would provide.  Sufficient training and supervision

would have made each of these choices less difficult and potentially have led to the

earlier discovery of the rape kit.

Finally, the wrong choice, including ignoring the handwritten notation

of the rape kit's storage location, filing the Yellow Invoice in the wrong file,

refusing to check one of the few other locations that the Yellow Invoice may have

been found, or submitting an erroneous affirmation to the court that the evidence

was lost or destroyed – all of which could permit a trier of fact to find that the City

failed to train or supervise its employees –, will frequently, if not always, deprive a

39

postconviction defendant of his procedural due process right to access evidence to which he is entitled.  Viewing all facts and the reasonable inferences to be drawn from such facts in favor of Newton, a reasonable jury could conclude that City employees were operating within a system that condoned or encouraged indifferent behavior and that there was "deliberately indifferent training or supervision."  As a result, claim nine against the City for municipal liability stands and the City's motion for summary judgment on this claim is denied.

### D.    Leave to Amend

On June 16, 2009 and July 6, 2009, respectively, Newton filed two motions for leave to file an amended complaint to add as additional defendants in their individual capacity a number of Bronx ADAs, former commanding officers of the PCD, and the OCME employees, to delete claims previously withdrawn or dismissed by the Court, and to modify the Complaint to "conform to the evidence."[134]  However, Newton did not have the benefit of this Opinion or my July 31, 2009 Opinion.[135]  Therefore, Newton should withdraw both motions for leave to amend, without prejudice, and renew the motion or motions, if necessary, after having considered his proposed amended complaint in light of these

---

[134]    *See* 6/16/09 Plaintiff's Motion to Amend the Complaint; 7/6/09 Plaintiff's Second Motion for Leave to Amend the Complaint.

[135]    *See Newton*, 2009 WL 2365412.

Opinions.

## V.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment dismissing plaintiff's fourth, sixth, seventh, eighth, and fifteenth causes of action is granted.  The City's motion for summary judgment dismissing plaintiff's ninth cause of action is denied.  In addition, plaintiff's state-based causes of action against all defendants – claims fourteen and sixteen – remain.

If Newton does not withdraw his motions for leave to amend the complaint, without prejudice to refile, he shall notify the Court in writing by October 19, 2009.  Alternatively, if Newton withdraws his motions, he shall do so no later than October 19, 2009.  If Newton renews his motion to amend, he shall do so no later than November 2, 2009.  Defendants shall file their opposition to the renewed motion to amend by November 16, 2009 and Newton shall file a reply by November 23, 2009.

The Clerk of the Court is directed to close this motion (docket no. 68).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 13, 2009

## - Appearances -

**For Plaintiff:**

John Francis Schutty III, Esq.
Law Office of John F. Schutty
445 Park Avenue, 9th Floor
New York, New York 10022
(212) 836-4796

**For Defendants:**

Arthur Gabriel Larkin III
Fred Michael Weiler
Assistant Corporation Counsel
The New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-1599