UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

ALAN NEWTON,

        Plaintiff,

  - against -

THE CITY OF NEW YORK; DISTRICT
ATTORNEYS MARIO MEROLA AND ROBERT T.
JOHNSON, INDIVIDUALLY, AND IN THEIR
OFFICIAL CAPACITY; ANDREA FREUND AND
VARIOUS JOHN/JANE DOES, INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITIES AS
EMPLOYEES OF THE CITY OF NEW YORK WHO
ARE/WERE ASSISTANT DISTRICT ATTORNEYS
WITHIN THE OFFICE OF THE DISTRICT
ATTORNEY, COUNTY OF BRONX; DETECTIVE
JOANNE NEWBERT, DETECTIVE PHILLIP
GALLIGAN, DETECTIVE [JOHN DOE]
HARTFIELD, DETECTIVE [JOHN DOE] RYAN,
DETECTIVE [JOHN DOE] HARRIS, POLICE
OFFICER DOUGLAS LEHO, POLICE OFFICER
WILLIAM SEAN O'TOOLE, LIEUTENANT
MICHAEL SHEEHAN, SERGEANT PATRICK J.
McGUIRE, POLICE OFFICER [JOHN DOE]
HASKINS, POLICE OFFICER [JANE DOE] KIELY,
INSPECTOR JACK J. TRABITZ AND VARIOUS
JOHN/JANE DOES, INDIVIDUALLY AND IN
THEIR OFFICIAL CAPACITIES AS EMPLOYEES
OF THE CITY OF NEW YORK WHO ARE/WERE
MEMBERS OF THE POLICE DEPARTMENT OF
THE CITY OF NEW YORK,

        Defendants.

--------------------------------------------------------------- X

<u>AMENDED
OPINION AND
ORDER</u>

07 Civ. 6211 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/27/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

Alan Newton was released from prison on July 6, 2006, after more than twenty-two years of incarceration for a rape and assault that DNA testing proved he did not commit. For eleven of those years, Newton repeatedly requested access to the rape kit that contained the ultimately exonerating DNA to no avail – not because Newton was not entitled to the rape kit, but because the government could not find it. As it turned out, the rape kit was in a safe storage location and within the City of New York's (the "City") possession the entire time. What had actually been "lost" was the paper on which the rape kit's storage location had been written – also later found in the City's possession, but misfiled. Misfiling, or "losing," this paper was tantamount to "losing" the rape kit. Without it and its notation of the rape kit's storage location, the rape kit may never have been found. Newton now brings this action against the City, and over a dozen of its officers and employees, on the basis of his erroneous conviction, alleging violations of his civil rights as a result of defendants' investigation, prosecution, and subsequent failure to examine exculpatory evidence. Defendants now move for summary judgment on Newton's five federal and one state-law claims stemming from the City's "loss" and subsequent discovery of the rape kit, which

contained, among other things, semen taken from the body of the victim.[1]  For the

reasons that follow, defendants' motion is granted in part and denied in part.

## II.  FACTS[2]

### A.  The Parties

In the early morning hours of June 23, 1984, a woman whose initials

are V.J.[3] was raped, robbed, and assaulted in the area of Crotona Park, in the

Bronx.[4]  On May 21, 1985, Newton was convicted by a jury of raping, assaulting,

and robbing V.J on the basis of eyewitness testimony and V.J.'s identification of

him as her assailant.[5]  On May 31, 1985, the court sentenced Newton to

---

[1]      Defendants seek partial summary judgment to dismiss plaintiff's
fourth, sixth, seventh, eighth, ninth and fifteenth causes of action to the extent they
survived this Court's July 31, 2009 Opinion and Order granting defendants' partial
motion for summary judgment. *See Newton v. City of New York*, No. 07 Civ. 6211,
2009 WL 2365412 (S.D.N.Y. July 31, 2009).

[2]      The facts in this section are not in dispute and are drawn from
Defendants' Rule 56.1 Statement ("Def. 56.1"), Plaintiff's Counterstatement
Pursuant to Rule 56.1 ("Pl. 56.1"), from the evidence submitted to this Court with
respect to this motion, including declarations and exhibits, and Newton's
Complaint ("Compl.").  Only the facts relating to this motion have been included.
Additional facts were summarized in this Court's July 31, 2009 Opinion and
Order. *See Newton,* 2009 WL 2365412, at *1-5.

[3]      The victim's full name is withheld pursuant to New York's rape
shield law.

[4]      *See* Compl. ¶¶ 50-51.

[5]      *See id.* ¶ 95.

concurrent prison terms of 8 1/3 to 25 years for the rape and robbery charges, followed by a consecutive prison term of 5 to 15 years for the assault.[6] Twenty-two years later, DNA evidence exonerated Newton and his conviction was vacated.[7]

Defendants Sergeant Patrick J. Maguire, civilian clerk Geraldine Kiely, police officer Stacy Haskins, Inspector Jack J. Trabitz – a senior police officer and supervisor – and other "John/Jane Does" were employed by the Property Clerk Division ("PCD") of the New York City Police Department ("NYPD") (collectively, the "PCD Defendants").[8] Defendants Mario Merola and Robert T. Johnson[9] were the elected District Attorneys of Bronx County during the relevant time period (together, the "DA Defendants").[10] Defendants John F. Carroll, Robert Moore, and Rafael Curbelo were Assistant District Attorneys in

---

[6]  *See id.* ¶ 97.

[7]  *See id.* ¶¶ 5, 33-35.

[8]  *See id.* ¶¶ 22-26.

[9]  Newton requests that this motion be stayed pursuant to Federal Rule of Civil Procedure Rule 56(f) so that he may depose Johnson. *See* Plaintiff's Memorandum of Law in Opposition ("Newton Opp.") at 14. This request is rejected for the same reasons this Court rejected the same request previously made by Newton with regard to certain other individuals – *i.e.*, failure to describe the information he seeks and how obtaining such information will generate a genuine issue of material fact. *See Newton,* 2009 WL 2365412, at *12.

[10]  *See* Compl. ¶ 8.

3

the Office of the District Attorney, Bronx County ("DAO") (collectively, the "ADA Defendants," and together with the PCD and DA Defendants, the "Individual Defendants"). The ADA defendants were responsible for conducting the searches for the rape kit.[11] The City was the Individual Defendants' employer at all relevant times.[12]

## B. The NYPD's Invoicing and Transfer Procedures

The NYPD's Property Guide contains written procedures pertaining to the intake and invoicing of property in the NYPD's possession, including items collected in connection with criminal investigations.[13] According to these procedures, a detective must complete an invoice upon the receipt of evidence and submit it to the PCD for logging and storage.[14] The PCD file clerk then distributes a white carbon copy of the invoice to be indexed by borough storage number, another white carbon copy to the Inventory Unit for storage, and a yellow "working copy"– the invoice copy critical to Newton's case – to the PCD to be

---

[11]    *See id.* ¶ 9.

[12]    *See id.* ¶ 11.

[13]    *See* NYPD Property Guide, Property Clerk Division, Ex. D to 6/25/09 Declaration of John Schutty, plaintiff's counsel ("Schutty Decl.") ("Property Guide").

[14]    *See id.* at Procedure Number ("Proc. No.") 201-1.

4

filed in the "Active Yellows File" by invoice number.[15] The yellow invoice

thereafter becomes the sole piece of paper that the NYPD and PCD use to track

the movement of the evidence.[16] The PCD file clerk then makes an entry in a

cross reference index book and files the property transfer receipt.[17] When a piece

of evidence is removed from the PCD – either for testing by the Office of the

Chief Medical Examiner for the City ("OCME") or for court proceedings – a

notation is to be made on the back of the yellow invoice, which is then moved to

the "Out-to-Court" file to await the evidence's return.[18] A similar notation of

removal is made in the Evidence to Court Book.[19] Along with giving the evidence

to the removing person, the window clerk gives the removing person a photocopy

---

[15] *See id.* In addition to these three copies, the PCD clerks distribute a green Evidence Release/Investigatory Copy, a blue Police Officer's Copy, and a pink finder's/prisoner's copy, none of which are relevant to Newton's claims. *See id.*

[16] *See* Deposition of Jack Trabitz, Ex. L to Schutty Decl. ("Trabitz Dep."), at 83. Trabitz's deposition took place over two days. The first day was on February 4, 2009 and the second was April 16, 2009. Because the page numbers for the second deposition began after the last page number of the first deposition "Trabitz Dep." is intended to include both dates.

[17] *See* Property Guide at Proc. No. 201-1.

[18] *See id.* at Proc. No. 211-2.

[19] *See id.*

5

of the yellow invoice.[20]  Upon return of the evidence, the window clerk makes a notation of its return on the back of the yellow invoice, notes the return in the Evidence to Court book, returns the yellow invoice to the Active Yellows File, and returns the evidence to its storage location.[21]

Prior to 2000, the PCD had a practice of destroying white and yellow invoices, even though the evidence "may have been in [the PCD's] custody at that time."[22]  According to Trabitz, once a white *or* yellow invoice was destroyed pursuant to this practice, the PCD "[may not be able to] render a definitive opinion as to whether the evidence was still in the possession, custody, or control of the [PCD]."[23]  The Property Guide also authorizes the "purge" of files containing "rape investigation[]" evidence, including invoices, after five years.[24]

---

[20]     *See id.*

[21]     *See id.* at Proc. No. 211-3.

[22]     Trabitz Dep. at 447-48.

[23]     *Id.* at 442.  *Accord id.* (Q.  So you need both copies of the invoice under the facts as I have presented them to you, to make a definitive response to a request for evidence, correct? . . . . A.  Correct.").

[24]     *Id.* at Proc. No. 211-7.  Although not expressly stated, it is fair to infer that the unwritten practice of destroying invoices was unrelated to procedure 211-7 because Trabitz's testimony regarding this practice occurred on an entirely different day than his testimony regarding procedure 211-7.  *Compare* Trabitz Dep. at 257- 270 (discussing procedure 211-7 on February 4, 2009) *with id.* at 446-454 (discussing the unwritten policy on April 16, 2009).  In fact, procedure 211-7 is not mentioned at all during the second day of the Trabitz deposition.  *See id.*

6

Sometime after 1984 (possibly 1986), because of the increasing

concern of contact with unknown bodily fluids, the NYPD began to send blood

and semen evidence from borough offices to the PCD's Pearson Place Warehouse

("Pearson Place") to be stored in "DOA Barrels" – containers that would safely

seal and contain fluid evidence.[25] After that date, when evidence was removed

from the PCD for testing by the OCME, the OCME would pack the evidence in

DOA Barrels and contact the person who removed the evidence from the PCD to

retrieve it from the OCME and return it to the PCD.[26] If the person who brought

the evidence to the OCME never retrieved it, the OCME staff would contact the

PCD to transfer the DOA Barrel to Pearson Place.[27]

Although the Property Guide contains no written procedures for

intake at Pearson Place or how evidence received in DOA Barrels was to be

processed and recorded by the PCD,[28] a systematic practice was in place. Upon

---

[25] *See* Deposition of Patrick McGuire, Ex. O to Declaration of Fred Weiler, Assistant Corporation Counsel ("Weiler Decl.") and Ex. M to Schutty Decl. ("McGuire Dep."), at 133. The parties have not provided an explanation for the term "DOA," but do not dispute that these barrels are referred to as "DOA Barrels."

[26] *See id.* at 80; Deposition of Patricia Ryan, OCME laboratory director, Ex. O to Schutty Decl. ("Ryan Dep."), at 108.

[27] *See* McGuire Dep. at 80; Ryan Dep. at 165.

[28] *See generally* Property Guide.

receipt of the DOA Barrel from the OCME, the Pearson Place clerk would complete an NYPD "Transfer Sheet/Receipt" acknowledging receipt of the DOA Barrel and the items within it.[29] Then, the clerk would deliver the original Transfer Sheet/Receipt to the OCME agent who delivered the DOA Barrel, tape one copy to the outside of the Barrel to show its contents, dispatch a second copy to the local borough office of the PCD where the evidence was originally registered, and retain a third copy at Pearson Place, along with photocopies of all invoices received with the DOA Barrel.[30]

These invoicing and transfer procedures have inherent problems. For example, in 1991, a consulting company, responding to the NYPD's Request for Proposal, stated in its report that "[a] system like this is extremely prone to clerical errors . . . ."[31] According to an Innocence Project[32] preliminary survey,

---

[29]  *See* McGuire Dep. at 85-88. Although plaintiff has requested the Transfer Sheet/Receipt that would have been created and distributed when DOA Barrel #22 1989 was received at Pearson Place, no such document has been produced. *See* Pl. 56.1 at 30 n.3.

[30]  *See* McGuire Dep. at 85-88.

[31]  5/13/91 CGI Consulting, Inc. Memorandum to the NYPD, Ex. G to Schutty Decl. ("5/13/91 CGI Mem."), at 2.

[32]  "The Innocence Project is a national litigation and public policy organization dedicated to exonerating wrongfully convicted people through DNA testing and reforming the criminal justice system to prevent future injustice." www.innocenceproject.org.

"'while nationally 32 percent of cases were closed because evidence was lost or destroyed, in New York, 50 percent of cases were closed for this reason.'"[33] In addition, Trabitz admits that there were other instances where yellow invoices were lost and never found.[34]

## C. Newton Requests Access to the Rape Kit

Shortly after V.J.'s assault on June 23, 1984, a "Vitullo rape kit" was used to collect physical evidence from V.J.'s body.[35] The rape kit contained pubic and head hair, three cotton swabs, and four microscope slides collected from V.J.[36] The same day the samples were collected in the rape kit, NYPD Detective Joanne

---

[33] Trabitz Dep. at 407-08 (quoting 7/17/06 Letter from Peter Neufeld and Barry Scheck to the Honorable Raymond W. Kelly). The Innocence Project letter was not submitted to the Court, but was introduced as an exhibit at Trabitz's deposition. *See id.* at 406-07.

[34] *See id.* at 422 ("Q. Were searches performed in the course of this Innocence Project investigation, for both white and yellow working copies of the invoices? . . . A. Searches were done for both white and yellow copy. Q. Was it determined that certain yellow working copies of the invoices could not be found? . . . A. Yes, it was determined that certain working copies, yellows, were not able to be found.").

[35] *See* 6/25/09 Declaration of Alan Newton ("Newton Decl.") ¶ 4.

[36] *See* 7/30/84 Police Laboratory Analysis Report, Ex. O to 4/23/09 Declaration of John Schutty, submitted with plaintiff's opposition to defendants' first motion for summary judgment.

Newbert completed invoice number 744483 to register the rape kit.[37]

Newton first requested testing on the rape kit on or about January 29, 1988.[38] At the time, Newton filed a motion in the Supreme Court of the State of New York, Bronx County, requesting only that an independent laboratory test whether semen collected from V.J. and semen stains from her clothing were produced by a "secretor" or a "non-secretor" (and thereafter determine if Newton was a match).[39] On April 6, 1988, Justice Burton Roberts granted Newton's request and ordered DA Merola to "secure and deliver" the rape kit to the OCME, where the independent laboratory could conduct the testing.[40] Pursuant to the court's order, ADA Stacey Edelbaum took possession of the rape kit on May 11,

---

[37]    *See* Property Clerk Division Yellow Invoice No. B744483, Ex. A to Schutty Decl. ("Yellow Invoice") The face of the invoice indicates that the rape kit was received by the PCD and assigned storage numbers. *See id.* (including in the bottom left hand corner of the Yellow Invoice two Bronx Borough Storage Numbers– 84B19041 and 84-10559); Pl. 56.1 ¶ 151.

[38]    *See* Newton Decl. ¶ 8.

[39]    *See id.*

[40]    *See* 4/6/88 Order of Justice Roberts, Ex. A to Schutty Decl., ¶ 3.

10

1988.[41] The rape kit was delivered to the OCME on July 27, 1988.[42] Defendants have not provided an explanation for the rape kit's location from May 1988 to July 1988.[43] Tests on the rape kit were inconclusive for semen within the rape kit.[44] Although it was ADA Edelbaum's responsibility to retrieve the rape kit from the OCME and return it to the PCD, and despite three written requests for return by the PCD to Edelbaum,[45] there is no record that Edelbaum ever retrieved the rape kit from OCME or that the PCD followed up on these requests. Finally, in or around December 1988, the OCME packed the rape kit into DOA Barrel #22 1989 and sent it to Pearson Place for DOA Barrel storage as indicated in the OCME's Property Clerk Book.[46] In addition, a notation to this effect was made on the Yellow Invoice, but the Yellow Invoice was never moved from the Out-to-

---

[41] *See* Yellow Invoice (indicating that the rape kit was delivered to ADA Edelbaum by an NYPD employee named "Monroe" at "1550" hours on May 11, 1988 along with ADA Edelbaum's thumb print, indicating that she took possession).

[42] *See* Ryan Dep. at 69.

[43] *See* Pl. 56.1 ¶ 171.

[44] *See* Ryan Dep. at 77-81.

[45] *See* 6/30/88, 8/31/88, and 7/7/92 Status of Outstanding Property Letter from the PCD to ADA Edelbaum, Ex. A to Schutty Decl.

[46] *See* 1988 OCME Property Clerk Log Book, Ex. J to Schutty Decl., at Entry 585; Ryan Dep. at 111-12.

Court file to the Active Yellows file. It was in DOA Barrel #22 1989 that the rape kit was ultimately found in 2005.[47] The Yellow Invoice was found in the Out-to-Court file in 2009. Among the documents attached to the Yellow Invoice was a notification that Newton had been arrested and a request that "all the vouchers in this case [including the rape kit] be . . . held as arrest evidence."[48]

In 1994, New York enacted subdivision 1-a to New York Criminal Procedure Law section 440.30 ("section 440.30(1-a)(a)"), permitting a postconviction defendant to "request the performance of a forensic DNA test on specified evidence" when moving to vacate a judgment and set aside a sentence. The request "shall" be granted upon a court's "determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant."[49] When section 440.30(1-a)(a) was enacted, the DAO adopted a practice of consenting to requests by defendants

---

[47]    *See* Trabitz Dep. at 222 ("once the property clerk invoice B744483 . . . was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property").

[48]    Arrest Notification, Ex. A to Schutty Decl. *See* Trabitz Dep. at 257-59 ("There is the possibility with an investigatory category that the category is changed . . . . A change of category would change the rules that apply . . . .").

[49]    N.Y. Crim. Proc. L. § 440.30 (1-a)(a).

to test DNA evidence and its ADAs would endeavor to find the evidence and get it tested.[50]

      After section 440.30(1-a)(a) was enacted, Newton made three additional requests to obtain a DNA test of the rape kit that resulted in multiple searches for the rape kit.[51] In each instance, the DAO consented to a search for the rape kit or began a search without objection in accordance with DAO policy and assigned a different ADA to undertake each search.[52] Each of the three ADAs – Carroll, Moore and Curbelo – have testified that they were generally familiar with how to retrieve evidence at the PCD using an invoice or invoice number. However, none of the ADAs were familiar with, or had received any formal training or written materials on, the PCD's system of tracking evidence via

---

[50]     *See* Deposition of ADA John Carroll, Ex. B to Weiler Decl. ("Carroll Dep."), at 45-46.

[51]     *See* Newton Decl. ¶¶ 16-20 (1994 motion filed pursuant to section 440.30(1-a)(a)), 21-24 (1995 habeas corpus petition resulting in 1997 search), 25-34 (1998 motion filed pursuant to section 440.30(1-a)(a)). Newton also made FOIL requests for the rape kit in 1989 and 2002, both of which were denied on procedural grounds. *See id.* ¶¶ 10-11, 35-36. Newton also claims his attorney made a letter request to the Bronx ADA in 1991, but he cannot locate this letter. *See id.* ¶¶ 12-15.

[52]     *See* Def. 56.1 ¶¶ 3, 17, 26; Pl. 56.1 ¶¶ 3, 17, 26, 208, 231, 239.

13

invoice.[53] To begin their search, each ADA consulted the DAO Appeals File to identify the Newton Invoice Number.[54] None of the ADAs recalled whether they saw a photocopy of the Yellow Invoice in the Appeals File. Instead, they speculated that they may have determined the Newton Invoice Number from court documents, briefs and memoranda in the folder.[55] Armed with the Newton Invoice Number, each ADA made several phone calls and/or visits to the PCD, OCME, and Pearson Place to locate the rape kit.[56] Ultimately each search was unsuccessful for either the rape kit *or* the Yellow Invoice. Thus, each ADA submitted an affirmation or letter summarizing his unsuccessful efforts to find the

---

[53] *See* Carroll Dep. at 12, 28-30; Deposition of ADA Robert Moore, Ex. F to Weiler Decl. ("Moore Dep."), at 14; Deposition of ADA Rafael Curbelo, Ex. J to Weiler Decl. and Ex. P to Schutty Decl. ("Curbelo Dep."), at 29-32.

[54] *See* Carroll Dep. at 47; Moore Dep. at 70; Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.

[55] *See id.*

[56] *See* Carroll Dep. at 50, 68 (Carroll made "several" telephone calls to the PCD and Pearson Place, between three and five visits to the PCD, had a "series of backs and forths" with OCME, but was unable to locate the rape kit or the Yellow Invoice); Moore Dep. at 70 (Moore reviewed Carroll's affirmation describing previous efforts to locate the rape kit, made telephone calls to the PCD and Pearson Place, but learned that the rape kit was still missing and no tracking receipts or invoices could be found); Curbelo Dep. at 25-26, 37, 43, 47, 61, 72-73 (Curbelo reviewed Carroll's affirmation and spoke with Moore regarding their unsuccessful attempts to locate the rape kit, visited the PCD several times, and called and wrote employees at Pearson Place a number of times, speaking to Police Officer Haskins and property clerk Kiely).

14

rape kit to the respective court assigned to rule on Newton's requests.[57] Based on

the unsuccessful searches and affirmations submitted to the court, Newton's

requests for a DNA test were denied.[58]

Sergeant McGuire, police officer Haskins, and civilian property clerk

Kiely also assisted in the 1998 search for the rape kit.[59] Although McGuire was

responsible for the intake and storage of evidence, he testified that he had "never

seen [the Property Guide] before" when it was shown to him during his 2009

deposition.[60] Kiely – who considered herself an out to court specialist at Pearson

Place[61] – and Haskins – a police officer who was "administratively reassigned" to

---

[57] *See* 11/1/94 Affirmation of John Carroll, Ex. C to Weiler Decl., ("Carroll Aff.") ¶¶ 6, 7 (noting that he "intend[ed] to consent to defendant's request" and "undertook an extensive investigation" to find the rape kit, but recommended denial of Newton's motion "given the unavailability of the physical evidence"); 4/23/97 Letter from Moore to Magistrate Judge Sharon Grubin, Ex. G to Weiler Decl. ("Moore Letter") (summarizing his unsuccessful attempts to locate the rape kit); 8/17/98 Affirmation of Rafael Curbelo, Ex. K to Weiler Decl., ("Curbelo Aff.") ¶¶ 12, 13 (recommending denial of the motion "given the unavailability of the physical evidence," the source for which was "numerous telephone conversations with" Kiely and Haskins and stating that "rape kits were preserved starting in 1988").

[58] *See* 11/17/94 Order of Justice John J. Byrne, Ex. D to Weiler Decl.; 9/9/98 Order of Justice Byrne, Ex. N to Weiler Decl.

[59] *See* McGuire Dep. at 7, 21-23; Def. 56.1 ¶ 52.

[60] *See* McGuire Dep. at 17.

[61] Deposition of Geraldine Kiely, Ex. N to Schutty Decl. ("Kiely Dep."), at 11.

15

the PCD for disciplinary reasons and subsequently dismissed from the NYPD[62] –
were also involved in the search for the rape kit under McGuire's supervision.
Although Kiely and Haskins was generally familiar with the invoice system and
intake procedures, they did not receive any formal training when they joined the
PCD.[63] Kiely also never received any training regarding the use or storage of the
various copies of invoices or any other documents used to register and track
evidence and was not familiar with the procedures employed by the PCD.[64]

At the conclusion of their unsuccessful search for the Yellow Invoice
or the rape kit, McGuire sent the DAO a letter, in which he stated that the Yellow
Invoice was:

> currently not in its last listed storage location. Property
> generally is removed from its storage location for one of
> two reasons. The first is 'out to court,' and the second is
> destruction. Items that go out to court are indicated on the
> original invoice which is stored *in the active files*.
> Currently there is no original voucher in the active file,
> *therefore it must have been destroyed.*[65]

---

[62] *See* Deposition of Stacy Haskins, Ex. S to Schutty Decl. ("Haskins
Dep."), at 12-15.

[63] *See* Kiely Dep. at 11; Haskins Dep. at 19-20.

[64] *See* Kiely Dep. at 13, 30.

[65] 8/26/98 Letter from Sgt. McGuire to Curbelo, Ex. L to Weiler Decl.
("8/26/98 McGuire Letter") (emphasis added).

McGuire also explained that had the evidence been destroyed, a notation to that effect would have been made on the Yellow Invoice, which would have then been filed in the closed files.[66] However, there was no way to confirm destruction because a fire in the facility in 1995 destroyed the closed files.[67] McGuire also stated that searching for any additional copies of the invoice at the PCD would be a "dead end" because the PCD "destroys inactive records more than six (6) years old."[68] At his deposition, however, McGuire testified that he was not aware that yellow invoices were also kept in the Out to Court File or that such a file existed.[69]

## D. The Rape Kit and Invoice Are Found

On July 15, 2005, pursuant to a request from the Innocence Project, ADA Elisa Koenderman sent a letter to Inspector Trabitz of the PCD requesting a new search for the rape kit, attaching a copy of the Yellow Invoice "for [Trabitz's] convenience."[70] The copy was a photocopy of the Yellow Invoice that could not

---

[66]    *See id.*

[67]    *See id.*

[68]    *Id.*

[69]    *See* McGuire Dep. at 197-98.

[70]    7/15/05 Letter from ADA Koenderman to Trabitz, Ex. H to Schutty Decl.

be located in any of the three prior attempts to find the rape kit.[71]  On the front of this photocopy appears a large, legible, handwritten note: "DOA Barrel #22 1989."[72]  The record is not clear as to how ADA Koenderman came into possession of this photocopy.  Trabitz instructed a colleague to search for the rape kit in DOA Barrel #22 1989; it was in this exact location that the rape kit was found.[73]  The evidence was then tested, the results of which led to Newton's exoneration on July 6, 2006.[74]

On or about January 2009, Trabitz received a photocopy of an "out-to-court" log from the City's Corporation Counsel, indicating that the last notation in the PCD's files of the rape kit's removal was 1988.[75]  Trabitz then directed Sergeant Thomas O'Connor to look for the missing Yellow Invoice in the 1988 Out to Court File at the PCD.[76]  It was here that O'Connor found the Yellow

---

[71]   *See id.*

[72]   *Id.*

[73]   *See* Trabitz Dep. at 222 ("once the property clerk invoice B744483 . . . was provided to me, it gave me the investigative tool that I needed to go and look for and positively retrieve the property.").

[74]   *See* 7/6/06 Order of Justice Byrne.

[75]   *See* Trabitz Dep. at 213-14.

[76]   *See id.*; 4/13/09 Declaration of Sergeant Thomas O'Connor, Ex. E to Schutty Decl. ("O'Connor Decl."), ¶¶ 2-3.

18

Invoice on or about January 31, 2009.[77] No one had previously searched the "out-to-court" files for the Yellow Invoice "because there had been no indication that the Vitullo rape kit was signed out to court until the recent production of the 'out-to-court' receipt."[78] On the front of the Yellow Invoice appears the same handwritten notation "DOA Barrel #22 1989" as the photocopy Koenderman sent to Trabitz. A photocopy of the Yellow Invoice with the DOA Barrel number notation was also found in the Appeals File of the DAO.[79]

## E. Claims

Newton's Complaint asserts twenty-one causes of action. All but eight have since been withdrawn or dismissed. Six of those causes of action allege that the Individual Defendants and the City failed to ensure that the rape kit was properly registered, stored, preserved, maintained, and produced in a timely manner in violation of Newton's constitutional rights.[80] These six causes of action include claims: (1) against the Individual Defendants for losing, misplacing and/or

---

[77]    *See* Trabitz Dep. at 213-14; O'Connor Decl. ¶¶ 2-3.

[78]    O'Connor Decl. ¶ 4.

[79]    *See* Photocopy of Property Clerk Division Yellow Invoice No. B744483, produced from DAO Appeals File, Ex. U to Schutty Decl. ("DAO Photocopy of Yellow Invoice").

[80]    *See* Compl. ¶ 13.

19

secreting the rape kit and conspiring to do so in violation of Newton's due process rights,[81] (2) against Trabitz, Merola, and Johnson for supervisory liability and negligent supervision,[82] and (3) against the City for its policymakers' maintenance of unconstitutional customs, decisions, policies and indifferent employee training or supervision in maintaining, controlling, and producing the rape kit in violation of Newton's due process rights.[83] Defendants move for summary judgment on these six claims and Newton opposes.[84]

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[85] "'An issue of fact is

---

[81]    *See id.* ¶¶ 154-163 (claim four), 213-219 (claim eight).

[82]    *See id.* ¶¶ 176-193 (claim six), 194-212 (claim seven), 273-289 (claim fifteen).

[83]    *See id.* ¶¶ 220-228 (claim nine).

[84]    The remaining two causes of action are state-based claims against all defendants for negligence and intentional infliction of emotional distress. *See id.* ¶¶ 263-272 (claim fourteen), ¶¶ 290-299 (claim sixteen). These causes of action are not at issue in this motion.

[85]    Fed. R. Civ. P. 56(c).

genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[86] "[T]he burden of demonstrating that no material fact exists lies with the moving party. . . ."[87]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[88] To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[89] and it "'may not rely on

---

[86] *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[87] *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[88] *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).

[89] *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

21

conclusory allegations or unsubstantiated speculation.'"[90] However, "'all that is
required [from a non-moving party] is that sufficient evidence supporting the
claimed factual dispute be shown to require a jury or judge to resolve the parties'
differing versions of the truth at trial.'"[91]

In determining whether a genuine issue of material fact exists, the
court must "constru[e] the evidence in the light most favorable to the non-moving
party and draw all reasonable inferences" in that party's favor.[92] However, "[i]t is
a settled rule that '[c]redibility assessments, choices between conflicting versions
of the events, and the weighing of evidence are matters for the jury, not for the
court on a motion for summary judgment.'"[93] Summary judgment is therefore
"appropriate only if there is no genuine issue of material fact and the moving party
is entitled to judgment as a matter of law."[94]

---

[90]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)
(quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[91]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206
(2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49
(1986)).

[92]     *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*,
477 U.S. at 247-50, 255).

[93]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl
v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[94]     *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

22

## B.    Section 1983

Section one of the Civil Rights Act of 1871 – known as section 1983

– states, in relevant part as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress.[95]

Section 1983 "does not create a federal right or benefit; it simply provides a

mechanism for enforcing a right or benefit established elsewhere."[96] "The

purpose of § 1983 is to deter state actors from using the badge of their authority to

deprive individuals of their federally guaranteed rights and to provide relief to

victims if such deterrence fails."[97]

Any form of liability under section 1983 requires the defendant's

---

[95]    42 U.S.C. § 1983.

[96]    *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423
F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816
(1985)). *Accord Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("'[O]ne cannot
go into court and claim a 'violation of § 1983' – for § 1983 by itself does not
protect anyone against anything.'" (quoting *Chapman v. Houston Welfare Rights
Org.*, 441 U.S. 600, 617 (1979))).

[97]    *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

23

direct involvement in causing the alleged damages. "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must p[rove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[98]

## C.    Procedural Due Process

"The Due Process Clause of the Fourteenth Amendment requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest."[99] However, "procedural due process protects only important and substantial expectations in life, liberty and property."[100] "[A]lthough 'liberty and property are broad and majestic terms,' . . . 'the range of interest protected by procedural due process is not infinite.'"[101] In order to establish a due process violation under the Fourteenth Amendment, a plaintiff "must show that he has a 'liberty . . . interest which has been interfered with by the State' and that 'the procedures attendant

---

[98]     *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) (internal citations omitted).

[99]     *Patterson v. City of Utica*, 370 F.3d 322, 329 (2d Cir. 2004).

[100]     *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 164 (2d Cir. 2001).

[101]     *Spanierman v. Hughes*, 576 F. Supp. 2d 292, 301-02 (D. Conn. 2008) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 571-72 (1972)).

24

upon that deprivation were [not] constitutionally sufficient.'"[102]

## D. Qualified and Absolute Immunity

Government officials performing discretionary functions are generally granted qualified immunity and are immune from suit provided that "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[103] The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful."[104]

In addition, prosecutors enjoy absolute immunity for "prosecutorial actions that are 'intimately associated with the judicial phase of the criminal process.'"[105] "[A]bsolute immunity may not apply when a prosecutor is not acting

---

[102] *Williams v. Town of Greenburgh*, 535 F.3d 71, 74-75 (2d Cir. 2008) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)) (alterations in original).

[103] *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)).

[104] *Id.* (quotation marks and citation omitted).

[105] *Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).

as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks."[106]

## E. Municipal Liability

For a person deprived of a constitutional right to have recourse against a municipality under section 1983, he or she must show harm that results from an identified municipal "policy," "custom," or "practice."[107] In other words, a municipality may not be found liable simply because one of its employees or agents is guilty of some wrongdoing.[108] Moreover, a policy, custom, or practice cannot arise from a single instance of unconstitutional conduct by an employee of the municipality.[109]

Because vicarious liability is inconsistent with section 1983's causation requirement,[110] "the 'official policy' requirement was intended to

[106]   *Id.* (quoting *Gregoire v. Biddle*, 117 F.2d 579, 581 (2d Cir. 1949)).

[107]   *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). *Accord Board of County Comm'rs v. Brown*, 520 U.S. 397, 402 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-81 (1986).

[108]   *See Brown*, 520 U.S. at 405.

[109]   *See Tuttle*, 471 U.S. at 831 (Brennan, J., concurring in part and concurring in the judgment) (stating that "[t]o infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*." ).

[110]   *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988).

distinguish acts of the municipality from acts of municipal employees, and thereby

make clear that municipal liability is limited to actions for which the municipality

is actually responsible."[111]  The Supreme Court has emphasized that:

> [I]t is not enough for a § 1983 plaintiff merely to identify
> conduct properly attributable to the municipality. The
> plaintiff must also demonstrate that, through its deliberate
> conduct, the municipality was the "moving force" behind
> the injury alleged. That is, a plaintiff must show that the
> municipal action was taken with the requisite degree of
> culpability and must demonstrate a direct causal link
> between the municipal action and the deprivation of federal
> rights.[112]

In the absence of an established written policy of the municipality, a plaintiff must

prove that a certain practice of a municipality is so "'persistent or widespread' as

to constitute 'a custom or usage with the force of law,'"[113] or that a practice or

custom of subordinate employees was "so manifest as to imply the constructive

acquiescence of senior policy-making officials."[114]

---

[111]  *Pembaur*, 475 U.S. at 479. *See also Nicholson v. Scoppetta*, 344 F.3d
154, 165 (2d Cir. 2003) (explaining that plaintiff must show that municipality is
actually responsible for her injury).

[112]  *Brown*, 520 U.S. at 404.

[113]  *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (quoting
*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)).

[114]  *Id.* (quoting *Sorlucco v. New York City Police Dept.*, 971 F.2d 864,
871 (2d Cir. 1992)).

27

## F.    Negligent Supervision

To state a claim for negligent supervision under New York law, a
plaintiff must first demonstrate that an employee was negligent. The plaintiff
must then allege "(1) that the tort-feasor and the defendant were in an
employee-employer relationship; (2) that the employer 'knew or should have
known of the employee's propensity for the conduct which caused the injury'
prior to the injury's occurrence; and (3) that the tort was committed on the
employer's premises or with the employer's chattels."[115] "It is well settled under
New York law that '[a] claim for negligent hiring or supervision can only proceed
against an employer for an employee acting outside the scope of her
employment.'"[116]

## IV.    DISCUSSION

### A.    Due Process

In June of this year, the Supreme Court decided *District Attorney's
Office for the Third Judicial District v. Osborne,* addressing a question sharing

---

[115]    *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citing
*D'Amico v. Christie*, 71 N.Y.2d 76, 87 (1987)) (quoting *Kenneth R. v. Roman
Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 793 (2d Dep't 1997)).

[116]    *Perkins v. City of Rochester*, 641 F. Supp. 2d 168, 174-75 (W.D.N.Y.
2009) (quoting *Stokes v. City of New York*, No. 05 Civ. 0007, 2007 WL 1300983,
at *14 (E.D.N.Y. May 3, 2007)). *Accord Colodney v. Continuum Health Partners,
Inc.*, No. 03 Civ. 7276, 2004 WL 829158, at *8 (S.D.N.Y. Apr. 15, 2004).

28

some similarities to the one presented here.[117]  Osborne brought a section 1983

action to compel the release of biological evidence so that it could be subjected to

DNA testing.[118]  Osborne claimed both a substantive and procedural due process

right to the evidence under the Federal Constitution and a procedural due process

right stemming from an Alaskan state statute that provided for postconviction

access to evidence.[119]  The Supreme Court expressly rejected Osborne's argument

that postconviction defendants have a substantive or procedural due process right

to postconviction DNA testing.[120]  However, the Court found that when a state

enacts a statute providing postconviction defendants access to evidence and a

procedure for accessing such evidence, the state has created a liberty interest that

is entitled to due process protection.[121]  However, federal courts are only to

intervene in the state's administration of access where the state's procedures for

---

[117]     *See* 129 S. Ct. 2308, 2320 (2009).

[118]     *See id.* at 2315.

[119]     *See id.*

[120]     *See id.* at 2322.

[121]     *See id.* at 2320. *Accord Williams*, 535 F.3d at 75 ("Liberty interests 'may arise from two sources – the Due Process Clause itself and the laws of the States.'") (quoting *Thompson*, 490 U.S. at 460); *Meachum v. Fano*, 427 U.S. 215, 226 (1976) (holding that once a state imposes limitations on its own discretion and requires that a specific standard prevail for decisionmaking, it creates a liberty interest "regardless of whether the limits stem from statute, rule or regulation").

29

postconviction relief "'offend[ ] some principle of justice so rooted in the

traditions and conscience of our people as to be ranked as fundamental,' or

'transgress[ ] any recognized principle of fundamental fairness in operation.'"[122]

The Supreme Court further determined that fault could not be found

with Alaska's procedures, noting that there was "nothing inadequate about the

---

[122] *Osborne*, 129 S. Ct. at 2320 (quoting *Medina v. California*, 505 U.S. 437, 446 (1992)). *See also id.* ("Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided."). Newton argues that the Second Circuit's decision in *McKithen v. Brown*, 481 F.3d 89 (2d Cir. 2007), mandates the application of the less burdensome standard of *Mathews v. Eldridge*, 424 U.S. 319 (1976). The *Mathews* standard arose from a due process challenge to the adequacy of administrative procedures prior to terminating disability benefits. It requires the court to balance three factors: "First, the private interest that will be affected by the government action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. In *McKithen*, the Second Circuit – after holding that the district court had subject matter jurisdiction to adjudicate similar claims under section 1983 – directed the district court to evaluate whether section 440.30(1-a)(a) gave rise to a liberty interest and, if so, to apply *Mathews* – not *Medina* – to determine whether the state had infringed on that liberty interest in violation of the plaintiff's procedural due process rights. *See McKithen*, 481 F.3d at 107. Because the Second Circuit's direction to apply *Mathews* was not necessary to its determination that the district court had subject matter jurisdiction, it is dicta. *See Alsol v. Mukasey*, 548 F.3d 207, 218 (2d Cir. 2008) (finding a portion of a prior Second Circuit decision dictum where it was "not necessary to [the Second Circuit's] holding"). As a result, I am bound by the Supreme Court's decision in *Osborne* that the higher *Medina* standard applies. Given, however, that Newton satisfies the *Medina* standard, he would likely satisfy the lesser *Mathews* standard.

procedures Alaska has provided to vindicate its state right to postconviction relief in general, and nothing inadequate about how those procedures apply to those who seek access to DNA evidence."[123] The Supreme Court expressly noted that its ability to evaluate Alaska's procedures was limited because Osborne had not pursued those procedures to test their adequacy.[124] The Court noted that

> [i]t is difficult to criticize the State's procedures when Osborne has not invoked them . . . . [I]t is Osborne's burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief. These procedures are adequate on their face, and *without trying them, Osborne can hardly complain that they do not work in practice.*[125]

There is no question after *Osborne* that section 440.30(1-a)(a) conferred on Newton a liberty interest in vacating his conviction by accessing evidence in the state's possession for the purpose of DNA testing. Furthermore,

---

[123]   *Osborne*, 129 S. Ct. at 2320.

[124]   *See id.* at 2321 (noting that Osborne had "sidestep[ed]" state procedures in favor of a federal cause of action).

[125]   *Id.* (citations omitted) (emphasis added). *Accord In re Smith*, No. 07 Civ. 1220, 2009 WL 3049202, at *2 (6th Cir. Sept. 24, 2009) ("[*Osborne*] held that, at most, a prisoner *may* have a *procedural* due process right to the proper application of a state-created right." (citing *Osborne*, 129 S. Ct. 2319-20)); *Jackson v. Clarke*, No. 07 Civ. 56510, 2009 WL 2222592, at *1 (9th Cir. July 27, 2009) ("[T]o state a due process claim, [plaintiff] must allege that he has a substantive right to postconviction relief under state law, and that the state's post conviction relief procedures 'are fundamentally inadequate to vindicate' that right." (quoting *Osborne*, 129 S. Ct. at 2320)).

as in *Osborne*, New York's procedures for obtaining such access, on their face, appear to comport with recognized principles of fundamental fairness. Under New York law, a postconviction defendant need only make a motion requesting access to evidence for DNA testing. The DAO then consents to access or a court must make a determination as to whether the defendant can show a "reasonable probability that the verdict would have been more favorable to him had the DNA test results been admitted into evidence at trial."[126]

However, on the question of procedural adequacy in operation, Newton's case and *Osborne* sharply diverge. In *Osborne*, the plaintiff failed to test, in practice, Alaska's procedures for accessing the requested evidence. Newton has tested New York's procedures and has shown them to fail. The Supreme Court has recognized that fundamental fairness requires that once a state creates a statutory right and puts procedures in place to protect that right, those

---

[126]    N.Y. Crim. Proc. L. § 440.30 (1-a)(a). *Accord Fuentes v. Superintendent, Great Meadow Corr. Facility*, No. 04 Civ. 0737, 2009 WL 2424206, at \*9 (E.D.N.Y. Aug. 5, 2009) (finding no procedural due process violation in light of *Osborne* where state court denied postconviction defendant's request for access to evidence for DNA testing under section 440.30(1-a)(a) upon the state court's determination that the defendant had failed to show the requisite reasonable probability and noting that the Alaskan procedures considered in *Osborne* were "less friendly to convicted criminals than the New York procedures at issue here").

procedures must comport with due process in application.[127] The Supreme Court

has also recognized in well-known cases such as *California v. Trombetta* and

*Brady v. Maryland* that fundamental fairness requires that when the government is

in possession of material exculpatory evidence, it must disclose the existence of

such evidence and produce it to the defendant.[128] However, *Osborne* held that

---

[127] *See Evitts v. Lucey*, 469 U.S. 387, 399-401 (1985) (holding that if a state chooses to dismiss an appeal when an incompetent attorney has violated local rules, it may do so only if such action does not intrude upon the client's due process rights, noting that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution – and, in particular, in accord with the Due Process Clause"); *Morrissey v. Brewer*, 408 U.S. 471, 488-89 (1972) (recognizing that states have the responsibility of establishing procedure regarding parole revocation hearings, but that such procedures must comport with "the minimum requirements of due process"); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (recognizing that although a state may choose whether to institute a welfare program, it must operate whatever programs it does establish subject to the protections of the due process clause).

[128] *See, e.g.*, *Trombetta*, 467 U.S. 479, 485 (1984) ("[C]riminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence.") (quotation marks omitted) (collecting cases); *United States v. Agurs*, 427 U.S. 97, 112 (1976) (holding that even in the absence of a defendant's specific request, the prosecution has a constitutional duty to produce exculpatory evidence that would raise a reasonable doubt about the defendant's guilt); *Brady*, 373 U.S. 83, 87 (1963) (holding that a defendant has a constitutionally protected right to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed).

these preconviction cases are not an appropriate framework for determining whether a state's procedures are adequate under the Due Process Clause.[129] Although *Osborne's* holding does not necessarily mean that the principle of fundamental fairness these preconviction cases seek to protect no longer exists postconviction, it does call into question the appropriateness of relying on this principle of fundamental fairness in Newton's case. I therefore rely on the principle of fundamental fairness that arises when a state creates procedures to protect a statutory right that implicates constitutional rights.

Newton had a right of access pursuant to the DAO's policy of consent and the stated intent of each ADA to consent in Newton's case.[130] Nevertheless, Newton was denied access to the rape kit for DNA testing – not because a state court made a fully informed determination that he was not entitled

---

[129]     *See Osborne*, 129 S. Ct. at 2320 ("Obsorne's right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. *Brady* is the wrong framework.").

[130]     Defendants do not dispute that Newton had a legal entitlement to the rape kit under section 440.30(1-a)(a) as required for a due process claim. *See N.Y. State Nat'l Org. for Women*, 261 F.3d at 164 ("'Process is not an end in itself. Its constitutional purpose is to protect a *substantive interest* to which the individual has a legitimate claim of entitlement.'") (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983)). Defendants' argument is that this legal entitlement did not give rise to a federal cause of action under section 1983. *See* Defendants' Reply Memorandum of Law at 1.

to it – but because the City and the Individual Defendants could not find the rape

kit even though it was always in the City's possession. Newton has offered

evidence that his continued, wrongful, imprisonment for twelve years after his

first request for the rape kit in 1994 was a direct result of the City's failure to

create and enforce a coherent evidence management system. As a result, Newton

has raised a question of material fact as to whether New York's procedures for

access to evidence for DNA testing violated principles of fundamental fairness

such that he was wrongfully deprived of his right to procedural due process.

This holding does not confer a due process right to access evidence

for DNA testing on all postconviction defendants. To do so would directly

contradict *Osborne*. Rather, once a state determines that a postconviction

defendant is entitled to evidence under section 440.30(1-a)(a), the defendant's due

process rights have been violated if attempts to locate the evidence are frustrated

due to a poor or non-existent evidence management system.[131]

---

[131]   Contrary to defendants' assertion, *Arizona v. Youngblood* does not
apply and Newton is not required to provide evidence from which a jury could
reasonably conclude that defendants acted in bad faith. *See* Defendants'
Memorandum of Law in Support at 4-9 (citing 488 U.S. 51 (1988)). Expressly
distinguishing *Brady v. Maryland* – which makes the good or bad faith of the State
irrelevant when the State fails to disclose to the defendant *known* materially
exculpatory evidence – *Youngblood* deals exclusively with the due process
implications of "the failure of the State to preserve evidentiary material of which
no more can be said than that it *could have been* subject to tests, the results of
which *might have* exonerated defendant."488 U.S. at 57 (emphasis added) (noting

## B.   Qualified and Absolute Immunity

Although the Individual Defendants are assumed to have been aware that section 440.30(1-a)(a) required them to locate the rape kit for DNA testing upon court order or DAO consent, at the time the Individual Defendants were searching for the rape kit, Newton's procedural due process right to access the rape kit had not yet been clearly established by the Second Circuit or the Supreme Court.  In 2007 – two years after the rape kit was found – the Second Circuit declined to address whether a federal due process right was created by the rights conferred by section 440.30(1-a)(a) and, instead, tasked the district court with this determination.[132]  The Supreme Court did not address this question until *Osborne* in 2009.  Without clear Supreme Court or Second Circuit authority on point, the

---

that part of the Court's rationale for treating a destruction of evidence case differently from a *Brady* case is that "'[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are *unknown and, very often, disputed.*'" (quoting *Trombetta*, 467 U.S. at 486) (emphasis added)).  This case is wholly distinguishable from the facts and rationale in *Youngblood* as the evidence in Newton's case *was preserved* and there is no question as to the exculpatory value of the rape kit – the bodily fluids it contained were tested for DNA and the results exonerated Newton.  As a result, there is no need for an assessment of bad faith under *Youngblood.*

[132]     *See McKithen*, 481 F.3d at 106 ("The district court, on remand, must, therefore, first consider whether this residual post-conviction liberty interest encompasses an interest in accessing or possessing potential exonerative biological evidence.").

Individual Defendants cannot be said to have been on notice of Newton's federal due process rights or the fact that they faced potential personal liability for violating those rights – thus, entitling all Individual Defendants to qualified immunity.

Newton erroneously argues that the Individual Defendants are not entitled to qualified immunity because "with the enactment of CPL § 440.30, plaintiff had the admitted, statutory right to request and receive the exculpatory rape kit, and no state actor performing under New York State law may claim ignorance of that law . . . ."[133] However, the existence of a state statutory right is irrelevant – the inquiry is whether a *federal* right had yet been recognized.[134] Because it had not, the Individual Defendants are entitled to qualified immunity and their respective motions for summary judgment are granted in their entirety.[135]

---

[133]    Newton Opp. at 9.

[134]    *See Davis v. Scherer*, 468 U.S. 183, 190-91 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").

[135]    Because supervisory liability imposes personal liability, Newton's Sixth and Seventh claims for supervisory liability against Sheehan, Trabitz, Merola and Johnson are also dismissed under qualified immunity. *See Poe v. Leonard*, 282 F.3d 123, 124 (2d Cir. 2002) (finding that a supervisory official is protected by qualified immunity unless both the federal right and the basis of supervisory liability were clearly established). The dismissal of Newton's federal claims against the Individual Defendants on qualified immunity grounds has no bearing on the question of whether the Individual Defendants are entitled to qualified

37

In addition, all DA and ADA Defendants are entitled to absolute

immunity. On November 13, 2009, the Second Circuit decided *Warney v. Monroe*

*County.*[136] In *Warney* – a case that also involved post-conviction requests for

DNA testing – the Circuit held that, "absolute immunity shields [a prosecutor's]

work performed during a post-conviction collateral attack, at least insofar as the

challenged actions are part of the prosecutor's role as an advocate for the state."[137]

Newton asserts that the conduct alleged – negligence in failing to locate a rape kit

for DNA testing – is not "intimately associated with the judicial process," but

rather, is administrative or ministerial in nature.[138] In *Warney,* the Second Circuit

was presented with – and rejected – just such an argument, concluding "that it is

unhelpful to ascertain the prosecutors' functional role by isolating each specific

act done or not done; rather, a prosecutor's function depends chiefly on whether

there is pending or in preparation a court proceeding in which the prosecutor acts

---

immunity for Newton's state-law claims. Newton's state-law claims against the
Individual Defendants remain.

[136]    *See* 587 F.3d 113 (2d Cir. 2009).

[137]    *Id.* at 122.

[138]    Plaintiff's Memorandum of Law Filed in Response to the Court's
Order to Show Cause Dated November 13, 2009 Requesting Briefs on the Second
Circuit's Recent Decision in *Warney v. Monroe County* at 1.

as an advocate."[139] The Circuit also noted that "a prosecutor enjoys absolute immunity even when doing an administrative act if the act is done in the performance of an advocacy function."[140]

Each ADA Defendant searched for the rape kit in connection with Newton's section 440.30(1-a)(a) motions and made written submissions to the court on the results of these searches. These are acts done in the performance of an advocacy function. Accordingly, the ADA Defendants are entitled to absolute immunity. As supervisors of the ADA Defendants, the DA Defendants are also entitled to absolute immunity.[141]

## C.    Municipal Liability[142]

Newton first asserts that the City is subject to liability on a failure to train or supervise theory. Despite the multitude of ways that the City's evidence

---

[139]    *Warney*, 587 F.3d at 123. *Accord id.* at 124 ("The proper and useful focus for ascertaining the function being served by a prosecutor's act is . . . on the pendency of court proceedings that engage a prosecutor as an advocate for the state.").

[140]    *Id.* at 124 (citing *Van de Kamp,* 129 S. Ct. 855).

[141]    *See Van de Kamp*, 129 S. Ct. at 862-63.

[142]    "While [ ] individual defendants are entitled to qualified immunity, the City is not. . . . [This] ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Tenenbaum v. Williams*, 193 F.3d 581, 597 (2d Cir. 1999).

management regulations and procedures were violated by its employees, this theory is not viable because Newton had no "clearly established" federal due process right at the time of the alleged violation.[143]

Newton next offers a theory of municipal liability based on policy, custom, or practice. Newton contends that the City had a policy, custom, or practice of destroying invoices without destroying the corresponding evidence, with the result that PCD employees were unable to determine when and if evidence was destroyed if invoices for the evidence could not be located.[144] Trabitz stated at his deposition that he was aware that prior to 2000 the PCD had a practice of destroying white and yellow invoices without destroying the evidence to which the invoices corresponded.[145] Trabitz further admitted that once a white or yellow invoice was destroyed, the PCD may not know whether it still had the

---

[143]     *Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998) (holding that "a claim for failure to train cannot be sustained unless the employees violated a *clearly established* federal constitutional right") (emphasis added).

[144]     *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Reconsideration and/or Reargument Dated November 16, 2009 ("Pl. Reconsideration Opp.") at 9. Although this alleged policy, custom, or practice is not unconstitutional, it may form the basis for Newton's *Monell* claim provided that it satisfies the remaining municipal liability requirements. *See Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 326 (2d Cir. 1986) ("[A] policy that is not itself unconstitutional may provide the basis for municipal liability.").

[145]     *See* Trabitz Dep. at 447-48.

evidence.[146] Trabitz has since "instructed [his] subordinates not to destroy any

invoices regarding property in the custody of the [PCD]."[147] Although Newton's

invoice was not destroyed pursuant to this policy, custom, or practice, a

reasonable trier of fact could conclude that when PCD employees were unable to

find Newton's yellow invoice, they assumed the rape kit had been lost or

destroyed, when, in actuality, the PCD was unable to conclusively determine that

fact.[148] Thus, Newton has raised a material question of fact regarding whether the

implementation of the policy, custom, or practice regarding the maintenance of

invoices that would allow the PCD to track the location of evidence caused the

City to violate Newton's constitutional rights.

        To demonstrate that this is a persistent or widespread policy, custom,

or practice, Newton first relies on a letter from the Innocence Project, which states

that, according to a "'preliminary analysis of its closed cases,'"[149] "'while

---

[146]    *See id.* at 442.

[147]    *Id.* at 447.

[148]    *See* 8/26/98 McGuire Letter (informing the DAO that "[c]urrently there is no original voucher in the active file, *therefore it must have been destroyed*") (emphasis added); Carroll Aff. ¶¶ 6-7 (noting that the rape kit was unavailable); Moore Letter (same); Curbelo Aff. ¶¶12-13 (same).

[149]    "Closed cases" appears to mean that, after learning that evidence had been lost or destroyed, the Innocence Project stopped pursuing the evidence on behalf of the convicted individual. *See* Trabitz Dep. at 407-08.

41

nationally 32 percent of cases were closed because evidence was lost or destroyed, in New York, 50 percent of cases were closed for this reason.'"[150] Next, Newton points out that Trabitz testified that there are other cases for which the yellow invoice is lost or missing.[151] This evidence is sufficient to show a persistent or widespread policy, custom, or practice of inconsistently destroying invoices and evidence, resulting in the inability to determine when and if evidence was destroyed if a yellow invoice for the evidence could not be found. Thus, the City's motion for summary judgment on Newton's *Monell* claim is denied.[152]

### D. Negligent Supervision

Newton's fifteenth cause of action asserts that Trabitz, Merola, and Johnson should be liable for their failures to adequately supervise their

---

[150]    *Id.* (quoting 7/17/06 Letter from Peter Neufeld and Barry Scheck to the Honorable Raymond W. Kelly).

[151]    *See id.* at 422.

[152]    Newton alleges two additional theories based on policy, custom, or practice. The first is based on the City's refusal to replace its paper invoice system when it "became [ ] clear that it was antiquated" and caused "clerical errors." Pl. Reconsideration Opp. at 9. This theory is subsumed in the policy, custom, or practice discussed above. The second, based on written procedure 211-7, fails because the procedure applies only to "rape investigation[]" evidence and Newton's rape kit was classified as "arrest" evidence. Pl. Reconsideration Opp. at 9; Property Guide at Proc. 211-7; Arrest Notification. *See also* Trabitz Dep. at 257-259.

employees.[153]  However, Newton cannot demonstrate that any PCD, OCME,

NYPD, or DAO employee acted outside the scope of his or her employment or, in

the alternative, that Trabitz, Merola, or Johnson knew or should have known of

any employee's misconduct.  Moving evidence, documenting any movement,

filing yellow invoices, searching for evidence, and reporting the details of a search

and its results to the court, are activities within the scope of PCD, OCME, NYPD,

or DAO employment.  Evidence of employees' negligence in undertaking these

tasks is not sufficient to demonstrate that their conduct was outside the scope of

their employment.[154]

    Even if Newton could demonstrate that an employee had acted

_____

    [153]    Because Newton's opposition papers do not address defendants'
motion for summary judgment on his negligent supervision claim, the claim is
deemed abandoned and summary judgment could be granted on that basis alone.
*See* Pl. Opp. at 11-14 (addressing only the federal supervisory liability claims
brought against Trabitz and Johnson); *Bellegar de Dussuau v. Blockbuster, Inc.*,
No. 03 Civ. 6614, 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (finding claim
abandoned by virtue of plaintiff's failure to address it in opposition to defendant's
summary judgment motion on the claim); *Arias v. NASDAQ/AMEX Mkt. Grp.*, No.
00 Civ. 9827, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (same).
Nevertheless, I have examined the merits of the claim and conclude that summary
judgment must be granted.

    [154]    *See Karoon v. New York City Transit Auth.*, 659 N.Y.S.2d 27, 29 (1st
Dep't 1997) (demonstrating that an employee can be negligent, but still act within
the scope of her employment, stating that "if the employee was negligent, the
employer must pay the judgment regardless of the reasonableness of the hiring or
retention or the adequacy of the training").

43

outside the scope of his employment, Newton has adduced no evidence to show that Trabitz, Merola, or Johnson knew or should have known of that employee's propensity to take such action, or that they were responsible for the hiring procedures that resulted in the hiring of a particular employee.[155] Accordingly, these defendants are entitled to summary judgment on Newton's negligent supervision claim.

## V. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment dismissing plaintiff's fourth, sixth, seventh, eighth, and fifteenth causes of action is granted. The City's motion for summary judgment dismissing plaintiff's ninth cause of action is denied. In addition, plaintiff's state-law claims against all defendants – claims fourteen and sixteen – remain.

The Clerk of the Court is directed to close this motion (docket no. 68). A conference is scheduled for February 3, 2010 at 3:00 p.m. in Courtroom 15C.

---

[155] *See Honohan v. Martin's Food of S. Burlington Inc.*, 679 N.Y.S.2d 478 (3d Dep't 1998) (granting summary judgment for employer on plaintiff's negligent supervision claim where plaintiff failed to demonstrate that employer had any notice of employee's unlawful conduct).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
             January 27, 2010

## - Appearances -

**For Plaintiff:**

John Francis Schutty III, Esq.
Law Office of John F. Schutty
445 Park Avenue, 9th Floor
New York, New York 10022
(212) 836-4796

**For Defendants:**

Arthur Gabriel Larkin III
Fred Michael Weiler
Assistant Corporation Counsel
The New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-1599