UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------------X

ALAN NEWTON,                                                          :      07-CV-6211
                                                                     :        (SAS)
                                        Plaintiff,                    :
                        -against-                                    :
                                                                     :
THE CITY OF NEW YORK; DISTRICT ATTORNEY                              :      **AMENDED**
ROBERT T. JOHNSON, INDIVIDUALLY, AND IN HIS                          :      **COMPLAINT**
OFFICIAL CAPACITY; STACEY EDELBAUM, JOHN F.                          :
CARROLL, ROBERT L. MOORE, RAFAEL CURBELO,                            :
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY AND                         :
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF                         :      **JURY TRIAL**
THE CITY OF NEW YORK WHO ARE/WERE ASSISTANT                          :      **DEMANDED**
DISTRICT ATTORNEYS WITHIN THE OFFICE OF THE                          :
DISTRICT ATTORNEY, COUNTY OF BRONX; PATRICIA                         :
RYAN, INDIVIDUALLY, AND IN HER OFFICIAL CAPACITY                     :
AS DIRECTOR OF THE SEROLOGY LABORATORY OF THE                        :
OFFICE OF THE CHIEF MEDICAL EXAMINER, PATRICK                        :
BUFFALINO, AND VARIOUS JOHN/JANE DOES,                               :
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS                     :
EMPLOYEES OF THE CITY OF NEW YORK AND MEMBERS                        :
OF THE OFFICE OF THE CHIEF MEDICAL EXAMINER;                         :
DETECTIVE JOANNE NEWBERT, DETECTIVE BERNARD                          :
RYAN, DETECTIVE ROLAND HARRIS, POLICE OFFICER                        :
DOUGLAS LEHO, POLICE OFFICER WILLIAM SEAN                            :
O'TOOLE, LIEUTENANT MICHAEL SHEEHAN, SERGEANT                        :
PATRICK J. McGUIRE, POLICE OFFICER TRACY HASKINS,                   :
GERALDINE KIELY, DEPUTY CHIEF JACK J. TRABITZ,                       :
DEPUTY INSPECTOR JOHN P. HIGGINS, DEPUTY                             :
INSPECTOR BRUCE J. MAJOR, CAPTAIN DONALD                             :
HACKSON, CAPTAIN JEROME NATHANSON, SERGEANT                          :
GEORGE KUTTLER, SERGEANT BRUCE KESSLER,                              :
SERGEANT ADRIAN MERRICK, SERGEANT COLLEEN                            :
DUNDAS, SERGEANT PATRICIA BRANDOW, LIEUTENANT                        :
WALTER SMITH, LIEUTENANT PATRICK McKEON,                            :
LIEUTENANT ANTHONY RUSSO, LIEUTENANT DAVID                           :
DEANGELIS, AND VARIOUS JOHN/JANE DOES,                               :
INDIVIDUALLY, AND IN THEIR OFFICIAL CAPACITIES AS                    :
EMPLOYEES OF THE CITY OF NEW YORK WHO ARE/WERE                       :
MEMBERS OF THE POLICE DEPARTMENT OF THE CITY OF                      :
NEW YORK,                                                            :
                                                                     :
                                        Defendants.                  :
-------------------------------------------------------------------------------------X

Plaintiff, Alan Newton, by and through his attorney, John F. Schutty of The Law Office of John F. Schutty, P.C., complaining of the Defendants, respectfully alleges:

## JURISDICTION & VENUE

1.      This action arises under the Constitution of the United States, particularly the First, Fourth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States through the Civil Rights Act, Title 42 U.S.C. §§ 1983 and 1988, as well as Article I, §§ 1, 5, 6, 9 and 11 of the New York State Constitution, for the violation of Plaintiff Alan Newton's civil rights.

2.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

3.      This Court also has supplemental, ancillary and pendant jurisdiction to adjudicate all claims asserted under state law herein under 28 U.S.C §§ 1367.

4.      The acts and transactions constituting the civil rights violations occurred in the County of the Bronx, in the Southern District of New York.   In addition, Defendants reside, are found, have agents, or transact their affairs in the Southern District of New York.   Venue is therefore, proper in this district pursuant to 28 U.S.C. §§ 1391 (b).

## THE PARTIES

5.      Plaintiff Alan Newton was, at the time of most of the acts alleged herein, a citizen of the United States and resident of the County of Bronx at 1330 Webster Avenue, Apt. 21K.   At the time of some of the acts alleged herein he was housed at various correctional facilities within the State of New York.   Plaintiff presently resides at 454 Glenwood Avenue, East Orange, NJ 07017.

6.      At all times referred to herein, Defendant The City of New York ("The City") was and still is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York, and situated within the Southern District of New York.

7.      At all times referred to herein, the Police Department of the City of New York (hereinafter "NYPD") was and still is an agency or instrumentality of The City, situated within the Southern District of New York.  The NYPD did not and does not have a legal identity separate and apart from Defendant The City.

8.      At all times referred to herein, Defendant Robert T. Johnson was the elected District Attorney of Bronx County for The City (hereinafter "DA Johnson"), and Andrea Freund, Esq. (hereinafter "ADA Freund"), Defendants Stacey Edelbaum, Esq. (hereinafter "ADA Edelbaum"), John F. Carroll, Esq. (hereinafter "ADA Carroll"), Robert L. Moore, Esq. (hereinafter "ADA Moore"), Rafael Curbelo, Esq. (hereinafter "ADA Curbelo"), and various John/Jane Doe Assistant District Attorneys (hereinafter "ADA John/Jane Does"), were Assistant District Attorneys in the Office of the District Attorney, County of Bronx.

9.      Upon information and belief, at all relevant times, Defendants DA Johnson, ADA Freund, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, and various ADA John/Jane Does, were acting within the scope of their employment as District Attorneys or Assistant District Attorneys for the State of New York.

10.     Upon information and belief, at all relevant times, Defendants DA Johnson, ADA Freund, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, and various ADA John/Jane Does, were acting under the color and pretense of the statutes,

ordinances, regulations, customs, and usages of the City and State of New York and under the authority of the Bronx District Attorney's Office.

11.     At all times referred to herein, Defendant The City, by its agents, servants, and representatives, was responsible for the operation, maintenance and control of the NYPD, the Office of the Chief Medical Examiner, and the Bronx County District Attorney's Office and the selection, training, supervision, evaluation and disciplining of personnel within these three offices.

12.     At all times referred to herein, Defendant DA Johnson, as the District Attorney for Bronx County, was the responsible policy maker for Defendant The City and the State of New York with respect to the management of the Bronx County District Attorney's Office.

13.     At all times referred to herein, Defendants DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, and various ADA John/Jane Does, acted on behalf of Defendant The City and the State of New York as municipal policymakers with the granted authority to: (a) determine what exculpatory information and records should be gathered and disclosed during the investigation and prosecution of individuals suspected or accused of crimes; (b) determine what evidence and testimony should be gathered and presented at grand jury proceedings, hearings and at trial; (c) ensure that criminal investigations are conducted thoroughly and diligently;  (d) ensure that evidence is not withheld or falsified; (e) ensure that witnesses do not commit perjury or give inaccurate testimony; (f) ensure that criminal proceedings are handled ethically and in accordance with the laws and Constitutions of the State of New York and the United States; (g) assert arguments that have a basis in fact and law; (h) conduct thorough and

diligent investigations to protect the rights of the innocent; and (i) ensure that criminal evidence is properly registered, stored, preserved, maintained and produced in a timely manner to a criminal defendant and his/her attorneys.

14.     At all times referred to herein, Defendants Patricia Ryan and Patrick Buffalino, and various John/Jane Does (hereinafter "OCME John/Jane Does"), were employed by the Defendant The City within the Office of the Chief Medical Examiner (hereinafter "OCME"), at 520 First Avenue, New York, NY 10016.

15.     At all times referred to herein, Defendant Patricia Ryan, individually and in her official capacity as an employee of the City of New York, was employed by the Defendant The City as a managing agent (viz., as the "Director of the Serology Laboratory") at the OCME and was involved in acts and/or omissions relating to: (a) the post-conviction testing of criminal evidence relating to Plaintiff Alan Newton, and (b) the registration, maintenance and/or storage and/or control of evidence relating to Plaintiff's arrest and conviction under Bronx Indictment No. 2441/84.

16.     At all times referred to herein, Defendant Patrick Buffalino (and various OCME John/Jane Does) was responsible for creating and storing chain-of-custody documents relating to criminal evidence tested at the OCME and for answering requests for chain-of-custody records maintained by the OCME.

17.     Upon information and belief, and at all relevant times, Defendants Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, individually and in their official capacity as employees of the City of New York, acted within the scope of their employment with Defendant The City.

18.     At all times referred to herein, Defendants Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, individually and in their official capacity as employees of The City, acted under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of Defendant The City.

19.     At all times referred to herein, Defendant The City, and its agents, servants and representatives, including Defendants Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, were responsible for following court orders; Defendants Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, were also responsible for other functions, including giving truthful evidence, revealing exculpatory evidence (and refraining from withholding or falsifying evidence), making further inquiry when reasonable in a criminal investigation (and not deviating from accepted practices in that regard), and preserving and properly storing critical evidence and documents resulting from a criminal investigation and/or conviction; Defendants Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, were obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States to ensure that innocent people were not incarcerated unjustly.

20.     At all times referred to herein, Defendants Detective Joanne Newbert (Shield 2604) (hereinafter "Newbert"), Defendant Detective Bernard Ryan (hereinafter "Ryan"), Detective Roland Harris (hereinafter "Harris"), Police Officer Douglas Leho (Shield 21937) (hereinafter "Leho"),  Police Officer William Sean O'Toole (Shield 1836) (hereinafter "O'Toole"), Sergeant Patrick J. Maguire (hereinafter "McGuire"), Police Officer Stacy Haskins (hereinafter "Haskins"), Sergeant Colleen Dundas (hereinafter

"Dundas"), Sergeant Patricia Brandow (hereinafter "Brandow"), Lt. Walter Smith (hereinafter "Smith"), Lt. Patrick McKeon (hereinafter "McKeon"),  Lt. Anthony Russo (hereinafter "Russo"), and Lt. David Deangelis (hereinafter "Deangelis") were employed by the Defendant The City as police officers.

21.     At all times referred to herein, Defendant Lieutenant Michael Sheehan (hereinafter "Sheehan") was employed by Defendant The City as a senior police officer and a supervisor, policy maker and Commanding Officer of the NYPD's Bronx Sex Crimes Unit.

22.     At all times referred to herein, Defendant Geraldine Kiely (hereinafter "Kiely") was employed by Defendant The City as a civilian employee of the NYPD.

23.     At all times referred to herein, Defendants Jack J. Trabitz (hereinafter "Trabitz"), John P. Higgins (hereinafter "Higgins"), Bruce J. Major (hereinafter "Major"), Donald Hackson (hereinafter "Hackson"), and Jerome Nathanson (hereinafter "Nathanson") were employed by the Defendant The City as senior police officers and as supervisors, policy makers and Commanding Officers of the NYPD's Property Clerk's Division (hereinafter "PCD").

24.     At all times referred to herein, Defendants George Kuttler (hereinafter "Kutler"), Bruce Kessler (hereinafter "Kessler"), Adrian Merrick (hereinafter "Merrick"), and various NYPD John/Jane Does, were employed by Defendant The City as senior police officers, supervisors, and policy makers at the Bronx borough office of the NYPD's PCD.

25.     At all times referred to herein, Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson,

Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, and various NYPD John/Jane Does, individually and in their official capacities as employees of the City of New York, who are/were members of the NYPD, were employed by Defendant The City and were either involved in acts and/or omissions relating to the arrest and conviction of Plaintiff Alan Newton and/or the registration and/or maintenance and/or storage and/or control of evidence relating to Plaintiff's arrest and conviction under Bronx Indictment No. 2441/84.

26.     Upon information and belief, and at all relevant times, Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, and various NYPD John/Jane Does, individually and in their official capacities as employees of the City of New York, who are/were members of the NYPD, were employed by the Defendant The City, and acted at all times within the scope of their employment for Defendant The City.

27.     At all times referred to herein, Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, and various NYPD John/Jane Does, individually and in their official capacities as employees of The City who are/were members of the NYPD, were acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of Defendant The City.

28.     At all times referred to herein, Defendant The City, and its agents, servants and representatives, including Defendants Newbert, Ryan, Harris, Leho,

O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, and various NYPD John/Jane Does, individually and in their official capacities as employees of The City who are/were members of the NYPD, were responsible for the unbiased investigation of crimes, the apprehension of proper suspects, the weighing of eyewitness evidence against alibi evidence, the pursuit and study of physical evidence, and the providing of accurate information for prosecution to the Bronx District Attorney's Office and other prosecutorial authorities; these Defendants were also responsible for other functions, including giving truthful evidence, revealing exculpatory evidence (and refraining from withholding or falsifying evidence), making further inquiry when reasonable in a criminal investigation (and not deviating from accepted practices in that regard), and preserving, storing, and producing critical evidence resulting from a criminal investigation and/or conviction upon request; these Defendants were obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

<u>**NOTICE OF CLAIM & ARTICLE 50(H) HEARING**</u>

29.     Plaintiff Alan Newton served written Notice of Claim upon The City and NYPD on September 29, 2006.  More than thirty (30) days have passed since the service and filing of said Notice and the claim has not been settled or otherwise resolved.

30.     On December 19, 2006, Plaintiff Alan Newton appeared and answered questions posed by counsel for The City at a hearing held pursuant to Section 50-H of the General Municipal Law.

31.     Plaintiff Alan Newton has satisfied all conditions precedent for the filing of the within action.

## INTRODUCTION TO THE CLAIM

32.     Plaintiff Alan Newton was released from prison on July 6, 2006 after an incarceration of more than twenty-two years for a crime that he did not commit.  The People of the State of New York alleged that he assaulted, robbed and raped a 25-year old woman (hereinafter referred to as "VJ" to protect her identity) on June 23, 1984 (Bronx Indictment No. 2441/84).  Plaintiff was convicted of this crime based solely on questionable eyewitness identifications.  No other evidence corroborated the questionable witness identifications created, cultivated and shaped by NYPD investigators and the Bronx District Attorney's Office.

33.     Throughout twenty-two plus years of incarceration, Mr. Newton steadfastly maintained that he was innocent and, in refusing to admit guilt for the crime, he was denied parole on three separate occasions.  He endured a lengthier imprisonment to avoid any admission of guilt that might hinder a future opportunity to establish his innocence.

34.     With advancements in forensic (DNA) evidence after his conviction, and after exculpatory evidence lost or secreted by the NYPD was located, Mr. Newton was finally exonerated of the assault, robbery and rape charges brought against him under Bronx County Indictment No. 2441/84.  See Justice John J. Byrne's July 6, 2006 Order vacating the latter conviction (and dismissing the accusatory instrument).

-10-

## FACTUAL AND PROCEDURAL BACKGROUND

35.     On May 27, 1984, Plaintiff was twenty-two (22) years old.  He was then employed by New York Telephone Company as a business representative trainee.  He had been previously and consistently employed since graduating high school as a bank teller – first, at the Dime Savings Bank, and then, at Manufacturer's Hanover Trust Co. He was living with his mother, two brothers and a sister (four other sisters lived elsewhere) in a five bedroom apartment at 1330 Webster Avenue, Bronx, New York.

36.     On June 23, 1984, a 25-year old woman, "VJ" [although VJ is now deceased, her name has been abbreviated to protect her family's privacy], was beaten and allegedly raped at 4:00 a.m. after exiting a convenience store in the Bronx.  Her assailant, in an apparent effort to prevent a subsequent identification, cut VJ's face with a box cutter, blinding her in the left eye.  VJ, an epileptic and admitted alcoholic, had taken her epilepsy medication and then consumed at least ten or eleven glasses of beer before encountering her assailant.  She initially told police his name was "Willie" and she offered only a vague description of him.  After Mr. Newton's mug shot photograph was shown to VJ, however, she misidentified Mr. Newton as her assailant and began to use Mr. Newton's features to describe her assailant.  Despite a solid alibi, Mr. Newton was indicted for the June 23, 1984 rape, robbery and assault.

37.     Under separate counts of Bronx Indictment No. 2441/84, Plaintiff Alan Newton was accused of raping, robbing and assaulting VJ, twice, between 4:00 and 5:00 a.m. on June 23, 1984.  Plaintiff adamantly denied that he was the assailant and he presented an alibi defense that was supported by two other witnesses.

-11-

38.     By the end of June, 1984, the criminal charges filed against Plaintiff developed increasing momentum: VJ, initially uncertain about her identification of Mr. Newton, grew increasingly confident after further, tainted meetings with NYPD investigators and ADA Freund; NYPD investigators and ADA Freund, who became unreasonably and increasingly convinced that they had arrested the correct man, ceased their investigation into other likely suspects, failed to follow leads that would have taken them away from Plaintiff, failed to test physical evidence that might have proved Plaintiff was innocent, and failed to present evidence to the grand jury and Mr. Newton about VJ's familiarity with her assailant and her inconsistent accounts of what occurred before the sexual assault; the District Attorney's Office aggressively prosecuted Mr. Newton as a sex offender, even after the complaining witness expressed an admitted lack of confidence in her identification of Mr. Newton.

39.     The first positive thing that happened to Mr. Newton in twenty-two years was that, in 2005, the Bronx District Attorney's Office and NYPD located a long-missing "rape kit" containing semen collected from VJ after the June 23, 1984 assault; Mr. Newton had requested this evidence more than sixteen (16) years earlier (in 1989).  A DNA test on the semen evidence conclusively established that: (1) Mr. Newton was not VJ's assailant, and (2) Mr. Newton had been misidentified by VJ (and another witness).

40.     On July 6, 2006, Justice John Byrne vacated Mr. Newton's conviction for rape, assault and robbery under Bronx County Indictment No. 2441/84 and dismissed the underlying accusatory instrument.

41.     We now know that Plaintiff was unjustly convicted of rape, robbery and assault under Bronx Indictment No. 2441/84, and unjustly denied material evidence, due

to a gross disregard for Plaintiff's constitutional rights by NYPD investigators, OCME employees, and members of the Bronx District Attorney's Office.  The investigation and prosecution of the crime by the Defendants was woefully tainted and flawed, and material evidence was withheld from Plaintiff and his attorneys.  The pre-conviction taints and flaws were only enhanced by the separate, wrongful post-conviction acts of certain Defendants while he was incarcerated – the intentional withholding and/or reckless loss/mishandling of critical exculpatory evidence (and "tracking" documents) in violation of Plaintiff's statutory and constitutional rights.  The Defendants' conduct demonstrates that the Defendants acted with a reckless disregard for Plaintiff's constitutional rights -- during their investigation of the crime, during their prosecution of Plaintiff at pretrial hearings and trial, and during Plaintiff's subsequent incarceration.

### The Robbery, Rape & Assault of VJ

42.    The victim of the alleged crime, VJ, began the evening of June 22, 1984 by visiting her mother and her mother's boyfriend at an apartment on 158th Street in the Bronx.  The trio spent the evening consuming five bottles of "Olde English" beer (this beer is sold in 40 oz. bottles).  VJ, an admitted alcoholic, drank at least eight or nine glasses of beer at that time.  She fell asleep, woke up after midnight, and allegedly walked to a friend's apartment at 169th Street and Third Avenue, where she drank more beer – at least two more glasses.  VJ then allegedly decided to visit her ex-boyfriend Robert Lee Dwight at his apartment at 180th Street.

43.    VJ had begun to suffer from epileptic seizures after a beating at the hands of her then-boyfriend, Mr. Dwight, in 1979 or 1980.  To control her seizures, she had been taking Phenobarbital (30 milligrams) and Dilantin (20 milligrams) every day.

Phenobarbital is a barbiturate with anticonvulsant effects; it is used to treat and prevent seizures; it acts by slowing down the brain and nervous system, thereby reducing the spread of seizure activity. Dilantin, the brand name for Phenytoin, is also an anticonvulsant that acts on the motor cortex to inhibit seizure activity. Epilepsy patients are regularly warned that alcohol should not be consumed after taking Phenobarbital or Dilantin because alcohol enhances the effects of the drugs – extreme drowsiness, motor impairment, dizziness, lightheadedness and unsteadiness increase and intensify.

44.    Though VJ had been warned not to mix her epilepsy medication with alcohol, she was still taking her daily epilepsy medication and drinking beer in June, 1984. In fact, she began the evening of June 22, 1984 by taking her epilepsy medication (Dilantin and Phenobarbital) and then consuming, admittedly, a substantial amount of alcohol -- *at least* ten or eleven glasses of beer -- in direct violation of her doctor's instructions. Since VJ was a very petite woman (she was five foot tall and weighed about 100 pounds), the consumption of ten or eleven glasses of potent beer, coupled with the epilepsy medication, would have caused her to be in an undeniable state of intoxication/inebriation late that evening and early the next morning.

45.    At approximately 4:00 a.m., VJ entered a bodega/superette located at 4373 Third Avenue (at 180th Street) intending to purchase yet more alcohol -- another quart of "Olde English" beer. Only one other person was present in the store at that time – the store clerk, Ms. Aurea Gonzalez. Ms. Gonzalez had begun her shift at 7:00 p.m. and had been working nine hours already by 4:00 a.m. Ms. Gonzalez heard a car horn honk just before VJ entered the store, and then she observed VJ enter the store with a black man. Ms. Gonzalez told police investigators that she saw VJ and the black man talking and

arguing in her store.  [VJ told the first few NYPD investigators who interviewed her that she had been with her assailant between 2:30 a.m. and 5:10 a.m., but they failed to convey this information to the District Attorney's Office, the grand jury, or the trial jury.] As VJ was approaching the front counter with her quart of Olde English beer, the black man also approached the front counter where the clerk was positioned; he paid for VJ's beer and a pack of cigarettes.  As VJ spoke with the store clerk, VJ saw the black man's face only for a few seconds through a small bulletproof window.

46.    Although VJ claimed at trial that she had never seen this black man before, the store clerk (Ms. Gonzalez) has recently testified that he entered the bodega with VJ arguing with her; the clerk heard him say "hurry up" as he left the front counter where VJ and the store clerk were talking.  This man was in the store for only a few moments; he departed shortly after purchasing a pack of cigarettes and paying for VJ's beer; VJ followed him out; the two patrons were observed arguing throughout their brief visit to the superette.

47.    Leaving the store, Ms. Gonzalez testified at trial that she observed the man, and then VJ, enter the car parked just outside the store – with no sign of a struggle. VJ, on the other hand, inconsistently claimed that "a man" suddenly grabbed her from behind after she left the superette; he allegedly grabbed her by the mouth, put a silver box cutter razor to her throat, and forced her, first, into a two-door blue and white Pontiac Grand Prix.

48.    In the car, VJ claimed that she recognized the man as the customer she had seen moments earlier in the bodega.  He drove to Southern Boulevard, made a right turn, and drove a few more blocks.  As the man made another right turn, the car stalled on a

hill.  VJ, who had been in the car for two minutes, allegedly could not get out because the door latch on the passenger door was missing.

49.     The man allegedly dragged VJ out of the car and took her to a nearby park.  He threw her on the grass, called her a "bitch," and sodomized her.  He then allegedly raped her, took her cigarettes and money ($15), and left.  VJ followed him and pleaded with him to return her money.  After he returned her money and cigarettes, she went back to look for her shoes.  Defendant Newbert has recently admitted that VJ was likely a prostitute engaged in a "sex for money" transaction with her assailant.

50.     VJ headed towards Southern Boulevard, but "he came back."  She believed that the same man that had sodomized and raped her in the park had returned and grabbed her from behind; he dragged her back up the hill and took her into a "dark," abandoned building.  With the razor again in his hand he took her up to the third floor landing.  There were no lights inside the building and there were no street lights nearby.  She nevertheless believes that it was the same man who had sodomized and raped her in the park because, when the man sat on her chest, she saw his face briefly in the dark.

51.     In the landing area, the man raped her again, called her "bitch," and cut her face and chest repeatedly with the box cutter.  He ejaculated inside of her.  He took her money and fled.  VJ passed out.  When she came to, she left the abandoned building, went to a call box, and requested police assistance.  According to VJ, the entire incident - - from when she was first forced into the car until she called the police - - took approximately forty-five minutes.

### The NYPD Investigation of the Crime

**A.      Initial Contact with VJ**

52.      On June 23, 1984, between 5:13 and 5:21 a.m., Police Officer Douglas Leho arrived at the call box located at 176th Street and Marmian Avenue in response to VJ's call for assistance.  When he arrived, VJ was hysterical and was bleeding from wounds on her face and chest.  She told Officer Leho that she "was walking home" when she was approached by a man at "158th Street & Park Ave." at about 2:30 a.m.; this man told her that she had to get into his car or he would kill her; VJ told Officer Leho that she was attacked, slashed and raped in his car; she claimed that she escaped from his car at 176th Street where she summoned police from a call box; she was able to supply only the most minimal description of her attacker: "a male black approximately 27 years of age wearing a beige shirt, pants.  That is about it."  She also advised Officer Leho that her assailant had used a blue and white Grand Prix automobile to abduct her.  Officer Leho transported VJ immediately to Jacobi Hospital.

53.      At the hospital, a "Vitullo rape kit" was used to collect critical physical evidence from VJ's body.  The "rape kit," containing among other things, blood, semen and hairs collected from VJ's body, was delivered to NYPD investigators for processing and testing.  Ultimately, an NYPD serologist, Detective Harris, was assigned the task of testing the physical evidence within the rape kit.  For some unexplained reason, NYPD investigators, including Detective Harris, failed to: (a) determine the blood type (serology) of VJ's assailant from the collected semen, or (b) compare the head, body and/or pubic hair to those of the victim or any suspect.  The rape kit was "vouchered" and

soon otherwise dismissed as irrelevant with regards to the police and DA Office investigation.

54.     VJ underwent lengthy surgery on June 23; she was in serious condition and allegedly was unable to convey much substantive information to the NYPD investigation team assigned to her case that day.   Detective Joanne Newbert did, however, speak briefly with the VJ at 12:30 p.m., just prior to her surgery on June 23.  VJ told Defendant Newbert during this interview that she was with her assailant between 2:30 a.m. and 5:10 a.m. that morning.

### B.     The Crime Scene Investigation

55.     After speaking briefly with VJ at Jacobi Hospital, Detective Newbert then went with an NYPD investigation team to the call box which VJ had used early that morning.  Following a trail of blood, NYPD investigators,  Defendant Newbert, Detective Phillip Galligan (now deceased and hereinafter referred to as Galligan), a Detective Hartfield (now deceased) and Defendant O'Toole went into an abandoned building located at 861 Crotona Park North.  A piece of a mirror and a pack of cigarettes were found on the third floor landing, but no "useful" fingerprints allegedly were found or recovered.

56.     According to Detective Newbert, the crime scene in the abandoned building (the third floor landing where the second attack took place) "was not sealed off"; no attempt was made to secure any fingerprints (by her or the crime scene unit) because the walls in that location were "filthy" and there was, in any event, likely to "be a slew" of fingerprints according to Newbert.  Upon information and belief, NYPD investigators

conducted no search, cursory or otherwise, of Crotona Park where the first attack occurred.

### C.    "Willie" Is the First Suspect

57.    Detective Newbert testified that, during the earliest stage of the NYPD investigation on June 23, VJ told her that a man named "Willie" had attacked her. Based upon that information, NYPD investigators (Detectives Galligan, Newbert, Hartfield and Police Officer O'Toole) canvassed the area around Crotona Park North on the afternoon of June 23 looking for witnesses; they found a woman (a Ms. Chamberlin or Chambrin) who knew someone named "Willie." This woman stated that she knew a "Willie" who drove a blue and white Pontiac and that he lived on the third floor of the abandoned building where the second attack took place. Detectives Newbert and Galligan, however, discounted the reliability of this seemingly relevant information claiming that Ms. Chamberlin was a "drug addict" who had been arrested several times. Ms. Chamberlin also allegedly provided the NYPD investigators with a "bogus" name and home address. Her real name and arrest record were never produced to Mr. Newton or his attorneys. An NYPD Complaint Follow-Up was not properly completed regarding the NYPD interview of Ms. Chamberlain, in disregard of NYPD written regulations. When Detective Galligan returned to the vicinity of 861 Crotona Park North the next day (June 24), he allegedly was unsuccessful in his attempts to find either Ms. Chamberlin or the blue and white Pontiac. Detective Galligan testified that Ms. Chamberlin had ten prior arrests and that she had previously used five different names. Detective Galligan admitted that he stopped looking for Ms. Chamberlin after June 25 because Alan Newton became the

"target" of the NYPD investigation -- to the exclusion of all others -- based on VJ's "identification."

58.     Detectives Newbert and Galligan ultimately reached the summary conclusion that Ms. Chamberlin could no longer be located and, in any event, they decided that she would be an unreliable and irrelevant witness in light of their belief that Alan Newton was VJ's assailant.  They took this action despite the fact that they learned that three "Willies" lived or had lived in the building where the second assault occurred.  Finally, the NYPD investigators also testified that, with respect to the blue and white Pontiac, "we had information that the car was stolen."  This latter bit "information" was totally unreliable layered hearsay; the "information" was from VJ who told them that "Willie had told her that the car was stolen."

59.     Detective Galligan claimed that he had placed notes in a notebook concerning his conversation with Ms. Chamberlin.  However, he no longer had those notes at the time of Mr. Newton's criminal trial.  Detective Galligan claimed that he turned the notes over to Detective Newbert, but when he looked in her file for the case he could not find them.  Those notes have never been turned over to Mr. Newton or his attorneys and apparently they have never been found.  No formal NYPD report was filed regarding the Chamberlin interview.  No further particulars were supplied to Mr. Newton or his defense attorney about "Willie," Ms. Chamberlin, or the blue and white Pontiac.

### E.     The NYPD's Tainted & Flawed "Identification" Procedures

### 1.     VJ

60.     VJ claimed that the man who attacked her in the abandoned building was the same man who was in the bodega and the same man who abducted her with his car.

She admitted, however, that saw his face in the bodega only "for about five seconds" (or less than "60 seconds"); that she saw his face in the car for "a minute, maybe a minute and a half," and that she was never able to observe his face clearly in the park, on the street, or in the abandoned building because of the darkness and the poor lighting.  In sum, she was medicated and intoxicated, and she readily admitted that she was never able to obtain a good look at her assailant.  Police also knew that she was an unreliable "street person," who likely worked some evenings as a prostitute, but they failed to convey this information to Plaintiff, his attorney, or the grand jury.

61.    VJ initially told the police that someone known as "Willie" had attacked her.  Her description of her assailant then changed over time.  VJ initially described her assailant only in the most general of terms to NYPD investigators.  First, to Police Officer Leho, in her hysterical state shortly after reporting the crime, she described her assailant only as a "male black approximately twenty-seven years of age wearing a beige shirt, pants.  That is about it."

62.    To Detective Newbert on June 23, VJ first described her assailant as a black man named "Willie" who was about 5'4" tall; she then inexplicably changed her estimation of his height to 5'9"; she estimated that he weighed 180 pounds, claiming that he was "large."  Still later, after viewing photographs and a physical lineup containing Mr. Newton, she told Detective Newbert that her assailant was 5'7" to 5'8" tall, and weighed 150 to 160 pounds.  Although Detective Newbert's handwritten notes and preliminary report on the incident described VJ's assailant as weighing "180 pounds," VJ and Newbert suspiciously reduced this weight estimate to "150 pounds" after Mr. Newton's photograph had been viewed and selected.  VJ initially admitted that she did

not know whether her assailant had a light or dark complexion "because it was so dark out," but then she later claimed confidently that he had a dark complexion.

63.    VJ was an admitted alcoholic taking epilepsy medication; she defied her doctor's instructions and had consumed a substantial amount of alcohol just prior to the crime – at least ten or eleven glasses of "Olde English" beer from forty ounce bottles. The inconsistencies in VJ's description of her assailant and her inconsistent accounts of the assault/rape, therefore, should have been questioned more thoroughly by NYPD investigators, especially in light of her admitted physical condition at the time of the attacks; unfortunately, the description inconsistencies were never questioned by NYPD investigators (or the Bronx District Attorney's Office).

64.    On June 25, 1984, VJ was shown a group of mug shot photographs at Jacobi Hospital while she was still recovering from her surgery (and loss of one eye); she was asked to tell NYPD investigators if anyone was "similar looking" to the man who had assaulted her.   It was only after VJ reviewed about 200 hundred mug shot photographs that she allegedly identified Mr. Newton.  Unfortunately, before the display of photographs, NYPD investigators (Newbert, Galligan, *et al*.) did not ask VJ about her assailant's features, *viz.*, his hair, eyes, nose, mouth, etc. (in violation of NYPD regulations).  It is quite significant that Detective Newbert was familiar with Mr. Newton, as she was the "Catching Detective" within the Bronx Sex Crimes Unit assigned to a sexual assault charge made against Mr. Newton just one month earlier.

65.    VJ's description of her assailant only became conveniently consistent after she viewed Mr. Newton's photograph and conferred with NYPD investigators about him. It is only then that she begins to describe her assailant as a black male, with short cut hair,

a mustache, 5'7" to 5'8" tall, and weighing 150 to 160 pounds.  NYPD investigators, specifically Defendants Leho, Newbert, Ryan, and O'Toole should have elicited a more complete description of the assailant from her first, as a check to determine how well she could recall him, before showing mug shot photographs to her.

66.     As VJ recovered from her injuries in the days following the attacks, and after she was shown Mr. Newton's photograph, she downplayed any reference that she had made previously to a "Willie"; in fact, she later denied that she ever knew the name of her attacker.

67.     On June 28, 1984, VJ viewed a lineup at a police station conducted by Detective Newbert.  Mr. Newton was seated in the number 5 position.  VJ testified that she wasn't sure her assailant was in the number 5 position "right away."  Though Detective Newbert claimed that VJ identified Mr. Newton as her assailant from simply seeing him in the lineup, Detectives Newbert and Galligan admitted in their trial testimony that VJ asked them to have each lineup participant repeat the phrase "I'll fix you so you don't identify me you bitch" -- a phrase that had been uttered by her attacker -- before a positive identification was recorded.  In other words, the evidence supports a conclusion that VJ could not make an immediate identification of Mr. Newton when she first observed him in a lineup.

68.     Three very flawed attempts at a voice identification were then conducted. During the first procedure, each member of the lineup remained seated and, in numerical order, they repeated the phrase *while the shade was up in the viewing room*.  VJ claimed that she could not hear Mr. Newton's voice, alleging that he had spoken the phrase too softly.  Mr. Newton then was asked to repeat the phrase a second time; according to

Detective Newbert, every other member of the lineup had repeated the phrase once. Detective Galligan and VJ, on the other hand, testified that each member of the lineup repeated the phrase a second time while standing "five or six inches" in front of the viewing window.  Mr. Newton claims that he, and he alone, was asked to approach the viewing window to display his mouth and teeth to VJ.

       69.     Following Mr. Newton's repeat of the phrase a second time at the viewing window with the shade up, VJ told Detective Newbert that she still was unable to hear number 5, and she left the viewing room "shaking her head"; the men then were told to go to a side door of the lineup room, which was slightly ajar, where they again repeated the phrase while VJ stood on the other side of the door.  A dispute exists as to whether VJ was able to even identify Plaintiff after the third attempted voice identification.  Detective Newbert has admitted, however, that she approached Plaintiff in the lineup room shortly after the third attempt at a voice identification and that she undeniably provoked Plaintiff by making an inflammatory remark.  According to Newbert's testimony at the Wade Hearing (98-99) (emphasis added), the following exchange occurred with Plaintiff: "I believe he said to me, "Was I picked out," then I said, "You were picked out," but I said ***"I don't know what is going on.  If you aren't the one that did it then there's somebody who is your clone, practically your clone doing what is going on."***  <u>See also</u> Wade Hearing testimony of Newbert at 20 ("I told him [Newton] that it is either you or somebody that is your clone.").  Plaintiff claims that Newbert told him in an angry tone at that time that he had <u>not</u> been selected and that he would be released; she told him that the sexual assault must have been committed by "his clone."  She then left the lineup room to confer with her colleagues.  Plaintiff subsequently did erupt, verbally, upon

being told that he would not be released; VJ apparently told the police, upon hearing Plaintiff's subsequent outburst, that he had the voice of the man who attacked her.

70.     During the first two voice identification procedures, NYPD Investigators impermissibly (a) advised the lineup members each to speak in the numerical order in which they had been viewed by VJ, while (b) allowing VJ to view the lineup participants as they spoke.  Detective Galligan admitted that there was a shade on the one-way mirror, which, if pulled down, would have prevented VJ from seeing the men as they spoke; the shade nevertheless remained up during the first two voice identification procedures. Detective Newbert recalled that VJ was viewing the one-way mirror as the lineup participants spoke.  During the third voice identification procedure, which took place at the side door, VJ was unable to see the men as they spoke.  However, during this final procedure, the lineup participants were still speaking in the numerical order in which they had been sitting (one through six).

71.     Police Officer O'Toole, who was inside the lineup room, recalled that the five fillers thought the voice identification procedure was a "big joke."  At least one of the fillers, who regularly participated in lineups at the Precinct in question, testified that this lineup was "different" because lineup members had to approach the viewing glass, speak, and show their mouths and teeth.  From his vantage point, O'Toole could not see whether the shade was up or down on the one-way mirror during the voice identification procedures, but he believed that the shade should have been down if they were testing only for a voice identification.

72.     With respect to the reliability of VJ's identification of Mr. Newton as her assailant, further egregious conduct occurred when VJ telephoned the Bronx District

Attorney's Office (ADA Freund) a few days prior to start of the criminal trial and advised that she was no longer "positive" that Mr. Newton was her assailant.   ADA Freund advised the trial judge: "I cannot state to the Court the exact words she used."

73.     The importance of the precise substance of that discussion between ADA Freund and VJ cannot be overstated; nevertheless, ADA Freund withheld exactly what VJ said from the court, Mr. Newton and his attorney.   Under these circumstances, ADA Freund and the Bronx District Attorney's Office showed a callous disregard for Mr. Newton's constitutional rights; ADA Freund had an obligation to disclose precisely what VJ had said in recanting prior to trial.   Moreover, ADA Freund also should have requested that the Wade Hearing be reopened to take evidence on the subject of VJ's identification confidence as she remained in exclusive control of this vital evidence (instead, ADA Freund and the Bronx District Attorney's Office opposed defense counsel's request that the Wade Hearing be reopened).

74.     At trial (before the jury), VJ subsequently claimed that her "identification" recantation was due only to a generalized fear of reprisal; significantly, however, she offered no evidence that any threats had been made to her or her family.   In front of the jury, she admitted only that, following additional pre-trial discussions with the Bronx District Attorney's Office, she became re-convinced that Mr. Newton was the right man. In short, after an improper pleading, coaching and rehabilitation session engineered by ADA Freund and the Bronx District Attorney's Office, VJ suddenly was able to point out Mr. Newton confidently again – this time to the jury.   DNA evidence has proven that VJ had, in fact, misidentified him; that her doubt as to Mr. Newton was legitimate, and that

she should not have been persuaded to testify otherwise by ADA Freund, the Bronx District Attorney's Office and NYPD investigators.

### 2. Ms. Aurea Gonzalez

75. The superette clerk, Ms. Aurea Gonzalez, reluctantly offered the only other evidence against Plaintiff Alan Newton at the criminal trial.

76. Ms. Gonzalez was the sole person working at the bodega at the corner of 180th Street and Third Avenue at 4:00 a.m. on June 23, 1984. She was nearing the end of her twelve hour shift when the critical events unfolded. She admitted that the black man that she observed with VJ that night was in her store a total of "more or less one to two minutes"; that he was in front of her at the counter for a fraction of that time, and that she had never seen him before.

77. Notwithstanding the fact that Ms. Gonzalez admittedly viewed VJ's assailant, for the first time, for less than a minute or so through a small bulletproof window, she somehow, nevertheless, identified Alan Newton as the perpetrator from a photo array. DNA evidence has proven now that she misidentified him. Again, NYPD investigators failed to compel Ms. Gonzalez to provide a complete description of the black man she observed in her store before showing her a limited array of six mug shot photos (one of the photos was of Alan Newton) and failed to employ a Spanish-speaking interpreter to ensure that the identification was certain.

78. Ms. Gonzalez claimed that she "more or less" described the black man to NYPD investigators as "black, tall, slender"; she doesn't recall giving any further details about his physical description. Detective Newbert has admitted that she didn't ask Ms. Gonzalez for any description of the man before asking her to examine the limited six-

person photo array.  An NYPD report confirms that no detailed description of the man was taken from Ms. Gonzalez before she was shown a photo array (in violation of NYPD regulations).  At trial, Ms. Gonzalez described VJ's assailant only in the most general of terms: "Black man, short hair, little moustache.  He was neither too tall nor too short.  He was average and he wasn't heavyset."

79.      Ms. Gonzalez is a native of Puerto Rico who speaks very little English. Det. Newbert admittedly does not speak conversational Spanish (Newbert Depo. at 135-136 – Ex. E), and no other NYPD investigator has come forward to testify that they were present at the photo array to explain what they wanted Ms. Gonzalez to do or answer any questions that she might have about what they were asking her to do.  Ms. Gonzalez was asked to look at the six-person photo array and advise only "if there was someone who looked like the person that was there at the time in the store."  Ms. Gonzalez was told that the person who was in her store that night was in the array of photographs and that she needed to pick him out.  Ms. Gonzalez allegedly picked Alan Newton's photo from the array (his photo was in position number 2).  Again, she admitted that she was asked just to pick out a person "who looked like the person" that she had seen in the store and she was told that the man who was in her store was in the photo array.  She then subsequently was asked by NYPD investigators to pick Mr. Newton out of a lineup (he was again in position number 2 in the lineup) and she allegedly accomplished that task.  Prior to this lineup procedure, Ms. Gonzalez was told that the man she had chosen from the photo array would be in the lineup and that she should not be afraid to pick him out.  Mr. Newton was offered only position number 2 in the lineup, the same position he was in within the photo array.

80.     Interestingly, and most importantly, Ms. Gonzalez, when not surrounded by NYPD investigators, was not able to point out Mr. Newton in a courtroom when asked to do so by ADA Freund -- when Ms. Gonzalez appeared for a [Wade] hearing just prior to trial.   After a subsequent improper pleading, coaching and rehabilitation session engineered by ADA Freund and the Bronx District Attorney's Office (and/or the NYPD), Ms. Gonzalez suddenly was able to point out Plaintiff confidently again -- to the jury at trial just a few days later.  Ms. Gonzalez explained that her previous inability to make an in-court identification was due to a "nervous condition."  She conceded, however, that nobody had threatened her.

81.     DNA evidence has proven that Ms. Gonzalez had, in fact, misidentified Mr. Newton, likely through the previously undisclosed instructions provided by NYPD investigators during her identification procedures; and, her inability to point out Mr. Newton at the Wade hearing was highly significant, so she should not have been persuaded to testify otherwise by ADA Freund and the Bronx District Attorney's Office (and/or NYPD investigators).

### F.      The Alibi Presented By Alan Newton

82.     Through his own testimony and that of two other witnesses, Alan Newton presented an alibi.  The gist of the defense was that he was at his girlfriend's home in Queens at the time of the offense: the early morning of June 23, 1984.  This information was conveyed to NYPD investigators, ADA Freund and the Bronx District Attorney's Office shortly after Mr. Newton's arrest.

83.     On the evening of June 22, 1984, Alan Newton testified that he went to a movie in Brooklyn with Ms. Marva Weston and her two children.  He stayed overnight at

Ms. Weston's home; he denied that he was in the Bronx on either the evening of Friday, June 22, or Saturday, June 23, 1984.  He strenuously denied that he had attacked VJ.

84.     Ms. Marva Weston testified that on the evening on June 22, 1984, Mr. Newton went with her and her two children to a movie.  Afterwards, they visited Ms. Weston's sister.  Mr. Newton, Ms. Weston, and the children then returned to Ms. Weston's two-family home in Queens at 8:45 p.m.  They watched television until approximately 10:00 p.m., when the children went to bed.  The children got up at midnight to watch "Hottracks," a show her children routinely watched on Friday nights.  They all watched the show until 2:00 a.m., when the children went back to bed.  Ms. Weston's 13-year old daughter, Lori Weston, testified in a similar manner.

85.     Ms. Marva Weston and Mr. Newton slept together from 2:00 a.m. until 7:00 a.m. on June 23, 1984.  At about 3:00 a.m. that morning, Ms. Weston's parents, who had been playing cards at a neighbor's house, rang the doorbell.  Ms. Weston went downstairs and let her parents in.  At that time, Mr. Newton was still asleep in Ms. Weston's room.  According to Ms. Weston, Mr. Newton could not have left the house without her knowledge, because he would have awakened her; he could not have returned alone because he did not have a key to her home.

### G.     Defendants Made No Attempt to Corroborate The Questionable Eyewitness Identifications

86.     NYPD investigators (Newbert, Galligan, Hartfield, Ryan, Harris, Leho and O'Toole) and ADA Freund improperly, but admittedly, focused on Alan Newton as the "target" of their criminal investigation within forty-eight hours of the crime.  They soon (along with the Bronx District Attorney's Office) failed to pursue leads to other suspects, they ignored or refused to examine evidence that would prove definitively

whether Mr. Newton was guilty or innocent and they concealed evidence that might have proved his innocence.  After Mr. Newton's arrest, the NYPD investigators closed their file and ceased their investigation, based solely on the questionable and tainted eyewitness identifications.

87.     Mr. Newton advised the aforementioned NYPD investigators and the Bronx District Attorney's Office very early in their investigation that he had an alibi that several witnesses would support.  These NYPD investigators and ADA Freund, however, callously ignored this information and failed to interview a single one of the alibi witnesses.

88.     No physical evidence was ever found that linked Mr. Newton to the crime, yet there was physical evidence collected that indicated that he was not VJ's assailant. NYPD investigators and the Bronx District Attorney's Office failed, however, to pursue the testing of this evidence or, worse, failed to disclose the results of testing that indicated that Mr. Newton was not the assailant.

89.     For example, NYPD investigators had VJ's clothing in their possession following the crime.  VJ had been savagely slashed and stomped by her assailant; her splattered blood would, no doubt, would have been on her assailant's clothing and footwear.  In fact, Mr. Newton was told that sneaker prints were seen on her clothing. When Mr. Newton was approached for questioning, NYPD investigators seized his sneakers so that the NYPD could determine: (a) if the treads on his sneakers matched those on VJ's clothing, and (b) if any blood belonging to VJ was on his sneakers.  For some unexplained reason, the blood tests were never performed (according to Detective Newbert), and the results of the sneaker tread print comparison were never disclosed to

Mr. Newton or his attorney.   The sneakers themselves were never returned to Mr.
Newton although he has sought their return for over two decades.

90.     Along these same lines, no search warrant was ever sought or issued to
determine: (a) whether the clothing on the assailant described by VJ might be found
within Mr. Newton's apartment, or (b) whether any clothing found within Mr. Newton's
apartment had VJ's blood on it.

91.     NYPD investigators (along with the Bronx District Attorney's Office) also
callously refused to test the physical evidence collected from VJ's body to determine if
any of it connected Mr. Newton to the crime.   Specifically, the semen collected from VJ
could have been tested for blood type; the head and pubic hairs collected from VJ could
have been compared to Mr. Newton's head and pubic hair.

## The Suppression Hearing

92.     Even though VJ was no longer convinced that Mr. Newton was her
assailant, ADA Freund wrongfully opposed the reopening of the Wade Hearing to allow
for questioning on VJ's post-Hearing recantation; the trial judge sided with ADA Freund
and refused to reopen the Hearing stating cavalierly "Whatever happens at trial happens
at trial."    Unfortunately, the "whatever" did happen at trial -- an innocent man was
unjustly convicted.

## The Trial Verdict

93.     Jury deliberations commenced at 3:05 p.m. on May 20, 1985.   At the
jury's request, numerous portions of the testimony of VJ and Ms. Gonzalez were read
back to the jury.   Deliberations adjourned at 10:45 p.m. and resumed the following

morning.  Following requested "readbacks" of testimony referring to "Willie," the jury reached a verdict at 4:30 p.m. on May 21.

94.    Mr. Newton was acquitted of the rape and sodomy charges that stemmed from the incident in the park.  However, he was convicted of rape, assault, and robbery (all in the first degree) in connection with the attack in the abandoned building.

### Sentencing

95.    On May 31, 1985, the court sentenced Mr. Newton to concurrent prison terms of 8 1/3 to 25 years for the rape and robbery charges followed by a consecutive prison term of 5 to 15 years for the assault.

### Mr. Newton's Claim of Innocence & Pursuit of Exoneration

96.    Following his arrest, and throughout his trial, and twenty-two (22) years of incarceration, Mr. Newton steadfastly maintained his innocence.  He repeatedly asked agents, servants and representatives of the The City (specifically, Defendants McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, various NYPD John/Jane Does, Patricia Ryan, Patrick Buffalino, various OCME John/Jane Does, and agents, servants and representatives of the Bronx District Attorney's Office (among others, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, DA Johnson, and various ADA John/Jane Does) to produce the DNA evidence relevant to his conviction (along with other evidence, including his confiscated sneakers).  He repeatedly requested the Vitullo rape kit that was used by NYPD investigators to collect semen from VJ so that testing might be performed to establish his innocence.

**The Defendants Fail to Honor a Court Order for Independent Testing**

97.     On or about January 29, 1988, Plaintiff and his attorneys filed a motion for an order directing the Bronx District Attorney's Office to allow independent testing on the Vitullo rape kit to determine: (a) whether semen collected from VJ was produced by a donor who was a "secretor" or a "non-secretor" (a/k/a "blood type testing"), and (b) whether Plaintiff was a "secretor" or "non-secretor."

98.     On April 6, 1988, Justice Burton R. Roberts of the Supreme Court of the State of New York, County of Bronx, issued a two-page order requiring the Bronx District Attorney's Office "to secure and deliver the exhibits [among other things, the Vitullo rape kit] to the offices of the Medical Examiner of the City of New York" where the Vitullo rape kit was authorized to be tested in the presence of "Dr. Robert Shaler of Lifecodes, Inc."; Dr. Shaler was expressly authorized to "supervise and perform serological tests on semen found on the exhibits."

99.     On May 11, 1988, ADA Edelbaum retrieved the Vitullo rape kit from the NYPD's Bronx Property Clerk's Office at 1550 hours.  In accordance with the rules and regulations of the PCD, ADA Edelbaum was required to produce a copy of the court order requiring its production "for court" and signed for the rape kit after leaving a right thumb print on the Yellow (working copy) of the Invoice used to track the movement of the evidence.

100.    On or about September 2, 1988, Defendant Patricia Ryan performed unknown tests on the Vitullo rape kit and determined that there was insufficient semen within the rape kit for the testing requested by Mr. Newton and his attorneys: "Samples analyzed gave negative enzymatic, microscopic, and immunological test for the presence

-34-

of semen."  Ms. Ryan failed to report that some of her test results were "inconclusive." In disregard of the April 6, 1988 Order of Justice Burton R. Roberts, the tests were performed upon the rape kit without Dr. Shaler being present.

101.    Upon information and belief, ADA Edelbaum never retrieved the Vitulo rape kit from the Office of the Chief Medical Examiner, despite repeated requests by the Bronx Property Clerk to return the evidence.  On or about August 31, 1988, ADA Edelbaum wrote to the Bronx Property Clerk and advised that "Justice Roberts ordered the DA's Office to turn over said evidence to Lifecodes Inc. to Dr. Robert Shaler."  The evidence was, in fact, turned over to the OCME *and Dr. Shaler never participated in the testing.*  In response to the question of when the evidence would be returned to the PCD, ADA Edelbaum responded with a "?".

102.    Upon information and belief, the Vitullo rape kit was sent back to the NYPD's PCD several months later (in late 1988 or early 1989) by the OCME in a barrel labeled "DOA Barrel # 22 1989."  An entry was made in an OCME "Property Clerk Book" to confirm the transfer back to the PCD.  Although the DOA barrel was delivered to a Queens warehouse of the NYPD's PCD, someone in the Bronx borough office of the PCD handwrote the rape kit's new location "DOA Barrel # 22 1989" on the original Yellow Invoice ("working copy") used to track the movement of the evidence at the Bronx borough office of the PCD; unfortunately, the documents relating to that evidence were not processed properly at the Bronx borough office of the PCD, *and the original Yellow Invoice could not be located, thereafter, until February 2009.*  Upon information and belief, a photocopy of the Yellow Invoice relating to the rape kit was supplied to the Bronx District Attorney's Office by the Bronx Property Clerk sometime in 1989; this

photocopy contained the handwritten notation setting forth the precise location of the rape kit; upon information and belief, this photocopy was readily available to ADA Carroll, ADA Moore, ADA Curbelo and DA Johnson when they were asked to produce the Vitullo rape kit by Mr. Newton and his attorneys in subsequent years.  In short, the Bronx borough office of the PCD and the Bronx District Attorney's Office had a document in their possession, at all times, that contained the precise location of the kit.

### The Defendants Failed to Produce the Rape Kit Upon Request

103.   After testing was performed on the Vitullo rape kit by Defendant Patricia Ryan in September 1988, Plaintiff renewed his requests for testing on the rape kit as DNA analysis methods improved.  The Defendants repeatedly advised in reply that "extensive searches were conducted" by the NYPD's PCD, but that the rape kit (and other evidence) could not be located.  In fact, the rape kit apparently had been returned to the NYPD's PCD, but due to clerical errors and a reckless disregard of procedures on the part of NYPD personnel within the PCD, and reckless disregard of procedures by the OCME and the Bronx District Attorney's Office, Plaintiff was advised that the evidence and its paperwork was "lost" and/or "destroyed"; in November 2005, more than sixteen (16) years after Plaintiff made renewed requests for the rape kit's production for "DNA testing," it was located in a warehouse owned, operated and/or controlled by the NYPD's PCD in the location described by a handwritten notation on the original Yellow Invoice.

### The Rape Kit Is "Lost" by the NYPD Property Clerk

104.   During Mr. Newton's trial (in May 1985), People's Exhibit 13 (the Vitullo rape kit) was introduced into evidence.  This piece of evidence was first entered into the NYPD Property Clerk system by Defendant Newbert on June 23, 1984; at that time, it

was registered by the NYPD under a "locator" or "tracking" document – NYPD Invoice No. B744483.  The original Invoice consisted of six originals (made by carbon paper) – two of these originals, an original White Invoice (used for inventory control) and an original Yellow Invoice (used as the document to log movement of the evidence) – were retained and filed in the Bronx borough office of the PCD.

105.    After the testing by Defendant Patricia Ryan in September 1988, Mr. Newton made a new request for the production of the Vitullo rape kit on September 25, 1989, when he served the NYPD with a "Freedom of Information Law Request" seeking the production of the NYPD's entire criminal investigation file relating to Bronx Co. Indictment number 2441/84.  The NYPD, through the Office of the Corporation Counsel, successfully opposed Plaintiff's September 25, 1989 request on procedural grounds and Mr. Newton was denied access to his criminal file and the rape kit.

106.    Mr. Newton next requested the production of the Vitullo rape kit in 1991. His attorney at that time, Stephen A. Somerstein, Esq., contacted the Bronx District Attorney's Office and asked that Office to locate the rape kit "and any other sperm or blood samples from articles of clothing worn by the victim" so that new DNA analysis techniques could be employed to test the semen.  At this point in time (1991), new DNA testing was readily available, and if the rape kit had been located and the semen tested, Mr. Newton would have been exonerated of VJ's rape.

107.    Mr. Newton next requested post-conviction DNA testing on the Vitullo rape kit, *pro se*, on August 16, 1994.  In response to this motion, ADA John F. Carroll stated:

> Intending to consent to defendant's request, your affirmant undertook an extensive investigation in order to determine the whereabouts of the

> aforementioned physical evidence.  It now appears, however, that the physical evidence was never returned to…the New York City Police Department Property Clerk's Office…extensive searches were conducted at the New York City Police Department Property Clerk's Office…The physical evidence was not located.

Affirmation of John F. Carroll, Esq. submitted in opposition to Alan Newton's request for post-conviction DNA Testing, dated November 1, 1994.

108.     The Supreme Court of the State of New York, Bronx County, denied Mr. Newton's August 16, 1994 request for post-conviction DNA testing on November 3, 1994, but only because the rape kit, Mr. Newton's sneakers and VJ's clothing allegedly could not be located by the NYPD Property Clerk, the OCME and the Bronx District Attorney's Office.  Upon information and belief, Defendants Dundas and Brandow were two of the people who ADA Carroll spoke with at the NYPD Property Clerk's Office and Defendants Smith and McKeon were (or should have been) involved in a search for the missing rape kit and missing NYPD Invoices at that time.  Upon information and belief, the latter Defendants acted in disregard of Property Clerk procedures and failed to find a vital tracking document (an NYPD Yellow Invoice) within the files of the Bronx office of the Property Clerk (or failed or refused to become involved in the search in derogation of his duties and responsibilities).

109.     On or about August 9, 1996, October 12, 1996 and March 24, 1997, Mr. Newton, again acting *pro se*, submitted renewed discovery requests to Magistrate Judge Sharon E. Grubin, for the allegedly lost rape kit, in connection with a *habeas corpus* petition Mr. Newton had filed with the United States District Court for the Southern District of New York.  Again, Mr. Newton requested the following items under NYPD Invoices/Vouchers:

1.      Voucher # B744556-Storage # 84B24723-1, pair of men's Sneakers
2.      Voucher # B744483-Storage # 84B19041, cigarette box, mirror, Vitulo Kit
3.      Voucher# B744512-Storage # 85B696, victim's clothing (jeans, maroon sweater, blouse)

110.    Mr. Newton also submitted separate Freedom of Information Law (FOIL) requests to the NYPD for certain items of evidence relating to his case, including the above three items.

111.    On April 23, 1997, in response to the aforementioned requests for the evidence, ADA Robert L. Moore wrote to Judge Grubin and stated the following:

> Upon information and belief, property retained as evidence by the New York City Police Department (for cases prosecuted in Bronx County) is either stored within the Property Clerk's facility at 4715 Pearson Place, Queens New York, or in the facility located within the Bronx County Criminal Court at 215 East 161st Street, Bronx, New York. *According to a representative of the Police Department Property Clerk at the Queens facility,* **items (1) and (2), listed above, were not found** *at the location following a search on this date* **and records of disposition are not available**. *According to a representative of the Bronx Borough Property Clerk, those* **items were not found in the Bronx facility** *following a search on this date,* **and records of disposition are not available**. *As previously noted, the petitioner has been advised, in prior state proceedings, that the Rape Kit (as listed above), could not then be located.* I have been advised that item (3), as listed above, is presently stored at the Pearson Place facility. I have requested on this date, by fax, that the property (item [3]) be maintained, pending final disposition of this petition.

Letter from ADA Moore to Magistrate Judge Grubin dated April 23, 1997 (emphasis added).

112.    No documentation has ever been produced to support ADA Moore's statement that a "search" was, in fact, performed by the NYPD for the three items of evidence, but ADA Moore's letter provides an official statement of the NYPD, the Bronx District Attorney's Office and The City that the rape kit and sneaker evidence (and the records relating to their disposition) had been "lost" (not found).  Some John or Jane

Does in the NYPD's Property Clerk's Offices in Queens and the Bronx apparently advised ADA Moore that a "search" had been performed for the evidence (and the tracking documents for the evidence) and ADA Moore's transfer of this information to Magistrate Judge Grubin and Mr. Newton now began to build a false and inaccurate record relating to the rape kit and sneaker evidence.   Upon information and belief, Defendant Russo was (or should have been) involved in a search for the missing rape kit and missing NYPD Invoices at that time.   Upon information and belief, the latter Defendant acted in disregard of Property Clerk procedures and failed to find a vital tracking document (an NYPD Yellow Invoice) within the files of the Bronx office of the Property Clerk (or failed or refused to become involved in the search in derogation of his duties and responsibilities).

113.   The NYPD officials in charge of the Pearson Place Warehouse should have known that it would be odd for the PCD to retain VJ's soiled clothing, but discard or destroy other important pieces of evidence relating to the same case.  The Bronx District Attorney's Office also should have found this peculiar, especially as we now know that this Office had a copy of a Yellow Invoice in its possession setting forth the precise location of the rape kit.   Nevertheless, due to the callous disregard of the Defendants, an actual physical search for the rape kit and sneaker evidence (and their original Yellow Invoices) was apparently never requested or was never performed properly.

114.   On July 9, 1998, Mr. Newton's attorneys filed a new motion requesting DNA testing (based on improved DNA testing techniques) on VJ's clothing, including her jeans; in connection with this motion, Mr. Newton's attorneys also renewed Mr. Newton's request for the production of the rape kit and his sneakers.

115.    As to the renewed request for the rape kit and sneakers, the result of the previous "search" for the evidence (that it could not be found) was reiterated and reinforced in an Affirmation signed by ADA Rafael Curbelo dated August 25, 1998:

> . . . numerous conversations with Ms. Kiely and Police Officer Haskins of the Property Clerk's Office at Pearson Place, Queens County, none of the above items [including the rape kit] could be located.  Upon information and belief, the source being the same, Vitullo [rape] Kits were preserved starting in 1988, and other items were likely destroyed in accordance with standard Police Department procedure.

Affirmation of ADA Rafael Curbelo in opposition to Alan Newton's renewed motion for DNA Testing, dated August 25, 1998.

116.    One week later, ADA Curbelo dispatched a letter to Mr. Newton's attorneys advising, however, that he had received a telephone call from a Ms. Kiely of the NYPD Property Clerk's Office at Pearson Place who had advised him, contrary to the advice he had previously been given and that he had provided to the court, that VJ's clothing had been located.  Letter from ADA Rafael Curbelo to Jorge Guttlein, Esq. dated September 1, 1998.  ADA Curbelo's September 1 letter attached a letter from Sergeant Patrick J. McGuire of the NYPD dated August 26, 1998 (responding to ADA Rafael Curbelo's request for the clothing, rape kit and sneaker evidence).  Sergeant McGuire advised:

> Storage # 85B696
> Preprint #B744512 [this is the same as the voucher #]
> Type: clothing
>
> The above voucher is currently in storage at the Property Clerk Storehouse located at Pearson Place (Bin # 2002-1)
>
> storage # 84B24723               storage #84B19041
> preprint#B744556                 preprint # B744423
> [pair of men's sneakers]         [cigarette box, mirror and rape kit]

> *The above two vouchers are currently not in its [sic] last listed storage location [White Invoices were filed by assigned borough storage number].* Property generally is removed from its storage location for one of two reasons. The first is "out to court," and the second is destruction. Items that go out to court are indicated on the original invoice which is stored in the active files. Currently **there is no original [Yellow] voucher in the active file [original Yellow Invoices were filed by pre-printed Invoice number in an "Actives" file; Yellow Invoices were moved from the "Actives" file to an "Out to Court" folder when the evidence temporarily left the custody of the PCD], therefore it must have been destroyed**. Items that are destroyed are indicated on the original voucher and then filed in the closed files. Unfortunately there was a fire in our facility during the summer of 1995 which destroyed these files. *This makes it impossible to say when and if the above property was destroyed. The only other means of researching the final disposition of these vouchers is through the Bronx Property Clerk office. Unfortunately, this is also a dead end.* **The N.Y.P.D. Records Section in connection with the Legal Bureau authorizes the Property Clerk to destroy inactive records more than six (6) years old.** As you well know, the Bronx Property Clerk Office has a lack of space and therefore they keep to that procedure.

Letter from Sergeant Patrick J. McGuire (NYPD) to ADA Rafael Curbelo dated August 26, 1998 (emphasis added).

117.    Sergeant McGuire's letter contains many inconsistencies and illogical claims. Sergeant McGuire's explanation implies that (1) since the two relevant vouchers were not in the "active" file and (2) since the "closed" files are destroyed after six years, then, (3) the evidence itself was destroyed. Sergeant McGuire suggests that evidence was necessarily destroyed when original Invoices could not be located (that was not the case, because then NYPD policy allowed Invoices to be destroyed while evidence remained in the custody of the PCD). In February 2009, the NYPD PCD found the original Yellow Invoices in an "Out to Court" file folder in the Bronx borough office of the PCD. No one apparently looked in that file folder previously. McGuire's letter suggests that no one tracked the NYPD's chain-of-custody of the rape kit and sneakers and that no one even considered looking in the "Out to Court" file for Yellow Invoices or the "Out to Court

Log Book" maintained by the Bronx borough office of the PCD (without having both the original White Invoice and the original Yellow Invoice, the NYPD had no way of knowing whether the evidence was truly destroyed).  McGuire's letter displays pure ignorance as to how original Yellow (working copy) Invoices were maintained, used and stored by the Bronx Property Clerk.  Upon information and belief, Defendant Deangelis was (or should have been) involved in a search for the missing rape kit and missing NYPD Invoices at that time.  Upon information and belief, the latter Defendant acted in disregard of Property Clerk procedures and failed to find a vital tracking document (an NYPD Yellow Invoice) within the files of the Bronx office of the Property Clerk (or failed or refused to become involved in the search).

118.    On September 9, 1998, the Court granted a portion of Mr. Newton's July 9, 1998 motion, and pursuant to court order, the NYPD delivered VJ's clothing to the OCME.  The OCME performed an initial screening of the clothing on October 16, 1998, without the knowledge of Mr. Newton or his counsel.  The Court denied the rape kit and sneaker "relief" requested by Mr. Newton because the NYPD professed an inability to produce these items.  On October 27, 1998, the District Attorney's Office informed the Bronx Supreme Court that the OCME tests were "negative" for semen on VJ's soiled clothing.  Mr. Newton then requested that he be permitted to have his own experts test the clothing.  The Court granted this request, and Mr. Newton's experts also returned a "negative" result: neither test found any usable semen on the jeans.  Sergeant McGuire's letter thereafter served to delay a proper search for the missing rape kit for another seven years.

119.     It is very significant that ADA Curbelo, in connection with either the pending *habeas corpus* petition in federal court or the 1998 CPL § 440.30 motion, dispatched a fax to Defendant Patrick Buffalino of the OCME on or about April 12, 1999 requesting information as to what the OCME did with the rape kit after its contents were tested in 1988 (among other things, chain-of-custody documents were requested that would have shown that the rape kit was returned to the NYPD in a "DOA" barrel in 1988).  Curbelo Depo. at 123-126.  Although the OCME's chain-of-custody documents would have shown the return of the rape kit to the NYPD (and the date the rape kit was returned), Mr. Buffalino apparently never responded to ADA Curbelo's fax.  Curbelo Depo. at 126 ("Q: To the best of your knowledge, were those chain of custody documents ever secured by the Bronx District Attorney's Office?  A: Not by me.").

### Mr. Newton's Renewed FOIL Requests to the NYPD

120.     In June 2002, frustrated by his then futile attempts to secure the rape kit evidence from the NYPD, Mr. Newton filed a *pro se* Freedom of Information Law ("FOIL") request with the OCME for the rape kit in the hope that the OCME had retained it after testing in 1988.  His OCME FOIL request was denied, allegedly because of an exemption from disclosure that applies to the records of the OCME.  Mr. Newton then, nevertheless, filed similar FOIL requests for the rape kit with the NYPD and the Bronx District Attorney's Office.  These requests also proved futile.

### The NYPD "Misplaces" the Rape Kit Tracking Document (Yellow Invoice)

121.     When plaintiff learned recently that the "tracking document" (the original Yellow Invoice) for the rape kit was, at all times, maintained and possessed by the Bronx

borough office of the PCD, it seriously altered, factually, who might be responsible for NYPD's failure to produce the rape kit in a timely manner.

122.    Defendant Trabitz and three Queens PCD employees had previously been named as Defendants in this action because all of the documents and news accounts of what had happened to the rape kit indicated that it was in the possession of the Queens borough office of the PCD (Plaintiff believed, mistakenly, that the tracking document would have moved to the Queens borough office with the evidence) when Plaintiff sought the rape kit for further testing.   Plaintiff had no way of knowing precisely how the PCD tracked the movement of criminal evidence before the depositions of PCD witnesses were commenced.     Plaintiff learned, during these depositions, about the significance/function of the original "Yellow Invoice" for the rape kit, and the fact that it never left the custody of the Bronx borough office of the PCD.  Trabitz Depo. at 60-61. The Bronx borough office of the PCD always had the "map" to the precise location of the rape kit (the original Yellow Invoice) in its possession, but that office failed to produce that document (or the evidence) to Plaintiff.

123.    After completing the first day of the Trabitz deposition, we immediately sought the deposition of Sgt. Thomas O'Connor as he found the original Yellow Invoice *sometime after January 31, 2009*.  The Defendants have yet to explain why they could not locate the original Yellow Invoices relating to Plaintiff's long-sought criminal evidence prior to January 31, 2009.

124.    The deposition of ADA Carroll on April 27, 2009 shed significant light on how many times the Bronx borough office of the PCD was contacted to assist in the search for the rape kit and how many times it failed to produce the location of the rape kit

– even though the rape kit's tracking document was, at all times, in the possession of that office.  Among other things, ADA Carroll testified that he had discussions with *both* the Bronx PCD office *and* the OCME inquiring about who had custody of the rape kit. Carroll Depo. at 50 ("It was a series of back and forths between the medical examiner and the [Bronx] property clerk…there were several visits to the [Bronx] Property Clerk's Office… and several phone calls to the medical examiner… and they would say we don't have it, we sent it back.  So then I go back to the [Bronx property] clerk's office and I'd say well, the medical examiner says you have it, they sent it back, and they would say no, we don't have it, blah, blah, blah…that went on for several months….").

125.    In short, Plaintiff now knows of the significance of the actions (or lack of actions) taken by the Commanding Officers (Defendants Kuttler, Kessler, Merrick and various John/Jane Does), employees (Defendants Dundas, Brandow and John/Jane Does) of the Bronx borough office of the PCD, and the "Integrity Control Officers" employed by the PCD between 1994 and August 1998 (Defendants Smith, McKeon, Russo, and Deangelis).  Plaintiff has sought the identity of additional John/Jane Does Defendants within the Bronx borough office of the PCD, through the service of Interrogatories, but The City has refused to answer the Interrogatories and the Court has refused to issue an Order compelling responses.  Thus, at this time, Plaintiff can only name Defendants Kuttler, Kessler, Merrick, Dundas and Brandow as proper Defendants from that office.

126.    Plaintiff also now knows that that the Bronx District Attorney's Office had a copy of the "map" to the missing rape kit (the Yellow Invoice) in its possession prior to November 2005 when it was provided to the NYPD.  No explanation has been provided

as to why the District Attorney Defendants (Edelbaum, Carroll, Moore, and ADA John/Jane Does) failed to produce that copy of this Invoice prior to November 2005.

127.    Finally, Plaintiff also knows now that requests were made to the OCME to produce chain-of-custody documents in its possession relating to the 1988 testing performed on the rape kit (if produced, these would have shown the return of the rape kit and date of its return to the PCD).   No explanation has been provided as to why the OCME Defendants (Patricia Ryan, Patrick Buffalino, *et al.*) failed to produce the chain-of-custody documents requested by the Bronx District Attorney's Office.

**Destruction of Rape Kits & Invoices by the NYPD**

128.    On April 16, 2009, Defendant Trabitz, the present Commanding Officer of the PCD, described the steps that would be taken by the PCD to record the destruction of a particular piece of criminal evidence – a stamp would be applied to the original White Invoice maintained by the borough office of the PCD who had originally accepted the evidence.   Trabitz Depo. at 429 ("The original white invoice would be stamped destruction, to…verify that something had been destroyed.").   He also admitted that, unless the PCD had *both* the original White Invoice *and* the original Yellow Invoice available for review, the PCD would not be able to determine if the criminal evidence was, in fact, still in the possession, custody and control of the PCD.  Id. at 428-429 ("If a member of the Property Clerk Division doesn't have one of the items, we may not be able -- one of the invoices, white or yellow, we may not have the information to locate the physical evidence.").   The original White Invoice allows the PCD to determine whether the evidence has been destroyed; the original Yellow Invoice allows the PCD to determine the location of the evidence within the PCD's facilities (if it has not yet been

destroyed).   Id. at 436 (Q: But if we have both of those invoices, we can find the property, or know where it is, and we can immediately determine whether it has been destroyed or not; correct?   A: If I have both of these, I can accomplish both of those tasks.").   He further admitted that if the PCD destroyed either the White or the Yellow Invoices (before the PCD destroyed the evidence itself) and the evidence had been moved from its original location, the PCD would not be able to state, definitively, whether the evidence was still in the possession, custody and control of the PCD.   Id. at 442 ("you [PCD] may not be able to [state whether the PCS still has it]").

129.   Trabitz admitted that, before he took over as the Commanding Officer of the PCD, supervisors in the borough offices of the PCD had the discretion to destroy original Invoices even if the property described on those Invoices had not yet been destroyed.   Upon taking over the PCD in 2000 (possibly through an "administrative memo 2006-19" in 2006), he changed the destruction policies of the PCD, namely: (1) he ordered that original invoices would no longer be destroyed, and (2) that Vitullo rape kits would no longer be destroyed.   Trabitz Depo. at 260 (Invoice Destruction: "I changed the policy [of destroying Yellow Invoices after five years]"), 263 ("Sometime during my tenure I had instituted a policy that no invoices are to be destroyed."); 270 (Rape Kits: "Prior to my assignment as the commanding officer of the Property Clerk Division in late 2000, and prior to my issuing this memo, which is administrative memo 2006-19, there were times when rape kits were destroyed.").   Thus, prior Commanding Officers of the PCD, namely, Defendants Higgins, Major, Hackson, and Nathanson, were allowing PCD employees to destroy Invoices, even though that the destruction of Invoices could lead to an inability to find evidence still in the possession of the PCD.

130.     In sum, the Commanding Officers of the PCD (before Trabitz) were allowing invoices and rape kits to be destroyed on what was a "discretionary" basis – and such practices could lead to an inability to find post-conviction criminal evidence (rape kits) still in the possession, custody and control of the PCD.  Any Commanding Officer that allowed original Invoices to be destroyed (without destroying the corresponding evidence) should have known that such an action would lead to an inability to state whether the PCD still had custody of the evidence (the original White Invoice relating to the "Newton rape kit" has never been found and/or produced to Plaintiff).

### The Pearson Place Warehouse Routinely Loses Critical Evidence

131.     A veritable plethora of New York City criminal cases have been thwarted by shoddy evidence management practices by the NYPD.

132.     In addressing individual cases of lost evidence by the NYPD (in cases remarkably similar to Mr. Newton's), the Innocence Project, the entity known for obtaining hundreds of post-conviction exonerations based on DNA evidence, states the following on its website:

> In New York City, 50% of cases the Innocence Project closed in the last 10 years were closed because of reports that evidence was lost or destroyed (according to a preliminary study of Innocence Project cases from 1996 to 2006) at Pearson Place Warehouse, which stores evidence for all crimes in the five boroughs of New York City.

> Several of these closed cases involve Sergeant Patrick McGuire, who notified the Innocence Project in writing that evidence in the cases did not exist at Pearson Place Warehouse – just as he did in Alan Newton's case before the evidence was finally located at the facility, eventually leading to his exoneration.

> Following are details on six of the Innocence Project's closed cases in New York City, including three where Sgt. McGuire claimed in writing that evidence no longer exists. (Names of clients and victims in these cases have been omitted to protect their privacy.) These are among the cases for which the Innocence Project

is now asking NYPD Commissioner Ray Kelly to conduct new evidence searches at Pearson Place Warehouse.

**John Doe #1 (Bronx)**

In 1989, Doe was convicted of raping and robbing a woman in the Bronx in 1987. The perpetrator grabbed the victim from behind while she was walking home from the bus stop, dragged her into a nearby apartment building, and raped her on the rooftop. An ambulance then took her to a hospital where a rape kit was collected. The victim was allowed to go to the bathroom and clean herself before the rape kit was taken. Doe was convicted, based largely on the victim's identification of him.

The Innocence Project took the case and spent nearly four years trying to locate the rape kit and the victim's clothing to determine whether DNA testing could prove Doe's innocence. Bronx Assistant District Attorney Eliza Koenderman worked with the Innocence Project to try to locate the evidence. She requested the evidence from every agency that might have it, and secured documentation from all of the agencies claiming that they did not have custody of the evidence. The case was closed in 2005 due to lack of evidence for DNA testing.

**John Doe #2 (New York)**

In 1985, Doe was convicted of rape and robbery. He was incarcerated for 14 years, and is currently serving the remainder of his sentence on parole.

The case against Doe was based primarily on the victim's identification of him. During the trial, the prosecution also submitted testimony that biological evidence was identified in the rape kit taken from the victim immediately following the attack. The Police Laboratory Serology Section, however, did not test the samples to determine the blood type (DNA testing was not available at the time).

The Innocence Project took Doe's case in 1995. As a result of the Innocence Project's litigation, the Manhattan District Attorney's Office conducted a search for biological evidence in the case. The DA's office worked directly with officials at several NYPD units involved in the case – including the serologist from Doe's trial, the lab that examined hair evidence for the trial, and the evidence division that is responsible for receiving and returning all evidence examined in the NYPD lab – and each of them formally claimed that they no longer had the evidence from the case.

The Innocence Project ultimately closed the case after pursuing the evidence for eight years.

**John Doe #3 (Queens)**

In 1987, a woman was assaulted on the Long Island Railroad as she was returning to her home from Manhattan. The victim was raped in the train's bathroom and was unable to see her assailant because the lights in the bathroom were not working. Prior to the assault, the victim had interacted with Doe because he was the train's conductor.

The victim's sister picked her up at the train station and took her to the police station. The victim then went to the hospital, where a rape kit was collected. Two days after the assault, the victim identified Doe as the man who attacked her on the train. Although she signed a complaint identifying Doe as her assailant, in court the victim conceded that she could not have seen her attacker, and that she had misunderstood the complaint she signed.

No biological evidence was admitted at Doe's trial. He was convicted and sentenced to 4 to 12 years in prison. Doe's conviction was overturned, but later reinstated.

The Innocence Project took Doe's case in 1995. Although Thomas was out of prison on parole, he asked the Innocence Project to continue seeking DNA testing that could clear his name. In response to an Innocence Project motion, the court ordered the hospital, the MTA police, and Pearson Place Warehouse to conduct searches for biological evidence in the case. Neither the police nor the hospital had any biological evidence, and the Innocence Project subsequently secured a court order for any documents the hospital or police had relating to the case. Those documents did not provide any information about biological evidence in the case. In 2000, after nearly a decade seeking evidence, the Innocence Project closed Doe's case.

**Cases Involving Sgt. Patrick McGuire:**

**John Doe #4 (Bronx)**

In 1980, a woman was raped in the lobby of her apartment building. The perpetrator stole the victim's ID card and several of her other belongings, and he later made threatening phone calls to her. Later, he returned to her home and cut her head with a piece of glass.

The victim identified Doe as her attacker. Although biological evidence was collected during the police investigation, it was not tested or admitted at Doe's trial. In 1981, Doe was convicted of rape and sodomy.

The Innocence Project took Doe's case in 2001. Along with Doe's court-appointed attorney, the Innocence Project sought access to physical evidence in the case from the hospital and police. No biological evidence was located, and Sgt. McGuire officially notified the Innocence Project that the evidence was destroyed in a fire.

**John Doe #5 (Kings)**

Doe was convicted in January 1984 of rape in the first degree, sodomy in the first degree, and assault in the third degree. His conviction was based largely on the victim's identification during a police lineup. Although there was a rape kit taken after the attack, it apparently was not presented as evidence in Doe's trial.

The Innocence Project took Doe's case in 1995. Knowing that if evidence from Doe's case still existed, it would be stored at Pearson Place Warehouse, the Innocence Project pursued the evidence at the facility. Sgt. McGuire helped search for the evidence. After no evidence was recovered from the on-site visit, Sgt. McGuire contacted the lab where the evidence may have been sent. The lab did not have the evidence. Sgt. McGuire had consistently maintained that the evidence was probably destroyed during a mass destruction of unclaimed property in 1992. Finally, in a 1997 letter, Sgt. McGuire officially notified the Innocence Project that the evidence in Doe's case had been destroyed. (Sgt. McGuire said that, complying with police procedure, his letter about the evidence was reviewed and approved by his supervisor.) Based on Sgt. McGuire's letter claiming that the evidence was destroyed, the Innocence Project closed Doe's case in 1997.

**John Doe #6 (Kings)**

In July of 1985, Doe was convicted of murder, rape, sodomy, and several weapons possessions charges. When a man and two women who were sitting in a park in East New York, a man armed with a gun approached them and demanded their money and oral sex from one of the women. The perpetrator tied up the man. The woman struggled with the perpetrator, who shot and killed her. The assailant then raped the other woman.

When Doe was arrested, he was wearing underwear that were bloodstained (he said that this was because he suffers from a kidney infection). The Innocence Project took Doe's case and sought testing on his underwear, as well as on the victim's rape kit and clothing. In 1997, after a search for evidence, the Innocence Project received written notification from McGuire's that the biological evidence from Doe's case was destroyed, and the case was closed.

Innocence Project Website, http://www.innocenceproject.org/Content/397.php.

133.   It is widely known that the NYPD's inventory and storage operations for criminal evidence are, and have been for many years, beyond crude and outdated. Despite widespread criticism of the NYPD's property management system, and internal

reports suggesting the need for remedial measures, none have been undertaken to modernize the system for finding old (pre-1990's) evidence.

134.    It is now widely known that the NYPD employs questionable policies and practices with regard to the registration, storage, control and production of evidence to criminal defendants.   Some of these questionable practices and procedures have been detailed by the Innocence Project in the quoted material above.

### The Rape Kit Is Finally Found – 16 Years Later

135.    Mr. Newton eventually convinced the Innocence Project to assist him in one final quest for the long lost rape kit.   Attorney Vanessa Potkin of the Innocence Project dispatched an e-mail to ADA Elisa Koenderman requesting that the Bronx District Attorney's Office and NYPD make one last, good-faith effort to locate the rape kit.   The NYPD Property Clerk's office was asked to assign someone who would individually search for and retrieve the rape kit from its storage location.

136.    This time, rather than cite merely to the rape kit Invoice by number, ADA Koenderman apparently supplied a photocopy of the Yellow Invoice (working copy) from the file of the Bronx District Attorney's Office; this photocopy contained the handwritten notation specifying the precise storage location of the evidence.   No one yet knows how this photocopy of the Yellow Invoice came into the possession of the Bronx District Attorney's Office.   This time, the Property Clerk's office found the missing rape kit --  where it had been placed sixteen (16) years earlier, after testing by Defendant Patricia Ryan -- in "DOA Barrel # 22 1989."   Instead of making a direct and proper search for the paperwork relating to the evidence at the Bronx borough office of the PCD and/or contacting the Office of the Chief Medical Examiner to determine how, when and

if the evidence had been returned to the NYPD's PCD, agents, servants and representatives of NYPD (including, but not limited to, Defendants McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, and various NYPD John/Jane Does) had previously and wrongfully reported back to the Bronx District Attorney's Office that the alleged loss of the paper Invoices indicated that the evidence had been destroyed. Moreover, certain Assistant District Attorneys employed by the Bronx District Attorney's Office, namely ADA Edelbaum, ADA Carroll, ADA Moore and ADA Curbelo (and various John/Jane Does), failed to supply sufficient information to the NYPD's PCD about: (a) the testing of the Vitullo rape kit by the OCME in 1988, and (b) the fact that the evidence had been returned thereafter in a particular "DOA barrel."  Upon information and belief, these ADAs possessed a photocopy of the NYPD Yellow Invoice ("working copy") relating to the rape kit in their file (which contained the precise location of the rape kit), but they failed to convey this copy of the Invoice or the information about its location to the NYPD's Property Clerk.  Defendants Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, had chain-of-custody documents in their files at the OCME, which would have revealed what happened to the rape kit, but these OCME Defendants failed to respond to requests from the Bronx DA's Office to produce the documentation.

137.   It is very clear that no NYPD PCD representative (including, but not limited to, Defendants McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, and various NYPD John/Jane Does) ever took the step of reviewing the procedures of the

PCD set forth in the PCD's "Property Guide" and tracked the NYPD's chain-of-custody of the rape kit.  If any of the aforementioned Defendants had reviewed the PCD's written procedures and tracked the chain-of-custody documents for the rape kit, the rape kit would have been found promptly upon request.  Instead, the aforementioned Defendants, with a reckless disregard for Plaintiff's constitutional rights, performed a cursory review of the PCD's records and files, found nothing, and summarily concluded that the rape kit had been destroyed.  The fact that VJ's soiled clothing still existed should have alerted any number of people to the possibility that the rape kit had not been destroyed in accordance with any specific policy on dated evidence: under any such policy, all of the evidence from the case would have been destroyed contemporaneously and, therefore, the existence of some parts of the evidence implied the existence of the rest.

138.    Because the NYPD's PCD acts as the final gatekeeper of evidence, any representations its members made to the Bronx District Attorney's Office effectively set the final status of the evidence.  Between 1989 and 2005, had the NYPD sought the original Yellow Invoice from the Bronx borough office of the PCD (with knowledge that the rape kit had been signed out for testing in 1988), they would have found VJ's rape kit.  Mr. Newton's request for DNA testing could have led to his exoneration for the rape of VJ as many as sixteen (16) years earlier – in 1989.

## Mr. Newton's Conviction Is Vacated

139.    The rape kit, once found in 2005, was submitted to the OCME's Department of Forensic Biology ("OCME"), and the evidence was split to enable replicate testing by an independent laboratory.  In April 2006, Forensic Science Associates ("FSA") obtained a full male STR DNA profile from the testing of the vaginal

and cervical swabs.  The OCME's testing of the cervical swab, completed in March 2006, yielded a partial profile, consistent with FSA's result.  New reference samples were collected from Mr. Newton and both FSA and the OCME generated Mr. Newton's DNA profile; it was compared to the one male profile obtained from the spermatozoa in the rape kit.  The DNA testing conclusively excluded Mr. Newton as the source of the spermatozoa recovered from VJ immediately after the rape.

140.    On July 6, 2006, Justice John Byrne of the Supreme Court of the State of New York (Criminal Term), County of Bronx, granted the joint motion of the Bronx County District Attorney's Office and defense counsel and vacated Mr. Newton's conviction pursuant to CPL § 440.10 (1) [newly discovered evidence], and dismissed the underlying accusatory instrument.

### Mr. Newton's Damages

141.    Alan Newton suffered substantial injuries and/or damages as a result of his unjust conviction and imprisonment, including but not limited to the following: twenty-two (22) years of physical suffering, pain, mental anguish, emotional distress, nervousness, depression, sleep disturbance, shame, embarrassment and humiliation caused by his arrest, conviction and the loss of his freedom; loss of enjoyment of life; injury to his reputation; loss of friends; the loss of his family's company during his incarceration (both of his parents died during his incarceration); psychological injury caused by his lengthy incarceration; loss of earnings/ pecuniary loss, loss of consortium, and the reasonable and necessary expenses associated with the defense he was compelled to present in the criminal action (including, but not limited to, his attorney's fees).

## LEGAL CLAIMS

### FEDERAL LAW CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### AGAINST INDIVIDUAL NYPD DEFENDANTS FOR THEIR
### WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL RIGHTS UNDER
### COLOR OF STATE LAW (UNDULY SUGGESTIVE I.D. PROCEDURES)

142.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 141, inclusive, with the same force and effect as if set forth at length herein.

143.   Defendants Newbert, Ryan, Leho, O'Toole and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, conducted unduly suggestive identification procedures (and suppressed/hid their conduct) that were highly likely to, and in fact did, lead two eyewitnesses to misidentify Plaintiff, including without limitation:

a.    Failing to determine the VJ's  competency to describe and/or identify her assailant in light of her condition at the time of the alleged crime (she was medicated and intoxicated);

b.    Failing to elicit detailed descriptions of VJ's assailant from the two eyewitnesses before showing them photographs and exposing them to lineups;

c.    Showing the eyewitnesses photo arrays in which Plaintiff's photograph was noticeably different from all other photographs;

d.    Showing the eyewitnesses photo arrays including Plaintiff's photograph at their homes and work places (or a hospital) prior to the eyewitnesses viewing Plaintiff in a physical lineup;

e.      Pressuring the eyewitnesses to make an identification of Plaintiff in spite of eyewitness statements that they "were not sure";

f.      Informing the eyewitnesses of Plaintiff's identity, address, and other identifying characteristics before obtaining a full description of VJ's assailant from them (and before the physical lineup and display of photographs);

g.      Informing the eyewitnesses that Plaintiff, a prime suspect in the rape of VJ, would be one of the people in the physical lineup;

h.      Informing the eyewitnesses that Plaintiff, a prime suspect in the rape of VJ, had been charged with another assault in the County of Bronx;

i.      Conducting a woefully defective voice identification procedure with VJ that permitted her to view each of the participants as they spoke;

j.      Conducting a woefully defective voice identification procedure with VJ that required Plaintiff, and Plaintiff alone, to speak a requested phrase several times more than the other participants;

k.      Purposely provoking Plaintiff during the voice identification procedure with VJ so that VJ would see and hear Plaintiff, and Plaintiff alone, speak in an angry and loud tone; and

l.      Engaging in post-identification suggestion by telling the eyewitnesses who had tentatively identified Plaintiff that the eyewitnesses had selected the right person and that "the other" witness also had identified him.

144.    Defendants Newbert, Ryan, Leho, O'Toole and various NYPD John/Jane Does committed these and other unduly suggestive acts intentionally and/or with reckless

disregard to Mr. Newton's clearly established constitutional rights and the obvious risks of inducing the eyewitnesses to misidentify.  These actions were taken despite other evidence indicating that Mr. Newton was innocent.  No reasonable police officer would have believed these procedures were lawful or would produce a reliable identification.

145.   Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, deliberately failed to disclose to the Bronx District Attorney's Office material information that they had had repeatedly employed unduly suggestive conduct to induce the two eyewitnesses to misidentify Alan Newton at physical and photographic identification procedures, *viz*:

   a.   Showing the two eyewitnesses photographs and photoarrays in which Mr. Newton's photograph was noticeably different from all other photographs;

   b.   Showing the two eyewitnesses photographs and photo arrays, including Mr. Newton's photograph, prior to their viewing him in a physical lineup (where he became the only common denominator);

   c.   Deliberately failing to document such repeated displays of  Mr.  Newton's photograph to the two eyewitnesses;

   d.   Pressuring the two eyewitnesses to make an identification of Mr. Newton;

   e.   Providing the two eyewitnesses with suggestive information about Mr. Newton prior to the physical lineups including his identity, his address and arrest history;

f.      Advising the two eyewitnesses that one of the people in the physical lineup, Mr. Newton, was the prime suspect and that the other eyewitness had already identified him; and

g.      Engaging in post-identification suggestion by telling the two eyewitnesses that they had selected the right person and, further, that the other eyewitness also had identified Mr. Newton;

146.    As a direct and proximate result of these unduly suggestive (and concealed) procedures, two eyewitnesses misidentified Mr. Newton as VJ's assailant both before and at trial, in violation of Mr. Newton's constitutional right to a fair trial and right not to be deprived of liberty without due process of law.

147.    The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

148.    Due to the unconstitutional misconduct of Defendants Newbert, Ryan, Leho, O'Toole and various NYPD John/Jane Does, Alan Newton suffered decades of

wrongful imprisonment and endured substantial physical, emotional and pecuniary injuries detailed above.

149.    Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

150.    Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Ryan, Leho, O'Toole, and various NYPD John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SECOND CAUSE OF ACTION
AGAINST INDIVIDUAL NYPD DEFENDANTS
FOR THEIR WRONGFUL VIOLATION OF
PLAINTIFF'S CIVIL RIGHTS UNDER COLOR OF STATE LAW
(FALSE ARREST & IMPRISONMENT & MALICIOUS PROSECUTION)**

151.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 150, inclusive, with the same force and effect as if set forth at length herein.

152.    Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, wrongfully arrested and detained Mr. Newton pursuant to legal process knowing: (a) that the only evidence -- two eyewitness identifications -- linking Mr. Newton to the crime alleged were highly suspect; (b) that they had collected physical evidence that they failed or refused to test, and then "lost" the evidence so no one else could test it; (c) that VJ had originally identified another man named "Willie" as her assailant; (d) that a man named "Willie" might be linked to the crime scene and the type of automobile used by

the assailant; (e) that Mr. Newton had an apparent alibi, (f) that there was an absolute absence of any physical evidence linking Mr. Newton to VJ or the crime scene, and (g) VJ had offered very inconsistent accounts of what occurred.  In short, the aforementioned NYPD police officers knew or should have known that they did not have probable cause for an arrest, detention and prosecution of Plaintiff Alan Newton.

153.    First, neither eyewitness provided anything close to a satisfactory identification as seen above.  VJ was intoxicated, medicated and, by her own admission, did not obtain a good and clear look at her assailant.  The only other witness, Ms. Gonzalez, saw VJ's assailant for less than a minute or so at the front counter of her store and she was subjected to impermissibly suggestive identification procedures.

154.    Second, Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does collected physical evidence from two crime scenes, but failed to perform or ensure follow up testing to confirm Mr. Newton's guilt or innocence.  In particular, these Defendants collected blood, semen and hairs from the victim, and sneakers from Mr. Newton, but failed to perform testing on these items to determine whether any links existed between the victim, Mr. Newton or some third person.  These same Defendants then proceeded to hide, secrete or lose this physical evidence in reckless disregard of Mr. Newton's constitutional rights.

155.    Third, Defendants Newbert, Ryan, O'Toole, and various NYPD John/Jane Does met with and interviewed a witness (Ms. Deborah Chamberlin) who offered information about a named "Willie" who may have been VJ's true assailant.  These Defendants, however, wrongfully and with reckless disregard for Mr. Newton's constitutional rights, dismissed the information offered by Ms. Chamberlin as

"unreliable" and failed to reveal the true identity of this witness and her potentially exculpatory information from Mr. Newton and his attorneys. In fact, these Defendants, individually or collectively, purposely lost, destroyed or secreted notes made by NYPD investigators during their interview of Ms. Chamberlin.

156.   Fourth, Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, never gave Mr. Newton's alibi any weight whatsoever. In spite of the inconsistencies in VJ's account of what occurred, these Defendants never even bothered to interview the people Mr. Newton was with at the times of the alleged crime.

157.   Fifth, Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, knew: (a) that the only evidence -- two eyewitness identifications -- linking Mr. Newton to the crime alleged were highly suspect and that VJ was especially unreliable; (b) that they had collected physical evidence that they failed or refused to test, and then "lost" the evidence so no one else could test it; (c) that VJ had originally identified another man named "Willie" as her assailant; (d) that a man named "Willie" might be linked to the crime scene and the type of automobile used by the assailant; (e) that Mr. Newton had an apparent alibi, and (f) that there was an absolute absence of any physical evidence linking Mr. Newton to the victim or the crime scene. In short, the aforementioned NYPD police officers knew or should have known that they did not have probable cause for an arrest, detention and prosecution of Plaintiff Alan Newton.

158.   Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, maliciously and/or without probable cause initiated the prosecution against Mr. Newton by wrongfully pressuring eyewitnesses into falsely identifying him

as the rapist, by submitting deliberate fabrications about the results of tests performed (or not) on physical evidence and the credibility of third-party witnesses, by ignoring exculpatory alibi information and omitting (and thereafter destroying) other exculpatory information.

159.    Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, misled the District Attorney's Office for Bronx County which authorized the arrest of Mr. Newton by presenting deliberate fabrications and making material omissions of exculpatory evidence.

160.    Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, maliciously continued the prosecution by improperly and wrongfully pressuring the eyewitnesses into falsely identifying Mr. Newton as the rapist, by deliberately (or with reckless disregard) failing to investigate any of the information that led away from Mr. Newton, as well as by hiding their misconduct and destroying evidence.

161.    The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately

caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

162.    The intentional conduct and/or reckless disregard of Mr. Newton's constitutional rights by Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, makes these Defendants liable to Mr. Newton under 42 U.S.C. § 1983.

163.    As a direct and proximate result of the wrongful conduct of Defendants Newbert, Ryan, Harris, Leho, O'Toole and various NYPD John/Jane Does, Mr. Newton was falsely arrested, falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades.  During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

164.    Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

165.    Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

### THIRD CAUSE OF ACTION
### AGAINST INDIVIDUAL DEFENDANTS
### FOR THEIR WRONGFUL VIOLATION OF
### PLAINTIFF'S CIVIL RIGHTS UNDER COLOR OF STATE
### LAW (LOSS OF MATERIAL, CRITICAL CRIMINAL EVIDENCE)

166. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 165, inclusive, with the same force and effect as if set forth at length herein.

167. Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, various NYPD John/Jane Does, DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, various ADA John/Jane Does, Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, acting within the scope of their employment and under color of state law, deliberately failed to register, store, preserve, test, maintain and control material and critical evidence relating to the crimes of which Alan Newton was charged (*i.e.*, they acted with reckless disregard of Plaintiff's constitutional rights).

168. While Plaintiff Alan Newton was incarcerated (and/or while any conviction against him remained on file), all of the Defendants had a constitutional obligation, as officers and agents of The City and/or State of New York, to register, store, preserve, test, maintain, control and produce material and critical evidence relating to the crimes of which Alan Newton was charged and convicted (at his request).  See, e.g., De Shaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989) ("when the State takes a person into its custody and holds him there against his will, the

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being").

169.    In fact, the aforementioned Defendants, acting within the scope of their employment and under color of state law, took an extraordinarily cavalier attitude with respect to their constitutional obligation to test, preserve and produce material and critical evidence relating to their investigation, prosecution and post-conviction incarceration of Alan Newton.

170.    With reckless disregard for Alan Newton's constitutional rights, the aforementioned Defendants, lost and/or misplaced and/or secreted the following material and critical evidence relating to Alan Newton's convictions under Bronx County Indictment No. 2441/84:

   a.    A rape kit containing, among other things, semen taken from the body of VJ after her rape (this kit was first discovered "lost" by the NYPD PCD in late 1989 and was not produced to Mr. Newton until 2005);

   b.    Mr. Newton's sneakers, taken from him in June of 1984 by NYPD investigators, were "lost" and never returned to him despite repeated requests;

   c.    The notes taken by Defendants Newbert, Galligan, et al., relating to their interview of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile;

d.     The "criminal background" information on Deborah Chamberlin that allegedly allowed Defendants Newbert, Galligan, *et al.*, to claim that Ms. Chamberlin was an "unreliable" witness; and

e.     The notes compiled by Defendants Newbert, Galligan, *et al.*, regarding their search of the Department of Motor Vehicles database for information about "blue and white Pontiac Grand Prix" vehicles in New York State.

171.   If the aforementioned evidence had been properly registered, stored, tested, preserved, maintained and controlled by Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, various NYPD John/Jane Does, DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, various ADA John/Jane Does, Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, and had it been produced to Mr. Newton and his attorneys in a timely manner, Mr. Newton would not have been convicted of the crime described above, or his incarceration would have been terminated more than a decade ago.

172.   The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be

free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his unjust incarceration for over twenty-two years.

173.    As a direct result of the deliberate (or reckless) failure to register, store, preserve, test, maintain and control material and critical evidence relating to the crime of which Alan Newton was charged and convicted, Mr. Newton endured a wrongful arrest and an unfair trial in violation of his clearly established constitutional rights; he was maliciously prosecuted; he was forced to endure a wrongful conviction, and then wrongfully imprisoned for over two decades.  During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

174.    Each of the aforementioned Defendants (Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, various NYPD John/Jane Does, DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, various ADA John/Jane Does, Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does) is liable personally and in their official capacity for these acts which damaged Plaintiff.

175.    Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, various NYPD John/Jane Does, DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, various ADA John/Jane Does, Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does,

for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

### FOURTH CAUSE OF ACTION
### AGAINST DEFENDANTS SHEEHAN,
### TRABITZ, HIGGINS, MAJOR, HACKSON,
### NATHANSON, KUTTLER, KESSLER & MERRICK
### FOR WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL
### RIGHTS UNDER COLOR OF STATE LAW (SUPERVISORY LIABILITY)

176.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 175, inclusive, with the same force and effect as if set forth at length herein.

177.    The acts of Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, were committed under their authority as NYPD Commanding Officers vested under and by virtue of the laws of the State of New York; their acts were, therefore, committed under the color of New York State law.

178.    Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, knew or should have known of the need for additional screening, training, supervising and disciplining of NYPD personnel to: (a) refrain from ignoring evidence of a criminal defendant's innocence; (b) refrain from misrepresenting withholding or falsifying evidence, (c) exercise care and thoroughness in the investigation and prosecution of a case of a crime involving no other evidence but identifications; (d) accurately identify and handle exculpatory material; (e) refrain from obtaining indictments in bad faith and without probable cause; and (f) record, inventory, protect, preserve and produce all criminal

evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.

179.   Through an intentional and deliberate indifference and/or a reckless disregard of basic civil rights, Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, failed to provide adequate screening, training, supervising, and disciplining of NYPD personnel with respect to: (a) misrepresenting, withholding and falsifying evidence, (b) conducting a proper investigation, (c) obtaining indictments in bad faith without probable cause, (d) identifying and handling exculpatory material in a proper manner, and (e) protecting, preserving and producing all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.  This reckless disregard of basic constitutional rights is evidenced by prior decisions of the courts of the State of New York reporting that the NYPD engaged in various acts of police misconduct and constitutional violations including: withholding exculpatory evidence from accused individuals, acting in a manner to obtain convictions at all costs rather than seeking truth and justice and, generally, in failing to act in a constitutional manner.

180.   Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, personally and/or through their authorized delegates, at all relevant times, had final, discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to the performance of duties by NYPD personnel.  Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, were NYPD "policy makers" on

behalf of the NYPD and The City; these Defendants acted, however, with a reckless disregard to the constitutional rights of persons coming into contact with the NYPD in the manner set forth above.

181.   Upon information and belief, NYPD personnel have not been disciplined by the NYPD for their misconduct, despite repeated judicial findings that NYPD personnel have engaged in misconduct.  Such failure constitutes a reckless disregard toward the constitutional rights of the accused, and such misconduct includes, but is not limited to, withholding or secreting exculpatory evidence from the criminally accused.

182.   Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, knew or should have known that the need for adequate screening, training, supervising, and disciplining of NYPD personnel was and is compelling because of the overriding credo of NYPD personnel to obtain and sustain convictions at all costs with deliberate and total disregard for the truth and the constitutional rights of the accused.

183.   Specifically, with respect to the NYPD Defendants named in this action, Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, knew or should have known of the inherent risks of permitting the NYPD Defendants named herein to handle this sex crime case and the resulting evidence.

184.   Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, knew that the Bronx Sex Crimes Unit and PCD of the NYPD would do all in their power to obtain and sustain a rape, robbery and assault conviction.  This circumstance required an even more

heightened and controlled level of supervision which should have been exercised or, alternatively, all conceivable steps should have been taken to ensure that the personnel within the Bronx Sex Crimes Unit and PCD would act ethically and, specifically, in accordance with their duties as officers of the peace and, specifically under <u>Brady v. Maryland</u> and similar cases.

185.    However, rather than providing more scrutiny and supervision to avoid such concerns, Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, actually fostered and instigated the wrongful conduct of NYPD personnel.  Supervisory personnel and others were apparently directly involved and became aware of, but ignored, the evidence and strong indications that Plaintiff Alan Newton was innocent and that material evidence was being withheld from Mr. Newton and his attorneys.

186.    In addition, during Mr. Newton's post-convictions proceedings and hearings, the NYPD and its management used every tool to prevent the disclosure of exculpatory evidence and hide the improper behavior of its employees.   Upon information and belief, it did no investigation into the circumstances surrounding this improper behavior but sought only to protect the "integrity" of the NYPD.

187.    But for the deliberate indifference of Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, in failing to adequately provide screening, training, supervision, and discipline of NYPD personnel, the innocent Plaintiff would not have been prosecuted nor convicted of the crime, nor would he have continued to suffer through the failure of his post-conviction motions.

188.   The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

189.   By reason of the aforesaid violations of Plaintiff's rights, Plaintiff is entitled to damages under 42 U.S.C. § 1983.

190.   The foregoing violations of Plaintiff's constitutional rights, his conviction, his sentence, his incarceration, and his resulting and continuing injuries were directly and proximately caused by the deliberate indifference of NYPD personnel to Plaintiff's constitutional rights.

191.   With respect to all of the wrongful actions and omissions alleged above, Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, knew to a moral certainty that NYPD personnel would confront situations requiring adequate screening, training, equipment, supervision, and discipline, and that there was a clear history of NYPD personnel mishandling such situations; these Defendants knew that wrong choices by NYPD

personnel had previously resulted in the deprivation of various citizens' constitutional rights.

192.    Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, are responsible personally and in their official capacities in this instance for the violation of Mr. Newton's rights.

193.    Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Sheehan, Trabitz, Higgins, Major, Hackson, Nathanson, Kuttler, Kessler, Merrick, and various NYPD John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**FIFTH CAUSE OF ACTION
AGAINST DA JOHNSON FOR HIS
WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL RIGHTS
UNDER COLOR OF STATE LAW (SUPERVISORY LIABILITY)**

194.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 193, inclusive, with the same force and effect as if set forth at length herein.

195.    The acts of ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, and various ADA John/Jane Does, were committed under their authority as Assistant District Attorneys vested under and by virtue of the laws of the State of New York; these acts were, therefore, committed under the color of the state law.

196.    DA Johnson knew or should have known of the need for additional screening, training, supervising and disciplining of Assistant District Attorneys in the Office of the District Attorney of Bronx County to: (a) refrain from ignoring evidence of

a criminal defendant's innocence; (b) refrain from misrepresenting withholding or falsifying evidence; (c) exercise care and thoroughness in the investigation and prosecution of a case of a crime involving no other evidence but identifications; (d) accurately identify and handle exculpatory material;  (e) refrain from obtaining indictments in bad faith and without probable cause; and (f) record, inventory, protect, preserve and produce all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.

197.    Through intentional and deliberate indifference and a reckless disregard of basic civil rights, DA Johnson failed to provide adequate screening, training, supervising, and disciplining of Assistant District Attorneys serving in the Office of the District Attorney of Bronx County with respect to (a) misrepresenting, withholding and falsifying evidence, (b) conducting a proper investigation, (c) obtaining indictments in bad faith without probable cause, (d) identifying and handling exculpatory material in a proper manner, and (e) protecting, preserving and producing all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.  This reckless disregard of basic constitutional rights is evidenced by decisions of the courts of the State of New York reporting that the Office of the District Attorney of Bronx County engaged in various acts of prosecutorial misconduct and constitutional violations including withholding exculpatory evidence from accused individuals, engaging in improper, disingenuous and factually vacant arguments, acting in a manner to obtain convictions at all costs rather than seeking truth and justice and, generally, in failing to act in a quasi-judicial capacity.

198.    The District Attorney of Bronx County, personally and/or through their authorized delegates, at all relevant times, had final, discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to the District Attorney's Office's performance of its duties.  The Defendant District Attorney (and/or his authorized delegates) was a City and State "policy maker"; he acted, however, with a reckless disregard to the constitutional rights of persons coming into contact with his Office in the manner set forth above.

199.    Upon information and belief, prosecutors have not been disciplined by the Office of the District Attorney of Bronx County for their misconduct, despite repeated judicial findings that prosecutors from their Office engaged in misconduct and despite knowledge that innocent people were being unlawfully detained through aggressive prosecutorial misconduct.   Such failure constitutes reckless disregard toward the constitutional rights of the criminally accused; such misconduct includes, but is not limited to, the withholding or secreting of exculpatory evidence from the accused.

200.    DA Johnson knew or should have known that the need for adequate screening, training, supervising, and disciplining of Assistant District Attorneys was and is compelling because of the overriding credo of prosecutors in the Office of the Bronx County District Attorney, to obtain and uphold convictions at all costs with deliberate and total disregard for the truth and the constitutional rights of the accused.

201.    DA Johnson knew or should have known that his prosecutors would do anything to obtain and uphold a rape, robbery and assault conviction.  This circumstance required a heightened and controlled level of supervision which should have been

exercised or, alternatively, the taking of all conceivable steps to ensure that the Defendant ADAs would act ethically and, specifically in accordance with their duties as quasi-judicial officers.

202.    DA Johnson also knew or should have known that evidence in a multitude of Bronx criminal cases was being lost or misplaced.

203.    However, rather than providing more scrutiny and supervision to avoid such concerns, the Bronx District Attorney's Office actually fostered and/or instigated the foregoing misconduct.   Supervisory personnel and others were apparently directly involved and became aware of, but ignored, the evidence and strong indications that Plaintiff Alan Newton was innocent and that evidence relating to his innocence was not being produced to him.

204.    In addition, during Mr. Newton's post-convictions proceedings and hearings, the Bronx District Attorney's Office used every tool to prevent the disclosure of (or secrete) exculpatory evidence and hide the improper behavior of its employees.   Upon information and belief, the Bronx District Attorney's Office did no investigation into the circumstances surrounding this improper behavior but sought only to protect the "integrity" of its office.

205.    But for DA Johnson's deliberate indifference to the inadequate screening, training, supervision, and discipline of Assistant District Attorneys for Bronx County, the innocent Plaintiff would not have continued to suffer through the failure of his post-conviction motions.

206.    The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and

Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

207.    By reason of the aforesaid violations of Plaintiff's rights, Plaintiff is entitled to damages under 42 U.S.C. § 1983.

208.    The foregoing violations of Plaintiff's constitutional rights, his conviction, his sentence, his incarceration, and his resulting and continuing injuries were directly and proximately caused by the deliberate indifference to Plaintiff's constitutional rights of persons by prosecutors in the District Attorney's Office of Bronx County.

209.    With respect to all of the wrongful actions and omissions alleged above, DA Johnson knew to a moral certainty that his Assistant District Attorneys would confront situations requiring adequate screening, training, equipment, supervision, and discipline; that there was a clear history of Assistant District Attorneys mishandling such situations; and, finally, that wrong choices by his Assistant District Attorneys frequently resulted in the deprivation of a citizen's constitutional rights.

210.    DA Johnson is, therefore, responsible personally and in his official capacity for the violation of Plaintiff's constitutional rights.

211.    Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendant DA Johnson for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

### SIXTH CAUSE OF ACTION
### AGAINST THE INDIVIDUAL DEFENDANTS FOR THEIR WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL RIGHTS UNDER COLOR OF STATE LAW (CONSPIRACY LIABILITY)

212.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 211, inclusive, with the same force and effect as if set forth at length herein.

213.    Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, various NYPD John/Jane Does, DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, various ADA John/Jane Does, Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, acting within the scope of their employment and under color of state law, agreed amongst themselves and with other individuals to act in concert in order to deprive Mr. Newton of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.

214.     In furtherance of this ongoing conspiracy each individual Defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.      Repeatedly employing unduly suggestive conduct to induce the two eyewitnesses to misidentify Plaintiff at physical and photographic identification procedures;

b.      Wrongfully pressuring eyewitnesses into falsely identifying Plaintiff as the rapist;

c.      Submitting deliberate fabrications about the results of tests performed (or not) on physical evidence collected from the victim, the crime scene and Plaintiff and/or agreeing wrongfully not to test the evidence to ensure that exculpatory evidence was not produced;

d.      Ignoring credible leads provided by third-party witnesses, and omitting (and thereafter destroying) exculpatory information provided by such witnesses;

e.      Deliberately or recklessly losing and/or misplacing and/or secreting material and critical evidence (including files) relating to Plaintiff's criminal convictions; and

f.      Deliberately (or with reckless disregard) failing to investigate any evidence that might tend to lead other investigators away from Mr. Newton.

215.    The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

216.    As a direct and proximate result of the conspiracy and actions in furtherance of the conspiracy by Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, various NYPD John/Jane Does, DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, various ADA John/Jane Does, Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does,  Mr. Newton was falsely arrested and imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades.  During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

217.    Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

218.     Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Higgins, Hackson, Nathanson, Kutler, Kessler, Merrick, Dundas, Brandow, Smith, McKeon, Russo, Deangelis, various NYPD John/Jane Does, DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, various ADA John/Jane Does, Patricia Ryan, Patrick Buffalino, and various OCME John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

### SEVENTH CAUSE OF ACTION
### AGAINST THE CITY FOR ITS POLICY MAKERS'
### WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL
### RIGHTS UNDER COLOR OF STATE LAW (MUNICIPAL LIABILITY)

219.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 218, inclusive, with the same force and effect as if set forth at length herein.

220.     Municipalities and their subdivisions may be held liable to an individual if they enforce a policy or custom that causes the deprivation of the individual's constitutional rights.

221.     Municipal liability may be based upon:

a.     a formally promulgated policy;

b.     a well settled custom or practice;

c.     a final decision by a municipal policymaker; or

d.     deliberately indifferent training or supervision.

222.    Defendant The City, by and through its final policymakers, maintained the following unconstitutional customs, decisions, policies, and/or indifferent employee training or supervision practices that allowed for various constitutional violations:

a.    NYPD personnel systematically conducted unduly suggestive identification procedures intended to and/or highly likely to cause misidentification of suspects;

b.    NYPD personnel systematically failed to disclose to prosecutors material information that was favorable to criminal defendants;

c.    NYPD personnel systematically fabricated falsely inculpatory evidence and/or committed perjury against suspects in order to secure arrests and close cases;

d.    NYPD personnel systematically abused process by presenting false evidence to courts reviewing investigations, arrests and detention of suspects;

e.    NYPD personnel systematically destroyed, lost or secreted evidence, or recklessly disregarded the rights of the accused in timely producing evidence, to further their personal goals of obtaining and sustaining convictions; and

f.    NYPD personnel acted with impunity in destroying criminal evidence, or by reporting it "lost" claiming that they had no duty to preserve and produce evidence once a conviction had been obtained and the criminal defendant's appeals had been

"exhausted" (but while the criminal defendant was still incarcerated).

223.    The City's unconstitutional customs, decisions, policies  and/or indifferent employee training or supervision practices were: (a) deliberately or recklessly indifferent to the obvious risks of inducing eyewitnesses to crimes to misidentify suspects, (b) deliberately or recklessly indifferent to the repeated destruction and/or loss of material criminal evidence, (c) deliberately or recklessly indifferent to a criminal defendant's constitutional rights, and (d) deliberately or recklessly indifferent to the issue of whether innocent people were being convicted of crimes.

224.    The City's municipality liability here is premised upon, among other things, its failure to adopt proper and reasonable policies and practices in the face of an obvious need to do so.

225.    The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

226. As a direct and proximate result of The City's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices, Mr. Newton was falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

227. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendant The City for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

## STATE LAW CAUSES OF ACTION

### EIGHTH CAUSE OF ACTION
### AGAINST THE DEFENDANTS
### FOR FALSE ARREST/ FALSE IMPRISONMENT

228. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 227, inclusive, with the same force and effect as if set forth at length herein.

229. Defendants Newbert, Ryan, Leho, O'Toole and various NYPD John/Jane Does, arrested and confined Alan Newton, intentionally and without the right to do so.

230. Defendants Newbert, Ryan, Leho, O'Toole and various NYPD John/Jane Does, did not have probable cause for believing that a crime had been committed and/or that Alan Newton had committed it.

231.    Defendants Newbert, Ryan, Leho, O'Toole and various NYPD John/Jane Does, did not act as reasonably prudent persons in effecting the arrest and confinement of Alan Newton.

232.    Following the wrongful arrest and wrongful initial confinement of Alan Newton, Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathanson, various NYPD John/Jane Does, DA Johnson, , various ADA John/Jane Does, and various OCME John/Jane Does, continued the unlawful detention and confinement of Plaintiff Alan Newton without probable cause by intentionally secreting, recklessly misplacing, and/or negligently losing exculpatory material (documents and evidence).

233.    Plaintiff Alan Newton did not consent to the arrest and confinement by the aforementioned Defendants.

234.    Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

235.    Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

236.    As a direct and proximate result of the false arrest and false imprisonment by one or more of the aforementioned Defendants, Mr. Newton was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for over two decades.  During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

237.    Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely,

Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various ADA John/Jane Does, and various OCME John/Jane Does, and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

### NINTH CAUSE OF ACTION
### AGAINST THE DEFENDANTS FOR MALICIOUS PROSECUTION

238.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 237, inclusive, with the same force and effect as if set forth at length herein.

239.    Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, and various NYPD John/Jane Does, initiated judicial proceedings against Plaintiff Alan Newton intentionally and without the right to do so.

240.    Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, and various NYPD John/Jane Does, did not have probable cause for believing that a crime had been committed and/or that Alan Newton had committed it.

241.    Defendants Newbert, Ryan, Leho, O'Toole Sheehan, and various NYPD John/Jane Does, did not act as reasonably prudent persons in initiating criminal proceedings against Alan Newton.

242.    Following the initiation of judicial proceedings against Plaintiff Alan Newton, Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, maliciously continued to use judicial proceedings to detain and confine Mr. Newton, without probable cause, by

intentionally secreting, recklessly misplacing, and/or negligently losing exculpatory material.

243.     Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

244.     Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

245.     As a direct and proximate result of the malicious prosecution by one or more of the aforementioned Defendants, Mr. Newton was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for over two decades.  During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

246.     Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**TENTH CAUSE OF ACTION
AGAINST THE DEFENDANTS
<u>FOR THE NEGLIGENT LOSS OF EVIDENCE</u>**

247.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 246, inclusive, with the same force and effect as if set forth at length herein.

248.    Defendants The City, Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, negligently failed to register, store, preserve, maintain and control critical evidence relating to the crimes of which Alan Newton was charged.

249.    While Alan Newton was incarcerated (and/or while any conviction against him remained on file), all of the Defendants had a duty and obligation, as officers and agents of the The City and/or State of New York, to register, store, preserve, maintain, control and produce material and critical evidence relating to the crimes of which Alan Newton was charged and convicted.  See, e.g., De Shaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989) ("when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being").

250.    In fact, Defendants The City, Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, took an extraordinarily cavalier attitude with respect to their duty and obligation to test and preserve material and critical evidence relating to their investigation and prosecution of Plaintiff Alan Newton.

251.    In breaching the aforementioned duty and obligation, Defendants The City, Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, lost and/or misplaced and/or secreted (and/or failed

to test evidence in accordance with an applicable court order) the following material and critical evidence relating to Alan Newton's rape conviction in May, 1985:

a.   A rape kit containing, among other things, semen taken from the body of VJ after her rape (this kit was "lost" or misplaced by the NYPD Property Division in 1989 and was not produced to Mr. Newton until 2005);

b.   Mr. Newton's sneakers, taken from him in June of 1984 by NYPD investigators, were "lost" and never returned to him despite repeated requests;

c.   The notes taken by Defendants Newbert, Galligan, *et al.*, relating to their interview of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile;

d.   The "criminal background" information on Deborah Chamberlin that allegedly allowed Defendants Newbert, Galligan, *et al.*, to claim that Ms. Chamberlin was an "unreliable" witness;

e.   The notes compiled by Defendants Newbert, Galligan, *et al.*, regarding their search of the Department of Motor Vehicles database for information about "blue and white Pontiac Grand Prix" vehicles in New York State.

252.   If the aforementioned evidence had been properly registered, stored, preserved, tested, maintained and controlled by Defendants The City, Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious

NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, and had it been produced to Mr. Newton and his attorneys in a timely manner, Mr. Newton would not have been convicted of the crime described above, or his incarceration would have been terminated more than a decade ago.

253.    As a direct and proximate result of the negligence of the aforementioned Defendants in registering, storing, preserving, maintaining, controlling and producing material and critical evidence relating to the aforementioned crime, Mr. Newton endured a wrongful arrest and an unfair trial; he was maliciously prosecuted; he was forced to endure a wrongful conviction, and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

254.    Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

255.    Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

256.    Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**ELEVENTH  CAUSE OF ACTION
AGAINST DEFENDANTS SHEEHAN, TRABITZ,
& DA JOHNSON  FOR NEGLIGENT SUPERVISION**

257.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 256, inclusive, with the same force and effect as if set forth at length herein.

258.    Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, knew or should have known of the need for additional screening, training, supervising and disciplining personnel, respectively at the NYPD, the Bronx District Attorney's Office and the OCME, to: (a) refrain from ignoring evidence of a criminal defendant's innocence; (b) refrain from misrepresenting withholding or falsifying evidence, (c) exercise care and thoroughness in the investigation and prosecution of a case of a crime involving no other evidence but identifications; (d) accurately identify and handle exculpatory material; (e) refrain from obtaining indictments in bad faith and without probable cause; and (f) record, inventory, protect, and preserve all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.

259.    Through intentional and deliberate indifference and/or a reckless disregard of basic civil rights, Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, failed to adequately provide for screening, training, supervising, and disciplining of their personnel with respect to (a) misrepresenting, withholding and falsifying evidence, (b) conducting a proper investigation, (c) obtaining indictments in bad faith without probable cause, (d) identifying and handling exculpatory material in a proper manner, and (e) protecting,

preserving and producing all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.  This reckless disregard of basic constitutional rights is evidenced by decisions of the courts of the State of New York reporting that the NYPD, Bronx District Attorney's Office and OCME engaged in various acts of misconduct and constitutional violations including: withholding exculpatory evidence from accused individuals, acting in a manner to obtain conviction at all costs rather than seeking truth and justice and, generally, in failing to act in a constitutional capacity.

260.   Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, personally and/or through their authorized delegates, at all relevant times, had final, discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to the performance of duties by their personnel.

261.   Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does breached their duty to supervise their personnel to prevent an abuse of authority.

262.   Upon information and belief, personnel employed by the Bronx District Attorney's Office, the NYPD and OCME have not been disciplined for their misconduct, despite repeated judicial findings of misconduct.

263.   Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, knew or should have known that the need for adequate screening, training, supervising, and disciplining of Assistant District Attorneys, NYPD personnel and OCME personnel was and is compelling because of the

overriding credo of these individuals to obtain and sustain convictions at all costs, with a deliberate and total disregard for the truth and the constitutional rights of the accused.

264.   Specifically, with respect to the NYPD, OCME and ADA Defendants named in this action, Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, knew or should have known of the inherent risks of permitting the individual Defendants named herein to handle the Newton criminal case and the resulting evidence.

265.   Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, knew or should have known that Bronx Sex Crimes Unit and PCD of the NYPD, the OCME and the Bronx District Attorney's Office would do all in their power to obtain and sustain a rape, robbery and assault conviction.  This circumstance required an even more heightened and controlled level of supervision which should have been exercised or, alternatively, all conceivable steps should have been taken to ensure that the Bronx Sex Crimes Unit and PCD of the NYPD, the OCME and the Bronx District Attorney's Office would act ethically and, specifically in accordance with their duties as officers of the peace and quasi-judicial officers.

266.   However, rather than providing more scrutiny and supervision to avoid such concerns, Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, actually fostered and instigated the wrongful conduct of their personnel.  Supervisory personnel and others were apparently directly involved and became aware of, but ignored, the evidence and strong indications

that Plaintiff Alan Newton was innocent and that evidence was being withheld from him and his attorneys.

267.   In addition, during all Mr. Newton's post-conviction proceedings and hearings, the NYPD, the OCME and the Bronx District Attorney's Office used every tool to prevent the disclosure of exculpatory evidence and hide the improper behavior of its employees.   Upon information and belief, they did no investigation into the circumstances surrounding this improper behavior but sought only to protect the "integrity" of their respective offices.

268.   But for the deliberate indifference of Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, in failing to provide adequate screening, training, supervision, and discipline of their personnel, the innocent Plaintiff would not have been prosecuted nor convicted of the crime, nor would he have continued to suffer through the failure of his post-conviction motions.

269.   The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.   Such misconduct also directly and proximately caused his

arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

270.     The foregoing violations of Plaintiff's constitutional rights, his conviction, his sentence, his incarceration, and his resulting and continuing injuries were directly and proximately caused by the negligent supervision, training and retention of incompetent personnel by Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does.

271.     Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, are responsible personally and in their official capacities in this instance for the wrongs perpetrated against Mr. Newton and the damages he sustained.

272.     Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

273.     Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Sheehan, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, and various OCME John/Jane Does, and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**AGAINST THE DEFENDANTS**
**<u>FOR INFLICTION OF EMOTIONAL DISTRESS</u>**

274.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 273, inclusive, with the same force and effect as if set forth at length herein.

275.     Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, owed a duty of care to act ethically and within the rules of law, as police officers or quasi-judicial officers, to ensure a fair investigation, a fair trial and proper post-conviction proceedings free from misrepresentation.

276.     Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, ADA Edelbaum, ADA Carroll, ADA Moore, ADA Curbelo, various ADA John/Jane Does, and various OCME John/Jane Does, failed to conduct themselves in that manner by knowingly, recklessly or negligently withholding and ignoring exculpatory evidence when they had an absolute duty to produce it and bring it promptly to the attention of the court and defense counsel.

277.     Various personnel within the Bronx District Attorney's Office, the OCME and the NYPD improperly argued against vacating Alan Newton's conviction in the face of mounting evidence of his innocence by, among other things, concealing evidence of his innocence.  By doing so, they placed their credibility and status as District Attorneys, scientists, Assistant District Attorneys and NYPD police officers before the court in a single-minded attempt to uphold a conviction at all cost, without regard to the truth.

278.     Through its personnel, the Bronx District Attorney's Office, the OCME, and the NYPD, failed to investigate further and properly when confronted with clear-cut evidence pointing toward the innocence of Alan Newton and they thereafter intentionally, recklessly or negligently lost, secreted or misplaced exculpatory evidence.

279.    Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, themselves, and through their personnel, did these outrageous, unethical and improper acts in a case fraught with ambiguity and, at a minimum, substantial doubt about the guilt of Alan Newton, thereby subjecting an innocent person to decades of imprisonment without any regard as to his innocence and the suffering that a conviction would create; these Defendants continued to fight to uphold Mr. Newton's conviction despite evidence in their possession - withheld from the defense - which clearly indicated Plaintiff's innocence.

280.    Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

281.    Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

282.    As a direct and proximate result of the above-described outrageous conduct by one or more of the aforementioned Defendants, Mr. Newton was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for over two decades.  During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

283.    Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, Nathansonvarious NYPD John/Jane Does, DA Johnson, various ADA John/Jane Does, and various OCME John/Jane Does, and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), punitive damages, plus

attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

## **JURY DEMAND**

Plaintiff Alan Newton hereby demands a trial by jury on all issues.

WHEREFORE, Plaintiff demands JUDGMENT against Defendants as follows:

I.      For compensatory damages in the amount of One Hundred Million ($100,000,000.00);

II.     For punitive damages in the amount of Fifty Million Dollars ($50,000,000.00);

III.    For reasonable attorneys' fees, together with costs and disbursements of this action pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court;

IV.    For pre-judgment interest and post-judgment, as allowed by law; and

V.     For such other and further relief as this Court may deem just and

proper.

Dated: New York, New York
       May 11, 2010

Respectfully submitted,
Law Office of John F. Schutty, P.C.

By:_____/s_____
         John F. Schutty
        (JS 2173)
445 Park Avenue, 9th Floor
New York, NY 10022
(212) 836-4796

## AFFIRMATION OF SERVICE

I, John F. Schutty, the undersigned attorney at law duly admitted to practice in the

State of New York, affirms under penalty of perjury, that on the 11th day of May 2010,

the annexed "Amended Complaint" was served personally by me upon:

**City of New York Law Department**
Office of Corporation Counsel
Attn: Arthur G. Larkin, Esq., Rm. 3-193
100 Church Street
New York, NY 10007


_____/s_____
John F. Schutty