USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9|14|10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ALAN NEWTON,

        Plaintiff,

  - against -

THE CITY OF NEW YORK; DISTRICT ATTORNEYS
MARIO MEROLA AND ROBERT T. JOHNSON,
INDIVIDUALLY, AND IN THEIR OFFICIAL
CAPACITIES; ANDREA FREUND AND VARIOUS
JOHN/JANE DOES, INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITIES AS EMPLOYEES OF THE CITY
OF NEW YORK WHO ARE/WERE ASSISTANT
DISTRICT ATTORNEYS WITHIN THE OFFICE OF THE
DISTRICT ATTORNEY, COUNTY OF BRONX;
DETECTIVE JOANNE NEWBERT, DETECTIVE PHILLIP
GALLIGAN, DETECTIVE [JOHN DOE] HARTFIELD,
DETECTIVE [JOHN DOE] RYAN, DETECTIVE [JOHN
DOE] HARRIS, POLICE OFFICER DOUGLAS LEHO,
POLICE OFFICER WILLIAM SEAN O'TOOLE,
LIEUTENANT MICHAEL SHEEHAN, SERGEANT
PATRICK J. McGUIRE, POLICE OFFICER [JOHN DOE]
HASKINS, POLICE OFFICER [JANE DOE] KIELY,
INSPECTOR JACK J. TRABITZ AND VARIOUS
JOHN/JANE DOES, INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITIES AS EMPLOYEES OF THE CITY
OF NEW YORK WHO ARE/WERE MEMBERS OF THE
POLICE DEPARTMENT OF THE CITY OF NEW YORK,

        Defendants.

------------------------------------------------------------X

**OPINION
AND
ORDER**

07 Civ. 6211
(SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Alan Newton was released from prison on July 6, 2006, after serving more than twenty-two years for a rape and assault that DNA testing ultimately proved he did not commit.  In 1988, Newton sought and was granted permission to test the rape kit containing the exonerating DNA evidence.  This never happened. Instead, Patricia Ryan, a laboratory scientist employed by the Office of the Chief Medical Examiner of the City of New York ("OCME") — rather than an independent laboratory — conducted the required forensic analysis.  Ryan did not detect the presence of any sperm in the biological fluid samples taken from the victim, and thus could not rule out Newton as the attacker.  Subsequent tests performed on the rape kit in 2006 and 2010, however, identified ample amounts of sperm and were able to conclusively establish Newton's innocence.

Newton has since brought a civil rights action against the City for his erroneous conviction, and asserts constitutional claims against Ryan for her alleged role in defendants' investigation, prosecution, and subsequent failure to examine exculpatory evidence.[1]  Newton also alleges a state law claim for malicious

---

[1]      On October 13, 2009, Ryan was dismissed from the suit on the basis of qualified immunity, because Newton's constitutional right to access the rape kit for DNA testing had not been clearly established at the time of her actions.  *See Newton v. City of New York*, No. 07 Civ. 6211, 2009 WL 3294996 (S.D.N.Y. 2009), *withdrawn on reconsideration and amended January 27, 2010.*  In a

prosecution against the City based on Ryan's alleged misconduct. Defendants now seek Ryan's dismissal from the case on the basis of governmental immunity, and alternatively, on the merits.[2] For the reasons that follow, defendants' motion is granted in its entirety.

## II.   FACTS[3]

### A.   Overview

In the early morning hours of June 23, 1984, a woman known as V.J.[4]

---

conference held on July 23, 2010, Ryan was putatively reinstated as a defendant based on newly discovered evidence alleged by plaintiff, with a final decision subject to the briefed motion to dismiss the reinstated claims.

Defendants allege that plaintiff has failed to demonstrate newly discovered evidence so as to merit reinstatement of his claims. Because I find that Ryan's damages liability is precluded by governmental immunity even when the alleged newly discovered evidence is taken into account, I do not address this argument.

[2]   In addition to challenging Newton's claims against Ryan on the merits or on the basis of immunity, defendants also seek dismissal of these claims as a sanction warranted under Rule 37(b) for Newton's failure to comply with a July 23, 2010 Court Order directing him to produce his blood type and secretor status to defendants.

[3]   The facts in this section are not in dispute and are drawn from the evidence submitted to this Court with respect to previous motions, including declarations and exhibits, and Newton's Amended Complaint ("Am. Compl."). Only the facts relating to this motion have been included. Additional facts were summarized in this Court's January 27, 2010 Amended Opinion and Order. *See Newton v. City of New York,* 681 F. Supp. 2d 473, 476-84 (S.D.N.Y. 2010).

[4]   The victim's full name is withheld pursuant to New York's rape shield law.

was raped, robbed, and assaulted in the area of Crotona Park, in the Bronx.[5]

Shortly thereafter, V.J. was taken to Jacobi Hospital for a physical examination,

which included the use of a "Vitullo rape kit" to collect and store biological

evidence gathered from V.J.'s body.[6]  The rape kit contained pubic and head hair,

as well as three cotton swabs and four microscope slides with body fluids.[7]  No

tests were conducted to determine the assailant's blood type from the semen

collected in the rape kit, or to compare the enclosed hairs with those of the victim

or Newton.[8]  Accordingly, Newton was not connected to V.J.'s assault by any

physical evidence.[9]

At trial, Newton presented two witnesses to support his assertion of an

alibi.[10]  On May 21, 1985, Newton was convicted by a jury of raping, assaulting,

---

[5]    *See* Am. Compl. ¶¶ 36-37.  The overall attack consisted of two incidents: rape and sodomy in an outdoor park area, followed by rape, assault, and robbery in an abandoned building.  *See id.* ¶ 94.

[6]    *See id.* ¶ 53.

[7]    *See* 7/30/84 Police Laboratory Analysis Report, Ex. O to 4/23/09 Declaration of John Schutty ("Schutty Decl. I"), plaintiff's counsel, submitted with plaintiff's opposition to defendants' 4/09/09 Motion for Partial Summary Judgment.

[8]    *See* Am. Compl. ¶ 53.

[9]    *See id.* ¶ 88.

[10]    *See id.* ¶ 82.

3

and robbing V.J. on the basis of eyewitness testimony and V.J.'s identification of him as her assailant.[11]  On May 31, 1985, the court sentenced Newton to concurrent prison terms of 8 1/3 to 25 years for the rape and robbery charges, followed by a consecutive prison term of 5 to 15 years for the assault.[12]  Twenty-two years later, DNA evidence exonerated Newton and his conviction was vacated.[13]

### B.    Testing the Rape Kit

Newton first requested testing on the rape kit on or about January 29, 1988, in a motion filed with the Supreme Court of the State of New York, Bronx County.[14]  At the time, Newton asked for an independent laboratory test to determine whether semen collected from V.J.'s person and clothing was produced by a "secretor" or a "non-secretor," and thereafter determine if Newton was a match.[15]  On April 6, 1988, Justice Burton Roberts granted Newton's request and authorized inspection of the rape kit "for the purpose of determining whether

---

[11]    *See id.* ¶ 37.  While Newton was convicted of the assault in the abandoned building, he was acquitted of the assault in the outdoor park area.  *See id.* ¶ 94.

[12]    *See id.* ¶ 95.

[13]    *See id.* ¶¶ 39-40.

[14]    *See* 6/25/09 Declaration of Alan Newton ("Newton Decl."),  ¶ 8.

[15]    *See id.*

4

scientific testing could be performed."[16]   If the examination yielded sufficient

biological data to complete a serological analysis, the Court allowed Newton to

apply for a further Order "directing the New York State Department of Corrections

to make arrangements" as necessary.[17]   Judge Roberts ordered Mario Merola, the

then-District Attorney of Bronx County, to "secure and deliver" the rape kit to the

Medical Examiner of the City of New York, where an independent laboratory and

doctor could conduct the first phase of the testing.[18]   For unknown reasons, on July

27, 1988, the rape kit was given to Ryan — an employee of the OCME — for

analysis,[19] rather than to Newton's expert Dr. Robert Shaler, who was named in

Judge Roberts' Order.[20]

On September 2, 1988, Ryan provided a written report stating that the

there was insufficient semen in the rape kit to complete the requested tests.[21]   Ryan

---

[16]     4/6/88 Order of Judge Roberts, Ex. A to 6/26/09 Declaration of John
Schutty ("Schutty Decl. II").

[17]     *Id.*

[18]     *See id.*

[19]     *See* 3/31/09 Deposition of Patricia Ryan, OCME laboratory director,
Ex. O to Schutty Decl. ("Ryan Dep."), at 69.

[20]     *See* 4/6/88 Order of Justice Roberts, Ex. D to 8/4/10 Declaration of
Arthur G. Larkin in Support of Defendants' Motion to Dismiss and/or Preclude
and/or Reconsideration of all Reinstated Claims ("Larkin Decl.").

[21]     *See* Am. Compl. ¶ 100.

noted that she did not observe any sperm on either the slides or within the swabs: "Samples analyzed gave negative enzymatic, microscopic, and immunological test for the presence of semen [on the swabs created by the hospital] . . . . Microscopic analysis [on the slides] did not show the presence of spermatozoa."[22]  Thereafter, the rape kit was returned to storage at the Property Clerk Division of the New York City Policy Department ("NYPD"), where it was subsequently misplaced until 2005.[23]  When the rape kit was finally re-located, it was submitted to the OCME's Department of Forensic Biology for DNA testing, and the evidence was divided to enable testing by an independent laboratory.[24]  The results of this testing, completed by the OCME in March 2006 and by the independent laboratory in April 2006, led to Newton's exoneration on July 6, 2006.[25]

### C.    Discovery of Ryan's Error

In anticipation of trial, Newton's counsel secured a court order on May 28, 2010 that required defendants to produce the rape kit for testing to

---

[22]     *See* 9/2/88 Serology Laboratory Report by Patricia Ryan, Ex. I to 8/13/10 Declaration of John Schutty ("Shutty Decl. III").

[23]     *See* Am. Compl. ¶¶ 136, 139.

[24]     *See id.* ¶ 139.

[25]     *See id.*; *see also* 7/6/06 Order of Justice John J. Byrne.

6

Newton's expert forensic scientist, Dr. Edward Blake.[26]  Dr. Blake's examination yielded a surprising discovery — "readily visible . . . intact . . . and abundant spermatozoa" on the slides found in the rape kit.[27]  Dr. Blake determined that the quantity and condition of the samples made them "more than adequate for a successful . . . DNA typing analysis,"[28] thus purportedly rendering "Ryan's examination of the hospital slides . . . ineffective and reckless" or perhaps implying "that she never examined the slides" at all.[29]

### D.   Claims

Based on the new evidence presented by Dr. Blake, this Court reinstated three causes of action in Newton's Amended Complaint, which alleged three federal civil rights claims against Ryan directly, as well as a state law claim against the City based on Ryan's alleged misconduct.[30]  Specifically, Newton asserted three causes of action involving Ryan, alleging: (1) Section 1983 claims based on a loss of evidence; (2) Section 1985 claims based on a civil rights

---

[26]     *See* 5/28/10 Order [Docket No. 140].

[27]     7/19/10 Declaration of Dr. Edward Blake, Ex. G to Schutty Decl. III, at ¶¶ 36, 47.

[28]     *Id*. at ¶ 37.

[29]     *Id*. at ¶ 52.

[30]     *See* 7/30/10 Order [Docket No. 143].

conspiracy to violate Newton's rights; and (3) Section 1983 claims for malicious prosecution against Ryan individually, with a corresponding state law claim against the City based on Ryan's employ.[31] These claims were previously dismissed on the basis of qualified immunity, but are reexamined here in consideration of the facts that have since emerged. Defendants argue that the rationale of immunity, either qualified or absolute, is still warranted and that the claims against Ryan must be permanently dismissed.

## III.    APPLICABLE LAW

### A.    Motion to Dismiss

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[32] and "draw all reasonable inferences in the plaintiff's favor."[33] However, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[34] To survive a

---

[31]    *See* Am. Compl. ¶¶ 166-175, 212-218, 238-246.

[32]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[33]    *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[34]    *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[35]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[36]  Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[37]  Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[38]

When determining the sufficiency of a claim under Rule 12(b)(6), the court is normally required to consider only the allegations in the complaint. However, the court is allowed to consider documents outside the pleading if the documents are integral to the pleading or subject to judicial notice.[39]

### B.    Immunity From Federal Causes of Action

"[G]overnment officials are entitled to some form of immunity from suits for damages.  As recognized at common law, public officers require this

---

[35]    *Twombly*, 550 U.S. at 564.

[36]    *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).

[37]    *Id.* (quotation marks omitted).

[38]    *Id.* (quotation marks omitted).

[39]    *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

9

protection to shield them from undue interference with their duties and from
potentially disabling threats of liability."[40]  Actions brought under Section 1983 are
to be read "in harmony with general principles of tort immunities and defenses
rather than in derogation of them."[41]  The form of immunity to which a public
employee is entitled "turns on the kind of function the employee is fulfilling in
performing the acts complained of."[42]

### 1.    Absolute Immunity

Absolute immunity gives "public officials entrusted with sensitive
tasks a protected area of discretion within which to carry out their
responsibilities."[43]  Specifically, "judges, prosecutors, and other persons acting
'under color of law' who perform official functions in the judicial process" are
fully protected "from liability for their judicial acts."[44]  As Justice Byron White

---

[40]    *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).  *Accord Cornejo v.
Bell*, 592 F.3d 121, 124, 127 (2d Cir. 2010).

[41]    *Burns v. Reed*, 500 U.S. 478, 486 (1991).

[42]    *Cornejo*, 592 F.3d at 127.

[43]    *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987).

[44]    *Briscoe v. LaHue*, 460 U.S. 325, 335 (1983).  *Accord Imbler v.
Pachtman*, 424 U.S. 409, 430 (1976) (noting that prosecutors are entitled to
absolute immunity because their prosecutorial activities are "intimately associated
with the judicial phase of the criminal process, and thus [are] functions to which
the reasons for absolute immunity apply with full force.").

articulated many years ago:

> The reasons for this rule are . . . substantial. It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings should be given every encouragement to make a full disclosure of all pertinent information within their knowledge.[45]

The Supreme Court has recognized three factors that must be addressed in determining whether a government official should be accorded absolute immunity for a particular function: (1) whether a historical or common law basis exists for immunity from suit arising out of performance of the function; (2) whether performance of the function poses obvious risks of harassing or vexatious litigation against the official, and (3) whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct.[46] Because "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity," accusations of malice or corruption do not disturb its protections.[47]

---

[45]    *Briscoe*, 460 U.S. at 335 (citations omitted).

[46]    *See Mitchell v. Forsyth*, 472 U.S. 511, 521-23 (1985).

[47]    *Imbler*, 424 U.S. at 419 n.13.

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."[48] The Supreme Court has been "quite sparing" in its recognition of absolute immunity, because "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties."[49]

### 2.    Qualified Immunity

For public officials outside the purview of absolute immunity, "the protection takes the form of 'qualified immunity,' *i.e.*, immunity from liability if the employee was acting in subjective and objective good faith."[50]  "Qualified immunity is an affirmative defense designed to protect the defendant public official not just from liability but also from suit thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial."[51]  In all cases, the qualified immunity analysis mandates a fact-specific inquiry.

"[G]overnment officials performing discretionary functions generally are

---

[48]    *Burns*, 500 U.S. at 486.

[49]    *Id.*

[50]    *Id.*

[51]    *Amore v. Novarro*, 610 F.3d 155, 161 (2d Cir. 2010) (quotation and alterations omitted). *Accord Jenkins v. City of New York*, 478 F.3d 76, 87 n.9 (2d Cir. 2007) ("[Qualified immunity] is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" (quoting *Forsyth*, 472 U.S. at 526)).

shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[52]  A discretionary function "involves an element of judgment or choice," such that the activity at issue does not have a predetermined outcome.[53] A government official engaged in ministerial "conduct that is not the product of independent judgment will be unaffected by threat of liability" and is therefore not protected by immunity doctrines.[54]

The inquiry as to whether an eligible government official is entitled to qualified immunity is two-fold.  One, the court "must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right."[55]  Two, "the court must decide whether the right as issue was clearly established at the time of the defendant's alleged misconduct."[56]  Courts have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in

---

[52]    *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1972).

[53]    *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

[54]    *Id.*

[55]    *Pearson*, 129 S. Ct. at 815-816.

[56]    *Id.* at 816 (quotation omitted).

light of the circumstances in the particular case at hand."[57]

The Second Circuit has held that a right is clearly established for

qualified immunity purposes if "(1) the law is defined with reasonable clarity, (2)

the Supreme Court or the Second Circuit has recognized the right, and (3) a

reasonable defendant would have understood from the existing law that his conduct

was unlawful."[58] "'Unless the plaintiff's allegations state a claim of violation of

---

[57]     *Id.* at 818. *Pearson* recognized, however, that the traditional sequence
"is often appropriate." *Id.*

[58]     *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (quotation
omitted). *Accord Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant,
dispositive inquiry in determining whether a right is clearly established is whether
it would be clear to a reasonable officer that his conduct  was unlawful in the
situation he confronted.").
        Despite the Supreme Court's clear directive, the Second Circuit has
not been consistent in regards to the circumstances under which a governmental
officer is entitled to qualified immunity. *Compare Manganiello v. City of New
York*, 612 F.3d 149, 164 (2d Cir. 2010) (recognizing a third condition under which
qualified immunity is triggered: "A government official sued in his official
capacity is entitled to qualified immunity (1) if the conduct attributed to him is not
prohibited by federal law; or (2) where that conduct is so prohibited, if the
plaintiff's right not to be subjected to such conduct by the defendant was not
clearly established at the time of the conduct; *or (3) if the defendant's action was
objectively legally reasonable . . . in light of the legal rules that were clearly
established at the time it was taken.*") (quotations and citations omitted) (emphasis
added)) *with Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415,
433 n. 11 (2d Cir. 2009) ("[O]nce a court has found that the law was clearly
established at the time of the challenged conduct and for the particular context in
which it occurred, it is no defense for a police officer who violated this clearly
established law to respond that he held an objectively reasonable belief that his
conduct was lawful."). *Accord Amore*, 610 F.3d at 162 (recognizing tension in the
case law as to [w]hether the 'objectively reasonable' inquiry is framed as part of

14

clearly established law, a defendant pleading qualified immunity is entitled to

dismissal.'"[59]

## IV.   DISCUSSION

### A.   Absolute Immunity

#### 1.   Prong One: Historical or Common Law Support for Immunity

The first factor identified by the Supreme Court in determining

whether absolute immunity protects a government official's discretionary

determination is "[t]he absence of historical or common-law support — either

direct or by analogy — for cloaking the challenged actions with absolute

immunity."[60]   This factor is "generally determinative."[61]   Thus, I begin by

---

the 'clearly established' inquiry, or apart from it . . . ."). Because the Supreme
Court has made clear that the qualified immunity test consists only of two prongs, I
will not consider the reasonableness of defendants' conduct here. *See, e.g.,*
*Walczyk v. Rio,* 496 F.3d 139, 165 (2d Cir. 2007) (Sotomayor, J., concurring) ("I
write separately to call the Court's attention to our collective failure to harmonize
our qualified immunity analysis with the Supreme Court's directives."). *Accord*
*Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir. 2009) ("[W]e adopt the
[Supreme] Court's two-part test and abandon our previous usage of a three-step
analysis.").

[59]      *Scott v. Fischer,* --- F.3d ----, No. 09 Civ. 1451, 2010 WL 2991085, at
* 8 (2d Cir. Aug. 2, 2010)  (*quoting Forsyth,* 472 U.S. at 526)).

[60]      *Mangiafico v. Blumenthal,* 471 F.3d 391, 395 (2d Cir. 2006).

[61]      *Id.*

considering whether Ryan's conduct was of the type traditionally protected by common law immunity.

Because there is no direct historical precedent involving the immunity of a forensic scientist tasked with testing biological evidence in a proceeding collateral to a criminal conviction, the court "may look by analogy to the historic or common law immunity granted to other figures within the judicial process."[62] "As a general principle, government [officials] are entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process."[63] Based on this reasoning, courts have extended a "cluster of immunities [to protect] the various participants in judge-supervised

---

[62]    *Id.* at 396.  *Accord Cornejo*, 592 F.3d at 127 ("While any analogy between two kinds of executive employees is never perfect, such reasoning by analogy is at the heart of judicial thinking: things that are essentially alike should be treated the same.").

[63]    *Mangiafico*, 471 F.3d at 396.  Although I utilize the term "absolute immunity" here, courts have often referenced the same concept under the title of "quasi-judicial immunity" when applied to actors other than judges.  *See, e.g., Imbler*, 424 U.S. at 420 (noting that courts "sometimes have described the prosecutor's immunity as a form of 'quasi-judicial' immunity and referred to it as derivative of the immunity of judges," who were the original beneficiaries of absolute immunity).

16

trials," including: witnesses;[64] grand jurors;[65] jurors;[66] prosecutors;[67] sheriffs;[68] coroners;[69] court reporters;[70] clerks of the court;[71] bailiffs;[72] town licensing board members,[73] social workers,[74] and arbitrators.[75]  The common feature amongst these disparate actors is their involvement in actions "integral to an on-going 'judicial phase' of a prosecution" or other adversarial proceeding.[76]  Whether or not their participation occurred in court or in a post-conviction context is not dispositive in

---

[64]   *See, e.g., Briscoe*, 460 U.S. 325.

[65]   *See, e.g., Turpen v. Booth*, 56 Cal. 65 (1880).

[66]   *See, e.g., White v. Hegerhorst*, 418 F.2d 894 (9th Cir. 1969).

[67]   *See, e.g., Imbler*, 424 U.S. 409.

[68]   *See, e.g., Doe v. McFaul*, 599 F. Supp. 1421 (N.D. Ohio 1984).

[69]   *See, e.g., Lambert v. Garlo*, 19 Ohio App. 3rd 295 (1985).

[70]   *See, e.g., Brown v. Charles*, 309 F. Supp. 817 (E.D. Wis. 1970).

[71]   *See, e.g., Wiggins v. New Mexico State Supreme Court Clerk*, 664 F.2d 812 (10th Cir. l981).

[72]   *See, e.g., Martin v. Hendren*, 127 F.3d 720, 722 (8th Cir. 1997).

[73]   *See, e.g., Dotzel v. Ashbridge*, 438 F.3d 320, 323, 324, 327 n.5 (3d Cir. 2006).

[74]   *See, e.g., Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 135-38 (4th Cir. 1989).

[75]   *See, e.g., Austern v. Chicago Bd. Options Exch.*, 898 F.2d 882, 886 (2d Cir. 1990).

[76]   *Warney v. Monroe County*, 587 F.3d 113, 121 (2d Cir. 2009).

an immunity inquiry.[77]

There is no question that Ryan — as a forensics scientist charged with testing the evidence against Newton — was "intimately associated with the judicial phase of the criminal process."[78] The determination of guilt is perhaps *the* defining characteristic of the criminal process,[79] and the serological analysis at issue was specifically intended as a gateway to demonstratively inculpate or exculpate Newton for the crime of which he had been convicted.  If the results had indicated that further scientific testing was possible, the state court authorized "such procedures as . . . necessary" to make a conclusive determination.[80]  Indeed, as plaintiff alleges, Ryan's findings were instrumental in determining the state's position on Newton's continued confinement.[81]

---

[77]    *Id.* at 123 (extending prosecutorial immunity to post-conviction collateral proceedings and noting that while the prosecutor's "functions may be somewhat administrative [at this stage], and may not always relate to in-court advocacy," they nonetheless are often "integral to an an-going judicial phase of a prosecution").  *Id.* at 121.  *Accord Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001).

[78]    *Imbler*, 424 U.S. at 430-31.

[79]    *See id.* at 426 ("Attaining the [criminal justice] system's goal of accurately determining guilt or innocence . . . .").

[80]    4/6/88 Order of Justice Roberts, Ex. D to Larkin Decl.

[81]    *See* Plaintiff's Trial Brief ("Pl. Tr. Br."), at 2 ("[P]laintiff will prove that his continued, wrongful imprisonment was the product of a false lab report maliciously forwarded to the District Attorney by defendant Patricia Ryan.").

Although Ryan's job was ostensibly to provide a neutral assessment of forensic data, her functional role cannot be ascertained on the basis of her "discrete actions."[82] Instead, the determination of whether her actions implicate her investigatory or advocacy capacity necessarily relies on "their role and function in an ongoing proceeding."[83] As the Second Circuit has opined, "[u]nless the DNA testing is considered with reference to context, it is impossible to classify functionally."[84] Here, the testing of the rape kit was "integral to and subsumed in the advocacy functions being performed in connection with [Newton's] post-conviction initiatives."[85] Ryan's analysis was conducted for the sole purpose of determining whether *Newton's* continued incarceration was necessarily warranted, not for a general purpose investigation to identify potential suspects in V.J.'s attack. Indeed, "[t]he DNA testing obviously would have bearing on the advocacy work of deciding whether to oppose [Newton's] initiatives" to vacate his

---

[82]    *Warney*, 587 F.3d at 123. *See also infra* Part IV.B.1 (discussing the subjectivity inherent in the process of forensic analysis).

[83]    *Warney*, 587 F.3d at 123.

[84]    *Id.* ("If the testing inculpated [the criminal defendant], it would be a potent tool of the advocacy; if it exculpated [him], it might be deemed administrative, in the sense that it would entail disclosure; if it inculpated someone else, it would be investigative, at least to the extent that it might identify the real killer.").

[85]    *Id.*

19

conviction.[86]

   To this end, in *Warney v. Monroe County*, the Second Circuit made

clear that prosecutors would be fully insulated from liability for their

administrative or investigative role in submitting DNA evidence for postconviction

testing.[87] The court reasoned that because the results of the testing would affect the

outcome of the proceedings against a defendant, they necessarily implicate an

advocacy function.[88] Because "absolute immunity . . . extends to non-prosecutor

officials when they are performing 'functions analogous to those of a

prosecutor[,]'"[89] Ryan is entitled to the same protections for her conduct as the

state's advocate in Newton's post-conviction proceedings.   That her findings

could have led to Newton's exculpation does not undermine the adversarial nature

of her position:  a prosecutor is similarly expected to seek truth above all, and to

disclose information that may exonerate a defendant.  The Second Circuit has

confirmed that "[t]he advocacy function of a prosecutor includes seeking

---

[86] *Id.*

[87] *See id.*

[88] *See generally id.*

[89] *Cornejo*, 592 F.3d at 127 (quoting *Butz v. Economou*, 438 U.S. 478, 515 (1978)).

exoneration and confessing error to correct an erroneous conviction."[90]  Thus,

while forensic analysis may sometimes be viewed as an investigatory activity, here

it served as an advocacy tool.

In any event, plaintiff does not contest the 'advocacy' categorization

of Ryan's functional role.  To the extent that plaintiff challenges Ryan's

entitlement to absolute immunity, he posits that she was not a quasi-judicial officer

because "she was not appointed by the court and she was not authorized to conduct

any testing."[91]  The basis for plaintiff's assertion is that the court order "authorized

testing by a forensic scientist retained by Mr. Newton's attorneys . . . [The Judge]

did not appoint his own expert."[92]  Yet absolute immunity is "justified and defined

by the functions it protects and serves, not by the person to whom it attaches,"[93]

and as plaintiff concedes, Ryan was "undeniably acting within the scope of her

duty as an OCME laboratory scientist in testing the rape kit pursuant to court

---

[90]  *Warney*, 587 F.3d at 125.

[91]  8/4/10 Plaintiff's Sur-Reply Memorandum of Law Filed in Opposition
to Defendants' Motion "For Preclusion and/or Dismissal of Reinstated Claims, and
for Reconsideration" ("Pl. Sur-Rep."), at 3.

[92]  *Id.*

[93]  *Forrester v. White*, 484 U.S. 219, 227 (1988).

order."[94]  Indeed, in plaintiff's words, "Ms. Ryan was employed by the OCME

specifically to conduct such tests and produce the type of report that is in issue in

this matter.  Particularly after a court issued order, Ms. Ryan's report was

foreseeable and the natural incident of her employment."[95]  Because Ryan was

acting as an arm of the state in conducting the testing, it is irrelevant that she was

not acting as a court-appointed expert.  As the Second Circuit has stated, "the

critical inquiry is not the official position of the person seeking absolute immunity,

but the specific action for which the person seeks immunity."[96]  Thus, in view of

the context in which Ryan conducted forensic testing of the rape kit, as well as the

specific and individualized purpose of the testing in Newton's criminal case,  the

---

[94]     Pl. Tr. Br. at 14.  Plaintiff's assertion about the scope of Ryan's
professional duties belies his only other argument against affording her absolute
immunity.  Plaintiff argues that "[e]ven if this Court were to make a stretch and
deem Patricia Ryan a quasi-judicial officer, under New York law her actions still
lack any colorable claim of authority and do not entitle her to immunity."  Pl. Sur.
Rep. at 3.  However, absolute immunity still applies where conduct occurred in
*excess* of jurisdiction, rather than the absence of it.  *See, e.g.*, *Mireles v. Waco*, 502
U.S. 9, 13 (1992) ("If judicial immunity means anything, it means that a judge
"will not be deprived of immunity because the action he took was in error . . . or
was in excess of his authority.") (quotation omitted).  Because Newton accepts that
Ryan had general authority to conduct such tests at the OCME, he can only argue
that she exceeded her jurisdiction, thus leaving her immunity protection intact.

[95]     Pl. Tr. Br. at 14.

[96]     *Mangiafico*, 471 F.3d at 394.

22

first and most important factor of the absolute immunity inquiry favors Ryan's protected status.

## 2.    Prong Two: Public Policy Considerations

The public policy prong of the three-factor immunity test also counsels in favor of granting absolute immunity to Ryan.  If laboratory scientists were exposed to liability on the basis of their alleged forensic testing errors, every criminal case involving biological evidence would become a breeding ground for additional litigation against the state and its actors.  Because Section 1983 lawsuits against forensics examiners "could be expected with some frequency" as defendants "transform resentment at being convicted into allegations" of improper scientific analysis, the "concern that harassment by unfounded litigation would cause a deflection of the [official's] energies from his public duties" is directly implicated.[97]  After all, a defendant receiving unfavorable forensic results can be expected to be disgruntled.  As the Supreme Court has noted, "if the defendant official could be made to answer in court each time a disgruntled defendant charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law" or otherwise facilitating the criminal

---

[97]    *Briscoe*, 460 U.S. at 343-44 (citations omitted)

23

justice process.[98] The primary purpose underlying the long-standing tradition of

absolute immunity for judges, prosecutors, and witnesses thus applies with equal

force to forensic scientists — the ability to "perform their respective functions

without harassment or intimidation."[99]

Exposure to suit may yield other unfavorable public policy results.

While laboratory scientists are compelled to comply with court orders requiring

their services, other public officials may be less inclined to grant permission for

post-conviction testing if doing so may invite the "the threat of a protracted

lawsuit, not to mention the prospect of money damages, [that] would inevitably

involve the diversion of the government's attention and resources."[100]  At the very

---

[98]     *Id.* (citations omitted).

[99]     *Butz*, 438 U.S. at 512.

[100]    *Mangiafico*, 471 F.3d at 397.  The Supreme Court has held that
prisoners do not have a constitutional right to post-conviction DNA testing. *See
District Attorney's Office for the Third Judicial District v. Osborne*, --- U.S. ----,
129 S. Ct. 2308 (2009).  New York's subdivision 1-a to New York Criminal
Procedure Law section 440.30 ("section 440.30(1-a)(a)"), enacted in 1994, permits
a post-conviction defendant to "request the performance of a forensic DNA test on
specified evidence" when moving to vacate a judgment.  While the request "shall"
be granted upon a court's "determination that if a DNA test had been conducted on
such evidence, and if the results had been admitted in the trial resulting in the
judgment, there exists a reasonable probability that the verdict will have been more
favorable to the defendant," there is still a measure of judicial discretion involved
in a defendant's post-conviction right to access evidence.  N.Y. Crim. Proc. L. §
440.30 (1-a)(a).  *See, e.g.*, *Fuentes v. Superintendent, Great Meadow Corr.
Facility*, No. 04 Civ. 0737, 2009 WL 2424206, at *9 (E.D.N.Y. Aug. 5, 2009)

least, "[t]he defense of such suits would necessarily complicate, if not intimidate, the making of what may be routine, discretionary decisions" by judges and prosecutors."[101] Moreover, the "finality of judgments" — identified by the Supreme Court as part of the foundational rationale for absolute immunity[102] — would be compromised, and respect for the criminal justice process eroded, as defendants second-guessed the integrity of the scientific testing used to convict them or justify their confinement, even after their guilt had already been subject to the safeguards of trial and determined by an impartial jury. As the Supreme Court has noted, "[t]he loser in one forum will frequently seek another."[103]

---

(finding no procedural due process violation in light of *Osborne* where state court denied post-conviction defendant's request for access to evidence for DNA testing under section 440.30(1-a)(a) upon the state court's determination that the defendant had failed to show the requisite reasonable probability).

Moreover, New York has no law requiring the preservation of evidence, a fact which could unfortunately serve to circumvent the spirit of section 440.30 (1-a)(a). The fear of continuous litigation in the wake of post-conviction testing may encourage the use of this evidentiary loophole. It may also dampen prosecutorial enthusiasm in helping post-conviction defendants access the evidence. Indeed, Newton's rape kit would not ultimately have been found were it not for Bronx Assistant District Attorney Elisa Koenderman's personal request that officials at the city storage facility conduct another search and her inclusion of the information identifying its location "for [their] convenience." 7/14/05 Letter from ADA Koenderman to Trabitz, Ex. H to Schutty Decl. I.

[101]     *Mangiafico*, 471 F.3d at 397.

[102]     *Forrester*, 484 U.S. at 225.

[103]     *Briscoe*, 460 U.S. at 335.

### 3.    Prong Three: Alternative Means of Redress

The third factor in the absolute immunity inquiry, the existence of

other remedies against laboratory scientists, is also satisfied.  State medical

examiners and forensics scientists are subject to professional disciplinary action,

which has been "considered sufficient in previous cases affording absolute

immunity."[104]   Additionally, the public is not left "powerless to deter misconduct

or to punish that which occurs," because the criminal law could respond to "willful

deprivations of constitutional rights."[105]

### 4.    Analysis

Taken as a whole then, the circumstances of the instant case support

absolute immunity for Ryan.  Certainly, the extension of absolute immunity to

laboratory scientists presents the supremely difficult task of balancing the equities

between the public good and individual rights, with "evils inevitable in either

alternative."[106]  "To be sure, this immunity does leave the genuinely wronged

---

[104]    *Mangiafico*, 471 F.3d at 397 n.4.

[105]    *Imbler*, 424 U.S. at 428-29.  "This Court has never suggested that the
policy considerations which compel civil immunity for certain governmental
officials also place them beyond the reach of the criminal law."  *Id.* at 429.

[106]    *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.) ("As
is so often the case, the answer must be found in a balance between the evils
inevitable in either alternative.  In this instance, it has been thought better to leave

defendant without civil redress against a[n officer] whose malicious or dishonest action deprives him of liberty."[107]  For this reason, the protection of absolute immunity may not be appropriate in a pre-conviction context where the jury's determination of guilt may result from a faulty scientific process, and where the laboratory scientist's role is primarily an investigative one.

But these are not the circumstances presented here.  Newton had an opportunity to assert his innocence at trial.  He presented two alibi witnesses to testify on his behalf and successfully convinced the jury to acquit him of one of the incidents of rape with which he was charged.[108]  Biological evidence played no role in his initial conviction.

Ryan's role in his prolonged incarceration resulted from her participation in a court ordered post-conviction adversarial proceeding, as a state advocate engaged in a search for the truth — thus satisfying "the ultimate question" for the grant of full immunity.[109]  The general characteristics of her profession only lend credence to the need for absolute immunity.  Under these

---

unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.").

[107]    *Imbler*, 424 U.S. at 427-28.

[108]    *See* Am. Compl. ¶¶ 82, 94.

[109]    *Warney*, 587 F.3d at 121.

circumstances, "the alternative of qualifying [her] immunity would disserve the broader public interest."[110]   As the Supreme Court has underscored, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible."[111]

## B.     Qualified Immunity

### 1.     Role of Judgment in Forensic Analysis

Even assuming, *arguendo*, that Ryan is not entitled to absolute immunity, she is shielded by the doctrine of qualified immunity.  As a threshold matter, Newton argues that Ryan's actions were not discretionary, and that she is therefore not eligible for qualified immunity.  In support of his contention, Newton offers one conclusory assertion: "There is simply no factual basis for arguing that Patricia Ryan had the 'discretion' to 'act in the shoes of [the named doctor on the

---

[110]     *Imbler*, 424 U.S. at 427-28.

[111]     *Briscoe*, 460 U.S. at 332-33 (quotation omitted). *Cf. Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) ("[Judicial] immunity applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of the consequences.").

court order] and report findings that were patently false."[112]  Newton

misapprehends the discretionary element which triggers qualified immunity.

Newton's constitutional grievance against Ryan lies with her failure to properly

examine the slides — not in the fact that she examined them.

To the extent that Newton asserts constitutional claims arising out of

the City's misdelivery of the rape kit to the wrong doctor, he necessarily does so

against the City — Ryan was not, by any account, responsible for the procedural

error in the delivery.  Her alleged misconduct is limited to the faulty examination

or misreporting regarding the absence of sperm on the slides, and her eligibility for

qualified immunity depends only on whether this particular act required an

exercise of judgment.  Moreover, whether or not Ryan was malicious or

incompetent in not identifying the semen on the slides has no bearing on the

question of whether her act of examining them necessarily entailed a measure of

judgment so as to leave open the *possibility* of a qualified immunity analysis.

That Ryan exercised discretionary judgment is underscored by the

Supreme Court's recent holding in *Melendez-Diaz v. Massachusetts*, which

requires forensic laboratory scientists to testify at the criminal trials for which they

---

[112]     Pl. Sur. Rep. Br. at 4.

29

handled evidentiary analysis.[113] The Court indicated that seemingly "neutral

scientific testing" is not really quite so "neutral or . . . reliable," and noted that even

the straight-forward methodology used to analyze seized drugs "requires the

exercise of judgment and presents a risk of error that might be explored on cross-

examination."[114] The Court explained that "[t]he same is true of many of the other

types of forensic evidence commonly used in criminal prosecutions" and cited an

article "discussing problems of subjectivity, bias, and unreliability of common

forensic tests."[115] The Court highlighted its conclusion that "there is wide

variability across forensic science disciplines with regard to techniques,

methodologies, reliability, types and numbers of potential errors, research, general

acceptability, and published material."[116] Certainly the process of forensic testing

is not a ministerial act with a definitive outcome — while DNA and biological

evidence are precise, they are still handled and interpreted by human beings.  The

---

[113]    *Melendez-Diaz v. Massachusetts*, --- U.S. ----, 129 S. Ct. 2527 (2009)
(finding that forensic lab reports are testimonial in nature and subject to the
Confrontation Clause, thereby allowing defendants to challenge their validity).

[114]    *Id.* at 2537.

[115]    *Id.*

[116]    *Id.* at 2538 (quoting National Academy Report S-5 and citing 5-9, 5-
12, 5-17, and 5-21 of the Report).

phenomenon of judgment involved in even the most routine medical analysis is evoked by the common refrain that a patient should always obtain a second opinion in regards to any serious diagnosis — even one derived from a seemingly clear x-ray.[117]

## 2.    Clearly Established Constitutional Right

Having determined that Ryan was conducting a discretionary

───────────────

[117]    While the immunity inquiry for federal claims is necessarily separate from that of state law claims, the determination that Ryan was engaged in a discretionary judgment for federal qualified immunity purposes is also instructive in a state law context. *See, e.g., McLean v. City of New York*, 12 N.Y.3d 194, 202 (2009) ("[D]iscretionary acts may not be a basis of liability: [W]hen official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice.") (quotation omitted). *See also United States v. City of New York*, 683 F. Supp. 2d 225, 269 (E.D.N.Y. 2010) ("The New York Court of Appeals has framed the official immunity standard as follows: 'Whether an action of a governmental employee or official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment. . . . [G]overnmental immunity . . . [attaches] to those [actions] involving an exercise of that discretion.'") (quoting *Mon v. City of New York*, 78 N.Y.2d 309, 313 (1991)).

Because I hold that Ryan's actions were discretionary in nature, she is entitled to immunity on Newton's state law claims. *See, e.g., Arteaga v. State*, 72 N.Y.2d 212, 216-217 & n. 1 (1988) (providing medical examiner as example warranting absolute immunity); *Pertilla v. Genetic Design, Inc.*, 166 Misc.2d 843 (Sup. Ct. Chenago Co. 1995) (extending full immunity to private laboratory performing DNA tests in a paternity proceeding). *Cf. Hirschfeld v. Spanakos,* 909 F.Supp. 174, 180 (S.D.N.Y.1995) (noting that New York "affords public officials considerably greater protection from individual capacity suits than the federal doctrine of qualified immunity").

function, the ensuing issue for qualified immunity purposes is whether she violated

Newton's clearly established constitutional rights when she erred — inadvertently

or otherwise — in her analysis of the rape kit. Even accepting Newton's claim that

Ryan acted with malice or incompetence, there is still no basis to infer that she

violated a clearly established constitutional right.

Newton alleges a violation of his Fifth and Fourteenth Amendment

due process rights, as well as a First Amendment claim for denial of his right of

access to the courts. Because the First Amendment claim can be summarily

dismissed on grounds other than immunity, I begin with a discussion of that claim.

### a.        First Amendment Claim

Defendants argue that Newton's First Amendment claim must be

dismissed because it was first raised in his trial brief and opposition in the instant

motion, and "submitted less than two months before trial in this three-year old

case."[118]  In response, Newton refers to two earlier references to a First

Amendment claim in his submissions to the Court:

> The very first paragraph of the Amended Complaint states:
> 'This action arises under the Constitution of the United
> States, particularly the First, Fourth, Sixth, Eighth and
> Fourteenth Amendments to the Constitution of the United
> States through the Civil Rights Act, Title 42 U.S.C.
> Sections 1983 and 1988. In arguing that his constitutional

---

[118]     Def. Rep. at 13.

rights were violated, plaintiff previously stated in a
memorandum of law filed with this Court that: "Due to
'page limits' imposed by the Court on the lengths of legal
briefs . . . we address the Due Process Clauses of the Fifth
and Fourteenth Amendments below, while expressly
reserving plaintiff's right to assert the other constitutional
violations asserted in the Complaint.[119]

Devoting two sentences to a constitutional claim amongst the countless court

submissions offered in the course of three years of litigation constitutes

abandonment. Defendants are entitled to notice of the specific issues that will be

litigated at trial, and two vague allusions to a First Amendment claim, without

explication and merely as a vehicle to reserve the right, are insufficient.[120]

Moreover, the sole reference to a First Amendment claim in plaintiff's

legal briefs — offered as one of plaintiff's two pieces of evidence that he did in

---

[119]    Pl. Sur. Rep. Br. at 3.

[120]    *See, e.g.*, *Singleton v. City of Newburgh,* 1 F. Supp. 2d 306, 312
(S.D.N.Y. 1998) (plaintiff's claim deemed "abandoned" where it was alleged in the
complaint but "not raised elsewhere in the record"); *Anti-Monopoly, Inc. v.
Hasbro, Inc.,* 958 F. Supp. 895, 907 n. 11 (S.D.N.Y. 1997) ("[T]he failure to
provide argument on a point at issue constitutes abandonment of the issue . . .
which provides an independent basis for dismissal."), *aff'd,* 130 F.3d 1101 (2d Cir.
1997); *Spearman v. Duchess County,* No. 05 Civ. 148, 2008 WL 2945991, at *1
n.1 (N.D.N.Y. July 25, 2008) (considering the First Amendment claims referenced
in plaintiff's Complaint abandoned because plaintiff did not provide supporting
arguments in his brief); *Kozey v. Quarles,* No. 04 Civ. 1724 , 2005 WL 2387708, at
*2 (D.Conn. Sept. 28, 2005) (holding that the plaintiff abandoned any First
Amendment claims because his "brief d[id] not make any arguments founded upon
the First Amendment").

fact assert a First Amendment violation earlier in the litigation — was in a response to defendants' June 5, 2009 motion for summary judgment, which sought dismissal "of all of plaintiff's federal constitutional claims concerning the alleged loss, or non-production, of the rape kit collected from the victim in his criminal case, during the years *1994-2005.*"[121]  Ryan's involvement in Newton's case was limited to 1988, and this attempt to preserve Newton's First Amendment claim (even if it were sufficient) cannot be applied to Ryan.  To hold otherwise would be unfairly prejudicial and unfair to defendants.[122]

### b.        The Fifth and Fourteenth Amendment Claims

While post-conviction defendants have no Fifth or Fourteenth Amendment due process rights to DNA testing, they do obtain a due process liberty interest if a state enacts a statute providing post-conviction defendants

---

[121]     5/18/09 Defendants' Memorandum of Law in Support of Their Motion for Partial Summary Judgment Dismissing All Claims Concerning Production of the Rape Kit ("Def. SJ Mem."), at 1 (emphasis added).

[122]     Newton attests that he did not argue any First Amendment claims out of deference to the Court's page limits for party submissions. *See* Pl. Sur. Rep. at 5 ("Due to page limits imposed by the Court on the lengths of legal briefs . . . we address the Due Process Clauses of the Fifth and Fourteenth Amendments below . . .") (quoting 6/26/09 Plaintiff's Memorandum of Law in Opposition to Defendants' Rule 56 Motion for Summary Judgment).  I do not credit this explanation.  He had no such qualms when he recently submitted six separate memoranda of law, totaling about sixty pages, for his motions *in limine* — despite the Court's limitation of twenty-five pages for legal briefs.

access to evidence.[123] The Supreme Court has recognized that fundamental fairness requires that once a state creates a statutory right and puts procedures in place to protect that right, those procedures must comport with due process in application.[124] However, New York did not enact a statute granting Newton the post-conviction right to access evidence until 1994 — six years after Ryan's flawed handling of the evidence. Indeed, in *Colon v. Kuhlmann* — decided the same year that Ryan conducted her forensic analysis — the Second Circuit held

---

[123]    *See Osborne*, 129 S. Ct. at 2322 (declining due process protection to convicted defendant denied access to DNA evidence: "We are reluctant to enlist the Federal Judiciary in creating a new constitutional code of rules for handling DNA."). *See also Meachum v. Fano*, 427 U.S. 215, 226 (1976) (holding that once a state imposes limitations on its own discretion and requires that a specific standard prevail for decisionmaking, it creates a liberty interest "regardless of whether the limits stem from statute, rule or regulation"); *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008) ("Liberty interests 'may arise from two sources – the Due Process Clause itself and the laws of the States.'") (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

[124]    *See Evitts v. Lucey*, 469 U.S. 387, 399-401 (1985) (holding that if a state chooses to dismiss an appeal when an incompetent attorney has violated local rules, it may do so only if such action does not intrude upon the client's due process rights, noting that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution – and, in particular, in accord with the Due Process Clause"); *Morrissey v. Brewer*, 408 U.S. 471, 488-89 (1972) (recognizing that states have the responsibility of establishing procedures regarding parole revocation hearings, but that such procedures must comport with "the minimum requirements of due process"); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (recognizing that although a state may choose whether to institute a welfare program, it must operate whatever programs it does establish subject to the protections of the due process clause).

that a police laboratory test for the presence of sperm on a rape kit slide did not

violate the defendant's constitutional rights, even though the test rendered the slide

useless for serological analysis and the defendant lacked any alternative biological

evidence which could rule him out as the rapist.[125]  Consequently, Ryan is entitled

to qualified immunity with respect to Newton's federal claims.[126]

_____

[125]     865 F.2d 29 (2d Cir. 1988).

[126]     Because I hold that Ryan is entitled to immunity, I do not consider
defendants' merit-based arguments in support of dismissal.  For similar reasons, I
decline to address defendants' argument that these claims should be dismissed as a
sanction pursuant to Rule 37(b)(2) based on Newton's failure to comply with this
Court's July 12 Order.  *See Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357,
1365 (2d Cir. 1991) (upholding severe sanctions when a party disobeys discovery
orders preventing disclosures relating to the merits of particular claims).
Nonetheless, a brief review of the sanctions issue is useful in order to present and
preserve a complete record.
          On July 12, 2010, I ordered Newton to provide defendants with his
blood type and whether he is or is not a secretor.  This information might have
been critical to defendants in responding to Newton's First Amendment claim.
Depending on the results or such serological testing, it is possible that Newton
cwuld not have been ruled out as V.J.'s attacker, based on testing available in 1988
— even if Ryan had properly performed such testing.  In that event, the alleged
mishandling of the testing would have caused no prejudice to Newton and could
not have deprived him of his access to the courts.
          Newton failed to comply with this Order.  During a telephone
conference held on September 2, 2010 Newton's counsel admitted that he had not
complied with the Order but defended his non-compliance by shifting blame to the
City for failing to justify the need for such testing.  This was wholly inappropriate.
His quarrel was with the Court not with the City.  Non-compliance with a
legitimate court is not an option.  After this conference, Newton immediately had a
blood test which identified his blood type as B+ (which made him a possible
secretor), but never provided information as to his secretor status.  While this Court
could dismiss the reinstated claims pursuant to Rule 37(b)(2) based on Newton's

## C.    Remaining State Law Claim Against the City

Newton's remaining state law claim against the City for Ryan's alleged misconduct is necessarily precluded by the determination that she acted with discretion.[127]  The New York Court of Appeals has explained:  "A public employee's discretionary acts — meaning conduct involving reasoned judgment — may not result in the municipality's liability."[128]  As discussed at length above, Ryan's forensic analysis did not require "direct adherence to a governing rule or standard with a compulsory result," but involved the exercise of her scientific experience and skill.[129]  As such, the City "is not answerable in damages for the injurious consequences of [Ryan's] action."[130]

---

failure to comply with a court order, I do not do so on this ground given the important public policy and constitutional issues implicated in Newton's reinstated claims.  Moreover, I am confident as to my ruling that the claims against Ryan must be dismissed based on either absolute or qualified immunity.  Nonetheless, should this ruling be overturned by a reviewing court, the sanction application would then be entitled to full and serious consideration.

[127]    *See supra* Part III.B.I.

[128]    *Lauer v. City of New York*, 95 N.Y.2d 95, 99 (2000).

[129]    *Tango v. Tulevech*, 61 NY2d 34, 41 (1983).

[130]    *Haddock v. City of New York*, 75 N.Y.2d 478 (1990).  Even if Ryan's actions were considered to be exclusively ministerial, Newton would need to demonstrate that the City owes him a special duty that might give rise to municipal liability.  *See, e.g., McClean*, 12 N.Y.3d at 202 ("[D]iscretionary municipal acts may never be a basis for liability, while ministerial acts may support liability only where a special duty is found.").  "A special relationship can be formed . . . when

37

## V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the

reinstated claims regarding plaintiff's third, sixth, and ninth causes of action is

granted.  The Clerk of the Court is directed to close this motion (docket no. 145).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September 14, 2010

---

[a municipality] voluntarily assumes a duty that generates justifiable reliance by
the person who benefits from the duty." *Id.* at 199.  Not only has Newton pled no
such facts in relation to Ryan, but this Court has already dismissed any cause of
action arising from a putative special relationship. *See* 7/16/08 Opinion and Order
(noting that plaintiff has not specified a cause of action stemming from a special
relationship claim).

Moreover, Newton did not respond to defendants' motion to dismiss
his claim against the *City* for Ryan's wrongdoing in his Opposition Brief, and
therefore abandoned his claim.  To the extent that he acknowledged his ninth cause
of action for malicious prosecution at all, he did so only in relation to Ryan
directly. *See, e.g., Dineen ex rel Dineen v. Stramka*, 228 F. Supp. 2d 447, 454
(S.D.N.Y. 2002) ("We note at the outset that plaintiff does not address these claims
in its opposition papers, enabling the Court to conclude that it has abandoned
them.").

38

**- Appearances -**

**For Plaintiff:**

John Francis Schutty III, Esq.
Law Office of John F. Schutty
445 Park Avenue, 9th Floor
New York, New York 10022
(212) 836-4796

**For Defendants:**

Arthur Gabriel Larkin III
Fred Michael Weiler
Assistant Corporation Counsel
The New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-1599