USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   5/12/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ALAN NEWTON,

                Plaintiff,

        - against -

THE CITY OF NEW YORK; SERGEANT
PATRICK J. McGUIRE, POLICE OFFICER
STACY HASKINS, GERALDINE KIELY, AND
CHIEF JACK J. TRABITZ, INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITIES AS
EMPLOYEES OF THE CITY OF NEW YORK,

                Defendants.

------------------------------------------------------------X

**OPINION AND
ORDER**

07 Civ. 6211 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION[1]

       The story of Alan Newton's wrongful incarceration for rape and

assault is a familiar and troubling one for this Court.  Newton was convicted in

1985, primarily on the basis of eyewitness testimony.  No DNA evidence was

offered at trial, as such testing was not available or trustworthy at that time.  In

August, 1994, New York passed a new law – subdivision 1-a to section 440.30 of

---

[1]        I presume familiarity with the underlying facts of this case, and
recount only those relevant to the instant motion.

1

the New York Criminal Procedure Law ("Section 440.30(1-a)"), which provides, in substance, that a post-conviction defendant may obtain DNA testing on specified evidence if the court determines that had such testing been done, and had the results been received at trial, there is a reasonable probability that the verdict would have been more favorable to the defendant.  Eight years later, in 2004, New York passed a new subdivision to the same statute – subsection 440.30(1-a)(b) – which provides, in substance, that upon a post-conviction defendant's request for DNA testing on specified evidence, the court may direct that the defendant be provided with information concerning the current or last known location of the evidence that defendant seeks to be tested.  But if the evidence no longer exists or its whereabouts are unknown, no adverse inference may be drawn against the prosecution.

Between 1994 and 2002, pursuant to section 440.30(1-a), Newton thrice sought and was granted permission by a New York court to conduct DNA testing on evidence from the crime scene.  In each instance, the City of New York (the "City") was unable to locate the rape kit containing the biological evidence critical to his freedom.  When the rape kit was finally found in 2005, DNA tests excluded Newton as the source of the sperm collected from the victim.  Newton's conviction was vacated by the New York Supreme Court and he was released from

2

prison in 2006.

Newton brought an action against the City and several individual City employees, alleging a federal civil rights claim and pendent state law claims for the City's failure to produce the rape kit when requested. The case proceeded to trial on the following claims: (1) a *Monell* claim under section 1983, asserting violations of Newton's Fourteenth Amendment right to due process and First Amendment right of access to the courts; (2) a general negligence claim based on the City's alleged breach of its voluntarily assumed duty to provide Newton with the rape kit; and (3) an intentional infliction of emotional distress ("IIED") claim against four City employees for their alleged roles in the search for the rape kit.

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, at the close of the liability phase of trial, the City moved for judgment as a matter of law on all of Newton's claims.[2] Plaintiff cross-moved for a judgment of liability on the negligence claim. I denied the cross-motions, with the exception of granting defendants' motion to dismiss the negligence claim.[3]

Newton's section 1983 and IIED claims were submitted to the jury, which found that the City had denied Newton his constitutional rights to due

---

[2]     *See* Trial Transcript ("Tr.") at 2201:07-2226:19.

[3]     *See Newton v. City of New York (Newton I)*, No. 07 Civ. 6211, 2010 WL 4177383 (S.D.N.Y. Oct. 22, 2010); Tr. at 2229:01-2240:07.

process and access to the courts, and held the City liable for eighteen million dollars in damages.  The jury also found that two of the four individual defendants, Sergeant Patrick J. McGuire and Chief Jack Trabitz, were liable to Newton on his IIED claim for ninety-two thousand dollars and five hundred thousand dollars, respectively.[4]

Defendants now renew their motion for judgment as a matter of law on Newton's section 1983 and IIED claims.[5]  For the reasons discussed below, defendants' motion to set aside the verdict pursuant to Federal Rule of Civil Procedure 50(b) is granted in its entirety.

## II.    LEGAL STANDARD

### A.    Judgment As a Matter of Law

Rule 50 permits a court to override a jury's verdict and enter judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

---

[4]    *See* Tr. at 2387:03-2388:25.  The jury found that the other two individual defendants, Geraldine Kiely and Stacy Haskins, were not liable to Newton on his IIED claims.

[5]    Alternatively, defendants move for a new trial or remittitur of the damages award.  Because I grant defendants' Rule 50(b) motion in its entirety, I do not consider these other claims.

4

evidentiary basis to find for the party on that issue."[6]  A jury verdict cannot be set aside lightly.  A court may not grant judgment as a matter of law unless (1) there is such a "complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or (2) there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]."[7]  Moreover, the scope of a post-verdict renewal of a motion for judgment as a matter of law under Rule 50(b) cannot exceed the pre-verdict motion made under Rule 50(a).[8]

The standard for granting judgment as a matter of law "mirrors" the standard for granting summary judgment.[9]  Accordingly, "[a] court considering  a request for judgment as a matter of law must 'consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that

---

[6]     Fed. R. Civ. P. 50(a)(1).

[7]     *United States v. Space Hunters, Inc.*, 429 F.3d 416, 429 (2d Cir. 2005) (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)).  *Accord Doctor's Assocs. v. Weible*, 92 F.3d 108, 111-12 (2d Cir. 1996).

[8]     *See Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001). *See also Lambert v. Genesee Hosp.*, 10 F.3d 46, 54 (2d Cir. 1993).

[9]     *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quotation marks and citations omitted); *Kerman v. City of New York*, 374 F.3d 93, 118 (2d Cir. 2004).

party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'"[10] "'The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'"[11]

## III.   DISCUSSION

### A.   Section 1983

The jury concluded that the City had violated Newton's procedural right to due process by failing to provide him with access to "DNA evidence to which he was entitled."[12]  This underlying constitutional violation gives rise to both Newton's *Monell* claim and his right of access claim,[13] but the City asserts

---

[10]   *Space Hunters*, 429 F.3d at 429 (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001)) (omission in original).

[11]   *Id.* (quoting *Tolbert*, 242 F.3d at 70).

[12]   Plaintiff's Memorandum of Law in Opposition to Defendants' Post-Trial Motions ("Pl. Mem.") at 4.

[13]   *See Board of County Comm'rs. Bryan County, Okl. v. Brown*, 520 U.S. 397, 405-07 (1997) (noting that "[i]n any § 1983 suit . . . the plaintiff must establish the state of mind required to prove the underlying violation" and distinguishing the state of mind required for the underlying violation from that required to prove municipal liability); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").  *See also Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002) ("[T]he very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek

6

that "under recent, controlling authority, Newton has no due process rights that can be vindicated in this . . . lawsuit."[14]  Specifically, the City argues that Newton's constitutional claims are "foreclosed as a matter of law" by *McKithen v. Brown*,[15] a Second Circuit decision issued after the close of Newton's trial.[16]  Additionally, the City argues that no rational juror could have concluded that any individual defendant acted with the requisite state of mind to implicate the due process clause.[17]

Before evaluating the parties' competing contentions, I emphasize that Newton's claim is based on an alleged *constitutional* violation under section 1983. A constitutional due process claim cannot be based on mere negligence, but rather

---

judicial relief for some wrong . . . [T]he right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court.").

[14]    Defendants' Memorandum of Law in Support of Their Post Trial Motions ("Def. Mem.") at 2.

[15]    626 F.3d 143, 153 (2d Cir. 2010).

[16]    *McKithen* was issued on November 19, 2010.  Newton's trial concluded on October 19, 2010.  The jury rendered a liability verdict on October 18, 2010 and a damages verdict on October 19, 2010.

[17]    Alternatively, the City also argues that Newton did not provide jurors with a sufficient evidentiary basis to establish a City policy, custom or practice of mishandling post-conviction evidence for purposes of his *Monell* claim.  Because I conclude that Newton cannot demonstrate an underlying constitutional violation to support municipal liability, I need not address the City's alternative argument.

must arise out of deliberate acts.[18]   It is not enough for Newton to have shown that the City's post-trial evidence management system is disorganized, or even that the City has lost post-trial evidence upon occasion.  Where, as here, there is only a limited liberty interest at stake, a disorganized or even dysfunctional system for realizing that interest does not give rise to a constitutional violation.  As disturbing as such negligence may be, in the end, that is what it is: mere negligence.[19]  To the extent that I have held otherwise in earlier opinions in this case, I am now required to shift my conclusions based upon the controlling authority of *McKithen*.  As the Second Circuit based its reasoning on the Supreme Court's decision in *District Attorney's Office for the Third Judicial District v. Osborne*,[20] I begin with a discussion of that case.

### 1.   Section 440.30

---

[18]     *See Shannon v. Jacobwitz*, 394 F.3d 90, 94 (2d Cir. 2005) (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).

[19]     *Cf. Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (noting in the context of a section 1983 claim, "[b]ecause the Eighth Amendment is not a vehicle for medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (establishing that, in the context of a section 1983 claim, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

[20]     129 S. Ct. 2308 (2009).

8

In *Osborne*, the Supreme Court held that a post-conviction defendant has no constitutional substantive due process right, and only a limited procedural due process right, to obtain DNA evidence for testing in order to support his claim of actual innocence.[21]   As the Court construed his argument, Osborne claimed that he had "an entitlement (what our precedents call a 'liberty interest') to prove his innocence, even after a fair trial has proved otherwise."[22]   The Court began by rejecting Osborne's claimed entitlement to meaningful access to state clemency proceedings, based on its earlier holding that "noncapital defendants do not have a liberty interest in traditional state executive clemency, to which no particular claimant is *entitled* as a matter of state law."[23]

However, the Court recognized that a prisoner may retain a "liberty interest in demonstrating his innocence with new evidence under state law."[24]   The Court held that this due process right is not parallel to a trial right, "but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in post[-]conviction relief."[25]   As such, the post-

---

[21]   *Id.* at 2320-21.

[22]   *Id.* at 2319.

[23]   *Id.* (quotations and citations omitted) (emphasis in original).

[24]   *Id.*

[25]   *Id.* at 2320.

9

conviction defendant's procedural due process right is a limited one, and "[t]he State accordingly has more flexibility in deciding what procedures are needed in the context of post[-]conviction relief."[26]

After further discussion, the Court held that Alaska's post-conviction relief statute – under which a post-conviction defendant could access DNA evidence for testing only if the evidence was newly available, had been diligently pursued, and would establish the defendant's innocence under the clear and convincing standard – provided a defendant with sufficient due process.[27] Applying the deferential *Medina* standard,[28] the Court found that Alaska's procedures were not "fundamentally inadequate" to vindicate a post-conviction defendant's limited liberty interest in post-conviction relief generally, or in access to DNA evidence in particular.[29]  Thus, in denying Osborne access to DNA evidence for testing under the Alaska statute, the Alaska Court of Appeals did not

---

[26]     *Id.*

[27]     *Id.* at 2317, 2320.

[28]     *See Medina v. California*, 505 U.S. 437, 446, 448 (1992) (establishing that a state's criminal procedure law does not violate the Due Process Clause unless it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation.").

[29]     *Osborne,* 129 S. Ct. at 2320.

unconstitutionally deprive Osborne of any liberty interest.

Following the decision in *Osborne*, the Second Circuit addressed a very similar petition under the relevant New York statute in *McKithen v. Brown*.[30] Finding that *Osborne* required the reversal of the district court's decision in *McKithen*, the court stated that prisoners who "seek[] evidence for their state court post-conviction actions" are only entitled to those due process rights recognized by the state legislature.[31]

As noted earlier, New York's post-conviction procedures for DNA testing were established in 1994 by section 440.30(1-a), which provides:

> Where the defendant's motion requests the performance of a forensic DNA test on specified evidence, and upon the court's determination that any evidence containing deoxyribonucleic acid ("DNA") was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant.[32]

---

[30]     626 F.3d 143.

[31]     *McKithen*, 626 F.3d at 153 (citing *Osborne*, 129 S. Ct. at 2320-21) ("Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided.").

[32]     N.Y. Crim. Proc. L. § 440.30(1-a)(a).  The quoted language was originally the full extent of § 440.30(1-a).  Upon the enactment of § 440.30(1-

Section 440.30(1-a) was amended in 2004 to require the disclosure of information regarding the physical location or disposition of DNA evidence, if it is known. Subsection 440.30(1-a)(b) provides that "[t]he court may direct the people to provide the defendant with information . . . concerning the current . . .[or] last known physical location of [the] specified evidence." However, no adverse inference may be drawn against the people if "the specified evidence no longer exists or [its] physical location . . . is unknown. . . ."[33]

Newton asserts that the City's failure to provide him with access to evidence for DNA testing "def[ied] the policy judgment reflected in the state legislation — and effectively nullif[ied] the liberty interest it affirms."[34]  Newton's argument must now be rejected.  In *McKithen*, the Second Circuit expressly held that New York's post-conviction DNA statute is not "fundamentally inadequate to vindicate [a prisoner's] residual liberty interest in demonstrating his innocence through a state post-conviction proceeding."[35]  Applying the deferential *Medina* standard of review as dictated by *Osborne*, the *McKithen* court held that subsection

---

a)(b), the original language was placed under the heading of § 440.30(1-a)(a).

[33]     *Id.* § 440.30(1-a)(b).

[34]     Pl. Mem. at 4 (emphasis omitted).

[35]     *McKithen,* 626 F.3d at 145.

440.30(1-a)(a) satisfies due process, even if read in a way that allows courts the discretion to reject a prisoner's requests for DNA testing.[36]  In approving of the state court's exercise of discretion not to order production of DNA evidence, *McKithen* further underscored that the liberty interest the statute confers on a post-conviction defendant is a limited one, contrary to Newton's contention.

The *McKithen* court declined to reach the issue of whether the statute was constitutional "as-applied" in McKithen's case, after determining that it lacked subject matter jurisdiction to do so, under the *Rooker-Feldman* doctrine.[37]  The *McKithen* court also did not reach the issue of whether subsection b of the statute is constitutionally adequate.  Because the New York courts denied McKithen the right to access DNA evidence, the City's obligation to inform him of the current or last known location of that evidence was not implicated.

In contrast, the New York courts repeatedly granted Newton the right to test the DNA evidence, but the City was unable to produce the evidence that

---

[36]    *See id.* at 153 n.6 ("[I]n light of the procedure *Osborne* upheld, McKithen cannot prove that New York's post-conviction DNA statute is fundamentally inadequate to vindicate his residual liberty interest in demonstrating his innocence through a state post-conviction proceeding.").

[37]    *See id.* at 154 ("*Rooker-Feldman* directs federal courts to abstain from considering claims when . . . (1) the plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state court judgment, (3) the plaintiff invites district court review of that judgment, and (4) the state court judgment was entered before the plaintiff's federal suit commenced.").

Newton requested.  As a result, and notwithstanding Newton's contention that subsection 440.30(1-a)(b) "has nothing to do with"[38] his claim, the legislative intent evident in subsection b is highly relevant to the question of whether the City committed a *constitutional* violation by failing to maintain the evidence from Newton's case in a manner that would have resulted in the production of that evidence upon Newton's demand.  There is no need to decide here whether subsection b is constitutional, as it was not in effect when Newton requested the evidence, nor is he challenging its constitutionality.  Nonetheless, its enactment in 2004 helps to clarify the legislative intent behind the statute and thus the extent of the liberty interest that the legislature meant to confer.

In *McKithen*, the Second Circuit held that 440.30(1-a)(a), granting post-conviction defendants a right to test DNA evidence under certain circumstances, is facially constitutional.  Subsection b grants post-conviction defendants an *additional* procedural right and imposes an additional burden on the City – to inform the defendant of the current or last location of DNA evidence, if it is known.  Prior to the enactment of subsection b, there was no authority for the proposition that the City had an obligation even to inform a defendant of the location of the evidence, much less an absolute obligation to provide the evidence.

---

[38]     Pl. Mem. at 5.

By enacting subsection b, the New York State legislature clarified that it intended to give post-conviction defendants the right to access DNA evidence, but that the right was a limited one.  Notably the statute does not mandate that the City must provide the DNA evidence and if the evidence is missing, the defendant goes free and is automatically entitled to financial compensation.  On the contrary, the statute is clear that, upon court order, the City must inform the defendant of the location of the evidence, *if it is known*, and that no adverse inference can be drawn against the City if it is not known.[39]

The thrust of Newton's argument is that because the New York legislature created a statutory right to access DNA under certain conditions, and because New York courts found that Newton satisfied those conditions, the City violated his due process right by failing to put in place appropriate procedures to safeguard his access to the DNA evidence.[40]  As Newton takes pains to remind me, at an earlier point in this case, I was persuaded by that argument.  However, I have been forced to reconsider, in light of the Second Circuit's decision in *McKithen*.

---

[39]     As Newton suggests, the prohibition on drawing an adverse inference pertains specifically to the context of an appeal filed under § 440.10(g).  *See* Pl. Mem. at 5.  However, even apart from that provision, the statute explicitly contemplates the possibility that the evidence might be missing or lost, in which case the only obligation of the City is to make a representation to that effect and to provide information about its last known location.  *See* § 440.30(1-a)(b).

[40]     *See* Pl. Mem. At 6.

That decision makes clear that the New York statute confers only a limited procedural due process right to access DNA evidence, not a *substantive* due process right.  The fact that it is a limited right signifies that a failure to provide the DNA, as a result of negligence but not of any intentional act, does not rise to the level of a constitutional violation.[41]

     Under these circumstances, the jury verdict on Newton's constitutional claim cannot be upheld.  Newton argues that due process "requir[es]

---

[41]    It bears noting that neither the 1994 statute, nor its 2004 amendment, existed at the time of Newton's trial.  Thus, at the time of these events, the City had no obligation to preserve the evidence, under *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) (holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").  The City's evidence management system during that period, while less than ideal, would have easily satisfied any constitutional standard to preserve evidence post-conviction.  However, after 1994, when § 440.30(1-a) took effect, the City was on notice that greater accountability with respect to preservation of DNA evidence would be required.  That has been made all the clearer over the past decade, as scores of defendants across the country have been exonerated by DNA evidence testing not available at the time of their convictions.  In fact, Deputy Chief Trabitz testified that when he became the head of the NYPD property clerk division in 2000, he ordered that sexual assault kits not be destroyed, as had been the previous policy.  He explained that he was motivated by the fact that "[t]he . . . technology advances every single day . . . I cannot predict what the entire future will bring, but as . . . a trained investigator for the City of New York, if I can keep these things knowing today what I know, that wasn't available in the past . . . I thought it was important to keep these items."  Tr. at 661:8-13 (Trabitz).  *See also id.* at 755:2-16 (Trabitz) (describing the City's efforts to switch from a paper-based system to an "automated property and evidence control system" in 2006 or 2007).

that DNA evidence that is, in fact, within government custody be *produced* (and be kept in a manner so that it is capable of being produced) in order that those wrongly convicted may have the factual grounds for establishing their innocence."[42]   However, the New York statute does not require that DNA evidence actually be produced, only that reasonable efforts be made to locate it and to inform the defendant of its location.   To hold that Newton has a right to *receive* the DNA evidence under the New York statute would be contrary to the plain meaning of the statute and would directly contradict both *Osborne* and *McKithen*. Furthermore, adopting Newton's argument would confer a substantive due process right, which the Supreme Court in *Osborne* expressly held does not exist.[43]   Under

---

[42]     Pl. Mem. at 7 n.2. (original emphasis omitted) (emphasis added).   In his opposition to the City's motion, Newton frequently references my own words in previous opinions in this case.   That is not surprising, given that I allowed the case to proceed to trial.   It is also — unfortunately — not persuasive.   *McKithen* represents controlling authority on an issue of first impression in the circuit.   *See also Skinner v. Switzer*, 131 S. Ct. 1289, 1293 (2011) ("[T]he Court's decision in *Osborne* severely limits the federal action a state prisoner may bring for DNA testing. *Osborne* rejected the extension of substantive due process to this area and left slim room for the prisoner to show that the governing state law denies him procedural due process.") (citations omitted).

[43]     *See Osborne*, 129 S.Ct. at 2323 ("Establishing a freestanding right to access DNA evidence for testing would force us to act as policymakers, and our substantive-due-process rulemaking authority would not only have to cover the right of access but a myriad of other issues . . . there is no reason to suppose that [federal courts'] answers to [questions about obligations to collect, retain and store forensic evidence] would be any better than those of state courts and legislatures, and good reason to suspect the opposite.").

*Osborne*, and even more clearly under *McKithen*, Newton has a right to the *process* under the New York statute, but not to any particular outcome.

In an earlier opinion in this case, I found that, unlike in *Osborne*, where Alaska procedures were facially adequate and the defendant had failed to test them as applied, Newton had tested New York procedures and showed that they were inadequate.[44]  I held that if New York's inadequate evidence retention system prevented a defendant from accessing DNA evidence to which a court determined he was entitled, his due process rights had been violated.[45]  However, *McKithen* holds that New York's procedures for post-conviction access to DNA evidence *are* constitutionally adequate, even if the end result is denial of access to such evidence.

Because the New York state courts repeatedly *granted* Newton's request for DNA testing of evidence, he received the process that he was due under 440.30(1-a)(a).  He was due no further process under the statute as it then existed. At most, once subsection b came into effect, Newton would also have had an entitlement to information about the current or last location of the evidence, if known.  For many years, the location of the evidence was *not* known, and Newton

---

[44]    *See Newton v. City of New York*, 681 F. Supp. 2d 473, 490 (S.D.N.Y. 2010).

[45]    *See id.* at 491.

was so informed.  Thus, Newton also received the process that he was due under subsection b of the statute, or would have been due, had that subsection been in effect when he requested the evidence.  Because the City could not locate the evidence until 2005, at no time during that period was Newton entitled to anything more than information about the last known location of the evidence.

The tragic fact that the evidence was not actually located and produced for testing until 2005 does not constitute a violation of Newton's procedural due process rights, since the *McKithen* court has expressly rejected the notion that a prisoner is "constitutionally entitled to *receive* evidence for the purpose of post-conviction DNA testing."[46]  That this delay in producing the DNA evidence resulted from the City's poor or non-existent evidence management system is indicative of negligence, but does not rise to the level of a constitutional violation.  Therefore, following *McKithen*, I now conclude that Newton's constitutional rights were not violated by the City's failure to locate or produce the DNA evidence that Newton sought under section 440.30(1-a).

### 2.    Implied Liberty Interest

The City also persuasively argues that Newton cannot demonstrate a liberty interest based on an implicit promise or reasonable expectation that he

---

[46]     *McKithen*, 626 F.3d at 145.

would be able to access the rape kit for testing.  Absent statutory language

*mandating* that post-conviction defendants be provided with evidence for DNA

testing, no prisoner can have a settled expectation in any particular outcome.  As

the Second Circuit has explained,

> [T]o claim a protected property interest in a particular
> administrative benefit or measure, an individual must have
> 'a legitimate claim of entitlement' in receiving the benefit
> or measure, not merely 'a unilateral expectation' in a
> desired administrative outcome. Where the administrative
> scheme does not require a certain outcome, but merely
> authorizes particular actions and remedies, the scheme does
> not create 'entitlements' that receive constitutional
> protection under the Fourteenth Amendment.[47]

The New York statute merely requires that the post-conviction

defendant be informed of the location of DNA evidence *if it is known*.  Subsection

440.30(1-a)(b) anticipates and allows for variable outcomes when post-conviction

defendants request access to DNA testing.  For example, sometimes the City will

know where the evidence is, and be ordered to produce it.  If the City is not sure

---

[47]     *Sealed v. Sealed*, 332 F.3d 51, 57 (2d Cir. 2003) (finding that "the
detailed and comprehensive procedures for investigating potential child abuse
mandated by state law . . . standing alone, create no independent substantive
entitlements, whose deprivation might trigger application of the Due Process
Clause"). *Accord Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 462 (1989)
("[A] State creates a protected liberty interest by placing substantive limitations on
official discretion . . . [generally] by establishing substantive predicates to govern
official decision-making, and, further, by mandating the outcome to be reached
upon a finding that the relevant criteria have been met.") (citations omitted).

20

where the evidence is, it must provide any available information as to its whereabouts.  If the evidence has been destroyed, that information too must be shared.  Because access to evidence is contingent on the City's ability to locate the evidence, the City's failure to provide the rape kit for testing cannot support an implied due process claim based on the deprivation of a liberty interest, after the Second Circuit's holding in *McKithen*.

### 3.    The State of Mind Requirement

Even assuming, *arguendo*, that Newton had an entitlement to the rape kit, his due process claim fails as a matter of law because he did not adduce sufficient evidence to permit the jury to conclude that any City official acted with a culpable state of mind — *i.e.*, something more than mere negligence.[48]  Because the due process clause is concerned with preventing abusive government conduct, the Supreme Court has explained that its protections are triggered only by "*deliberate* decisions of government officials to deprive a person of life, liberty or

---

[48]    *See, e.g.*, *Daniels*, 474 U.S. at 333 ("Where a government official's act causing injury to life, liberty, or property is merely negligent, no procedure for compensation is *constitutionally* required.") (citations omitted); *Davidson v. Cannon*, 474 U.S. 344, 347 (1986) ("[T]he Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property.").  *See also Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004) ("It is well established that mere negligence is insufficient as a matter of law to state a due process violation.").

property."[49]  Accordingly, Newton could not prevail on his due process claim at

trial unless he presented adequate evidence to suggest that municipal officials acted

with some degree of culpable intent, rather than mere carelessness, in failing to

---

[49]        *Daniels*, 474 U.S. at 331-32.  While *Daniels* and its progeny made
clear that the due process clause is implicated by intentional state action, they
arguably "left open the question of whether anything less than intentional conduct,
such as recklessness or gross negligence[,]" can establish a constitutional
deprivation.  *Morales v. New York State Dept. of Corrections*, 842 F.2d 27, 30 (2d
Cir. 1988).  *Compare, e.g., Bryant v. Mafucci*, 923 F.2d 979, 983-84 (2d Cir. 1991)
("The Supreme Court has . . . enunciated no general standard regarding due process
claims . . . under § 1983, except that mere negligence is insufficient to state a
viable claim.") (citations omitted) *with Shannon*, 394 F.3d at 94 (2d Cir. 2005)
("By ruling in *Daniels* that a negligent act could not amount to a constitutional
deprivation, the Court . . . clearly articulated that a finding of intentional conduct
was a prerequisite for a due process claim.") (citations omitted).  At least in some
circumstances in the prison context, the Second Circuit has allowed due process
claims to survive based on evidence that a prison official acted with "deliberate
indifference," a standard tantamount to recklessness.  *See, e.g., Morales*, 842 F.2d
at 30 ("[Following *Daniels*,] this circuit has continued to adhere to the position that
a state prison guard's deliberate indifference to the consequences of his conduct for
those under his control and dependent upon him may support a [due process] claim
under § 1983.") (citations omitted).  *Accord Farmer v. Brennan*, 511 U.S. 825, 836
(1994) (explaining that deliberate indifference and recklessness are "equivalent"
concepts and elucidate the same level of culpability).
        Amidst this backdrop, the parties strenuously but needlessly dispute whether
Newton's due process claim can be sustained by proof that a City official
*recklessly*  — as opposed to *intentionally* — deprived him of access to the rape kit.
Because Newton failed to present sufficient evidence that City officials acted with
"something more than mere negligence," his claim does not implicate any
constitutional concerns and there is no need to ascertain the appropriate culpability
standard for purposes of this motion.  *Farmer*, 511 U.S. at 835.  *Accord Grant v.
New York City Dept. of Corrs.*, 104 F.3d 355, 1996 WL 734052, at *2 (2d Cir. Dec.
23, 1996) (table) ("Although it is unclear . . . if 'gross negligence' or 'recklessness'
would support a due process claim, this Court has held that the standard would, at
the very least, require more than ordinary negligence.").

22

procure the rape kit for testing.

At trial, Newton demonstrated that the City's property clerk division relied on two paper documents to track the movement and disposition of evidence in its possession.  As Newton's counsel explained to the jury, "these documents are essential" and necessarily work in tandem — if even one is lost, the evidence will "never" be found within the City's vast network of storage facilities.[50]  Routine administrative errors can thus have devastating and irreversible consequences in terms of the ability to retrieve evidence.[51]  Notwithstanding grave deficiencies in the City's evidence management *system*, however, Newton's due process claim cannot be sustained absent proof that a City *official* acted with the requisite constitutional culpability in withholding evidence.[52]

In Newton's case, the rape kit could not be located due to "(i) the

---

[50]  Tr. at 2292:02-2293:09 (Pl. Summation).

[51]  *See id*. at 2284:9-11 (reminding jurors of the following exchange with a former commanding officer of the property clerk division: (Q)"If you lost the paper, you lost the ability to find the evidence?" (A) "The game was over.").

[52]  *See Board of County Comm'rs. Bryan County, Okl.*, 520 U.S. at 405-07 (noting that "[i]n any § 1983 suit . . . the plaintiff must establish the state of mind required to prove the underlying violation" in addition to the state of mind required to prove municipal liability).  Newton appears to conflate the standard of proof required for his *Monell* claim with that required for his due process claim. *See* Tr. at 2335:07-11 (Pl. Summation) ("We have presented evidence that Mr. Newton was deprived of his . . . Fourteenth Amendment right to liberty.  And this was all due to a poor or nonexistent evidence management system.").

misfiling of the rape kit invoice in the Bronx 'out to court' files, together with the loss of the 'out of custody' card, and (ii) the failure to keep a copy of the invoice in the Pearson Place warehouse books."[53]  These errors were committed in 1988 and 1989, before DNA evidence was used in criminal cases and post-conviction defendants had any statutory rights to access evidence for testing.  None of the individual employees responsible for handling the paperwork could have reasonably anticipated that their actions might one day implicate Newton's constitutional rights.  As such, Newton did not establish that any City actor withheld evidence in deliberate contravention or disregard of his right to due process.[54]

---

[53]     Def. Mem. at 6 (citing Tr. at 674-81 (Trabitz); Tr. at 1247-49, 1254-55 (Kessler); Tr. at 1290-92 (Kiely); Tr. at 1604 (McGuire)).  *Accord* Tr. at 2285 (Pl. Summation).

[54]     Tr. at 2247:19-2248:17 (Pl. Summation).  In his summation, plaintiff's counsel passionately argued that the City's inability to produce the rape kit for testing was the result of "numerous acts of negligence" which collectively pushed the bar beyond "simple negligence" to "reckless disregard." *Id*. at 2285:04. Yet Newton cannot establish a constitutional deprivation by aggregating the City's alleged wrongs. *First*, to the extent that Newton's deprivation claim is based on reckless denial of access to evidence, the state of mind requirement can be satisfied only by those individuals who originally mishandled the paperwork and lost the proverbial "needle in a haystack." *Id*. at 2292:21-22.  Regardless of the level of due care exercised by any municipal official, he or she could not have reasonably been expected to locate the rape kit without the invoice.  Under these circumstances, the continued failure by City officials to find the rape kit does not give rise to any sort of constitutional culpability, despite the gross inadequacies of the City's evidence management system. *Second*, Newton must demonstrate that at

To the contrary, the trial evidence indicated that City officials often went to great lengths to locate and produce the rape kit for testing.  For example, plaintiff's closing argument at trial reminded jurors about the testimony and story of Assistant District Attorney John Carroll, who was

> so frustrated by an inability to get an answer from the Bronx property clerk's office that they invited him to go back behind the cage and look for it himself . . . And John Carroll, very decent guy, undertook that task . . . [of] looking in the property clerk's office, the size of a football field, looking in books when he didn't know what he was looking for[.][55]

Indeed, despite the impracticability of locating the rape kit without the paper record, City officials did not give up their search.   As one of Newton's witnesses told the jurors, Assistant District Attorneys "will do what they can" to secure evidence for testing.[56]

---

least one City employee acted with a greater degree of culpability than mere negligence *before* he can argue that the City's acts of negligence were so numerous as to reach constitutional proportions.

[55]     *Id.* at 2287:06-15 (Pl. Summation).

[56]     *Id.* at 1983:17-20 (Vanessa Potkin ("Potkin"), Plaintiff's former counsel.  *Accord id.* at 1886:19-1895:21, 1983:02-20 (Potkin) (testifying that ADA Elisa Koenderman was cooperative and immediately responsive to requests for permission to test existing evidence and for assistance in locating the missing rape kit; that her efforts helped locate the rape kit; and that she sought to get Newton released as soon as possible once the DNA results came back).  Potkin is a staff attorney at the Innocence Project, a non-profit entity that "represent[s] people with claims of innocence that can be proven through DNA[,]" and which took

Accordingly, as sympathetic as I am to Newton's claims, no reasonable juror could find that any municipal actor deprived Newton of a federal right based on the evidence proffered at trial.  Newton must seek relief for any extant claims in the state courts.[57]

---

Newton's case.

[57]    As I explained in ruling on the parties' Rule 50 cross-motions, Newton cannot sustain a negligence claim as a matter of law.  *See Newton v. City of New York*, No. 07 Civ. 6211, 2010 WL 4177383 (S.D.N.Y. Oct. 22, 2010). Briefly, the official action at issue in this case involved the exercise of discretion, and "[g]overnment action, if *discretionary*, may not be a basis for liability. . . ." *McLean v. City of New York*, 905 N.E.2d 1167 (2009).  Conversely, *ministerial actions* may be a basis for liability, "but only if they violate a *special duty* owed to the plaintiff, apart from any duty to the public in general." *Id.*

Even if the official action at issue in this cases were ministerial, any negligence on defendant's part cannot rise to the level of tortious behavior because the case does not fall within the "narrow class of cases in which a '*special relationship*' can arise from a duty voluntarily undertaken by a municipality to an injured person." *Id.* at 1172 (emphasis added) (noting how infrequently the government's failure to properly do its job results in liability because of the special relationship requirement).  *First*, there was no "illusory promise of *protection* offered by the municipality." *Kircher v. City of Jamestown*, 74 N.Y.2d 251, 256 (1989) (emphasis added).  *Second*, even if the City's undertaking to locate the rape kit constituted protection, that undertaking did not, as a matter of law, "constitute an action that would lull a plaintiff into a false sense of security or otherwise generate *justifiable reliance*." *Dinardo v. City of New York*, 13 N.Y. 3d 872, 874 (2009) (emphasis added) (holding that municipal defendants' "vaguely worded statements" that "something was being done" to have a violent student removed from a classroom were insufficient to "constitute an action that would lull a plaintiff into a false sense of security or otherwise generate justifiable reliance" in action by assaulted teacher).  *Accord Kircher*, 74 N.Y.2d at 258 (finding no justifiable reliance where police officer's failure to respond to bystanders' report of kidnapping led to victim's repeated rape and assault, notwithstanding that the officer's assurance of assistance caused bystanders to abandon their efforts to aid

### B.      IIED Claims

The City argues that Newton's IIED claims against Chief Trabitz and former Sergeant McGuire for $500,000 and $92,000, respectively, cannot be upheld because Newton did not meet the exacting standard for such claims under state law — *i.e.*, that the "conduct [is] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."[58]  In response, Newton argues that "the defendants are merely contesting a reasonable factual determination reached by a jury" and attempting to upset "credibility . . . determinations that may not be challenged now."[59]  Newton contends that "[a]fter hearing the evidence and weighing all the facts, the jury found that Trabitz and McGuire, in fact, acted differently than they had testified and their reckless

---

the victim and that "plaintiff's failure to rely can be directly attributed to her dire circumstances").

[58]      *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993) (quotation marks and citation omitted) ("The [outrageous conduct element of an IIED claim] serves the dual function of filtering out petty and trivial complaints that do not belong in court, and assuring that plaintiff's claim of severe emotional distress is genuine. . . [It is] the one most susceptible to determination as a matter of law." (quotation marks and citations omitted)).

[59]      Pl. Mem. at 18.

behavior made their actions extreme and outrageous."[60]  The issue, for purposes of

this motion, is thus whether Newton presented a "legally sufficient evidentiary

basis" to support a finding in his favor on the IIED claims.[61]

              After reviewing the evidence presented at trial, I do not believe that a

reasonable juror could conclude that either Chief Trabitz or Sergeant McGuire

acted atrociously or intolerably in the search for the rape kit.  IIED "is a very

narrow tort with requirements that 'are rigorous, and difficult to satisfy.'"[62]  As the

Second Circuit has noted, "'[c]ourts are reluctant to allow recovery under the

banner of intentional infliction of emotional distress absent a deliberate and

malicious campaign of harassment or intimidation.'"[63]  Here, neither Sergeant

McGuire nor Chief Trabitz exhibited *any* malice towards Newton; to the contrary,

Newton asserts that "their *reckless* behavior made their actions extreme and

---

[60]      *Id.*

[61]      Fed. R. Civ. P. 50(a)(1).

[62]      *Snyder v. Phelps*, — U.S. —, 131 S. Ct. 1207 (Mar. 2, 2011) (Alito, J., dissenting) (quoting W. Keeton *et al.*, Prosser and Keeton on Law of Torts § 12, 61 (5th ed. 1984)).  *Accord Howell*, 81 N.Y.2d at 122 (noting the "strictness" of the IIED standard, and observing that "of the [IIED] claims considered by [the New York Court of Appeals], every one has failed because the alleged conduct was not sufficiently outrageous").

[63]      *Margrabe v. Sexter & Warmflash, P.C.*, 353 Fed. App'x 547, 550 (2d Cir. 2009) (quoting *Cohn-Frankel v. United Synagogue of Conservative Judaism*, 246 A.D.2d 332, 333 (1st Dep't 1998)).

outrageous."[64]

Moreover, the testimony presented at trial indicated that both Sergeant McGuire and Chief Trabitz attempted to help Newton locate the rape kit. For example, Sergeant McGuire tasked his personnel at the property clerk division, police officer Stacey Haskins and civilian employee Geraldine Kiely, to assist with the search for the rape kit.[65]  When their efforts proved futile, he personally "took over [the] investigation and . . . did the exact same things that they did, just double checking, and . . . [incorporating] additional steps that they didn't take" by virtue of his additional supervisory authority.[66]  Sergeant McGuire's efforts to locate the rape kit were reasonable under the circumstances.  That he, like so many others, could not actually produce the rape kit does not transform his conduct into the realm of the indecent or intolerable.[67]  Moreover, Chief Trabitz's contribution to the search efforts was noted by two of Newton's most important witnesses — the Assistant District Attorney and defense attorney who worked together to overturn

---

[64]    Pl. Mem. at 18.

[65]    Tr. at 1580:18-1583:16 (McGuire).

[66]    *Id*. at 1576:20-24 (McGuire).

[67]    Newton also asserted IIED claims against Haskins and Kiely, but the jury rejected those claims.   Given that the evidence indicated that Sergeant McGuire's efforts to locate the rape kit were at least on a par with, if not more involved, than those of Haskins and Kiely, the jury's verdict against Sergeant McGuire cannot be reasonably sustained.

his conviction and free him from prison.[68]  Indeed, the rape kit was ultimately located during an additional evidentiary search that Chief Trabitz "facilitate[d]" and which was undertaken at his direction.[69]  In light of the evidence presented at trial, there exists no reasonable basis upon which a juror could determine that either Chief Trabitz or Sergeant McGuire acted contrary to all possible bounds of social decency.

## IV.   CONCLUSION

For the foregoing reasons, the City's motion to set aside the verdict is granted in its entirety.   The Clerk of the Court is directed to close this motion [Docket No. 207] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:   New York, New York
May 12, 2011

---

[68]   *See, e.g.*, Tr. at 828:17-831:15 (Koenderman); *id.* at 1890:08-1892:13 (Potkin).  Plaintiff's counsel credited the testimony of these witnesses in his summation.  *Accord id.* at 2291:08 (Pl. Summation) (commenting to the jurors that ADA Koenderman provided "very forthright testimony").

[69]   *Id.* at 828:23 (Koenderman).  The reasonableness of the jury's IIED verdict is further undermined by its decision to hold Chief Trabitz liable for five times the damages imposed on Sergeant McGuire, even though Newton benefitted significantly more from Chief Trabitz's intervention.

30

**- Appearances -**

**For Plaintiff:**

John Francis Schutty III, Esq.
Law Office of John F. Schutty
445 Park Avenue, 9th Floor
New York, New York 10022
(212) 836-4796

**For Defendants:**

Arthur Gabriel Larkin III
Assistant Corporation Counsel
The New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-1599